# EXHIBIT 2

Signed by AustLII

# FEDERAL COURT OF AUSTRALIA

## Pokémon Company International, Inc. v Redbubble Ltd [2017] FCA 1541

| | |
|---|---|
| File number: | VID 313 of 2016 |
| Judge: | **PAGONE J** |
| Date of judgment: | 19 December 2017 |
| Catchwords: | **INTELLECTUAL PROPERTY** –infringement of an artistic work – requirement of original artistic work – presumption of ownership – authorisation of infringement - fair dealing – parody or satire – unauthorised reproduction – declaratory relief |
| | **CONSUMER LAW** – misleading and deceptive conduct – representation of sponsorship, approval or affiliation – effect of conduct on class of persons – application allowed |
| Legislation: | *Competition and Consumer Act 2010* (Cth) <br> *Copyright Act 1968* (Cth) <br> *Copyright Amendment Act 2006* (Cth). <br> *Copyright (International Protection) Regulations 1969* (Cth) <br> Title 17, United States Code |
| Cases cited: | *AGL Sydney Ltd v Shortland County Council* (1989) 17 IPR 99 <br> *Allam v Aristocrat Technologies Australia Pty Ltd* (2012) 95 IPR 242 <br> *Aristocrat Technologies Australia Pty Ltd v DAP Services (Kempsey) Pty Ltd* (2007) 157 FCR 564 <br> *Australian Competition and Consumer Commission v TPG Internet Pty Ltd* (2015) CLR 640 <br> *Avel Pty Ltd v Multicoin Amusements Pty Ltd* (1990) 171 CLR 88 <br> *Bodum v DKSH Australia Pty Ltd* (2011) 280 ALR 649 <br> *Campomar Sociedad, Limitada v Nike International* (2000) 202 CLR 45 <br> *Digga Australia Pty Ltd v Norm Engineering Pty Ltd* (2008) 166 FCR 268 <br> *Flexopack SA Plastics Industry v Flexopack Australia Pty Ltd* (2016) 118 IPR 239 <br> *Glyn v Weston Feature Film Co* [1916] 1 Ch 261 |

Signed by AustLII

*IceTV Pty Ltd v Nine Network Australia Pty Ltd* (2009) 239
CLR 458

*Interlego v Croner Trading* (1992) 111 ALR 577

*International Writing Institute v Rimila Pty Ltd* (1994) 30
IPR 250

*Lee v Westpac Banking Corp* [2015] FCA 467

*Metricon Homes Pty Ltd v Barrett Property Group Pty Ltd*
(2008) 248 ALR 364

*Milpurrurru & Ors v Indofurn Pty Ltd & Ors* (1994) 54
FCR 240

*Prebble v Commissioner of Taxation* (2003) 131 FCR 130

*Productions Avanti Cine-video v Favreau* (2012) 177 DLR
$(4^{th})$ 568

*Rawson Finance Pty Ltd v Deputy Commissioner of
Taxation* (2010) 189 FCR 189

*Reckitt & Colman Products Ltd v Borden Inc* [1990] RPC
341

*Roadshow Films Pty Ltd v iiNet Ltd* (2011) 194 FCR 28
*Roadshow Films Pty Ltd v iiNet Ltd (No 2)* (2012) 248 CLR
42

*TCN Channel 9 Pty Ltd v Network 10 Pty Ltd* (2001) 108
FCR 235

*The Corporation of the City of Adelaide v Australasian
Performing Rights Association Ltd* (1928) 40 CLR 481

*TVBO Productions Ltd v Australian Skynet Pty Ltd* (2009)
82 IPR 502

*Undershaft (No 1) Ltd v Federal Commissioner of Taxation*
(2009) 175 FCR 150

*Universal Music Australia Pty Ltd v Cooper* (2005) 150
FCR 1

*Universal Music Australia Pty Ltd v Sharman Licence
Holdings* (2005) 220 ALR 1

*University of New South Wales v Moorhouse* (1974) 133
CLR 1

*Veda Advantage Ltd v Malouf Group Enterprises Pty Ltd*
(2016) 241 FCR 161

*Williamson Music Ltd v Pearson Partnership & Another*
(1987) FSR 97

| | |
|---|---|
| Date of hearing: | 6, 7, 8 and 11, 12 and 13 September 2017 |
| Registry: | Victoria |
| Division: | General Division |
| National Practice Area: | Intellectual Property |

Signed by AustLII

| | |
|---|---|
| Sub-area: | Copyright and Industrial Designs |
| Category: | Catchwords |
| Number of paragraphs: | 77 |
| Counsel for the Applicant: | Mr B Caine SC with Ms Cunliffe |
| Solicitor for the Applicant: | Corrs Chambers Westgarth |
| Counsel for the Respondent: | Mr R Cobden SC with Mr Fleming |
| Solicitor for the Respondent: | Allens |

Signed by AustLII

# ORDERS

**VID 313 of 2016**

| | |
|---|---|
| BETWEEN: | **THE POKÉMON COMPANY INTERNATIONAL, INC.**<br>Applicant |
| AND: | **REDBUBBLE LTD**<br>Respondent |

| | |
|---|---|
| JUDGE: | **PAGONE J** |
| DATE OF ORDER: | **19 DECEMBER 2017** |

**THE COURT DECLARES THAT:**

1.  Contrary to sections 18(1) and 29(1)(g) and (h) of the Australian Consumer Law, the website at www.redbubble.com (the Redbubble Website) contained:

    (a)  representations that products available through the Redbubble Website bearing the words 'Pokémon' or 'Pokemon', or the character names or images set out in items 1-29 of Schedule 1 to this Order; and

    (b)  representations that products available through the Redbubble Website bearing the words 'Pokémon GO', 'Team Instinct', 'Team Mystic' or 'Team Valor', or the images set out in items 1-4 of Schedule 2 to this Order,

    were supplied, licensed, associated, sponsored, approved or authorised by the Applicant or such other entity able lawfully to authorise Pokémon merchandise.

2.  Contrary to sections 18(1) and 29(1)(g) and (h) of the Australian Consumer Law, Google Shopping advertisements sponsored by the Respondent on the website at www.google.com (the Google Website) contained:

    (a)  representations that products available through the Google Website bearing the character names or images set out in items 1-12 of Schedule 1 to this Order; and

    (b)  representations that products available through the Google Website bearing the words 'Team Mystic' or the image set out in item 3 of Schedule 2 to this Order,

Signed by AustLII

- ii -

were supplied, licensed, associated, sponsored, approved or authorised by the Applicant or such other entity able lawfully to authorise Pokémon merchandise.

3.      The Respondent infringed copyright in the artistic work in Schedule 3 to this Order by:

     (a)      making the artistic works in Schedule 4 to this Order available on the Redbubble Website;

     (b)      exhibiting, by way of trade on the Redbubble Website, articles bearing the artistic works in Schedule 4 to this Order when the Respondent knew, or ought reasonably to have known, by 25 November 2015 that:

          (i)      the making of the articles constituted an infringement of the copyright; or

          (ii)      in the case of imported articles, would, if the articles had been made in Australia by the importer, have constituted such an infringement; and

     (c)      authorising reproduction, in Australia, of the artistic works set out in Schedule 5 to this Order onto the products identified in that schedule.

**THE COURT ORDERS THAT:**

4.      The Applicant be awarded nominal damages of $1.

5.      The Respondent pay 70% of the Applicant's costs of the proceeding, excluding those costs referred to in Order 4 of the Orders made by Pagone J on 14 March 2017, such costs to be agreed or, in the absence of agreement, to be determined by the Court, in accordance with order 7 below.

6.      If the parties reach agreement on the amount of costs to be paid, the parties are to notify the Court of such agreement and provide to the Court short minutes of appropriate orders to be made by consent.

7.      If the parties have not reached agreement on the amount of costs to be paid by 12 noon on 19 January 2018, the parties are to notify the Court of the failure to reach agreement by 4pm on 19 January 2018, following which the amount of costs will be determined by the Court in accordance with the Costs General Practice Note (GPN-COSTS), such that:

     (a)      costs be awarded in a lump sum pursuant to r 40.02(b) of the Federal Court Rules 2011 (Cth);

Signed by AustLII

- iii -

(b)    a Costs Summary, not exceeding 5 pages in length (omitting formal parts), be filed and served by 4pm on 16 February 2018;

(c)    any Costs Response, not exceeding 4 pages in length (omitting formal parts), be filed and served by 4pm on 2 March 2018; and

(d)    the proceeding be listed for a hearing before a Registrar of the Court to determine the amount of the lump sum at 9.30am on 12 March 2018 or such other time and date as the Court may order.

Signed by AustLII

- iv -

**Schedule 1**

| Item | Character name | Character image |
|------|----------------|-----------------|
| 1. | Pikachu |  |
| 2. | Bulbasaur |  |
| 3. | Charmander |  |
| 4. | Charizard |  |

Signed by AustLII

- v -

| 5. | Snorlax |  |
|----|---------|----------------------|
| 6. | Eevee |  |
| 7. | Flareon |  |
| 8. | Jolteon |  |

Signed by AustLII

- vi -

| | | |
|---|---|---|
| 9. | Vaporeon |  |
| 10. | Gengar |  |
| 11. | Jigglypuff |  |
| 12. | Ponyta |  |

Signed by AustLII

- vii -

| 13. | Squirtle |  |
| 14. | Dragonite |  |
| 15. | Magikarp |  |
| 16. | Clefairy |  |

Signed by AustLII

- viii -

| 17. | Psyduck |  |
|-----|---------|---------|
| 18. | Blastoise |  |
| 19. | Butterfree |  |
| 20. | Mewtwo |  |

Signed by AustLII

- ix -

| 21. | Vulpix |  |
|---|---|---|
| 22. | Sylveon |  |
| 23. | Lucario |  |
| 24. | Togepi |  |

Signed by AustLII

- x -

| 25. | Umbreon |  |
|---|---|---|
| 26. | Leafeon |  |
| 27. | Glaceon |  |
| 28. | Espeon |  |

Signed by AustLII

- xi -

| 29. | Venusaur |  |
|-----|----------|----------------------|

Signed by AustLII

- xii -

**Schedule 2**



| Item | Image |
|------|-------|
| 1. | |
| 2. | |
| 3. | |
| 4. | |

Signed by AustLII

- xiii -

**Schedule 3**



Signed by AustLII

- xiv -

**Schedule 4**













- xv -

Signed by AustLII

- xvi -

Signed by AustLII

- xvii -












Signed by AustLII

- xviii -

 

 



Signed by AustLII

- xix -

**Schedule 5**

| Artistic work | Product |
|---|---|
|  | One sticker |
|  | One sticker |
|  | One t-shirt |

Note:   Entry of orders is dealt with in Rule 39.32 of the *Federal Court Rules 2011*.

Signed by AustLII

# REASONS FOR JUDGMENT

**PAGONE J:**

1      The Pokémon Company International, Inc. ("TPCi") sues Redbubble Ltd ("Redbubble") for
alleged contraventions of ss 18, 29(1)(g) and 29(1)(h) of Schedule 2 to the *Competition and
Consumer Act 2010* (Cth) ("the Australian Consumer Law") and for alleged breaches of
copyright in the images of the Pokémon Pikachu character contrary to the *Copyright Act 1968*
(Cth) ("the Copyright Act").

2      TPCi is a wholly owned subsidiary of The Pokémon Company which was established in
Tokyo in April 1998 originally as the "Pokémon Center Co., Ltd".  That company was jointly
owned by Nintendo Co. Ltd ("Nintendo"), Creatures Inc. and Game Freak Inc. and in April
1998 launched in Tokyo a specialist store for Pokémon merchandise which was subsequently
extended across Japan.  TPCi was originally incorporated in Delaware as Pokémon USA Inc.
in February 2001 and since incorporation has overseen the licensing of Pokémon products
outside of Asia including Australia, North America, South America, Europe and Africa.
Its responsibilities include brand management, licensing of Pokémon merchandise, marketing
of the Pokémon Trading Card Game, the animated Pokémon TV series, Pokémon movies and
the official  US Pokémon website.

3      In 1996 two Pokémon video games were released in Japan for the Nintendo Game Boy.
These video games were first released in the United States in 1998, and subsequently in
Australia in the same year under the names Pokémon Red and Pokémon Blue, and featured
Pokémon characters including Pikachu, Bulbasaur, Squirtle, Charmander, Charizard, Snorlax,
Eevee, Flareon, Jolteon, Vaporeon, Gengar, Jigglypuff, Ponyta, Dragonite, Magikarp,
Clefairy, Psyduck, Blastoise, Butterfree, Mewtwo, Vulpix and Venusaur.  A wide variety of
related Pokémon products were launched following the release of the video games including
the Pokémon Trading Card Game, an animated TV series, movies and spin-off video game
titles.  The animated TV series features the Pokémon characters in the adventures of a 10 year
old boy named Ash and his best friend Pikachu.  Pokémon's proceeding against Redbubble is
confined to 29 of approximately 800 characters in the Pokémon universe which all have
invented or concocted names that are not descriptive or generic, namely: Pikachu, Bulbasaur,
Squirtle, Charmander, Charizard, Snorlax, Eevee, Flareon, Jolteon, Vaporeon, Gengar,
Jigglypuff, Ponyta, Dragonite, Magikarp, Clefairy, Psyduck, Blastoise, Butterfree, Mewtwo,
Vulpix, Sylveon, Lucario, Togepi, Umbreon, Leafeon, Glaceon, Espeon and Venusaur.

Signed by AustLII

- 2 -

4      Redbubble Pty Ltd was founded in 2006 in Melbourne by Mr Martin Hosking, together with Mr Peter Styles and Mr Paul Vanzella, for the purpose of implementing a business idea of creating an internet marketplace throughout the world for a "print-on-demand" personalisation service for customers who wanted to purchase a product with an image or word which had been created by an artist or designer.   Mr Hosking gave evidence in the proceeding and described the driving force behind the Redbubble business model as stemming from the idea of an online marketplace where designers could upload and sell their designs.   On 2 February 2007 Redbubble officially launched the website at www.redbubble.com as the primary platform for the Redbubble Marketplace.   It purchased the domain name in 2006 as the primary brand and domain for the Redbubble Marketplace and, according to Mr Hosking, was the first website on which artists could sell directly to customers, maintain copyright in their works, regulate their own margins, and choose the products which could be sold bearing their artworks.   A blog was established at about the same time as the Redbubble website was launched.

5      An aspect of the business plan of the Redbubble Marketplace involved the means to fulfil the sale of products with an image or design uploaded onto the website by the designer or artists. The Redbubble Marketplace, in general terms, was conceived to operate by enabling artists and designers (who for convenience will usually be referred to as "the artists" without needing in this proceeding to make any qualitative finding about them as artists or designers) to upload work onto the Redbubble website which could then be applied by others (who for convenience will usually be referred to as the "fulfillers") on products such as t-shirts, mugs and other such consumer items for sale.   The Redbubble Marketplace began with only one fulfiller based in Horsham, Victoria but soon included fulfillers in other parts of the world, particularly in the United States of America, as the Redbubble website customer base grew. Redbubble experienced rapid growth between 2011 and 2015, growing from a gross transaction value of $6 million in the 2011 financial year to $88.4 million in the 2015 financial year.   In April 2015 it raised $15.5 million in new capital from a group of investors to accelerate its international expansion plans and to fund other growth initiatives. On 16 May 2016 it listed on the Australian Stock Exchange and raised $30 million through an initial placement offer from the issue of new shares and a further $9.8 million from the sell-down of shares owned by existing investors.   Redbubble's market capitalisation had reached $267.7 million at the date of listing.

Signed by AustLII

- 3 -

6       Redbubble conceded, and it was the direct evidence of Mr Hosking, that one of the risks identified from the development of the business plan was that those uploading material on the Redbubble Marketplace might infringe copyright or might upload illegal material. Redbubble sought to mitigate those risks by requiring those uploading material to agree to Redbubble's terms of service before uploading content to the Redbubble website by terms which included (a) explicitly acknowledging that copyright protected or illegal material would not be uploaded to the Redbubble marketplace and (b) providing an indemnity to Redbubble for any copyright infringement or other illegal activity.   Redbubble also established other procedures and policies which will be considered below.

7       It may be convenient to deal first with the claims by TPCi that Redbubble has breached provision of the Australian Consumer Law.   Redbubble admitted that it is subject to the prohibition in Schedule 2 of the Australian Consumer Law: see s 131.   Section 18(1) of Schedule 2 of the Australian Consumer Law provides:

> A person must not, in trade or commerce, engage in conduct that is misleading or deceptive or is likely to mislead or deceive.

Sections 29(1)(g) and (h) provide respectively:

> (1)    A person must not, in trade or commerce, in connection with the supply or possible supply of goods or services or in connection with the promotion by any means of the supply or use of goods or services:
>
> […]
>
> (g)    make a false or misleading representation that goods or services have sponsorship, approval, performance characteristics, accessories, uses or benefits; or
>
> (h)    make a false or misleading representation that the person making the representation has a sponsorship, approval or affiliation;
>
> […]

Pokémon alleges that Redbubble has contravened each of these provisions by representations appearing on links it sponsors on Google and on Redbubble's website.

8       There was substantial agreement between the parties about the details of the business operated by Redbubble in respect of which infringements were alleged.   In general terms the parties agreed that the third parties described as "artists" may become registered members on the Redbubble website by visiting the website and setting up an account.   The artists were then able to upload material on the Redbubble website, which Pokémon described in paragraph 32 of its statement of claim as "Redbubble artworks", and which Redbubble agreed

Signed by AustLII

- 4 -

was uploaded on its website, although Redbubble disputed that the proper description of the material uploaded was "Redbubble artworks". Redbubble, in other words, disputed the implication in the description that the artwork belonged to Redbubble or that Redbubble was responsible for what was uploaded onto its website. In large part such disputes stemmed from the structure of the pleadings but did not reveal substantial disagreement about the underlying process of Redbubble's business or of the facts in the proceeding. The parties agreed that those described as artists uploaded work described as artwork onto the portfolio section of the artist's account of the Redbubble website, and the parties agreed that the uploading occurred on the Redbubble website and that the material was saved to servers used by Redbubble which were located outside of Australia. The parties also agreed that it was a condition of registration that the artist agreed to be bound by the user agreement between the artist and Redbubble which specified, amongst other things, that the artist owned all copyright in the content of the work or had permission to use the content and all of the rights required to display, reproduce and sell the content of the work which was uploaded by the artist.

9     On 3 February 2016 searches were undertaken on the Google website on behalf of TPCi for 12 Pokémon characters. Screenshots were taken on that day of each of the searches which Redbubble agreed were accurate screenshots of the search results for each of the 12 searches that appeared as Annexure 1 to the statement of claim as the search results for the terms shown on the date and times shown on the screenshots. The screenshot for the Pikachu character at Annexure 1 to these reasons was, and may be taken, as a sufficient example of the other 11.

10    The screenshot in Annexure 1 to these reasons shows some highlighting which was made for the purposes of the proceedings, but otherwise reveals the results of the search done using Google for a Pikachu shirt. On the top left hand side is the Google URL for a Pikachu shirt. On the right hand side there are links sponsored by Redbubble for Pikachu shirts. On the left there are what the parties referred to as organic, that is non-sponsored links, including links to the Redbubble website, for Pikachu t-shirts. The layout of some of the other 11 screenshots for 3 February 2016 is different but each contains for present purposes information which is broadly to the same effect, namely, information of links sponsored by Redbubble to items connected with the Pikachu character as well as a link to the Redbubble website for products from an internet search by reference to the Pikachu character. The name Redbubble appears in both the organic search results and in the sponsored links. A person, including a

Signed by AustLII

- 5 -

consumer, who searched, for example, for a Pikachu shirt would obtain a search result that
would show six Redbubble sponsored links containing Pikachu in the title, an image of a
t-shirt bearing an image on the shirt and the name Redbubble under the image of the t-shirt.

11      Mr Rossi gave evidence that Google sponsored links were used by consumers searching for
specific products such as a Pikachu t-shirt.  Mr Rossi was the head of Paid Marketing for the
Redbubble group of companies which includes the respondent.  He was acquainted with how
Google Shopping and the Google search engine work and has used them daily in the course
of his work for Redbubble.   Google Shopping is an internet search facility (or "engine")
offered by Google which allows users of the Google search engine, including potential retail
consumers, to search for products online and to compare prices between products available
on different electronic commerce platforms.  Mr Rossi agreed that sponsored links typically
contain the title of an artwork displayed on the Redbubble website, a brief description of the
product, the price of the product and an image of the artwork depicted on the Redbubble
website.  A person searching for a particular product, such as a Pikachu t-shirt, can click on a
sponsored link and will be taken directly to a page of the website containing the artwork
featured on the Redbubble website.   Redbubble pays for Google sponsored links to the
Redbubble website and provided the information to Google in the Google sponsored links.
A Redbubble sponsored link on the Google website might appear next to an advertisement for
another online retailer like, in the case of another example, a retailer such as "Hot Topic" or a
retailing department store with an online presence such as Target.  Sponsored links are an
important part of Redbubble's marketing campaign, amongst other types of marketing,
because, to use the words of Mr Rossi, they "direct traffic to products available via"
Redbubble on its website.

12      Redbubble connects a data feed of products to the Google Merchant Center to enable
products to show on Google Shopping as sponsored links.  The Merchant Center is an online
platform through which a user can create and manage shopping advertising campaigns.
The connection between what Redbubble supplies and Google's Merchant Center is through
an application programming interface which does not involve any manual actions on behalf
of Redbubble to update the product feed after connection.   Content in certain fields on
Redbubble's product feed will automatically appear on the Google Merchant Center through
the application programming interface.  The fields of Redbubble's product feed prescribed by
Google in the application programming interface are:

Signed by AustLII

- 6 -

(a)     A product identification, being an individual numeric code ascribed to each product (for example, 00009012).

(b)     The availability of the product, indicating whether the product is available for purchase.

(c)     The brand name, being a recognisable name associated with the electronic commerce platform.

(d)     The condition of the product, which in the case of all products available for purchase through the Redbubble website was "new".

(e)     A description of the product type, for example, whether the product was a unisex t-shirt together with the description provided by the artist selling the product on the Redbubble Website (for example, "watercolour painting of a fox").

(f)     The Google Product Category grouping which groups products into categories such as "apparel".

(g)     A Product Preview Image Link being a URL linking to the image of the artwork that the seller uploaded to the Redbubble website.

(h)     A Product Page Link, being a URL linking to the webpage on the Redbubble website where a consumer can purchase the product from the artist.

(i)     The price, being the retail price set by the artist.

(j)     The Product Type, being the product types on which the artist has chosen to sell his or her artwork, for example, t-shirt, sticker or poster.

(k)     The title of the artwork created by the artist.

(l)     The Shipping Price.

(m)     The Shipping Price Country.

13      Consumers for products which are available through the Redbubble website include consumers who might wish to purchase a t-shirt with an image of Pikachu or another Pokémon character.  There was nothing on the website to indicate that Redbubble was not authorised by TPCi or other entity able to authorise others to sell products that might contain an image, or to make clear that Redbubble did not have a lawful association or authorisation of sponsorship.  A person selecting a sponsored link would be directed to the Redbubble website, but a consumer directed to the Redbubble website would still not be informed of any

Signed by AustLII

- 7 -

lack of authorisation by TPCi, or by any other entity able to authorise Redbubble, in respect
of any article on its website which had been downloaded by an artist containing a Pokémon
character such as Pikachu.  A consumer has no further need to browse the Redbubble website
if he or she had selected an item on a sponsored link that appeared on the Google webpage of
an item available through the Redbubble website that had been uploaded by an artist who was
registered with Redbubble.

14    Redbubble controls the content of its sponsored links on Google.  It allows artists registered
with Redbubble to select the tags and descriptions which appear with the artwork they upload
onto the Redbubble website as their own.  The process leading to the offering of art for sale
on the Redbubble website occurs through a computer program designed for Redbubble to
operate in an automated fashion.  Mr Victor Kovalev gave evidence in the proceeding of the
operation of the Redbubble website.  He was the Chief Technology Officer of Redbubble and
described the activities leading to the sale by artists of articles with works uploaded by the
artists onto the Redbubble website as taking place in a completely automated fashion from
Redbubble's perspective with no, or virtually no, human intervention on the part of
Redbubble.  Mr Kovalev explained that the signing up of artists, the indexing of artworks, the
receipt of orders, the facilitation of transactions, the communications with suppliers relating
to transactions, and all dispatch and billings were controlled by Redbubble's software system
being a suite of various "bespoke applications written by Redbubble staff and contractors"
that were then executed on servers located in the United States.  It is from that program which
the information was fed to Google Shopping through the application programming interface
as had been described by Mr Rossi.

15    Redbubble was aware, as previously mentioned, of the risk of potential infringement of
copyright and other rights by artists registered through its website.  Mr James Toy gave
evidence of the measures adopted by Redbubble to discourage, prevent and penalise
infringements and other contraventions of intellectual property and consumer rights.  Mr Toy
was an attorney and the assistant general counsel of the Redbubble group of companies
employed by Redbubble Inc at the San Francisco office.  His evidence included a description
of the measures taken to prevent abuse and infringements of rights to which artists registered
with Redbubble might not be entitled.  Redbubble has an intellectual property policy ("the IP
policy") designed to discourage and prevent the infringement or contravention of intellectual
property and consumer rights by those uploading material onto the Redbubble website.
That includes a detailed user's agreement, the existence of a content team to monitor

Ex. 2
Page 169

Signed by AustLII

- 8 -

activities on the Redbubble website and a process for owners of intellectual property rights to notify Redbubble of potential infringements to require that material be removed. The evidence was that Redbubble can, and has, identified certain keywords as negative keywords that become blocked for use by Redbubble's registered artists. Redbubble could, in other words, have made a decision to block automatically artists from using trademarked words as tags. Mr Toy explained that doing so would be easier, cheaper and would require less effort than adopting what Redbubble considered to be the proactive measures described by Mr Toy, but the view was taken by Redbubble that blocking tags had an undesirable and disproportionate effect of preventing artists from using such words in legitimate, non-infringing ways and contexts. Redbubble, however, subsequently blocked the use of certain words, such as "Pikachu", once it has become aware of the potential for infringement, although Mr Rossi, who was cross-examined about this, was not certain of the exact date when that had happened.

16    Pokémon complained also about the material found on the Redbubble website in addition to that found through the Google sponsored links. The Google searches, as mentioned above, also gave links to the Redbubble website other than as a sponsored link. Three experts were called to give evidence and they produced a joint report in which they summarised their opinions on propositions they had been asked to consider. The three experts were Mr Brent Coker, Mr Martin Tomitsch and Mr Anuj Luthra. Mr Luthra was the head of engineering at Redbubble and explained in the joint report that it was common for users to start searching for specific things on a search engine, like Google, and for websites matching their interest. A consumer using a Google search for a Pikachu t-shirt, or a Pikachu shirt, could thus access the Redbubble website via the organic (that is, the non-sponsored link) search links. A consumer selecting the Redbubble link would be taken to a Redbubble website of the kind shown in Annexure 2 to these reasons. On the top left hand corner of that example there appears the URL for the Redbubble shop page as it appeared on the screenshot on 13 April 2014 at 3.05pm. The body of the screenshot shows a series of characters in a shop format, which to varying degrees (except perhaps the mouse in the middle of the left hand side of the page) appear to be Pikachu related characters. The screenshot in Annexure 2 to these reasons is the beginning of the first page of the search result showing that 11,564 results were produced for the search "Pikachu" in connection with Redbubble. Comparable results were found for the other searches in respect of the other characters on which TPCi based its claim.

Signed by AustLII

- 9 -

17    The results of the searches on the Redbubble website were to its shop page from which a consumer was able to select and purchase the product shown.  The prices associated with the products available through Redbubble have some significance in TPCi's claim against Redbubble because the prices are within the range of prices for like products sold by authorised licensees.  The recommended retail price of an authorised Pokémon t-shirt is, for example, $25 and is therefore within the range of prices between $25 and $30 for comparable products which appeared on the Redbubble website from the search for Pikachu.  A consumer for a product might possibly regard the fact that the price is within the range a consumer might expect to pay for a product from an authorised vendor as an indicator that the product was available for purchase from a dealer authorised by TPCi or by another entity able to authorise such dealings; a consumer would, at least, not be made suspicious about whether the product was being made available from an unauthorised dealer as might arguably occur if there were a marked disparity between the price on the website and the prices charged by authorised dealers.

18    The experts were largely in agreement that a consumer would generally use internal website search functions to find relevant pages within websites.  Dr Coker opined that users who know what they are searching for would be more likely to use internal search box functions whilst users who had more open search criteria would be less likely to use the internal search box functions and more likely to use other navigation functions.  Dr Tomitsch agreed that internal search functions were important and Mr Luthra conceded that most users would start from an external search engine like Google but considered that consumers using the Redbubble website would use the internal search engine to narrow their results.  A consumer going onto the Redbubble website directly would find on the home page a search facility in which they could enter a name, such as Pikachu, to search for a t-shirt.

19    It was submitted on behalf of TPCi that consumers searching for Pokémon merchandise who are somewhat familiar with online shopping and search engines and with Pokémon characters, but who do not have a detailed knowledge of any client licensing arrangement, will be misled or deceived by the representations on the internet searches.  In *Campomar Sociedad, Limitada v Nike International* (2000) 202 CLR 45 the High Court said that the effect of conduct or representations upon ordinary or reasonable members of a class must be considered where the issue is the effect of conduct on a class of persons.  At [102]-[103] the Court said:

Signed by AustLII

- 10 -

102     It is in these cases of representations to the public, of which the first appeal is one, that there enter the "ordinary" or "reasonable" members of the class of prospective purchasers. Although a class of consumers may be expected to include a wide range of persons, in isolating the "ordinary" or "reasonable" members of that class, there is an objective attribution of certain characteristics. Thus, in *Puxu*, Gibbs CJ determined that the legislation did not impose burdens which operated for the benefit of persons "who fail[ed] to take reasonable care of their own interests". In the same case, Mason J concluded that, whilst it was unlikely that an ordinary purchaser would notice the very slight differences in the appearance of the two items of furniture in question, nevertheless such a prospective purchaser reasonably could be expected to attempt to ascertain the brand name of the particular type of furniture on offer.

103     Where the persons in question are not identified individuals to whom a particular misrepresentation has been made or from whom a relevant fact, circumstance or proposal was withheld, but are members of a class to which the conduct in question was directed in a general sense, it is necessary to isolate by some criterion a representative member of that class. The inquiry thus is to be made with respect to this hypothetical individual why the misconception complained has arisen or is likely to arise if no injunctive relief be granted. In formulating this inquiry, the courts have had regard to what appears to be the outer limits of the purpose and scope of the statutory norm of conduct fixed by s 52. Thus, in *Puxu*, Gibbs CJ observed that conduct not intended to mislead or deceive and which was engaged in "honestly and reasonably" might nevertheless contravene s 52. Having regard to these "heavy burdens" which the statute created, his Honour concluded that, where the effect of conduct on a class of persons, such as consumers, was in issue, the section must be "regarded as contemplating the effect of the conduct on reasonable members of the class".

(Footnotes omitted).

In *Flexopack SA Plastics Industry v Flexopack Australia Pty Ltd* (2016) 118 IPR 239 Beach J set out at [260]-[273] some non-contentious principles applicable to cases such as the present:

260     First, there is no meaningful difference between the words and phrases "misleading or deceptive", "mislead or deceive" or "false or misleading"; see *Australian Competition and Consumer Commission v Dukemaster Pty Ltd* [2009] FCA 682 at [14] per Gordon J and *Australian Competition and Consumer Commission v Coles Supermarkets Australia Pty Limited* (2014) 317 ALR 73 at [40] per Allsop CJ.

261     Second, where the issue is the effect of conduct on a class of persons (rather than identified individuals to whom a particular misrepresentation has been made or particular conduct directed), the effect of the conduct or representations upon ordinary or reasonable members of that class must be considered (*Campomar Sociedad, Limitada v Nike International Ltd* (2000) 202 CLR 45 at [102] and [103]). This hypothetical construct avoids using the very ignorant or the very knowledgeable to assess effect or likely effect; it also avoids using those credited with habitual caution or exceptional carelessness; it also avoids considering the assumptions of persons which are extreme or fanciful. Third, the objective characteristics that one attributes to ordinary or reasonable members of the relevant class may differ depending

Signed by AustLII

- 11 -

on the medium for communication being considered. There is scope for diversity of response both within the same medium and across different media.

262    Fourth, for the purposes of s 18, one must identify the relevant conduct and then consider whether that conduct, considered as a whole and in context, is misleading or deceptive or likely to mislead or deceive. Such conduct is not to be pigeon-holed into the framework or language of representation (cf the language of s 29).

263    Fifth, conduct is misleading or deceptive or likely to mislead or deceive if it has the tendency to lead into error (*Australian Competition and Consumer Commission v TPG Internet Pty Ltd* (2013) 250 CLR 640 at [39] per French CJ, Crennan, Bell and Keane JJ). But conduct causing confusion or wonderment is not necessarily co-extensive with misleading or deceptive conduct (*Google Inc v Australian Competition and Consumer Commission* (2013) 249 CLR 435 at [8] per French CJ, Crennan and Kiefel JJ). Mere confusion or wonderment will not establish misleading or deceptive conduct (*Taco Company of Australia Inc v Taco Bell Pty Ltd* (1982) 42 ALR 177 at 201 per Deane and Fitzgerald JJ). In *SAP Australia Pty Ltd v Sapient Australia Pty Ltd* (1999) 169 ALR 1 at [51], the Full Court accepted that there may be evidence of initial confusion that did not result in any person seeking to commence negotiations, which would fall short of amounting to misleading or deceptive conduct.

264    Sixth, the question is whether there was a real but not remote chance or possibility that the relevant conduct was misleading or deceptive or likely to mislead or deceive. To assess this one looks at the potential practical consequences and effect of the conduct.

265    Seventh, for the purposes of s 18, the words "likely to mislead or deceive" demonstrate that it is not necessary to show actual deception. Relatedly, it is not necessary to adduce evidence from persons to show that they were actually misled or deceived.

266    Eighth, there must be a sufficient nexus between the impugned conduct or apprehended conduct and the customer's misconception or deception. As was said in SAP Australia Pty Ltd v Sapient Australia Pty Ltd (1999) 169 ALR 1 at [51] by French, Heerey and Lindgren JJ:

> The characterisation of conduct as "misleading or deceptive or likely to mislead or deceive" involves a judgment of a notional cause and effect relationship between the conduct and the putative consumer's state of mind. Implicit in that judgment is a selection process which can reject some causal connections, which, although theoretically open, are too tenuous or impose responsibility otherwise than in accordance with the policy of the legislation.

267    Subject to one qualification, the error or misconception must result from the respondent's conduct and not from other circumstances for which the respondent was not responsible. But conduct that exploits or feeds into and thereby reinforces the pre-existing mistaken views of members of the relevant class may be misleading or deceptive or likely to mislead or deceive.

268    Ninth, conduct that is merely transitory or ephemeral where any likely misleading impression is likely to be readily or quickly dispelled or corrected does not constitute conduct that would infringe s 18 (*Knight v Beyond*

Signed by AustLII

- 12 -

*Properties Pty Ltd* (2007) 242 ALR 586 at [58] per French, Tamberlin and Rares JJ).

269    Tenth, and relatedly, it is one thing to say that the conduct must be more than transitory or ephemeral, but it is another thing to say that the conduct or its effect must endure up to some "point of sale". There is no such requirement to establish a s 18 contravention. Relatedly, it is not necessary to show any actual or completed transaction entered into.

270    Eleventh, in determining whether a contravention of s 18 has occurred, the focus of the inquiry is on whether a not insignificant number within the class have been misled or deceived or are likely to have been misled or deceived by the respondent's conduct. There has been some debate about the meaning of "a not insignificant number". The *Campomar* formulation looks at the issue in a normative sense. The reactions of the hypothetical individual within the class are considered. The hypothetical individual is a reasonable or ordinary member of the class. Does satisfying the *Campomar* formulation satisfy the "not insignificant number" requirement? I am inclined to the view that if, applying the *Campomar* test, reasonable members of the class would be likely to be misled, then such a finding carries with it that a significant proportion of the class would be likely to be misled. But if I am wrong and that a finding of a "not insignificant number" of members of the class being likely to be misled is an additional requirement that needs to be satisfied, then I would make that finding in the present case. For a discussion of these issues, see Greenwood J's analysis in *Peter Bodum A/S v DKSH Australia Pty Ltd* (2011) 280 ALR 639 at [206] to [210] and *National Exchange Pty Ltd v Australian Securities and Investments Commission* (2004) 61 IPR 420 at [70] and [71] per Jacobson and Bennett JJ.

271    Twelfth, in the case of a descriptive or generic word, for an applicant to make good an allegation of affiliation it may need to demonstrate that the word has acquired a secondary meaning and become distinctive of the applicant's business. Whether a secondary meaning exists is a question of fact to be determined having regard to all the relevant contextual circumstances. It is also said that it may be difficult to establish that a descriptive name, as opposed to a concocted or invented name, has become distinctive of the applicant's business.

272    Relatedly, however, there is no requirement under the Australian Consumer Law to show an exclusive reputation (*Cadbury Schweppes Pty Ltd v Darrell Lea Chocolate Shops Pty Ltd* (2007) 159 FCR 397 at [99] per Black CJ, Emmett and Middleton JJ).  Indeed, query whether it is necessary to show a reputation at all (see Heerey J in *Woodtree Pty Ltd v Zheng* (2007) 164 FCR 369 at [34]).  But perhaps it may be said that one need show only "[v]ery slight activities" and it can be established even without retail sales (*Miki Shoko Co Ltd v Merv Brown Pty Ltd* [1988] ATPR 40-858 at [49,278] per Lockhart J).

273    Thirteenth, while s 18 and s 29(1)(a), (g) and (h) have a broader scope of operation than the tort of passing off, when those sections are applied to facts asserted to give rise to a passing off then in practice a court may be guided by similar principles (see *Hornsby Building Information Centre Pty Ltd v Sydney Building Information Centre Ltd* (1978) 140 CLR 216 at 227 per Stephen J).

Signed by AustLII

- 13 -

The relevant date for assessing whether conduct amounts to misleading or deceptive conduct is the date the conduct commenced.  See *Flexopack* [275]; *Optical 88 Limited v Optical 88 Pty Limited (No. 2) & Ors* (2010) 275 ALR 526, [333].

20      A significant reputation has been created in the marketplace for what might be described generally as the Pokémon brand.  The Pokémon fictional universe, as mentioned above, comprises a group of more than 800 characters that players of Pokémon video games or trading card games can find, capture, train, trade, collect and use in battle against their rivals in the quest to become top Pokémon trainers.  The Pokémon brand has become distinctive and is well known in its own right irrespective of who may be the legal owner: see *Bodum v DKSH Australia Pty Ltd* (2011) 280 ALR 649 at [94], [279]; *Reckitt & Colman Products Ltd v Borden Inc* [1990] RPC 341 at [406].  The reputation of the brand is associated with the name "Pokémon", the names of the different Pokémon characters, and the distinctive images of each of those characters.

21      In 2016 Pokémon Go was released and that has also developed a substantial reputation with a distinctive Pokémon Go logo and distinctive logos for the three Pokémon Go teams, namely, Team Instinct, Team Mystic and Team Valour.  Pokémon Go was designed as a game for smartphones developed by Niantic Inc in conjunction with The Pokémon Company.  It is a reality game with the Pokémon characters in the players' actual physical surroundings using GPS technology.  Players of the game explore their real surroundings to find and catch Pokémon characters.  The game is the same worldwide but the locations differ depending upon the location of the player.  Pokémon Go was launched in Australia on 5 July 2016 and can be downloaded in Australia via the App Store and Google Play.  Pokémon Go had surpassed 500 million downloads around the world by September 2016 and was said to hold the App Store record for the most downloads in the first week of a launch.  The characters of Pokémon Go include Pikachu, Bulbasaur, Squirtle, Charmander, Charizard, Snorlax, Eevee, Flareon, Jolteon, Vaporeon, Gengar, Jigglypuff, Ponyta, Dragonite, Magikarp, Clefairy, Psyduck, Blastoise, Butterfree, Vulpix and Venusaur.

22      Pokémon has a substantial reputation in Australia and Redbubble admits that the name Pokémon is well-known in Australia.  The first two Pokémon video games were, as mentioned above, released for the Nintendo Game Boy in Japan in 1996.  They were first released in the United States in 1998 and subsequently, in the same year, in Australia under the names Pokémon Red and Pokémon Blue.  The Pokémon video games are based on a

Signed by AustLII

- 14 -

selection of Pokémon characters.  More than 40 different Pokémon video games have been released in the 19 years since 1998 and many have been promoted and sold in Australia during that time.  The video games sold in Australia during that period include the Pokémon Red version and the Pokémon Blue version (1998), Pokémon Yellow, Special Pikachu edition (1999), Pokémon Gold version and Pokémon Silver version (2000), Pokémon Crystal version (2001), Pokémon Diamond version and Pokémon Pearl version (2007), Pokémon X version and Pokémon Y version (2013), and Pokémon Omega Ruby and Pokémon Omega Sapphire (2014).  More than 279 million video games have been sold worldwide as at February 2016 with new Pokémon video games being released approximately each year and core Pokémon video games introducing new characters being released every two to four years.  Pokémon Sun and Pokémon Moon were released worldwide, including in Australia, in November 2016.

23    The Pokémon Trading Card Game has been sold in Australia by the applicant since at least 2005.  The Pokémon Trading Card Game was distributed in Australia from 1999 by a third party under licence by Nintendo in America Inc.  Between 2003 and 2005 it was distributed in Australia by Nintendo Australia but since 2005 it has been distributed in Australia by the applicant.  More than 21.5 billion Pokémon Trading Card Game cards have been shipped to 74 countries in 11 languages as at March 2016.  In oral evidence Ms Long said that new packs have been released four times a year since inception.

24    The animated television series featuring Pokémon characters in the adventures of a 10 year old boy named Ash with his best friend Pikachu have been broadcast in Australia since at least 2000.  Home videos and DVDs of those television shows have been widely promoted and distributed since 2001.  In cross-examination Ms Long said that there have been 20 seasons of the television series since 1998 and by 2010 there had been some 57,000 DVDs of the Pokémon television series, seasons 1-9.  The series has been broadcast in Australia by free to air television and on the Cartoon Network.  Season 1 aired on free to air television and on the Cartoon Network in 2000.  The evidence of Ms Long was of broadcasts in Australia for most of the series and, relevantly, until the first letter of demand was sent to Redbubble by Pokémon in January 2011.

25    Pikachu featured in each of the seasons of the television series.  Ms Long gave evidence of having watched most of the episodes through to the end of season 14 and that she had watched the first 50 seconds of episode 9 of season 1 at the request of counsel for Redbubble.

Signed by AustLII

- 15 -

In doing so she identified the first 50 seconds as being the opening credits which appeared in each episode of season 1 and the parties agreed that the characters which appeared in that opening sequence were the characters pleaded in the statement of claim as Pikachu, Bulbasaur, Squirtle, Charmander, Charizard, Blastoise, Butterfree and Venusaur.  The parties also agreed that in the entirety of episode 9 the following additional Pokémon characters appeared, namely,  Eevee, Flareon, Jolteon, Vaporeon, Magikarp, Psyduck and Vulpix.

26    Pokémon movies have also been sold in Australia in VHS and DVD formats via the applicant's licensees.  The characters featured in the movies have appeared in at least one movie or animated episode.  Pikachu has appeared in all of them and the parties agreed that the characters which appeared in the first movie were Pikachu, Bulbasaur, Squirtle, Charizard, Vaporeon, Dragonite, Psyduck, Blastoise, Mewtwo, Vulpix, Togepi and Venusaur.

27    An important part of the commercial activities of the applicant is to licence the sale of merchandise connected with the Pokémon brand.  The precise number, identity and prices are not important for present purposes, but it is clear from the evidence that there were significant licensed sales of products of Pokémon branded merchandise in respect of most of the pleaded Pokémon characters up to the date in January 2011 when the applicant wrote a letter of demand to Redbubble.  The sales by reference to characters over the relevant period were set out in a lengthy exhibit to the affidavit of Ms Long and helpfully summarised by Counsel for TPCi in closing address.   The Pikachu character featured on many Pokémon branded merchandise including plush toys, t-shirts and books.  The Sylveon character was not relevant because that character was not released until 2013, although the evidence exhibited through Ms Long included  sales of toys and figures in relation to that character after its release.

28    Conduct is misleading or deceptive "if it has the tendency to lead into error": see *Flexopack* at [263]; *Australian Competition and Consumer Commission v TPG Internet Pty Ltd* (2015) CLR 640 at [39].   The Redbubble website and the internet advertisements sponsored by Redbubble on Google contained representations contrary to ss 18(1), 29(1)(g) and (h) of the Australian Consumer Law that the products available through those websites were supplied, licensed, associated, sponsored, approved or authorised by TPCi or such other entity able to entitle Redbubble to make such representations.   A consumer searching for one of the Pokémon characters in suit on the internet search engine provided by Google would be taken to pages of the kind annexed to these reasons.  What appeared in the sponsored links differed

Signed by AustLII

- 16 -

somewhat from what appeared on the Redbubble website but in each case a consumer would see representations that artworks on products available through the Redbubble website were supplied, licensed, associated, sponsored, approved or authorised by TPCi or by another entity able lawfully to authorise Pokémon branded merchandise. The name Redbubble appeared in both the sponsored links and the Redbubble links. The words "sponsored" appeared in the case of the sponsored links above the item available for purchase, such as the red t-shirt in the top row in the Annexure 1 to these reasons. Each of the sponsored links has a price and the name of the Pokémon character used for the search such as, in the case of the example, the name "Pikachu". The sponsored link search result for Pikachu, for example, had a white t-shirt with the word "Pikachu" in the search result together with a price and also the name "Redbubble". A consumer obtaining that search result would be told that selecting a sponsored result would take the consumer to the sponsor, which in this case was Redbubble. A consumer would see six highlighted Redbubble sponsored links in the example in Annexure 1 containing the word "Pikachu" in the title, t-shirts bearing an image of Pikachu, and the name "Redbubble" under the image. The evidence of Mr Rossi was that Google sponsored links are used by customers searching for a specific product and that Google sponsored links are attractive to customers intending to make a purchase quickly without the effort of browsing through the Redbubble website appearing in the non-sponsored search results in Annexure 1. A potential customer taken to the Redbubble webpage as a result of clicking the sponsored link would not be told anything to suggest that Redbubble was not an authorised online retailer of Pokémon products such as the Pikachu t-shirt depicted and described in the sponsored link. The consumer arriving at the Redbubble linked page could add the item to a purchase cart and select the payment option to purchase the product directly from the Redbubble website. There was nothing on the Redbubble website to inform the consumer that there was no connection, authorised or otherwise, between Redbubble on the one hand and TPCi (or any other entity authorised to exploit Pokémon products) on the other.

29   The effect of the representations is to be considered by reference to "ordinary or reasonable members of that class" of persons to whom the representations are directed: see *Flexopack* at [261]; see also *Campomar* at [102] and [103]. In this case that class is those persons seeking to purchase products as retail customers. It was submitted for Redbubble that the only representation on the website was that articles, such as a t-shirt, were available for sale. This was submitted in part to follow from the fact "that the internet [was] awash with

Signed by AustLII

- 17 -

Pokémon characters" on other sites.  Amongst those was Bulbapedia, other fan sites, Etsy and Ebay.   It may be assumed that some of the relevant class of persons will have such knowledge of the Pokémon world, or the availability of Pokémon products, that the effect upon them of what appeared from the search would not have been to be misled or deceived, but, as Beach J observed at [261] in *Flexopack*, the "hypothetical construct avoids using the very ignorant or the very knowledgeable to assess effect or likely effect" as well as the habitually cautious and exceptionally careless.  The representations may not be made in all of the results from the internet search but the ordinary or reasonable retail consumer for Pikachu related products would have the repeated representation in a significant number of search results that what was offered through Redbubble was supplied, licensed, associated, sponsored, approved or authorised by TPCi when that was not the case.  It is not an answer to a claim of contravention that the conduct may not have misled or deceived up to the point of sale: *ACCC v TPG Internet Pty Ltd* at [50]; *Veda Advantage Ltd v  Malouf Group Enterprises Pty Ltd* (2016) 241 FCR 161 at [254]; *Flexopack* at [269].

30        A consumer using the Redbubble internal search function would find similar representations. The experts agreed that search engines like Google are commonly used by consumers and are an important means of finding relevant pages they are searching for on websites.  Mr Luthra, as mentioned, explained in the joint expert report that it was common for users to start by searching for specific things on a search engine like Google to find a website matching their interest.  The Redbubble website in Annexure 1 could be accessed by choosing the organic search link on the left side of the annexure which would generally take the consumer to a Redbubble shop page.   An example of the shop page is at Annexure 2 of these reasons showing 11,564 results for the search on the Redbubble website.  The particulars to paragraph 43 of the statement of claim set out the relevant results for different searches of the Pokémon characters in suit.   11,564 results were identified in the case of the search for Pikachu of which some were of the kind in the screenshot in Annexure 2.  The Redbubble logo appeared on its website with nothing to suggest that Redbubble was not authorised by TPCi or by any other entity able to authorise Redbubble.  The price for the item was within the same range as a customer could expect to pay for the product from an authorised merchandiser consistently with the evidence of the prices sold for products by authorised Pokémon licensees.  Some of the 11,564 results would not contain the representations of authorisation, connection or sanction by TPCi or other entity with the right to licence authorised products but many

Signed by AustLII

- 18 -

would, such as all those appearing in Annexure 2 except the mouse on the left on the third line.

31    A consumer wishing to locate a product directly on the Redbubble website would, according to the experts, undertake a search from the search function on Redbubble's homepage. Dr Coker explained that a user searching for something in particular, such as a truck design, would be more likely to use the internal search box function than to browse on Google more generally.  Dr Tomitsch agreed that the internal search function was important and Mr Luthra considered that most users would start at an external search function but considered that consumers using the Redbubble website would use the internal search engine to narrow their results.  A person searching on the Redbubble website would thus be able to enter a name, such as "Pikachu", and search for a t-shirt by reference to that name.  Such a consumer would be directed to the relevant page enabling the purchase of the item because of the tags and titles which Redbubble allows its registered artists to use to describe their products for sale in connection with the fulfillers.

32    TPCi's copyright case in the proceedings relied upon the artistic work depicted as Pikachu in paragraph 11(a) of the Statement of Claim, namely:



TPCi claimed to be the owner of the copyright in the Pikachu work, that copyright subsisted in it pursuant to s 32 of the Copyright Act as extended by the *Copyright (International Protection) Regulations 1969* ("the International Protection Regulations"), and that the work was an original artistic work pursuant to s 10 of the Copyright Act.  Redbubble admitted that the Pikachu work was an artistic work pursuant to s 10 of the Copyright Act but did not admit that TPCi was the owner of any copyright in the Pikachu work or that it was original or that copyright subsists in it pursuant to s 32 of the Copyright Act as extended by the International Protection Regulations.

Signed by AustLII

- 19 -

33    TPCi claimed to have copyright in the Pikachu work as a published artistic work. Section 32(2) of the Copyright Act provides in the case of published artistic works:

> (2)    Subject to this Act, where an original literary, dramatic, musical or artistic work has been published:
>
> (a)    copyright subsists in the work; or
>
> (b)    if copyright in the work subsisted immediately before its first publication--copyright continues to subsist in the work;
>
> if, but only if:
>
> (c)    the first publication of the work took place in Australia;
>
> (d)    the author of the work was a qualified person at the time when the work was first published; or
>
> (e)    the author died before that time but was a qualified person immediately before his or her death.

TPCi's claim of subsistence of copyright in the Pikachu work requires that the Pikachu work be original, that its first publication took place in Australia and that the author of the work was a "qualified person" within the meaning of s 32(2) as defined by s 32(4).

34    The requirement that the Pikachu work be an original artistic work within the meaning of s 32(1) of the Copyright Act will not be satisfied by a mere mechanical reproduction or a slavish copy of an earlier copyright work.  The revision of an earlier original work, however, will attract independent copyright protection provided that the latter work has the requisite degree of originality over and above the earlier work.   What is required to establish originality is that the subsequent work had some independent intellectual effort, although the work may have no literary merit, novelty or inventiveness: see *IceTV Pty Ltd v Nine Network Australia Pty Ltd* (2009) 239 CLR 458, 474, [33]; *Interlego v Croner Trading* (1992) 111 ALR 577, 608-609.  In *Digga Australia Pty Ltd v Norm Engineering Pty Ltd* (2008) 166 FCR 268 Lindgren J said at [52]:

> 52.    The following principles of law were, it appeared, not controversial on the appeal:
>
> •    The necessary skill and labour to confer originality for copyright purposes is not necessarily excluded where there is change from one medium to another, for example, a drawing of a three-dimensional object, such as a prototype:  see *L B (Plastics) Ltd v Swish Products Ltd* [1979] RPC 551 at 568-569; *Interlego AG v Tyco Industries Inc* [1989] AC 217 (*Interlego*) at 263;  *Swarbrick v Burge* (2004) 208 ALR 19 at [138] – [140]; Garnett K, Gillian D and Garbottle G, *Copinger and Skone James on Copyright* (15th ed, Sweet & Maxwell, London, 2005) (*Copinger*) vol 1 at [3–135].

Signed by AustLII

- 20 -

- The owner of copyright in an original artistic work does not, simply by mechanically reproducing it, create a further original artistic work attracting copyright protection:  The *Reject Shop Plc v Robert Manners* [1995] FSR 870 (*The Reject Shop*).  If the position were otherwise, the way would be open for the copyright owner to "re-start" the period of copyright protection, and, indeed, to do so many times:  see *Interlego* at 255-256, 263, 268.

- Where a copyright owner makes a mere a mere mechanical reproduction of the copyright work, the copy will not itself be an original work attracting copyright protection, but it may be seen to enjoy vicariously the benefits of the copyright protection attached to the earlier work, although only for the duration of that copyright, and only, of course, if remedies are still available in respect of that copyright: *Copinger* vol 1 at [3-134]; and see *Interlego* at 268; *Biotrading & Financing OY v Biohit Ltd* [1996] FSR 393 at 395-396; *Biotrading & Financing OY v Biohit Ltd* [1998] FSR 109 at 116-117.

- Whether successive revisions of an earlier original work will attract independent copyright protection depends on whether they have the requisite quality of originality over and above that of the earlier original work or earlier original revision:  *Interlego* at 263; *Interlego AG V Croner Trading Pty Ltd* (1992) 39 FCR 348 at 378-379 per Gummow J; *C&H Engineering v F Klucznik & Son Ltd* (1992) 26 IPR 133 at 139.

- Where the author of a drawing makes preliminary drawings before producing the final version, the final version is not denied originality merely because it was preceded by the preliminary drawings:  *L A Gear Inc v Hi-Tec Sports Plc* [1992] FSR 121 at 136; *Biotrading & Financing OY v Biohit Ltd* [1998] FSR 109 at 116-117; *Copinger* vol 1 at [3-133]-[3-134].

Drawings derived from earlier drawings may still be seen as distinct original artistic works sufficient to attract independent copyright, with the test for determining whether one drawing based on another attracted copyright being a visual one: see *Interlego* at 609.  The question for the Court was stated in *Interlego* at 609 to be "whether a latter drawing [was] merely a copy of the earlier, or [was] a new artistic work".  In that case the Court relied upon evidence that the two works in question were "visually distinctive": *Interlego* at 610.  In *Metricon Homes Pty Ltd v Barrett Property Group Pty Ltd* (2008) 248 ALR 364 it was said at [42] that a plan would be an original artistic work in the statutory sense "if it [was] recognisably the author's own work as opposed to a copy of another's work or a trivial variation of another's work".

35    TPCi claimed copyright in the Pikachu work described as "PB&W7 - Pikachu (50/149)" in the certificate of registration issued in accordance with Title 17 of the United States Code. Evidence of originality in that work was given by Mr Monahan who was the lawyer retained by TPCi and was responsible for filing hundreds of copyright registrations in the USA for

Signed by AustLII

- 21 -

Pokémon cards each year since at least 2010, including those described as "PB&W7 - Pikachu (50/149)" in the certificate of registration.  He swore an affidavit stating that he remembered the card with the image of the Pikachu work that was part of the Black and White 7 series that he filed for copyright registration.  The process of registration in the United States undertaken by Mr Monahan involved him submitting an electronic registration with the image of the work.  The Pikachu character was a longstanding character that had featured on a number of the Pokémon cards that he had registered over the years. He acknowledged that there were several hundred characters in the new series and that he could not recite or list them all but said that he could recognise their names when they were given to him.  His evidence, however, was of being confident that the Pikachu work was not a derivative work, notwithstanding that there had been earlier depictions of Pikachu.

36   Mr Monahan was questioned closely in cross-examination about his knowledge of the creation of the works he had registered, including the Pikachu work, and his evidence can be accepted as establishing the requisite degree of originality in the Pikachu work relied upon for the copyright claim.  He was asked about the investigations he undertook personally in relation to the 149 cards of the 7th series of the Black and White series to determine whether each was a derivative work or whether there was any pre-existing work and said in oral evidence in cross-examination:

> After registering so many of these and in somewhat exhaustive consultation with my client, I've come to understand, if not to know, that the playing cards are not derivative - they are not re-hashed from the audio-visual works: that artwork is created and stands alone.  So they are not compilations of other works; they are not created from animation sells; and so they are not derivative or compilation works …

He repeated his explanation that the basis of his answer was having had "extensive consultations with" his client from which he had come to "understand, if not to know that the playing card artwork [was] created without derivation or consultation to the animation work or other IP assets that exist within TPCi's portfolio".  He conceded in cross-examination that he had not stood over the shoulder of any creator and, therefore, that he did not have direct eyewitness, or other direct, knowledge beyond that gained from "detailed consultation with the client" but that "with respect to each series of the cards, [he had] consult[ed] with the client to determine which - for instance, which Japanese card they derive[d] from, or [… where] the artwork comes from".  His specific and direct evidence was that of consulting with the client to determine that the works were made by the Japanese company and were made as the Japanese card, although, as mentioned, he did not fly personally to Japan and had

Signed by AustLII

- 22 -

not been witness to the creation process. It had been his specific professional responsibility to obtain and secure registrations in accordance with lawful entitlements and requirements. He was confident in that context of his conclusion that the Pikachu work was not a copy based upon an animation cell because of his experience over many years of consulting with the client as his professional obligations and legal duties. In specific response in cross-examination about being confident in giving evidence that the pose of Pikachu was not derivative of any other pose already published, Mr Monahan said that every investigation he had done about the card making process enabled him to say that the cards were generated on their own and were not derivative of the animation, "common poses notwithstanding".

37    Subsistence of copyright requires also that the first publication of the work took place in Australia, but the effect of Regulation 4(1) of the International Protection Regulations is that an artistic work first published in Japan by a Japanese citizen is given the same protection under the Copyright Act as if it had first been published in Australia by an Australian resident. Regulations 4(1) and (4) provide:

> **Protection--Berne Convention countries, UCC countries, USA, Rome Convention countries, WPPT countries and WTO countries (Act s 184)**
>
> Work, and subject-matter other than a work, made or first published in a foreign country
>
> (1)    Subject to these Regulations, a provision of the Act that applies in relation to a literary, dramatic, musical or artistic work or edition first published, or a sound recording or cinematograph film made or first published, in Australia (an *Australian work* or *subject-matter*) applies in relation to a literary, dramatic, musical or artistic work or edition first published, or a sound recording or cinematograph film made or first published, in a Berne Convention country, a Rome Convention country, a UCC country, a WCT country, a WPPT country or a WTO country (a *foreign work* or *subject-matter*):
>
>     (a)    in the same way as the provision applies, under the Act, in relation to an Australian work or subject-matter; and
>
>     (b)    as if the foreign work or subject-matter were made or first published in Australia.
>
> […]
>
> (4)    Subject to these Regulations, a provision of the Act relating to a work or subject-matter other than a work that applies in relation to a person who, at a material time, is resident in Australia (an *Australian resident*) applies in relation to a person who, at a material time, is resident in a Berne Convention country, a Rome Convention country, a UCC country, a WCT country, a WPPT country or a WTO country (a *foreign resident*):
>
>     (a)    in the same way as the provision applies, under the Act, in relation to

Signed by AustLII

- 23 -

an Australian resident; and

(b)    as if the foreign resident were an Australian resident.

[…].

The Pikachu work was established to have been first published in Japan, and Redbubble accepted that the author was Japanese and, therefore, that the author was a qualified person within the meaning of s 32(2), as defined by s 32(4) of the Copyright Act, and as extended by International Protection Regulations.

38    TPCi would, in any event, if it were necessary to decide the issue, have had the benefit of the presumption under s 126A of the Copyright Act by virtue of the certificate tendered by Mr Monahan.  Section 126A(3) presumes the year and place of first publication of a work to be that stated in a certificate issued in a qualifying country unless the contrary is established. Section 126A(3) and (4) provide:

**Foreign certificates**

(3)    If a certificate or other document issued in a qualifying country in accordance with a law of that country states the year and place of the first publication, or of the making, of the work or other subject matter, then that year and place are presumed to be as stated in the certificate or document, unless the contrary is established.

(4)    For the purposes of this section, a document purporting to be a certificate or document referred to in subsection (3) is, unless the contrary intention is established, taken to be such a certificate or document.

A certificate of registration was relied upon in these proceedings which stated the first place of publication of the Pikachu work to have been Japan and the date of first publication to have been 15 April 2012.

39    TPCi's claim of ownership relied upon s 126B(3) of the Copyright Act which provides that a person is presumed to have been the owner of the copyright at the time stated in a certificate or other document issued in a qualifying country in accordance with a law of that country.  In that context TPCi relied upon the certificate of registration issued under the seal of the copyright office in accordance with Title 17 of the United States Code, attesting that registration had been made for the work described as "PB&W 7-Pikachu (50/149).

40    Section 126B(3) creates a presumption of ownership where a certificate issued in a qualifying country "states that a person was the owner of copyright in the work".  Section 126B(4) provides that a document "purporting to be a certificate or document referred to" in the

Signed by AustLII

- 24 -

previous subsection is taken to be such certificate or document unless the contrary intention is established.   Sections 126B(3) and (4) provide:

**Foreign certificates**

(3)   If a certificate or other document issued in a qualifying country in accordance with a law of that country states that a person was the owner of copyright in the work or other subject matter at a particular time, then the person is presumed to have been the owner of the copyright at the time, unless the contrary is established.

(4)   For the purposes of this section, a document purporting to be a certificate or document referred to in subsection (3) is, unless the contrary intention is established, taken to be such a certificate or document.

The certificate relied upon by TPCi did not in terms state that TPCi was the "owner" of the copyright work.   Indeed, Mr Monahan gave evidence, that a certificate of copyright registration in the United States describing a copyright claimant as an owner cannot be obtained.   Mr Monahan was an experienced attorney and was the principal, as sole practitioner, of a legal practice conducted under the name Astrolabe LLC.   Mr Monahan gave evidence of the registration process for copyright works in the United States as essentially a depositing arrangement where people who are the owners of copyright, or perhaps more precisely, where people who claim to be the owners of copyright, are able, if they wish, to take advantage of a registration process subject to penalties for perjury if making false claims.   Mr Monahan explained that the system of registration of ownership in the United States does not confer ownership by registration but that it provided an evidentiary function for those who claimed ownership and, significantly, that claims of ownership were subject to a penalty for perjury if a false claim was made.

41   The permissive system for registration in the United States permits only the owner to be registered.   Section 408(a) and (b) of the United States provisions provide:

**s 408   Copyright registration in general**

(a)   REGISTRATION PERMISSIVE. – At any time during the subsistence of the first term of copyright in any published or unpublished work in which the copyright was secured before January 1, 1978, and during the subsistence of any copyright secured on or after that date, the owner of copyright or of any exclusive right in the work may obtain registration of the copyright claim by delivering to the Copyright Office the deposit specified by this section, together with the application and fee specified by sections 409 and 708. Such registration is not a condition of copyright protection.

(b)   DEPOSIT FOR COPYRIGHT REGISTRATION – Except as provided by subsection (c), the material deposited for registration shall include –

Signed by AustLII

- 25 -

(1)    in the case of an unpublished work, one complete copy or
phonorecord;

(2)    in the case of a published work, two complete copies or
phonorecords of the best edition;

(3)    in the case of a work first published outside the United States, one
complete copy or phonorecord as so published;

(4)    in the case of a contribution to a collective work, one complete copy
or phonorecord of the best edition of the collective work.

A system of registration which does not confer ownership is consistent with the general rules
concerning the ownership of copyright in works.  The general rule of ownership of copyright
in a work does not depend upon registration but upon identification of the author.

42    Section 126B was inserted into the Copyright Act by the *Copyright Amendment (Parallel
Importation) Act 2003* (Cth) with effect from 13 May 2003.  The Supplementary Explanatory
Memorandum described the mischief to which it was directed as being to address the
"concern about the difficulty and/or expense of proving copyright subsistence and ownership
in infringement cases in Australia where evidence to the contrary is not provided".
The section was amended in 2006 by altering the effect of the provision from being *prima
facie* evidence of the matters shown on the face of the certificate with a "stronger
presumption that the statements contained on the labels, marks, certificates or other chain of
ownership documents are presumed to be stated 'unless the contrary is established'":
see Explanatory Memorandum to the *Copyright Amendment Bill 2006* (Cth), paragraph 2.2.
It was submitted for Redbubble, however, that the presumption created by s 126B did not,
and could not, apply to a certificate of registration of the kind provided in the United States
and relied upon by TPCi, because the certificate did not state in express words that the person
claiming to be the owner was the owner of copyright in the works.  A submission to that
effect found favour in *Dallas Buyers Club v iiNet* (2015) 245 FCR 129 where Perram J
concluded that copyright in a film had originally been owned by Dallas Buyers Club LLC
and, in reaching that conclusion, disregarded the certificate produced which had also showed
that it was the owner of copyright on 1 November 2013.  At [35]-[36] his Honour said:

35    I infer from this evidence that the contractual arrangements which were
entered into in order to bring Dallas Buyers Club into existence were made
by Dallas Buyers Club LLC. From this I conclude that it was the original
copyright owner. It might be noted that the only other possible candidate for
the role of producer would have to be Voltage. The ISPs did not submit that
the copyright was originally vested in any other entity apart from these two
companies. In any event, I conclude that the copyright in the film was
originally owned by Dallas Buyers Club LLC.

Signed by AustLII

- 26 -

36    In reaching that conclusion, however, I disregard the certificate produced by Mr Wickstrom which, according to him, showed that Dallas Buyers Club LLC was the copyright owner on 1 November 2013. Although that is factually correct, the certificate does not advance this case. It is not a certificate which 'states that a person was the owner of copyright in the work' within the meaning of s 126B(3) of the Copyright Act so the certificate does not have *prima facie* effect under that provision. All that the certificate says is that Dallas Buyers Club LLC claims to be the copyright owner. This is not sufficient but, given my conclusions, neither is it relevant.

His Honour's observations about the certificate were, strictly speaking, *obiter dicta* and were not necessary for the determination of the issues which had arisen before him in interlocutory proceedings.  The view expressed by his Honour at [36] that the certificate was not one within the meaning of s 126B(3) of the Copyright Act because the certificate was not one which "states that person was the owner of the copyright of the work", however, was given in a reasoned decision and should be followed unless persuaded that his Honour's decision was clearly wrong or plainly wrong: *Undershaft (No 1) Ltd v Federal Commissioner of Taxation* (2009) 175 FCR 150, [68]-[88]; *Rawson Finances Pty Ltd v Deputy Commissioner of Taxation* (2010) 189 FCR 189, [56]; see also *Prebble v Commissioner of Taxation* (2003) 131 FCR 130.  In that context it is relevant that his Honour did not appear to have the evidence about the system of registration in the United States that was in evidence in this proceeding, and that the issue before his Honour may not have been as fully argued as it was in this proceeding.

43    Whether or not a certificate or other document issued by a qualifying country "states that a person was the owner of copyright in the work" is to be determined, as his Honour in *Dallas Buyers Club* considered, by construing the certificate issued by the qualifying country and relied upon in the proceeding.  That is consistent with the effect of s 126B(4).  Whether a certificate "states that a person is the owner of copyright" in a work may appear from the certificate other than by a statement formulated by the words that a person was the owner. The purpose of s 126B(3) is to provide a mechanism to establish rebuttable evidence of ownership by production of a certificate from a qualifying country identifying the owner. The owner in the case of certificates issued in the United States is the person who claims to be the owner and, therefore, a certificate may be taken to state who is the owner by identifying the person who claims to be the owner.  Ownership may be stated to be, in other words, as was the case of the certificate relied upon by TPCi in this case, by a certificate identifying the person making the claim of ownership.  TPCi is clearly stated in the certificate as the claimant of ownership of the copyright work.  The certificate attests to the registration

Ex. 2
Page 188

Signed by AustLII

- 27 -

of TPCi as the person claiming ownership in a system of registration entitling persons claiming ownership to be registered as claimants of ownership and who do so subject to prosecution and penalty for perjury.   Section 126B(3) applies to certificates or other documents issued by a "qualifying country", which is defined in s 10 in terms to include the United States of America.  It would seem curious, therefore, that the legislature would intend to effect the purpose described in the Supplementary Explanatory Memorandum accompanying the enactment of s 126B(3) in terms which would exclude its application in the United States of America.   That, however, (as was accepted by senior counsel for Redbubble), would be the consequence of the argument that the certificate relied upon by TPCi was not one which "state[d] that a person was the owner of copyright in the work" as was accepted by his Honour in *Dallas Buyers Club*.  In those circumstances, I am satisfied that the certificate relied upon comes within the meaning of s 126B(3) of the Copyright Act and that I should not follow the *obiter* view to the contrary at [36] in *Dallas Buyers Club* as being clearly wrong or plainly wrong.

44      A consequence of that conclusion is that it is unnecessary to deal with some of the facts explored by senior counsel for Redbubble about authorship of the Pikachu work.  TPCi did not establish ownership by evidence of authorship of the Pikachu work although there was some evidence about how the Pikachu work came to be made.  It may be assumed that an individual employed by a company related to, but not being, TPCi was the author of the work, and that TPCi obtained an assignment of, or became entitled to, the copyright which was claimed in the certificate issued in accordance with Title 17 of the United States Code.  None of the evidence on those matters, however, established anything to the contrary of the claim by TPCi which was made in the certificate of being the owner of the copyright in the Pikachu work.  The presumptions effected by s 126B(3) of the Copyright Act may thus be relied upon to establish ownership by TPCi with effect from the date in the certificate which was stated to be 26 October 2012.

45      TPCi relied upon 29 images of works found on the Redbubble website as alleged infringements of TPCi's copyright in the Pikachu work.  The 29 images are reproduced as Annexure 3 to these reasons and show the Pikachu character in suit.  TPCi submitted that Redbubble infringed TPCi's copyright in the Pikachu work by (a) making the alleged infringing works available on the Redbubble website and thereby communicating the Pikachu work or a substantial part of it to the public, (b) offering or exposing Redbubble products to which the alleged infringing works had been applied for sale on the Redbubble website, or

Signed by AustLII

- 28 -

exhibiting the alleged infringing works and products in public by way of trade through the Redbubble website, and (c) offering to reproduce or authorise the reproduction of the alleged infringing works onto the products and thereby offering to reproduce or authorising the reproduction of the Pikachu work.  Another pleaded claim was not pressed at trial in light of the evidence.  TPCi had pleaded that Redbubble had infringed TPCi's copyright by creating a copy of the alleged infringing work on the Redbubble server to be displayed on the Redbubble website and thereby reproducing the Pikachu work, but that was not pressed because TPCi accepted that the evidence of Redbubble was that its servers were in America and therefore that no reproduction had taken place in Australia.

46      Section 36 provides that the copyright in an artistic work is infringed by a person doing any of the acts comprised in the copyright.  The owner of copyright in an artistic work has an exclusive right to communicate the work to the public: Copyright Act, s 31(1)(b)(iv).  For these purposes s 10(1) defines communicate to include to "make available online or electronically transmit" a work.  Senior counsel for Redbubble correctly conceded that the Redbubble reproductions in Annexure 3 of these reasons were electronically transmitted and made available online, but submitted that the communication was not by Redbubble but by the artist using the Redbubble website.

47      Section 22(6) of the Copyright Act provides that a communication is taken to have been made "by the person responsible for determining the content of the communication" but Redbubble submitted that it was not the person responsible for determining the content of the 29 examples of alleged infringing communications of the Pikachu work.  There is no further statutory definition of the expression "person responsible for determining the content" of the communication, and identification of the person who is responsible for determining the content of the communication is ultimately a question of fact.  In *Universal Music Australia Pty Ltd v Cooper* (2005) 150 FCR 1 it was held that the proprietor, manager or operator of a website that provided hyperlinks to remote websites on which sound recordings were hosted did not determine the content of the remote websites from which the communications had taken place.  In that case Tamberlin J at [75] drew a distinction between a capacity to prevent the hyperlinks from being added to a website and an ability to determine the content of a communication from a remote website.  At [76] his Honour said:

> It is the entitlement and role of the designer, operator and owner of a remote website to determine what is placed on that website and therefore what is the "content" of that website.  If the content includes infringing copyright material, then the

Signed by AustLII

- 29 -

responsibility for that lies with the person or persons who place that material on the
remote website and thereby make it available for transmission to the public.  This is
consistent with the "Digital Agenda Copyright Amendments: Exposure Draft and
Commentary" (February 1999).

The importance of the facts in identifying the person responsible for determining the content
of the communications may be seen also from the decision in *Roadshow Films Pty Ltd v iiNet
Ltd* (2011) 194 FCR 285; *Roadshow Films Pty Ltd v iiNet Ltd (No 2)* (2012) 248 CLR 42.

48   It may be necessary, in evaluating the facts, to consider in this context the technical,
contractual and other practical matters that may bear upon an ability to determine the content
of a communication.  The issue arose in the *Roadshow* case in the context of considering who
was responsible for making available infringing films over the internet using software
described as the BitTorrent system.  The evidence in that case was of a protocol which
permitted individual internet users to save a film in fragments on their computer.  The way in
which the software operated permitted others to request copies of films which would be
provided by fragments of the film that would subsequently be reassembled on the computer
from which the request had been made.  It was held in that case that the films had been made
available online each and every time a customer connected their computer to the internet and
that the person who had installed the software so as to respond to a request permitting the
communication was one of the persons responsible for the communication.   Emmett J
considered s 22(6) at [166] saying:

> Section 22(6) provides that the maker of a communication is the person responsible
> for determining the content of the communication. Section 22(6A) has the effect that
> a person is not responsible for determining the content of a communication merely
> because the person takes a step to gain access to what is made available online or to
> receive an electronic transmission. It is not correct to say that the sole causative
> factor in the transmission taking place and the content of the transmission is the
> request from the downloading computer. The process of electronic transmission is
> not simply one of a request and transmission, determined by the requesting party.
> The sender of the Film file is the party who determines the content of the
> communication, by having the BitTorrent Client software installed in a computer so
> as to respond to a request for a Film file, thus permitting the communication to occur.

Jagot J said at [337]-[338]:

> 337.   iiNet's final argument may be rejected immediately.   There may be more
> than one person responsible for determining the content of a communication.
> On the evidence the iiNet users downloaded the appellants' films from the
> swarm using the BitTorrent protocol.   The iiNet users made those films
> available online by storing the copy on their computers with the BitTorrent
> protocol activated so that the films became available on connection of the
> computer to the internet.   By this means peers in the swarm seeking to
> download that film using the BitTorrent protocol could obtain by electronic

Signed by AustLII

- 30 -

transmission copies of pieces or fragments of the film from the iiNet user's computer.  On the evidence, the DtecNet agent (operating as a BitTorrent client or peer in the swarm) did obtain copies of pieces or fragments of film from the computer of iiNet users by electronic transmission.

338.   iiNet's submissions on this point assume that a person in the position of the iiNet user, having once downloaded a film, has no further control of or even involvement in the sharing of that film over the internet by peers in the swarm. That assumption is incorrect. The iiNet user, as the evidence from the DtecNet agent in this case proved, must have continued to store the film on the computer, continued the active operation of the BitTorrent protocol on the computer, and either continued to connect the computer to or took no step to disconnect the computer from the internet. By taking these steps, the iiNet user is responsible for determining the content of any communication of that film (or a piece or fragment of it) to the DtecNet agent and, by inference, other peers in the swarm. The other peer requesting the piece or fragment may also be responsible for determining the content but that fact does not take the iiNet user outside the scope of the definition of "communicate" as provided for in s 22(6) and (6A) of the *Copyright Act*.

At [685] Nicholas J said:

The respondent argued that the evidence established that iiNet users who transmitted pieces of the appellants' films in response to requests issued by DtecNet did not electronically transmit such pieces because they did not determine the content of the relevant transmission: see s 22(6) of the Act. This argument must be rejected because it is factually incorrect and contrary to authority. The content of the relevant communication is determined by the person who responds to the request, not the person who makes it, because it is the person who responds to the request who determines the content of the response. The respondent's argument mirrors an argument that was put on behalf of the copyright owners in *Cooper* which was rejected by the trial judge but not relied upon in the appeal: see *Universal Music Australia Pty Ltd v Cooper* (2005) 150 FCR 1 at [69]-[74] per Tamberlin J.

In the present case Redbubble does not provide the content of the communications in the sense of being the originator of any of the 29 images on its website said to be infringements of the Pikachu work.  In each case the originator was the artist who had placed the image on the Redbubble website.  Redbubble, however, was responsible for determining that content through its processes, protocols and arrangements with the artists.  Redbubble's position is not like that of an internet provider.  Redbubble is the host of the website with the infringing material.  It has a user agreement with artists which deals with matters including the possibility of infringing materials, an IP policy, and a team dedicated to deal with impermissible content.

49    The final element to consider is whether there has been an infringement by reproduction in Australia.   In that connection an infringement may be actionable even though the communication which occurred in Australia may have originated from outside Australia.  In *Roadshow* Nicholas J at [663] said:

Signed by AustLII

- 31 -

It is the combined effect of ss 101 and 86(c) which requires that there be an electronic transmission made by a person in Australia to the public. The fact that the public for this purpose includes the public outside Australia makes it clear that the transmission need not begin and end in Australia. Further, while the act of communication must be done in Australia, it need not be done by a person who is physically in Australia. A person who is physically outside Australia who makes a film available online to the public in Australia, does the act referred to in s 86(c) in Australia. And if that person electronically transmits the film to the public in Australia from outside Australia he or she likewise does the act referred to in s 86(c) in Australia.

In *TVBO Productions Ltd v Australian Skynet Pty Ltd* (2009) 82 IPR 502, Foster J said at [51]-[52]:

51. Having regard to the means deployed by the fourth respondent to transmit to Australia Episode 5 of *Twin of Brothers*, it seems to me that it communicated by electronic transmission that episode to the public in Australia. It caused the requisite signals to be transmitted from its base station in Taiwan to subscribers of the first respondent's pay television service within Australia. It determined the content of the communication (see s 22(6) of the Act). It was not a broadcast within the meaning of that word as defined in s 10 of the Act.

52. The fourth respondent's transmission emanated from Taiwan, but this circumstance does not absolve it from liability. The transmission was received by pay TV subscribers within Australia. The fourth respondent did not have a licence to transmit that episode to the first respondent's subscribers within Australia. I find that, unless restrained, the fourth respondent will, in all probability, repeat this conduct.

The communications may, in the present case, have originated from Redbubble from outside Australia but the infringing communications occurred in Australia.

50    The second claim of infringement was that the works reproduced on the Redbubble website were infringements by sale or other dealing. Section 38 of the Copyright Act provides:

**Infringement by sale and other dealings**

(1) Subject to Division 3, the copyright in a literary, dramatic, musical or artistic work is infringed by a person who, in Australia, and without the licence of the owner of the copyright:

(a)    sells, lets for hire, or by way of trade offers or exposes for sale or hire, an article; or

(b)    by way of trade exhibits an article in public;

if the person knew, or ought reasonably to have known, that the making of the article constituted an infringement of the copyright or, in the case of an imported article, would, if the article had been made in Australia by the importer, have constituted such an infringement.

(2) For the purposes of the last preceding subsection, the distribution of any articles:

Signed by AustLII

- 32 -

    (a)    for the purpose of trade; or

    (b)    for any other purpose to an extent that affects prejudicially the owner of the copyright concerned;

shall be taken to be the sale of those articles.

(3)    In this section:

"*article*" includes a reproduction or copy of a work or other subject-matter, being a reproduction or copy in electronic form.

Infringement of s 38 requires TPCi to establish a relevant dealing by Redbubble of an article in Australia with requisite actual or constructive knowledge. An article for these purposes includes a reproduction or copy of a work in electronic form: Copyright Act, s 38(3).

51    The onus of proving the absence of the licence of the owner of the copyright in relation to such an infringement is upon the party asserting the infringement: see *Avel Pty Ltd v Multicoin Amusements Pty Ltd* (1990) 171 CLR 88, 94-95. Redbubble admitted for these proceedings, however, that it was not directly authorised or licenced by TPCi or the Pokémon company or Nintendo. Ms Long also gave direct evidence that Redbubble was not an authorised licensee of TPCi. The electronically generated pictures of the articles were available for sale through the website by fulfillers in different parts of the world, particularly in America, and also in Australia, initially from one place, and subsequently from a second place. Redbubble submitted, however, that TPCi had not established either a relevant dealing in Australia or the requisite knowledge required by the provision. It was submitted for Redbubble that its system of a marketplace, including its terms and conditions of sale to any reader, would make clear that there was no article on the Redbubble website that was "for sale in any sense".

52    The prohibition in s 38 is not as narrow as Redbubble submitted. Infringement is not established by "any" dealing with an artistic work, but an infringement is not limited to those dealings constituting a sale by a defendant in Australia. It extends to all of the dealings expressly described in the provision, including the offering or exposing for sale and the exhibiting of an article in public by way of trade. In this case articles had been exhibited in public by way of trade within the meaning of s 38(1)(b). Whatever the terms of trade may be through the terms and conditions of sale adopted by Redbubble, it has exhibited articles in public by projecting images on products which were able to be sold to potential customers. That was done by way of trade by Redbubble. The URL and screenshot of the articles exhibited in Annexure 3 are of specified articles exhibited in public for sale through the terms

Signed by AustLII

- 33 -

and conditions governing the transaction between the end user, the artist and Redbubble. Items 1-3, 5-12, 14-15, 20-22, 25, 27 and 29 in Annexure 3 to these reasons are of images exhibited in public by way of trade for application to t-shirts. Items 4 and 18 exhibit images for application as stickers and items 23 and 24 are for iPhone cases. Each is an article, albeit in an electronic form, as contemplated by the extended definition in s 38(3).

53      Redbubble also contended that TPCi had not established the requisite actual or constructive knowledge required to establish the infringement of s 38(1). By this provision there will be an infringement of the copyright in an artistic work by certain dealings where the person had actual or constructive knowledge that the article dealt with constituted an infringement of the copyright. The knowledge required for these purposes was that described by von Doussa J in *Milpurrurru & Ors v Indofurn Pty Ltd & Ors* (1994) 54 FCR 240 at 257 in the context of s 37, where his Honour said:

> "Knowledge" for the purposes of s.37, refers to notice of facts such as would suggest to a reasonable person having the ordinary understanding expected of persons in the particular line of business that a breach of copyright was being committed: *Apple Computer Inc. and Anor v Computer Edge Pty Ltd and Another* (1984) 1 FCR 549 at 561-562; *Kalamazoo (Aust.) Pty Ltd v Compact Business Systems Pty Ltd and Others* (1985) 95 FLR 101 a 126-127 and *R.C.A. Corporation v Custom Cleared Sales Pty Ltd (1978) 19 ALR 123*. By virtue of the *Copyright Amendment Act 1991*, s.3, it is no longer necessary to establish actual knowledge. Constructive knowledge is sufficient. Knowledge of the law is not required. It is sufficient that there be actual or constructive knowledge that intellectual property rights would be infringed, without knowing the precise nature of those rights: *Star Micronics Pty Ltd and Anor v Five Star Computers Pty Ltd and Others (t/a Computerfair)* (1990) 18 IPR 225 at 235-236. The knowledge of Mr Bethune is to be imputed to Beechrow: see the authorities discussed in *Beach Petroleum NL and Another v Johnson and Others* (1993) 43 FCR 1 at 24ff.

Redbubble submitted in this context that there was nothing in existence about which it could have the requisite actual or constructive knowledge, and that having been put on notice by letter of 25 November 2015 was insufficient to establish actual or constructive knowledge.

54      It may be accepted, as was submitted for Redbubble, that knowledge is a matter that must be specifically pleaded and particularised: *Federal Court Rules 2011* (Cth), r 16.43; *Lee v Westpac Banking Corp* [2015] FCA 467. The pleadings and particulars in this case relied upon correspondence between the parties and the fact of the commencement of the proceedings to have put Redbubble on notice sufficient to establish actual or constructive knowledge. An affidavit was sworn by Mr James Norman Toy on behalf of Redbubble which set out the correspondence between the parties between 2011 and 2014. Mr Toy was at the time the Assistant General Counsel for the Redbubble group of companies including

Signed by AustLII

- 34 -

Redbubble.  He deposed to TPCi having sent to Redbubble a letter dated 31 January 2011 identifying three artworks on the Redbubble website that were alleged to be infringements of the Pokémon trademark and copyrighted characters.  That correspondence had occurred before Mr Toy joined Redbubble and he could not locate any record showing any response from Redbubble to that letter, but he deposed to the fact of the letter having been received by Redbubble.  On 6 January 2012 TPCi sent Redbubble a notice complaining about infringement of copyrighted work described as being the "world-famous and copyrighted Pokémon intellectual property and more specifically Pokéballs and Pikachu" in a collection of artworks on the Redbubble Website (although Mr Toy remarked that the notice did not identify any specific artworks).  Other correspondence followed but there was a lengthy gap between 22 August 2014 and 26 November 2015.  On the latter date, however, the external legal representatives acting for TPCi sent a letter to Redbubble complaining about infringement of copyright "in all Pokémon characters, including 30 characters" that were specifically identified.  That letter identified conduct which was claimed, amongst other things, to be the sale or offering for sale of infringing images on Redbubble products within the meaning of s 38 of the Copyright Act.  One of the types of products specifically identified related to the Pikachu character which was said in the letter to be featured on the website and offered for sale on Redbubble products.  There was further correspondence between the parties between 3 December 2015 and 14 April 2016 when TPCi commenced proceedings.  By 25 November 2015 Redbubble knew, or ought reasonably to have known, that its exhibiting of articles in public by way of trade would have constituted an infringement on the hypothesis contemplated by s 38(1).  Infringement pursuant to s 38(1) is established where the actual or constructive knowledge is either that the making of the article constituted an infringement, or that the article would have constituted an infringement on the hypothesis that it had been made in Australia by an importer.

55      The third claim of infringement was that Redbubble authorised the reproduction of the Pikachu work, or a substantial part of it, when it arranged for the fulfillers to make in Australia items bearing each of the artwork in Annexure 3 to these reasons.  The infringement of authorisation assumes that there was a primary infringer which another has authorised.  Section 36 of the Copyright Act provides:

**Infringement by doing acts comprised in the copyright**

(1)     Subject to this Act, the copyright in a literary, dramatic, musical or artistic work is infringed by a person who, not being the owner of the copyright, and

Ex. 2
Page 196

Signed by AustLII

- 35 -

without the licence of the owner of the copyright, does in Australia, or authorizes the doing in Australia of, any act comprised in the copyright.

(1A)   In determining, for the purposes of subsection (1), whether or not a person has authorised the doing in Australia of any act comprised in the copyright in a work, without the licence of the owner of the copyright, the matters that must be taken into account include the following:

(a)   the extent (if any) of the person's power to prevent the doing of the act concerned;

(b)   the nature of any relationship existing between the person and the person who did the act concerned;

(c)   whether the person took any reasonable steps to prevent or avoid the doing of the act, including whether the person complied with any relevant industry codes of practice.

(2)   The next three succeeding sections do not affect the generality of this section.

The evidence of primary infringement in this case included the sale in Australia of two stickers and a t-shirt bearing an infringing work made in Australia by Australian fulfillers. Mr Kovalev was cross-examined on these items and accepted that there had been some sales in Australia of items produced by fulfillers in Australia with images claimed to be infringements. The transcript of the Redbubble 2016 annual general meeting recorded its business expansions, including the appointment of new fulfillers in Australia described in the transcript as localising Redbubble's "direct-to-garment tee-shirt and hoodie business into Australia". That was consistent also with Redbubble's announcement to the Australian Stock Exchange of two Australian fulfillers on a world map showing "Fulfiller Expansion Over Time". It was accepted for Redbubble that a person outside Australia could authorise acts of infringement within Australia (see *Cooper v Universal Music Australia Pty Ltd* (2006) 156 FCR 380 at [11], [134]) but it was submitted that the conduct of Redbubble when considered "overall in the totality" did not amount to authorisation as explained by the relevant authorities.

56   In *University of New South Wales v Moorhouse* (1975) 133 CLR 1 Gibbs J said at 12 that a person "cannot be said to authorize an infringement of copyright unless [the person] has some power to prevent it". His Honour went on to consider the authorities and at 13 said:

It seems to me to follow from these statements of principle that a person who has under his control the means by which an infringement of copyright may be committed - such as a photocopying machine - and who makes it available to other persons, knowing, or having reason to suspect, that it is likely to be used for the purpose of committing an infringement, and omitting to take reasonable steps to limit its use to legitimate purposes, would authorize any infringement that resulted from its use.

Signed by AustLII

- 36 -

These principles were subsequently elucidated by the enactment of s 36(1A) of the Copyright Act: see also *Universal Music Australia Pty Ltd v Sharman Licence Holdings* (2005) 220 ALR 1 at [403]; *Cooper v Universal Music* (2006) 156 FCR 380 at [20] and [136]; see also Sterling and Carpenter, *Copyright Law in the United Kingdom and the Rights of Performers, Authors and Composers in Europe* (Legal Books Pty Ltd, 1986), [503]. The Redbubble website, and its interface with Google, was largely automated and was intended to have no input from Redbubble, but in *Cooper* Branson J expressed the view at [43] that it was immaterial to whether there had been authorisation that a website operated automatically. The alleged infringer in that case did not control the usual way in which links were added to the site and the Full Court upheld the decision of the primary judge that Mr Cooper was liable for authorising copyright infringement. At first instance Tamberlin J had said at 150 FCR 1 at [85]-[86]:

85    The words "sanction" and "approve" are expressions of wide import. Cooper, in my view, could have prevented the infringements by removing the hyperlinks from his website or by structuring the website in such a way that the operators of the remote websites from which MP3 files were downloaded could not automatically add hyperlinks to the website without some supervision or control by Cooper. The evidence of Professor Sterling, who was called on behalf of the applicants, is unchallenged, and suggests that a website operator is always able to control the hyperlinks on his or her website, either by removal of the links or by requiring measures to be taken by the remote website operator prior to adding a hyperlink. A person cannot create a hyperlink between a music file and a website without the permission of the operator of the website, because access to the code required to create the link must occur at the level of the website. The Cooper website employed a "CGI-BIN" script to accept hyperlink suggestions from visitors to the website. By virtue of this script, such suggestions were automatically added to the website without the intervention of Cooper. The evidence demonstrates that alternative software was in existence that would have enabled a third party to add a hyperlink to a website, but which required the consent or approval of the website operator before such hyperlinks were added.

86    I note that Mr Speck, in cross-examination, agreed that Cooper could not control whether any particular sound recording remained on the internet or on a remote website. However, this is not the issue. The issue is whether Cooper had sufficient control of his own website to take steps to prevent the infringement. In my view, Cooper clearly did have sufficient control regarding both the user accessing his website and the remote operator placing hyperlinks on the website.

On appeal Branson J said at 156 FCR 380 at [41]-[53]:

41    I therefore reject the contention that unless Mr Cooper had power, at the time of the doing of each relevant act comprised in a copyright subsisting by virtue of the Act, to prevent its being done, he had no relevant power within the meaning of s 101(1A)(a). I conclude that, within the meaning of the paragraph, a person's power to prevent the doing of an act comprised in a

Signed by AustLII

- 37 -

copyright includes the person's power not to facilitate the doing of that act
by, for example, making available to the public a technical capacity
calculated to lead to the doing of that act. The evidence leads to the
inexorable inference that it was the deliberate choice of Mr Cooper to
establish and maintain his website in a form which did not give him the
power immediately to prevent, or immediately to restrict, internet users from
using links on his website to access remote websites for the purpose of
copying sound recordings in which copyright subsisted.

42      I conclude that, within the meaning of s 101(1A)(a), Mr Cooper had power to
prevent the copying in Australia of copyright sound recordings via his
website. He had that power because he was responsible for creating and
maintaining his MP3s4FREE website. As stated above, the principal content
of the website comprised links to other websites and files contained on other
servers. Senior counsel for Mr Cooper conceded that, in effect, the
overwhelming majority of the files listed on the website were the subject of
copyright. The website was structured so that when a user clicked on a link to
a specific music file a copy of that file was transmitted directly to the user's
computer.

43      It is immaterial, in my view, that Mr Cooper's website operated
automatically in the sense that, although he could edit links on the site, he did
not control the usual way in which links were added to the site. The evidence
also leads to the inexorable inference that it was the deliberate choice of
Mr Cooper to establish his website in a way which allowed the automatic
addition of hyperlinks.

[…]

53      The amended notice of appeal of E-Talk and Mr Bal remained confusingly
drawn notwithstanding the deletion of most of the original grounds of appeal.
However, the appeal was argued without objection on the basis that the
primary judge erred:

(a)      in failing to find that, by reason of s 112E of the Act, E-Talk and
Mr Bal were to be taken not to have authorised any infringement of
copyright in sound recordings by users of Mr Cooper's website; or
alternatively

(b)      if s 112E had no relevant operation, in finding that E-Talk and
Mr Bal had authorised any relevant infringing conduct.

Kenny J said at [148]-[153]:

148     Bearing in mind the findings of the primary judge that were not challenged
on appeal, the hyperlinks on the website operated by Mr Cooper permitted an
internet user to access the sound recordings stored in the MP3 files on remote
computers. Every time an internet user activated a link on the website, which
was effective to download a sound recording in Australia that was stored on a
remote computer, there was an infringing act. Mr Cooper created and
operated the website. He could have prevented these infringing acts, either by
not establishing the link in the first place or, subsequently, by disabling or
removing the link. The fact that internet users could make other online copies
of the sound infringements as a consequence of effective activations of the
links on the website operated by Mr Cooper.

149     In the circumstances, it was not reasonably open to Mr Cooper to claim mere

Signed by AustLII

- 38 -

indifference to the use internet users made of the website. The findings at first instance as to the nature, the contents and structure of the website, which were not seriously contested, plainly supported the further finding that Mr Cooper deliberately designed the website to facilitate infringing downloading of sound recordings. Mr Cooper's position was, in this respect, entirely different from that of the manufacturers and vendors of blank tapes, which was considered in *Australian Tape Manufacturers* 176 CLR 480.

*The nature of the relationship between Mr Cooper and the internet user and operators of remote websites*

150     There was no error in the primary judge's finding that Mr Cooper established a relationship between him and the remote website operators when he created the facility for them to put links on the website that he operated. This was a relevant and direct relationship. Mr Cooper also created relationships with relevant internet users when he provided facilities to initiate direct downloading of the sound recordings at these remote websites. The existence of a relevant relationship is also supported by the primary judge's finding that Mr Cooper derived financial advantage from it. That is, he was able to enter into commercial arrangements on account of internet users' patronage.

*Whether Mr Cooper took reasonable steps to prevent or avoid that infringing act*

151     The finding made by the primary judge entitled him to conclude that Mr Cooper did not take reasonable steps to prevent or avoid the infringements that occurred in the downloading of sound recordings. His Honour found, and it is not disputed, that the disclaimers did not accurately state the law and that Mr Cooper did not take any steps "to ascertain the legality of the MP3s to which the hyperlinks related or the identity of the persons submitting the MP3s": see *Universal Music* 150 FCR 1 at [87].

*Conclusions with respect to Mr Cooper*

152     So far as internet users and remote website operators were concerned, the website was in substance an invitation to use the hyperlinks provided and to add new links in order that sound recordings could be downloaded from remote websites, and a principal purpose of the website was to enable infringing copies of the downloaded sound recordings to be made. The fact that the website also carried a warning that some downloading could be illegal did not lessen the force of the invitation. Mr Cooper countenanced the specific infringing downloading and copying that occurred as a direct consequence of activating the hyperlink on the website operated by him. For the reasons stated below at [168]-[170], Mr Cooper's activities took him outside the protection of s 112E.

153     I agree with Branson J that Mr Cooper authorised the infringement in Australia of the Record Companies' copyright in sound recording by authorising internet users to make copies of sound recordings in which copyright subsisted, and operators of remote websites to communicate these sound recordings to the public.

In that case the court also held that the internet service provider ("E-Talk") had also authorised the infringements which had taken place via Mr Cooper's website.

Signed by AustLII

- 39 -

57    In reaching that conclusion the Court considered the business conducted by the internet service provider which hosted Mr Cooper's website.   Branson J said at [58]-[65] (see also Kenny J at [154]-[158]):

58    The above submission is untenable. No challenge is made to the findings of the primary judge that:

(a)    E-Talk (which traded as Comcen Internet Services), together with Com-Cen, conducted an internet service provider business under the name Comcen;

(b)    The Comcen business hosted Mr Cooper's website;

(c)    E-Talk was aware of the high level of usage of Mr Cooper's website and of the copyright problems arising therefrom;

(d)    Mr Cooper received free web-hosting from Comcen in return for the display on his website of the Comcen logo with a hyperlink to the Comcen website, www.comcen.com.au; and

(e)    E-Talk took no steps to prevent the acts of infringement which took place via Mr Cooper's website.

59    The evidence before his Honour established that the registered owner of the domain name www.comcen.com.au was E-Talk.

60    In my view, the above findings of the primary judge were sufficient to support the primary judge's conclusion that E-Talk was unable to invoke the protection afforded by s 112E. His Honour did not find that E-Talk authorised an infringement of copyright in a sound recording just because another person used its facilities to do something the right to do which is included in the copyright.

*Did E-Talk Authorise?*

61    In determining whether E-Talk authorised the doing in Australia of any act comprised in the Record Companies' copyrights it is necessary to take into account, together with other relevant things, the matters identified in s 101(1A) of the Act (see [15] above).

62    As all of the relevant acts of copyright infringement took place via Mr Cooper's website, I conclude that E-Talk had power to prevent the doing of the acts concerned because, together with Com-Cen (of which Mr Bal was also the controlling mind), it had the power to withdraw the hosting of Mr Cooper's website (s 101(1A)(a)).

63    I would place no weight on the, at best, remote relationships between E-Talk, on the one hand, and the users of Mr Cooper's website and the remote providers of music files on the other hand (s 101(1A)(b)).

64    E-Talk could have, but did not, take reasonable steps to prevent or avoid the doing of the acts of infringement (s 101(1A)(c)). Rather than withdrawing hosting of Mr Cooper's website, or otherwise placing pressure on Mr Cooper to stop his website being used for the predominant purpose of copyright infringements, E-Talk sought to achieve a commercial advantage from advertising on Mr Cooper's website.

Signed by AustLII

- 40 -

65    In the circumstances, in my view, no error has been shown to affect the conclusion of the primary judge that E-Talk and Mr Bal, its controlling mind, authorised the acts of copyright infringement which resulted from the use of Mr Cooper's website. At the least, E-Talk countenanced the acts of infringement (see *Australasian Performing Rights Association Ltd v Jain* 26 FCR 53 and [20] above).

The internet service provider in *Cooper* was aware of the high level of usage of Mr Cooper's website and of the copyright problems arising from it. Mr Cooper received free web-hosting in return for advertising and the internet service provider took no steps to prevent the infringement taking place through Mr Cooper's website. The internet service provider had the power to withdraw hosting and therefore, could have prevented the infringement, but did not take reasonable steps to prevent the infringement by Mr Cooper in order to achieve a commercial advantage by advertising the website. The same may be said about Redbubble.

58    The first matter required by s 36(1A)(a) to be taken into account in determining whether or not Redbubble authorised the doing in Australia of any act comprised in the Pikachu work without the licence of TPCi is the extent (if any) of Redbubble's power to prevent the doing of the act concerned. In this case Redbubble had the power to prevent the infringements which occurred by articles being exhibited on the website by way of trade. Redbubble had designed and operated the system by which the images were uploaded, by which the images were searched for by potential customers, by which they could be purchased by customers, and by which they were sent to fulfillers for manufacture. Redbubble was involved in every part of the development and operation of its system and had absolute power to control or alter any aspect of it. The evidence of Mr Kovalev given on behalf of Redbubble was of it having established a system, as part of its commercial enterprises, for the system to operate in "a completely automated fashion with no, or virtually no, human intervention on the part of Redbubble" once the system was established for Redbubble. The system was designed to Redbubble's specifications to operate as it did to achieve Redbubble's commercial objectives. Redbubble had complete control over how its system operated and was able to change it if it wished to do so. The system included an indexing system which enabled customers to locate works, including works infringing copyright in the Pikachu work. The system enabled customers to order articles printed with infringing works by accepting payment from customers, facilitating manufacture by the fulfillers, and keeping the customers updated on the status of any orders they had made. It was, as explained by Mr Kovalev, the Redbubble program that enabled a customer to perform a search on the Redbubble website which "will trawl the Redbubble website for tags and titles that match the search terms". The software

Signed by AustLII

- 41 -

created an index storing information with key word matches to enable fast searching.  Results
were displayed on the Redbubble website by relevance to the search terms and the customers
were able simply to select and arrange payment for any article directly on the Redbubble
website.  The customer could select the product to be purchased directly on the Redbubble
website with choices which included such variables as (where appropriate) the size or type of
the product.  The customer could view the purchase cart and confirm the quantity of the
product to be ordered.  The customer could select shipping options and could choose from
different methods of payment which could be effected simply by clicking the link marked
"pay".  A customer clicking "pay" would be redirected to a confirmation page which set out
the details of the order, including the estimated delivery date.  A customer would then receive
a confirmation email from Redbubble setting out the details of the order and providing an
order tracking number.  Redbubble did not itself manufacture, warehouse, dispatch, receive
or distribute any physical products ordered by the process, but Redbubble had a number of
third party fulfillers who fulfilled orders placed through the Redbubble website including
Australia. A third party fulfiller would be notified by Redbubble of a new order which would
then be processed by the fulfiller by manufacturing the requested product.  The third party
fulfiller was automatically chosen by the Redbubble software based on the product type and
the customer's delivery address.   The third party fulfiller would then send a request to the
Redbubble software once the product has been manufactured and was ready for shipment.
That prompted the Redbubble system to generate an email to be sent to the customer with the
order and shipping details provided to Redbubble by the third party fulfiller.

59      Redbubble also had in place systems to monitor the steps taken by the users of the website.
Mr Toy explained the operation of the team (referred to as the "content team") of employees
who were primarily responsible for administering the IP policy of Redbubble.  A task of the
content team was to review the artists' accounts on a weekly basis, including the account
histories, of all "[u]ploaders who have had an artwork moderated" in the preceding week,
whether as a result of a takedown notice, the proactive moderation activities of Redbubble, or
otherwise.   The content team would take one of a number of actions depending upon the
number and nature of the artwork which had been uploaded by the uploader that had been
moderated.   The action that could be taken by the content team included the sending of a
warning, the restricting of an account, the suspension or deletion of the account, or the
continuation of monitoring the uploader without restricting, suspending or deleting the
account for the time being.  Redbubble could, if it chose, have instituted measures to prevent

Signed by AustLII

- 42 -

users of the internet services from uploading the works by applying tags that would automatically prevent artists from using trademarked words. It could immediately have taken down or removed infringing material and could simply have filtered or blocked communications. Mr Toy said, as mentioned above, that Redbubble had considered whether automatically preventing artists from using trademarked words would be an appropriate way of preventing intellectual property infringement and other unlawful conduct but that a decision had been made that such an approach, although "easier, cheaper and requir[ing] less effort than adopting" the measures in fact adopted by Redbubble, "would have [had] the undesirable and disproportionate effect of preventing artists from using such words in legitimate, non-infringing ways and contexts". For present purposes the question, however, is not whether that decision is justified but whether that decision is indicative of the extent of Redbubble's power to prevent the doing of the acts constituting infringements.

60    The second matter required to be taken into account by s 36(1A)(b) is the nature of any relationship existing between the person alleged to have authorised the infringement and person, or persons, who did the act complained of. In this case it may be assumed both that the artists and the fulfillers are not employees of Redbubble and that they are, rather, third parties dealing with Redbubble at arm's length. The relationship between Redbubble and the fulfillers is thus a commercial relationship for mutual profit. Redbubble selected the fulfillers to make the articles ordered by customers and arranged for the payment for their work. It was in Redbubble's commercial interests to ensure that the fulfillers would produce product of sufficient quality to satisfy customers and to ensure control over the disbursement of payments of the amounts received from the end customer to the artists, the fulfillers and to Redbubble. Redbubble took a portion of the price of every sale of a product produced by a fulfiller. Mr Kovalev explained that a base amount for each product type on the Redbubble website was made up of an amount payable to Redbubble as a Redbubble fee being the "service fee Redbubble charges for hosting the marketplace and facilitating the transaction" and a fee payable to the fulfiller for the manufacture of the article by the third party fulfiller.

61    The third matter required by s 36(1A)(c) to be taken into account is whether Redbubble took any reasonable steps to prevent or avoid the infringements. Senior counsel for Redbubble described the question of the reasonableness of steps taken as being "a very wide landscape" and submitted that the steps Redbubble took were reasonable. Questions frequently arise, as Nicholas J observed in *Roadshow Films* (2011) 194 FCR 285 at [782], in the area of copyright law upon which minds might reasonably differ. In that case a decision not to

Signed by AustLII

- 43 -

suspend or terminate an account in response to a notice was held not to amount to authorisation of the infringement by a customer.  The mere fact of having a power does not make its use the only reasonable step to be taken for the purpose of s 36(1).  In *Roadshow Films Pty Ltd v iiNet Ltd (No 2)* (2012) 248 CLR 42 Gummow and Hayne JJ considered relevant to the question of reasonableness, the negative impact of the use of a power which would otherwise have prevented an infringement observing at [137]-[139]:

137    As indicated earlier in these reasons, the power of iiNet as an ISP with respect to the use of facilities provided to subscribers was limited by the nature of their commercial relationship; iiNet could not control the choice of its subscribers and other users to utilise the BitTorrent software, nor could iiNet modify the BitTorrent software or take down the appellants' films which were made available online.

138    At all material times iiNet had many thousands of account holders. Was it a reasonable step to require of iiNet that it monitor continually the activities of IP addresses to provide precise details of primary infringements that had been committed, and then take further steps to forestall further infringements? Warnings might or might not have that effect. Evidence was lacking of likely behaviour in that respect by users of ISP facilities. Further, with respect to the AFACT Notices, was it reasonable to expect iiNet to issue warnings or to suspend or terminate the contracts of customers when AFACT had not fully disclosed the methods used to obtain the information in the AFACT Notices? Those methods were disclosed only by the provision of expert evidence during the preparation of the case for trial.

139    In truth, the only indisputably practical course of action would be an exercise of contractual power to switch off and terminate further activity on suspect accounts. But this would not merely avoid further infringement; it would deny to the iiNet customers non-infringing uses of the iiNet facilities. And, in any event, in the absence of an effective protocol binding ISPs (and there is no such protocol) the iiNet subscribers whose agreements were cancelled by iiNet would be free to take their business to another ISP.

(Footnotes omitted).

In the Full Federal Court Emmett and Nicholas JJ both concluded that there had not been authorisation by a failure to take steps which if taken would have prevented the infringement: see *Roadshow Films v iiNet* (2011) 194 FCR 285 at [257]; [731]-[732].

62    It is important not to lose sight in this context of the function of taking into account the reasonable steps taken by a person said to have authorised an infringement. Section 36(1A)(c) is neither in form nor in effect a statutory defence to infringement by authorisation, but is, rather, a direction to take into account those steps taken by an alleged authoriser which were reasonable steps.  The task, therefore, is not to determine whether there may have been other reasonable steps which might have been taken but to ensure that

Signed by AustLII

- 44 -

the reasonable steps actually taken are considered when determining whether there had been authorisation of the infringement.  The submissions by the parties in respect of the reasonable steps taken by Redbubble were to some extent, however, not directed to the relevant task required by the provision.  TPCi focused upon other reasonable steps that Redbubble could have taken, in particular, that Redbubble could have automatically prevented artists from using trademarked words as tags.  Redbubble, for its part, emphasised the reasonableness of the steps it had taken.  In that context Redbubble submitted also that the parody and satire exception was relevant to a consideration of the reasonable steps taken by Redbubble because a blocking of certain tags would necessarily block examples of uses that were parodies or satires that would not be infringements.  Neither approach used by the parties is that required by s 36(1A)(c) which is directed to ensuring that any reasonable steps which have been taken by an alleged authoriser to prevent or avoid an infringement are taken into account in determining the factual inquiry into whether the infringement was authorised together with, of course, all other fact, matter and circumstance bearing relevantly and probatively upon the relevant statutory inquiry into whether there had been authorisation.  It may be accepted, therefore, both that there were other steps which Redbubble could have taken that might have been reasonable and that the steps actually taken by Redbubble were reasonable steps directed to preventing infringement.

63      There were, indeed, many reasonable steps taken by Redbubble directed to preventing infringement.  Chief amongst those was the considered, and publicly available, IP policy.  Redbubble was aware of the risk of intellectual property infringement occurring through the process it had set up, and had considered what steps it should take to prevent or minimise that from occurring.  The IP policy was an important, and a reasonable, step to that end.  The establishment of the content team was another reasonable step taken by Redbubble to prevent infringements.  The IP policy set out the process that could be followed by persons who considered that an artwork on the Redbubble website infringed their intellectual property or similar rights and could ask Redbubble to moderate the artwork.  A person who considered that his, her or its intellectual property or similar rights had been infringed could, as was described in the IP policy, send an email to a specific address at Redbubble with specified information describing the intellectual property, identifying the artwork on the Redbubble website claimed to be an infringement, and provide other information of a kind directed to seeking to have the infringing work taken down.  Redbubble also accepted and processed complaints which it received other than by that means, and had in place personnel to deal

Signed by AustLII

- 45 -

with takedown notices and other complaints of infringement.   The IP policy had procedures to permit a person uploading material to have their artwork moderated as a result of mistake or misidentification or wishing to have their artwork reinstated.   It had other proactive measures to discourage, prevent and penalise infringements and contraventions on its website, and, at least since December 2014, had had one or more anti-fraud software applications in place.

64    The reasonable steps taken by Redbubble also included those steps undertaken specifically in response to complaints of infringement by TPCi.   TPCi sent a letter on 31 January 2011 to Redbubble identifying three artworks on the Redbubble website which were alleged to infringe "the Pokémon trademark and copyrighted characters".   Nearly a year later, on 6 January 2012, TPCi sent a notification pursuant to the *United States Digital Millennium Copyright Act* ("DMCA"; c.f *Copyright Act*, Division 2AA, ss116AA-116AJ) complaining about works infringing copyright in Pokéballs and Pikachu.   The notice of 6 January 2012 followed a form prescribed by the DMCA which was referred to in Redbubble's IP policy. Redbubble responded on 8 January 2012 acknowledging that it recognised and respected the rights of others and that it had implemented a process to enable all rights holders to raise concerns about content on the Redbubble website.   That email went on to request, not unreasonably, that Redbubble be provided with the information described in its IP policy to ensure "that all rights [were] treated fairly while also ensuring that matters are dealt with swiftly".   To that end the email provided a convenient link in which to find the material sought for Redbubble to respond to the complaint.   It appears, however, that TPCi did not respond to that request by Redbubble to enable Redbubble to deal with TPCi's request in that manner.

65    On 10 October 2012 TPCi sent another takedown notice to Redbubble complaining about infringement of what was described as the world famous and copyrighted Pokémon intellectual property including Rattata, Tangela, Diglett, Sandshrew, Geodude, Eevee, Kudone, Hitmonlee, Hitmonchan, Squirtle, Slowpoke and Psyduck.   On 10 October 2012 Redbubble responded in the same terms as its email to TPCi the previous January.   The response of 10 October 2012 may have been computer generated but on the same day a follow up email was sent by Ms Caroline King, a former member of the content team of Redbubble, responding to TPCi stating, amongst other things:

> You have provided us with all the information to enable us to take down the relevant content in accordance with our policy…except, the URL you have provided is not

Signed by AustLII

- 46 -

functioning.  We kindly request that you provide us with the functioning URLs as described in our policy, so that we may identify the designs that you believe infringe the rights of the Pokémon Company International, Inc.

That follow up response was another reasonable step taken in the context of the policies and processes adopted by Redbubble to prevent infringement.  It resulted in TPCi identifying 14 artworks on 11 October 2012 with reference to URLs on Redbubble's website.  On that same day Ms King moderated the artworks and informed TPCi and the uploader.

66      On 16 January 2013 TPCi sent a takedown notice to Redbubble complaining about other infringement of copyright in respect of specified characters.  That notice gave nine specified URL references and resulted in the prompt creation of a "ticket" indicating that the issue would be considered and dealt with.  The following day, on 17 January 2013, Redbubble wrote to the relevant person at TPCi in respect of the complaint stating that the information in the complaint had been reviewed and that, in accordance with Redbubble's IP policy, the content referred to had been removed and the relevant end-user had been written to about the complaint and the removal of the content.  On 26 November 2015 a letter of demand was sent by the solicitors for TPCi in respect of alleged infringements, including of the Pikachu work.  It is not necessary to identify every other instance in the correspondence and dealings between Redbubble and TPCi which show other reasonable steps taken to prevent or avoid infringement, and it can be assumed that Redbubble acted promptly to prevent infringements in accordance with its policies.  It can also be assumed that Redbubble's business is not directed to profit by the infringement of intellectual property rights.

67      Whether Redbubble can be said to have authorised the infringing acts is a question of fact to be determined in part by the inferences to be drawn from its conduct: see *University of New South Wales v Moorhouse* (1974) 133 CLR 1, 21; *The Corporation of the City of Adelaide v Australasian Performing Rights Association Ltd* (1928) 40 CLR 481, 504; *Roadshow Films Pty Ltd v iiNet Ltd (No 2)* (2012) 248 CLR 42, 66, [60].  In the present case it may be assumed, as is clearly established from the facts, that Redbubble did not expressly authorise any infringement but that it took conscious, considered and reasonable steps, both proactively and responsively, to prevent infringements and to prevent the continuation of infringements.  The question, however, is whether the facts and relevant inferences establish constructive authorisation of infringement.  The business established by Redbubble carried the inherent risk of infringement of copyright of the kind complained of by TPCi.  It is true that Redbubble sought to mitigate the risk, but it was an inevitable incident of the business, as

Signed by AustLII

- 47 -

Redbubble chose to conduct it, that there were likely to be infringements.  It could have prevented them by taking other steps but for business reasons Redbubble chose to deal with the risk of infringement by a process that enabled the infringements to occur.  Such infringements were embedded in the system which was created for, and adopted by, Redbubble.  There may have been a sound commercial basis for Redbubble to manage the risks of infringement as it did, but in doing so it authorised the infringements which occurred.

68   Redbubble relied also upon s 41A of the Copyright Act in respect of those works reproduced in Annexure 3 numbered 1, 3, 4, 8 and 11 to 26 and submitted that each of those examples were non-infringing reproductions as fair dealings for the purpose of parody or satire within the meaning of s 41A.  That section was introduced into the Copyright Act in 2006: see *Copyright Amendment Act 2006* (Cth).  The courts had previously had occasion to consider whether burlesques and parodies might not constitute infringing reproductions: see S Ricketson, *The Law of Intellectual Property* (The Law Book Company, 1994), 198-203, [9.66]-[9.78]; see also Gillian Davies, Nicholas Caddick and Gwilym Harbottle *Copinger and Skone James on Copyright*, Volume One, (Thomson Reuters, 17th edition, 2016), [9-62]-[9-71]; J Lahore, *Copyright Law* (1988) 7195-7204; J.A.L. Sterling and M.C.L Carpenter, *Copyright Law in the United Kingdom* (Legal Books Pty Ltd, 1986), [505].  The relevance of parodies in copyright had then arisen in the context of determining whether works directly derived from another had good claims to be treated as new and independent works in their own right, such as in a parody of another, and not as infringing reproductions.  In *Glyn v Weston Feature Film Co* [1916] 1 Ch 261 Younger J had said at 268 "that no infringement of the plaintiff's rights takes place where a defendant [had] bestowed such mental labour upon what he has taken and has subjected it to such revision and alteration as to produce an original result"; see also *Williamson Music Ltd v Pearson Partnership & Another* (1987) FSR 97.  In that context Conti J had said in *TCN Channel 9 Pty Ltd v Network 10 Pty Ltd* (2001) 108 FCR 235 at [17] that the essence of parody is imitation "whereas satire is described as being a form of ironic, sarcastic, scornful, derisive or ridiculing criticism of vice, folly or abuse, but not by way of an imitation or take-off"; see also *AGL Sydney Ltd v Shortland County Council* (1989) 17 IPR 99, 105-6.

69   Section 41A of the Copyright Act now provides that a fair dealing will not constitute an infringement of copyright if the fair dealing is for the purpose of parody or satire.  Section 41A provides:

Ex. 2
Page 209

Signed by AustLII

- 48 -

### Fair dealing for purpose of parody or satire

A fair dealing with a literary, dramatic, musical or artistic work, or with an adaptation of a literary, dramatic or musical work, does not constitute an infringement of the copyright in the work if it is for the purpose of parody or satire.

Difficult questions of characterisation arise where a work has been used in a modified form. To qualify for the protection the use must be both fair and for the purpose of parody or satire where parody or satire is not "used as a shield to avoid intellectual work in order to benefit from the notoriety of the parodied (or satirised) work": see *Productions Avanti Cine-video v Favreau* (2012) 177 DLR (4th) 568 at 594 per Gendreau JA (Biron J concurring). In that case Rothman JA, agreeing with his colleagues, said at 575 that there was "an important line separating a parody of the dramatic work created by another writer or artist and the appropriation or use of that work solely to capitalize on to "cash in" on its originality and popularity".

70    It follows from these observations, and from the express terms of s 41A of the Copyright Act, that what must be shown for the protection to be relied upon is that the use made of the work was both fair and for the purpose of parody and satire, and not just that what was produced might in the eyes of some be a parody or satire. The relationship between a dealing as "fair" and the purpose as "parody" is apt to overlap, if not to be co-extensive, but the statutory protection in s 41A requires that there be established that the person dealing with the work did so for the purpose of parody. There was no evidence that any of the infringing works had been for the purpose of parody. Ms Long was cross-examined about a number of the images claimed to come within the exception afforded by s 41A in an affidavit to establish by that cross-examination that some of those images might be seen as humorous, satirical or parodies of the Pikachu work. It is doubtful whether the evidence sought to be adduced in cross-examination of Ms Long, could, if it had been given, have established that the purpose of the person making the alleged parody or satire had made it for that purpose. However, none of the examples relied upon as parodies or satires were shown to be uses of the Pikachu work for the purpose of parody. Each, rather, appears on its face to be a use of the Pikachu work for profit. That some of the infringing works may be humorous, or even satirical or parodies, does not establish that the use was for a purpose where it may fairly be concluded that the purpose was not the parody or satire but the commercial exploitation of the original work in modified form.

Ex. 2
Page 210

Signed by AustLII

- 49 -

71    It becomes necessary to consider what, if any, remedy is to be granted.  TPCi sought damages
in the Australian Consumer Law claim calculated at $44,555.84 for each assumed lost sale at
a royalty rate of 7.5%.  The monetary claim in the copyright claim was of a nominal amount
of less than $50, although it was calculated by counsel for Redbubble at less than 10 cents.
Senior counsel for Redbubble correctly accepted that declarations of infringement would be
appropriate  if  infringement  were  found.    There  will,  therefore,  be  declarations  of
infringement in the terms sought and in accordance with these reasons.  The parties will be
directed to submit a proposed form of order within 2 days of publication of these reasons.

72    The  claim  for  injunctive  relief  sought  by  TPCi  against  Redbubble  is  more  problematic.
The  terms  of  the  injunction  sought  in  the  statement  of  claim  in  respect  of  the  breach  of
copyright  are  not  apt  to  apply  to  a  case  of  authorisation  of  infringement.    However,  the
evidence  in  this  proceeding  has  not  established  the  threat  of  repeated  infringement  if  the
conduct were found to have infringed TPCi's rights.  The evidence for Redbubble was that of
seeking to comply with its obligations under law and it has amended its program so that there
was no evidence before the Court of a threat of further infringement.  In those circumstances
there will be no injunction granted.

73    The  claim  for  damages,  which  was  calculated  at  $44,555.84,  was  based  upon  a  number  of
assumptions.  Ms Eggleston, on behalf of TPCi, sought to identify the number of units sold
through the Redbubble website which were tagged or titled with "Pokémon" or the character
names of the image.  Ms Eggleston was the Senior Manager, Licensing for TPCi and had
access to the books and records kept and maintained by TPCi in the ordinary course of its
business.  She had also been provided with a document discovered by Redbubble in the
proceedings setting out the quantity of sales in certain product categories, the total gross sales
of products in those categories to consumers in Australia, and the total service fees paid to
Redbubble in respect of those sales in Australian dollars.  Ms Eggleston then calculated the
average royalty rate of TPCi with reference to the range of products in respect of which it
would be entitled to a royalty.  The amount of $44,555.84 claimed by way of damages was
essentially the application of the royalty rate of 7.5% upon the assumption that TPCi would
have received a royalty of that amount upon an authorised sale for the same item sold through
Redbubble.

74    Senior  counsel  for  TPCi,  however,  correctly  conceded  that  the  claim  was  based  upon  an
assumption of "a one to one diversion for sales" and, therefore, correctly accepted that there

Signed by AustLII

- 50 -

would be a need for some discount because a one to one diversion for sales was unlikely to
have been the case.  Indeed the evidence was that many, if not all, of the items sold through
the Redbubble website were unlikely to be items in respect of which TPCi would receive a
royalty.  There was no evidence to establish that many of the sales were of the kind of items
which were available for sale and commercialisation within the Pokémon universe.  Many of
the items sold through the Redbubble website involved a "mash up" of images, such as the
combination of Pikachu and Homer Simpson.  The finding of an infringing use of a work, or
an impermissible representation in trade, does not necessarily lead to the conclusion that the
sale made by the infringement or upon the misrepresentation was necessarily a sale that
would have been made by the wronged party.  The unreliability of such an assumption in this
case can be seen from the fact that the infringements were in the use of the image in mash ups
in, and in items that were not sold or authorised for sale by TPCi.  The evidence thus did not
support a confident finding of damages in the amount claimed.  Such damages as may be
assumed to have been suffered must, at best, be nominal.  The same is true, as was conceded
by senior counsel for TPCi, of the damages claim for breach of copyright under s 15(2) of the
Copyright Act.  The amount had at one point been miscalculated as $508 by multiplying the
amount claimed from the particular date by 75.  It was then miscalculated as $50 by
multiplying the relevant number of items by .75.  The amount ought, however, have been
calculated by multiplying the relevant number of units by .075, resulting in a damages claim
of about 10 cents.

75      TPCi also sought, and pressed, a claim for additional damages under s 115(4) of the
Copyright Act.  That section provides:

           (4)     Where, in an action under this section:

           (a)      an infringement of copyright is established; and

           (b)      the court is satisfied that it is proper to do so, having regard to:

                    (i)      the flagrancy of the infringement;  and

                    (ia)     the need to deter similar infringements of copyright;
                             and

                    (ib)     the conduct of the defendant after the act
                             constituting the infringement or, if relevant, after the
                             defendant was informed that the defendant had
                             allegedly infringed the plaintiff's copyright; and

                    (ii)     whether the infringement involved the conversion of a work
                             or other subject-matter from hardcopy or analog form into a
                             digital or other electronic machine-readable form; and

Signed by AustLII

- 51 -

    (iii)    any benefit shown to have accrued to the defendant by reason of the infringement; and

    (iv)    all other relevant matters;

the court may, in assessing damages for the infringement, award such additional damages as it considers appropriate in the circumstances.

The award of damages under this section is discretionary with the matters to be taken into account being those identified in s 115(4)(b).

76    The fact that only nominal damages may be awarded is no bar to a claim for additional damages properly brought forward: *Allam v Aristocrat Technologies Australia Pty Ltd* (2012) 95 IPR 242 at [410]; see also *Aristocrat Technologies Australia Pty Ltd v DAP Services (Kempsey) Pty Ltd* (2007) 157 FCR 564 at [54]. Amongst the matters to consider in deciding whether to award additional damages is the flagrancy of the infringement and the need to deter similar infringements. In *International Writing Institute v Rimila Pty Ltd* (1994) 30 IPR 250 Lockhart J said at 255:

> The term "flagrancy" has been variously defined in the reported cases. It was described in *Prior v Lansdowne Press Pty Ltd* (1975) 29 FLR 59 at 65 as "calculated disregard of the plaintiff's rights, or cynical pursuit of benefit". In *Ravenscroft v Herbert & New English Library Ltd* [1980] RPC 193 it was described at 208 as "the existence of scandalous conduct, deceit and such like; it includes deliberate and calculated copyright infringement".

> Plainly, flagrancy is not established by proof of mere knowledge of copying. If it were, then every instance of infringement under s 37 and s 38 would attract additional damages because knowledge of copying or of infringement is an essential element of any act of secondary infringement under those sections.

In the present case it was contended for TPCi that the flagrancy of the infringement was to be seen from TPCi having put Redbubble on notice of an infringement and then having failed to rectify its conduct but having taken what senior counsel of TPCi described as "a wait and see approach". It is conceivable that there may be circumstances in which an alleged infringer adopting a "wait and see" position may amount to flagrancy in the sense contemplated by s 115(4), as considered by his Honour in *Rimila*, but this is not such a case. Redbubble may have made a commercial decision concerning the risks of infringement but its conduct did not amount to a flagrant disregard of the rights of TPCi. It had in place processes to prevent and mitigate breaches which were reasonable and defensible. Flagrancy is not established merely by having failed in defending a claim of infringement and the position taken by Redbubble of maintaining an entitlement to act as it did was not flagrant in the sense contemplated by s 115(4) for the award of additional damages.

Signed by AustLII

- 52 -

77    Accordingly, judgment in favour of TPCi will be in the form of declaratory orders and nominal damages of $1.00. The proceeding will be relisted for submissions on the form of declaratory orders and on costs.


I certify that the preceding seventy-seven (77) numbered paragraphs are a true copy of the Reasons for Judgment herein of the Honourable Justice Pagone.


Associate:


Dated:      19 December 2017

Signed by AustLII

- 53 -

## ANNEXURE 1



Signed by AustLII

- 54 -

**ANNEXURE 2**

Signed by AustLII

- 55 -

**ANNEXURE 3**

| | | |
|---|---|---|
| 1 | http://www.redbubble.com/people/rya dasu/works/4791385-i-pikachu?grid_pos=337&p=t-shirt |  |
| 2 | http://www.redbubble.com/people/igi nschoices/works/16839952-pikachu?grid_pos=510&p=t-shirt |  |
| 3 | http://www.redbubble.com/people/tre kvix/works/7989381-pikachwho?grid_pos=1049&p=t-shirt |  |
| 4 | http://www.redbubble.com/people/an otherpkmnkid/works/13591261-pikachu-firered-leafgreen?grid_pos=1436&p=sticker |  |

Signed by AustLII

- 56 -

| 5 | http://www.redbubble.com/people/hi mehimine/works/10349110-minimalist-pikachu-from-super-smash-bros-brawl?grid_pos=1937&p=t-shirt |  |
|---|---|---|
| 6 | http://www.redbubble.com/people/rap idkoala/works/10128858-pikachu?grid_pos=2390&p=t-shirt |  |
| 7 | http://www.redbubble.com/people/be be-gun/works/16772194-pikachu?grid_pos=2409&p=t-shirt |  |
| 8 | http://www.redbubble.com/people/lili morning/works/6409536-pikachu?grid_pos=2445&p=t-shirt |  |

Signed by AustLII

- 57 -

| 9 | http://www.redbubble.com/people/whereismypanda/works/15201342-pikachu?grid_pos=2470&p=t-shirt |  |
| 10 | http://www.redbubble.com/people/bandaidbrand/works/20017182-pikachu?grid_pos=2501&p=t-shirt |  |
| 11 | http://www.redbubble.com/people/rewydo/works/14220964-pika-the-13th?grid_pos=2519&p=t-shirt |  |
| 12 | http://www.redbubble.com/people/emmalouise92/works/20165092-sailor-pikachu?grid_pos=1463&p=t-shirt |  |

Signed by AustLII

- 58 -

| 13 | http://www.redbubble.com/people/fu-man-chu/works/12456511-join-the-dark-side-with-darth-pika |  |
| 14 | http://www.redbubble.com/people/geawje/works/11250726-princess-pika?grid_pos=1757&p=t-shirt |  |
| 15 | http://www.redbubble.com/people/ze2d/works/19696325-pikator?grid_pos=2316&p=t-shirt |  |
| 16 | http://www.redbubble.com/people/redmedkit/works/22034334-pikadrake?c=536565-pikacrossovers |  |

Signed by AustLII

- 59 -

| 17 | http://www.redbubble.com/people/rac hick123/works/10626054-pikastew-stewie-griffin-as-pikachu |  |
| 18 | http://www.redbubble.com/people/mo rgogo/works/15546017-jake-the-pikachu?grid_pos=1030&p=sticker |  |
| 19 | http://www.redbubble.com/people/se nsebrain/works/21508653-funny-pokemon-jokemon |  |
| 20 | http://www.redbubble.com/people/19 89aus/works/20985661-pika-quinn?grid_pos=749&p=t-shirt |  |

Signed by AustLII

- 60 -

| 21 | http://www.redbubble.com/people/sausagechowder/works/11530565-assassemon?grid_pos=1211&p=t-shirt |  |
| 22 | http://www.redbubble.com/people/betmac/works/19064160-pikawho?grid_pos=3083&p=t-shirt |  |
| 23 | http://www.redbubble.com/people/conanart/works/21593979-pikachu-zelda?grid_pos=1468&p=iphone-case |  |
| 24 | http://www.redbubble.com/people/deanlord/works/9353101-pikario?grid_pos=1561&p=iphone-case |  |
| 25 | http://www.redbubble.com/people/hardkor/works/14502330-pika-bowie?grid_pos=3293&p=t-shirt |  |

Signed by AustLII

- 61 -

| 26 | http://www.redbubble.com/people/mi sterjfro/works/13980128-mcc-thunder |  |
| 27 | http://www.redbubble.com/people/wa rpeleven/works/12591770-doctor-pika?grid_pos=2921&p=t-shirt |  |
| 28 | http://www.redbubble.com/people/wa rpeleven/works/14905190-pikachu-princess |  |
| 29 | http://www.redbubble.com/people/rib oo/works/12424830-pika-libre?grid_pos=2054&p=t-shirt |  |