# EXHIBIT 2

# FEDERAL COURT OF AUSTRALIA

**Hells Angels Motorcycle Corporation (Australia) Pty Limited v Redbubble Limited [2019] FCA 355**

| | |
|---|---|
| File number(s): | QUD 902 of 2015 |
| Judge(s): | **GREENWOOD J** |
| Date of judgment: | 15 March 2019 |
| Catchwords: | **COPYRIGHT** – consideration of whether copyright continues to subsist in an artistic work described as the "Membership Card image" authored by a United States citizen in the United States of America in 1954 |
| | **COPYRIGHT** – consideration of whether the 1954 work authored by a man by the name of "Sundown" is an anonymous work or a pseudonymous work – consideration of whether the relevant corporation in the United States of America is the owner of the copyright subsisting in the work in suit – consideration of the evidence and statutory provisions going to the question of whether that corporation is the owner of the copyright work in suit having regard to the application of the domestic copyright law of Australia |
| | **COPYRIGHT** – consideration of whether the applicant is an exclusive licensee of the contended grantor of the exclusive licence having regard to the integers of the term "exclusive licensee" in s 10(1) of the *Copyright Act 1968* (Cth) |
| | **COPYRIGHT** – consideration of whether a work described as the "Fuki current Death Head design" is a derivative work and whether copyright subsists in it independently of the "Membership Card image" |
| | **COPYRIGHT** – consideration of whether the first respondent has exercised any one of the relevant exclusive rights of the copyright owner on the assumption that ownership of the copyright as contended is made out |
| | **TRADE MARKS** – consideration of whether the applicant is an authorised user of the trade marks in suit having regard to the integers of s 8 of the *Trade Marks Act 1995* (Cth) |

**TRADE MARKS** – consideration of whether the first respondent has infringed the registered trade marks in suit having regard to the elements of s 120(1) and s 120(2) of the *Trade Marks Act* – consideration of the question of damages and exemplary damages

**TRADE MARKS** – consideration of a cross-claim by the first respondent for an order directing the Registrar of Trade Marks to remove the registered trade marks of Hells Angels Motorcycle Corporation of the United States from the Register

**INTELLECTUAL PROPERTY** – consideration of whether the applicant has standing to bring the proceedings

| | |
|---|---|
| Legislation: | *Copyright Act 1968* (Cth), ss 10(1), 14(1)(a), 22(6), 22(6A), 24, 29(1)(a), 29(3), 31(1)(b)(i), 31(1)(b)(iii), 32, 33, 34, 36, 101(1A), 119, 210, 213(2), 213(4), 213(8), 239<br>*Trade Marks Act 1995* (Cth), ss 7(3), 7(4), 7(5), 8(1), 8(2), 8(3), 17(3), 26(1), 26(2), 92(3), 92(4)(b), 100(1)(c), 120(1), 120(2)<br><br>*Australian Consumer Law*, ss 18, 29 |
| Cases cited: | *Australian Performing Right Association Ltd v Canterbury-Bankstown League Club Ltd* (1964) 81 WN Pt (1) (NSW) 300<br>*Enzed Holdings Ltd v Wynthea Pty Ltd* (1984) 4 FCR 450<br>*Ernest Turner Electrical Instruments Ltd v Performing Right Society Ltd* [1943] Ch 167<br>*Google Inc. v Australian Competition and Consumer Commission* (2013) 249 CLR 435<br>*Heidelberg Graphics Equipment Ltd v Andrew Knox & Associates Pty Ltd* (1994) ATPR 41-326<br>*International Harvester Company of Australia Pty Ltd v Carrigan's Hazeldene Pastoral Company* (1958) 100 CLR 644<br>*Jennings v Stephens* [1936] Ch 469<br>*Lodestar Anstalt v Campari America LLC* (2016) 244 FCR 557<br>*Performing Right Society Ltd v Harlequin Record Shops Ltd* [1979] 1 WLR 851<br>*Pioneer Kabushiki Kaishai v Registrar of Trade Marks* (1977) 137 CLR 670<br>*Ramset Fasteners (Aust) Pty Ltd v Advanced Building Systems Pty Ltd* (1999) 164 ALR 239<br>*Rank Film Production Ltd v Dodds* [1983] 2 NSWLR 553 |

*Roadshow Films Pty Ltd v iiNet Limited* (2012) 248 CLR 42
*Telstra Corporation Limited v Australasian Performing Right Association Limited* (1997) 191 CLR 140
*The Koursk* [1924] P 140
*The Shell Company of Australia Limited v Esso Standard Oil (Australia) Limited* (1963) 109 CLR 407
*Thompson v Australian Capital Television Pty Ltd* (1996) 186 CLR 574
*University of New South Wales v Moorhouse* (1975) 133 CLR 1
*WEA International Inc. v Hanimex Corporation Ltd* (1987) 17 FCR 274
*Winstone v Wurlitzer Automatic Phonograph Co of Australia Pty Ltd* [1946] VLR 338

| | |
|---|---|
| Date of hearing: | 25 September 2017, 26 September 2017, 27 September 2017, 28 September 2017 and 29 September 2017 |
| Date of last submissions: | 15 February 2018 |
| Registry: | Queensland |
| Division: | General Division |
| National Practice Area: | Intellectual Property |
| Sub-area: | Copyright and Industrial Designs |
| Category: | Catchwords |
| Number of paragraphs: | 552 |
| Counsel for the Applicant/Cross Respondent: | Mr D Eliades |
| Solicitor for the Applicant/Cross Respondent: | Solus IP Pty Ltd |
| Counsel for the First Respondent/Cross Claimant: | Mr R Cobden SC with Ms E Bathurst |
| Solicitor for the First Respondent/Cross Claimant: | Allens Linklaters |

# ORDERS

**QUD 902 of 2015**

| | |
|---|---|
| **BETWEEN:** | **HELLS ANGELS MOTORCYCLE CORPORATION (AUSTRALIA) PTY LIMITED ACN 123 059 745**<br>Applicant |
| **AND:** | **REDBUBBLE LIMITED ACN 119 200 592**<br>First Respondent |
| | **HELLS ANGELS MOTORCYCLE CORPORATION**<br>Second Respondent |
| **AND BETWEEN:** | **REDBUBBLE LIMITED ACN 119 200 592**<br>Cross-Claimant |
| **AND:** | **HELLS ANGELS MOTORCYCLE CORPORATION**<br>Cross-Respondent |
| | **HELLS ANGELS MOTORCYCLE CORPORATION (AUSTRALIA) PTY LTD ACN 123 059 745**<br>Other |
| **JUDGE:** | **GREENWOOD J** |
| **DATE OF ORDER:** | **15 MARCH 2019** |

**THE COURT ORDERS THAT:**

1.    The applicant submit to the Court within 10 days proposed orders giving effect to the reasons for judgment published today.

2.    Costs are reserved for later determination.

Note:   Entry of orders is dealt with in Rule 39.32 of the *Federal Court Rules 2011*.

# REASONS FOR JUDGMENT

**GREENWOOD J:**

## Background and introduction to the issues

1    In these proceedings, the applicant Hells Angels Motorcycle Corporation (Australia) Pty Limited ("HAMC Aust" or the "applicant") takes issue with the conduct of the respondent, Redbubble Ltd ("Redbubble") arising out of, put simply, the contended structure, method of operation, functionality and outcomes generated when persons (otherwise called "artists"), and consumers (otherwise called "buyers") engage with Redbubble's website ([Web] redbubble.com) (the "Redbubble website").

2    The Redbubble website enables an artist (or for that matter, a non-artist who might simply be a person seeking to appropriate another person's works or trade marks for commercial gain, subject to Redbubble's contended protocols governing the operation of the website so as to manage the conduct of such persons), to upload an image, drawing, photograph, design, name, mark or sign or any other expression of creative (or non-creative) work to the website.  The artist nominates the class of goods to which the work can be applied (selected from Redbubble's pre-determined list of available products, for example, T-shirts, caps, mugs) and the website enables consumers to search, by tags or keywords, and transact so as to order and pay for, through the website, a selected article bearing the work.

3    The Redbubble website causes a third party fulfiller to be appointed (from a panel preselected by Redbubble) to fill the order by applying the image (or relevant subject matter) to, for example, a mug or a T-shirt.

4    The functionality of the Redbubble website also enables the despatch and delivery of the article with the work applied as ordered, to the buyer's nominated address.

5    Redbubble says that it acts as the "agent of the artist" in enabling the transaction through its website.  Redbubble says that in doing so, and in operating the Redbubble website generally, it is simply providing an open, online, electronic marketplace where artists and consumers can engage and transact with one another.

6    It will be necessary in these reasons to examine the evidence going to the structure, functionality and operation of the Redbubble website in some detail.  That is especially so because Redbubble says that the entire functionality of its website is effected by software

located on servers in the United States of America.  Redbubble says that the uploaded images are stored on servers in the United States and all commands giving effect to a step taken by an artist to, for example, upload an image or relevant subject matter to the site, or a consumer to transact, takes place in the United States and not in Australia.

7    HAMC Aust contends that by reason of the manner and method of operation of the Redbubble website, Redbubble has infringed the copyright said to be subsisting in two artistic works; infringed certain registered trade marks; and engaged in conduct in contravention of ss 18, 29(1)(g) and 29(1)(h) of the *Australian Consumer Law* (the "ACL").  Apart from contentions of direct infringement, HAMC Aust says, in the alternative, that Redbubble has authorised infringements of the copyright in the relevant works by others (artists) and has engaged in a "common design" with artists in bringing about the infringement of copyright so as to render Redbubble and the artists joint tortfeasors.

8    As to the precise conduct said to constitute the copyright infringements, the applicant contends (as articulated more precisely in closing oral addresses) that the critical complaint (the "case") is that Redbubble has engaged in a direct infringement of the copyright in the two works (s 36(1), *Copyright Act 1968* (Cth) (the "*Copyright Act*" or the "1968 Act") by, in Australia, "communicating the work to the public" within the meaning of s 31(1)(b)(iii) of the *Copyright Act*.  That is said to follow because Redbubble is said to have made the relevant work in suit "available online" for the purposes of the definition of the term "communicate" in s 10(1) of the *Copyright Act*.  Alternatively, Redbubble is said to have authorised the conduct of the artist in making the work available online by uploading an image or relevant subject matter and has thus *authorised* an infringement by the artist.

9    Redbubble contends that the applicant has failed to identify precisely, in terms of the technology, the point on the continuum when an infringing step occurs so as to test the authorisation principles against the infringement said to have been authorised.

10   HAMC Aust says that Redbubble and the artists are joint tortfeasors in the trade mark infringements.  The applicant also says that Redbubble has authorised trade mark infringements by the artist.

11   It will, of course, be necessary to examine the precise statutory integers of the relevant conduct and the application of those integers to the facts.

12      HAMC Aust is neither the owner of the copyright said to subsist in the two copyright works in suit, nor the registered owner in Australia of the relevant trade marks in suit.

13      HAMC Aust says that it derives its standing to sue as the *exclusive licensee* in Australia of the copyright owned by the second respondent, Hells Angels Motorcycle Corporation (US) ("HAMC US").  HAMC US is the registered owner in Australia of the trade marks in suit in these proceedings.  HAMC Aust says that it is the *authorised user* in Australia of the relevant marks.

14      The rights of HAMC Aust in the copyright and the relevant trade marks are said to derive from an agreement dated 14 May 2010 between HAMC US and HAMC Aust in which the grant of rights is described as "an exclusive non-transferable licence" to use the marks and copyright subsisting in works substantially identified in the relevant trade marks.  Redbubble contends that a proper analysis of the agreement, taken in conjunction with evidence of the way in which HAMC Aust engages with HAMC US concerning use of the copyright works (particularly having regard to the definition of the term "exclusive licensee" in s 10(1) of the *Copyright Act*), and the trade marks (having regard to the definition of "authorised user" and "authorised use" in s 8 of the *Trade Marks Act 1995* (Cth) ("*Trade Marks Act*"), suggests that HAMC Aust is neither an exclusive licensee of the copyright nor an authorised user of the trade marks.

15      Redbubble says that the proceedings should be dismissed on that ground alone.

### *The copyright works*

16      As to the copyright, the works relied upon by the applicant are these.

17      *First*, an artistic work (in respect of which there is no challenge to the originality of the work) depicting a skull in profile wearing a motorcycle helmet adorned with exposed feathers in the form of a wing or headdress described as the "Membership Card image" or "Membership card". The image is depicted below.



18      The applicant says that the Membership Card image is a work commissioned by the "San Francisco Chapter" of the Hells Angels Club (as explained later in these reasons) on 2 September 1954.  The author is a man called "Sundown".  He is said to have been a resident of San Francisco at the time of authorship of the image.  He is said to be Robert D. Kestner (also spelt "Kistner").  The applicant says that the work was "completed" in 1954.  The applicant says that HAMC US is the owner of the copyright subsisting in the Membership Card image although the applicant accepts that there is no assignment (or no evidence of an assignment) in writing vesting the legal title to the copyright in HAMC US.

19      It will be necessary to examine the chain of title to the work starting with "Sundown" as the author of the work in 1954.

20      As to the question of whether copyright continues to subsist in the Membership Card image, issues arise in relation to s 34 of the *Copyright Act*.  Section 34, as it stood prior to the commencement of the *United States Free Trade Agreement Implementation Act 2004* (Cth) (the "*Free Trade Implementation Act*") (which had the effect of, among other things, extending the term of a relevant work from 50 years to 70 years), provided:

> (1)     Subject to subsection (2), if the *first publication* of a literary, dramatic, musical or artistic work is anonymous or pseudonymous, any copyright subsisting in the work by virtue of this Part continues to subsist until the end of the period of 50 years after the end of the calendar year in which the work was first published.

> (2)     Subsection (1) does not apply in relation to a work if, at any time before the end of the period referred to in that subsection, the *identity* of the *author* of the work is *generally known* or can be *ascertained by reasonable inquiry*.

[emphasis added]

21    As to s 34, the following questions arise.

22    The question of whether copyright subsists in an original artistic work published or unpublished and the term or duration of that subsistence falls to be determined by Part III of the *Copyright Act* having regard to, relevantly, ss 32, 33 and 34.   However, s 210 of the *Copyright Act*, contained within Part XI, which addresses transitional matters, provides that notwithstanding anything in Part III, copyright does not subsist by virtue of that part in a work (relevantly here, an artistic work made in 1954) first published before the commencement date of the *Copyright Act* (which commenced on 1 May 1969) *unless* copyright subsisted in the work under the *Copyright Act 1911* immediately before the commencement of the 1968 Act.

23    If copyright did so subsist, it continues to be governed by Part III.

24    The *Free Trade Implementation Act* commenced operation on 1 January 2005.   Thus, 31 December 2004 is a material date.  Section 33 (which has effect "subject to s 34"; s 33(1)), prior to 1 January 2005, provided that copyright in an artistic work continued to subsist until the expiration of 50 years after the end of the calendar year in which the author of the work died.   Section 34, however, provided prior to 1 January 2005, that if first publication of an artistic work occurred *anonymously* or *pseudonymously*, any copyright subsisting in the work by reason of Part III would continue to subsist until 50 years after the end of the calendar year in which the work was first published (on the apparent assumption that it would not be possible in respect of such a work to determine the date of death of the author and thus determine the term under the "end of the life of the author plus 50 years" rule (the "primary rule")).

25    If Sundown's work was first published anonymously or pseudonymously prior to 31 December 1954, the subsistence of copyright in the work ended on 31 December 2004.  However, even though a work might be published anonymously or pseudonymously, a circumstance might arise at some point in the period between the end of the calendar year of first publication and 50 years, in which the *identity* of the author becomes *generally known*, in which event the primary rule would operate.

26    Another circumstance might be that even though the author is not *generally known*, his or her identity "can be ascertained by reasonable inquiry".   In that circumstance, the primary rule would also apply.

27    In either of those circumstances, s 34(2) has the effect of displacing the operation or application of s 34(1) with the result that the duration of the subsistence of any copyright falls to be

determined in accordance with s 33.  From 1 January 2005, the term became, under the primary rule, the end of the calendar year in which the author of the artistic work died plus 70 years.

28      Assuming that s 34(1) "applied" (at a time prior to 1 January 2005) to the Sundown work, copyright ceased to subsist in the work at 31 December 2004 and did not therefore enjoy the benefit of the statutory changes on 1 January 2005.  Questions of fact become:  When was the Sundown work first published?  Was it published anonymously or pseudonymously?  In the relevant period contemplated by s 34(1), was the identity of the author generally known or could it have been ascertained by reasonable inquiry?

29      Redbubble says that the work was published in 1954 because reproductions of the work were supplied "to the public" between 9 September 1954 and 31 December 1954, for the purposes of s 29(1)(a) of the *Copyright Act*.

30      If first publication occurred in 1954 a question arises as to whether at any time in the period ending 31 December 2004 the identity of Sundown was generally known or could have been ascertained by reasonable inquiry.  If so, s 34(1) as it stood had no application and the term of the copyright would not have expired on 31 December 2004.  Redbubble says that Sundown's identity was not generally known in the period contemplated by s 34(1) and his identity could not have been ascertained by reasonable inquiry.  The applicant contends otherwise and says that s 34(1) has no application.

31      Other aspects of the factual matrix going to this issue are in contest.

32      The second copyright work is an artistic work described as the "current Death Head design", the author of which is Mr John Makato Fukushima, known as "Fuki".

33      In the pleading, the applicant describes the work as "enhancements to the winged skull image" appearing on the Membership Card:  para 11A.  It is said to have been made or "created" in 1983 and first published in the United States in 1983.  The author at the time of authorship was a United States citizen resident in the United States.

34      The applicant says that by agreement between HAMC US and Fuki, the copyright in the current Death Head design was to be owned by HAMC US.  Mr Fukushima assigned the ownership of the copyright in the current Death Head design to HAMC US in writing on 16 September 2015.  However, he inadvertently attached the wrong image to the assignment document.  A fresh assignment was signed by him on 29 March 2017 correcting the attachment.  Mr Fukushima's current Death Head design is depicted below.



35    Redbubble says that the applicant has not established any *originality* in the current Death Head design and it is true to say that in the closing address on behalf of the applicant, counsel effectively abandoned any reliance upon contentions of copyright subsistence in this work as a separate work.

36    However, the matter has not been abandoned by the applicant.

37    As to the trade marks in suit, the applicant relies upon the following trade marks registered in Australia in the name of HAMC US having regard to the classes in Schedule 1 to the Trade Mark Regulations in each case:

(a)    Trade Mark 526530 registered in Class 16 for the following words/image:



(b)    Trade Mark 723219 for the words "HELLS ANGELS" registered in Classes 14, 16, 25 and 26.

(c)    Trade Mark 723463 registered in Classes 14, 16, 25 and 26 for the following image:



(d)    Trade Mark 1257992 for the words "HELLS ANGELS" registered in Classes 14, 16, 25 and 26.

(e)     Trade Mark 1257993 for the following image registered in Classes 14, 16, 25 and 26:



38      Trade Mark Registrations 526530, 723463 and 1257993 contain a depiction of either the Membership Card image or the Fuki current Death Head design.  Trade Marks 723219 and 1257992 consist simply of the words "Hells Angels".

39      As to Trade Mark 526530, it was registered with effect from 8 January 1990 in respect of printed matter; book binding material; photographs; printers type in Class 16 of Schedule 1 to the *Trade Marks Regulations 1995* (the "Regulations").

40      As to Trade Mark 723219, it was registered with effect from 2 December 1998 in respect of the following goods:

(i)     in Class 14 of Schedule 1 to the Regulations:  "Jewellery, precious stones, watches and clocks, rings, metal badges and belt buckles in this class";

(ii)    in Class 16 of Schedule 1 to the Regulations:  "Printed matter including magazines, pamphlets and brochures, labels in this class, flags in this class, instructional and teaching material (except apparatus), playing cards, stationery including pens and posters";

(iii)   in Class 25 of Schedule 1 of the Regulations:  "Clothing including leather belts and jackets, footwear and headgear; headbands and armbands not being made of leather and being goods in this class";

(iv)    in Class 26 of Schedule 1 to the Regulations:  "Badges and belt buckles not being made of precious metal; embroidered and cloth material badges for attachment to clothing and headgear".

41      As to Trade Mark 723463, it was registered with effect from 5 December 1996 in respect of the following goods:

(i) in Class 14 of Schedule 1 to the Regulations: "Jewellery, precious stones, watches and clocks, rings, metal badges and belt buckles in this class";

(ii) in Class 16 of Schedule 1 to the Regulations: "Printed matter including magazines, pamphlets and brochures, labels in this class, flags in this class, instructional and teaching material (except apparatus), playing cards, stationery including pens and posters";

(iii) in Class 25 of Schedule 1 to the Regulations: "Clothing including leather belts and jackets, footwear and headgear";

(iv) in Class 26 of Schedule 1 to the Regulations: "Badges and belt buckles not being of precious metal, embroidered and cloth material badges for attachment to clothing and headgear, headbands and armbands not being of leather".

42    As to Trade Mark 1257992, it was registered with effect from 11 July 2008 in respect of the following goods:

(i) in Class 14 of Schedule 1 to the Regulations: "Jewellery, goods in precious metal, clocks and watches, earrings, keyrings, badges, chains, pins";

(ii) in Class 16 of Schedule 1 to the Regulations: "Printed matter, newspapers, periodical publications, books, photographs, stationery and adhesive materials (stationery); paper, cardboard, paper articles and cardboard articles, bookbinding material, artists' materials, paint brushes, ordinary playing cards; printers' type and clichés (stereotype); all included in this class";

(iii) in Class 25 of Schedule 1 to the Regulations: "Articles of clothing, footwear and headgear, including coats, jackets, trousers, overalls, shirts, pullovers, sweaters, hats, vests, waistcoats, cardigans and belts (for wear)";

(iv) in Class 26 of Schedule 1 to the Regulations: "Badges, belt clasps, lace and embroidery, buttons, headwear ornaments, patches for repairing textile articles, pins and needles".

43      As to Trade Mark 1257993, it was registered with effect from 11 July 2008 in respect of the
        following goods:

>       (i)     in Class 14 of Schedule 1 to the Regulations:  "Jewellery, goods in
>               precious metal, clocks and watches, earrings, keyrings, badges, chains,
>               pins";
>
>       (ii)    in Class 16 of Schedule 1 to the Regulations:   "Printed matter,
>               newspapers, periodical publications, books, photographs, stationery and
>               adhesive materials (stationery); paper, cardboard, paper articles and
>               cardboard articles, bookbinding material, artists' materials, paint
>               brushes, ordinary playing cards; printers' type and clichés (stereotype);
>               all included in this class";
>
>       (iii)   in Class 25 of Schedule 1 to the Regulations:  "Articles of clothing,
>               footwear and headgear, including coats, jackets, trousers, overalls,
>               shirts, pullovers, sweaters, hats, vests, waistcoats, cardigans and belts
>               (for wear)";
>
>       (iv)    in Class 26 of Schedule 1 to the Regulations:  "Badges, belt clasps, lace
>               and embroidery, buttons, headwear ornaments, patches for repairing
>               textile articles, pins and needles".

### The contended infringements

44      As to the contended infringements of the trade marks by Redbubble, the applicant relies upon
        four examples of artists uploading images to the Redbubble website and offering for sale
        products to which the uploaded image might be applied.  In three of the four examples,
        transactions occurred in which the trade mark was applied "to goods".  The four examples
        relied upon by the applicant are set out below:

**Example 1 – a Unisex T-shirt Hells Angels MC Virginia**



**Example 2 – a poster described as "Angel with Angel"**



**Example 3 – a T-shirt described as 1st Hells Angel T November 2015**



**Example 4 – a T-shirt identified as Hells Angels – Death before Dishonour Design**



45      Clearer examples of the images in Examples 3 and 4 are set out below:





46      Example 1 is described as "E1" in Attachment E to the applicant's third further amended
        statement of claim ("FASOC").  Example 2 is "E4" in the FASOC.  Example 3 is "E5" in the
        FASOC and Example 4 is an image described and depicted at para 29A(a) of the FASOC.

47      As to the statutory integers of s 120 of the *Trade Marks Act*, the applicant says that Redbubble has, by reason of its operation of the Redbubble website having regard to the functionality of the site, engaged in the conduct of using, as a trade mark, a sign (each of the previous four examples) that is substantially identical with or deceptively similar to the relevant trade mark(s) in relation to goods or goods of the same description in respect of which the relevant trade mark is registered.  Examples 1 and 2 are said to infringe all five trade marks in suit.  Example 3 is said to infringe Trade Marks 723463 and 1257993.  Example 4 is said to infringe Trade Marks 723219, 723463, 1257992 and 1257993.

48      Otherwise, Redbubble and the artist are said to be joint tortfeasors because they are engaged in a common design to use a sign which is substantially identical or deceptively similar to the identified registered trade marks, as a trade mark, in trade, in relation to goods or goods of the same description for which the relevant mark is registered.

49      As to "use of a trade mark", by Redbubble, the applicant places emphasis upon s 7(4) and s 7(5) of the *Trade Marks Act* which is in these terms:

> (4)     In this Act:
>
> **use of a trade mark in relation to goods** means use of the trade mark upon, or in physical or other relation to, the goods (including second-hand goods).
>
> (5)     In this Act:
>
> **use of a trade mark in relation to services** means use of the trade mark in physical or other relation to the services.

50      As to use of a sign, as a trade mark, as expressly required by s 120, s 17 of the *Trade Marks Act* provides that a trade mark is a sign used, or intended to be used, to *distinguish* the goods or services dealt with or provided in the course of trade by *a* person *from* goods or services so dealt with or provided by any *other* person.  In other words, the "infringer" must be using the relevant sign as a badge of origin of goods or services.

51      As to sales of products transacted through the Redbubble website (and data concerning the number of views concerning the four examples mentioned earlier), the details are these:

| Example | Sales | Views |
|---------|-------|-------|
| Example 1 | 2 | 304 |
| Example 2 | 4 | 1,724 |
| Example 3 | 1 | 767 |
| Example 4 | 0 | 11 |

52    As to each of these examples, the following matters should be noted, based on the evidence of Mr James Toy, Redbubble's assistant general counsel based in San Francisco.

***Some aspects of the uploading of images and transactions concerning the four examples***

53    The image at Example 1 was uploaded by a person named De Ann Troen whose username on the Redbubble website was "photroen". When signing up to the Redbubble website, Ms Troen gave, as her address, an address in Virginia in the United States of America. Ms Troen uploaded the artwork to the Redbubble website on 21 September 2014 and gave it a title "7825".

54    The Redbubble "Content Team" on 30 December 2014 took steps to "Moderate" the artwork as a result of a letter from the applicant's solicitor, Mr Bolam, to Redbubble dated 24 December 2014 (received on 29 December 2014). By "moderated", Mr Toy means that as a result of Mr Bolam's letter, steps were taken to "remove or disable access to the webpage on the Redbubble website where the artwork was listed and through which products bearing the artwork could be purchased": para 21, Mr Toy's affidavit, 27 July 2017.

55    The artwork was never reinstated to the website.

56    While the artwork remained on the site in the period 21 September 2014 to 30 December 2014, two users purchased a product bearing the artwork through the website.

57    Mr Gavin Hansen ordered a T-shirt bearing the artwork on 18 November 2014. Mr Hansen provided a shipping address to Redbubble in Currumbin, Queensland, 4223. The T-shirt with the artwork applied was manufactured by a third party fulfiller called "SSI Digital Print Services" in Denver in the United States. The shipping company, UPS, delivered the T-shirt to Mr Hansen's nominated address.

58    A user named Steve Sawyer ordered a T-shirt bearing the artwork on 18 November 2014. Mr Sawyer provided a shipping address in Lincolnshire, England. The T-shirt with the artwork applied was manufactured by a fulfiller called "T-Shirt & Sons" in the United Kingdom. A supply company called "Whistl" delivered the T-shirt to Mr Sawyer's nominated address.

59    The image at Example 2 was uploaded by a person named Mel Hok whose username on the Redbubble website was "LavaMel". When signing up to the Redbubble website, Ms Hok provided as her address, an address in West Yorkshire, England. Ms Hok uploaded the artwork to the site on 17 November 2009 and gave it a title "Angel with Angel". The Redbubble

Content Team moderated the artwork on 30 December 2014 as a result of the letter from Mr Bolam dated 24 December 2014. The artwork was never reinstated. Mr Toy says that during the period that the artwork remained on the website between 17 November 2009 and 30 December 2014, four users purchased a product bearing the artwork through the Redbubble website.

60      On 30 November 2009, a user named Karin Lawrence ordered a matted print bearing the artwork. Ms Lawrence provided to Redbubble, as her shipping address, an address in Sutton-in-Ashfield, England. The matted print was manufactured by a third party fulfiller called "Horsham Colour" in Australia. The shipping company, Australia Post, delivered the matted print from Horsham Colour directly to Ms Lawrence. Ms Lawrence also ordered a framed print bearing the artwork on 30 November 2009. The framed print was manufactured by a third party fulfiller called "Prodigi" in the United Kingdom. The shipping company, Whistl, delivered the framed print from Prodigi directly to Ms Lawrence.

61      On 22 September 2011, a user named Shannon Faherty ordered a photographic print bearing the artwork. Ms Faherty provided to Redbubble, as a shipping address, an address in California, USA. The photographic print was manufactured by a third party fulfiller called "Bayphoto" in California, USA. The shipping company, USPS, delivered the photographic print from Bayphoto directly to Ms Faherty.

62      On 5 December 2014, Gavin Hansen ordered a poster bearing the artwork. Mr Hansen provided as his shipping address, an address in Currimbin, Queensland, 4223. The T-shirt was manufactured by a third party fulfiller called "HC Pro" in Horsham, Australia. The shipping company, Australia Post, delivered the poster from HC Pro directly to Mr Hansen.

63      As to Example 3, the person who uploaded the artwork to the website is a user named Becks Boyd, whose username on the website was "Becks Boyd". When signing up to the Redbubble website, Ms Boyd provided, as her address, an address in Addlestone, United Kingdom. Ms Boyd uploaded the artwork to the Redbubble website on 4 August 2015 and gave it a title "Hells Angel". The Redbubble Content Team moderated the artwork on 25 November 2015. The artwork was never reinstated. During the period that the artwork remained on the Redbubble website between 4 August and 25 November 2015, one user purchased a product bearing the artwork through the website. The user was Gavin Hansen who ordered a T-shirt bearing the artwork on 9 November 2015. Mr Hansen provided his shipping address as an address at Currimbin, Queensland, 4223. The T-shirt was manufactured by a third party

fulfiller called "SSI Digital Print Services" in Denver in the United States.  The shipping companies, UPS and Australasian Mail Service, delivered the T-shirt from SSI Digital Print Services directly to Mr Hansen.

64      As to the fourth example, the artwork was uploaded to the website by a user named Pandora Kelly whose username on the site was "OriginalApparel".  When signing up to the website, Ms Kelly provided, as her address, an address in Winterton, United Kingdom.  Ms Kelly uploaded the artwork to the website on 31 March 2015 and gave it a title "Hells Angels – Death Before Dishonour".  The Redbubble Content Team moderated the artwork on 3 April 2015.  The artwork was never reinstated.  While the artwork remained on the website between 31 March and 3 April 2015, no person purchased a product bearing the artwork through the Redbubble website.

65      Mr Gavin Hansen is a trainee trade mark officer of the applicant.  His role includes "monitoring, predominantly online, and identifying uses of signs which might be considered deceptively similar to those HAMC AUS is entitled to use under the authority of the trade mark owner Hells Angels Motorcycle Corporation, the second respondent in the proceeding": para 2, affidavit Gavin Hansen, 4 April 2017.

### Other background matters

66      The applicant contends that a proper examination of the functionality of the Redbubble website and the sequence of steps involved in effecting a transaction between an artist and a buyer renders Redbubble the seller.  In other words, the applicant says that Redbubble is not simply providing an "internet service" to artists and buyers and nor is it merely establishing an electronic market.  Rather, Redbubble, through the functionality of the website, takes the order, issues the invoice, effects payment, derives revenue as a result of the transaction, arranges for the order to be fulfilled and arranges for postage and delivery of the relevant article to the buyer.  Moreover, the applicant says that throughout various parts of the process, Redbubble undertakes these "services" in and by reference to the Redbubble trade marks.  The applicant says that goods bear a swing tag or other reference to Redbubble and these factors are indicia of Redbubble being the relevant "seller" of the goods bearing the impugned marks.

67      Redbubble contends that it is not "using" the marks as suggested and nor are the integers of s 120 of the *Trade Marks Act* made out.

68      It also says that because the functions effected through the Redbubble website are effected by routines on the servers in the United States, there is no relevant conduct occurring "in Australia".  Redbubble also says that although s 120 of the *Trade Marks Act* does not contain the words "in Australia" (unlike s 36(1) of the *Copyright Act*), the entire "territorial" structure established by the *Trade Marks Act* for national registration and use of trade marks suggests that the Parliament did not intend the proscription of infringing conduct to apply to something done outside Australia (extra-territorially) even though conduct outside Australia might concern a trade mark registered in Australia.

69      Redbubble says that the infringing conduct must occur "in Australia".

70      Apart from all of these issues (including the proposition that no relevant conduct occurs in Australia due to the location of the servers and the place of execution of commands), Redbubble says, so far as direct infringement or authorisation is concerned, that the website is an online electronic open marketplace where artists and consumers engage.  Redbubble says that it does not determine the content of that which is uploaded; it has agreements in place with artists to address the importance of intellectual property rights; and it takes steps to "moderate" the site and remove material about which complaints are made concerning intellectual property issues where there seems to be a basis for concern.

71      Apart from all of these issues, Redbubble also has a cross-claim for revocation of the registered trade marks on the ground of non-use.  I will address the content and detail of that matter as a separate question.

**Ownership of the copyright in the Membership Card image**

72      For the purpose of addressing this issue, I accept that the image appearing on the Membership Card was drawn or made by a man called Sundown in or about September 1954 in San Francisco.

73      In relation to the question of ownership of the copyright in the Membership Card image, it should be noted that the applicant does not rely upon, as proof of ownership, the registration of the image entitled "Hells Angels Membership Card (1954)" in or with the *United States Copyright Office* bearing Registration Visual Work Number VAu001214935 or the amended registration.

74      The relevant matters are these.

75   Mr Ralph "Sonny" Barger is a United States citizen born in Modesto, California in 1938.  At the time of his declaration in these proceedings on 29 March 2017 he was residing in Livermore, California.  He has been a member of the "Hells Angels Motorcycle Club" (the "Club") continuously since 1957.

76   The Club is comprised of "a group of motorcycle enthusiasts".

77   Mr Barger founded the Hells Angels Oakland "Charter" of the Club in 1957 (the "Oakland Charter").  As an officer of the Oakland Charter, Mr Barger was a member of the governing Board made up of "officers" of the Hells Angels Charters in California.  He was a member of the Board of Directors of "Hells Angels, Frisco Inc".  He was a member of the Board of that company and also "its successor corporations", as he puts it, "for many years".  He was a member of the Cave Creek Arizona Charter for many years.  He is currently a member of the Oakland Charter.

78   Mr Barger says that he is the person most knowledgeable about the creation and evolution of the logos, brands and trade marks used by the various Hells Angels charters and the role of the relevant corporation charged with the responsibility of managing the intellectual property developed or created by the Charters or members of the Club.

79   Mr Barger says that the first Hells Angels Motorcycle "club" was founded in March 1948 in the Fontana/Bernardino, California area.  One of the founders was William Charles Graves, a Second World War Veteran.  Mr Barger says that it is a myth that the founders of that club were part of the 303rd Hells Angels Bomber B17 Group from WWII.  He says that a First World War fighter squadron apparently used the name "Hells Angels".  The "Berdoo club" began using, as the name of the club, "Hells Angels" in its various dealings from 1948.

80   Initially, the various Hells Angels "clubs" in California were "only loosely affiliated".  In the 1950s, the Californian clubs comprising Berdoo, Frisco "So. Cal [Southern California]" and Oakland, joined into one "brotherhood called the Hells Angels Motorcycle Club"; the "Club" as earlier mentioned and defined.

81   After the Club formed, individual clubs became Charters of the Club.  Officers of what were now the various "Charters' began meeting as a Board of Directors of the Club.  Mr Barger participated in these meetings.  Decisions of the Board of the Club bound the Charters.  All Charters had to approve the admission of a new Charter.  Guidelines were established about

how insignia could be used.  "Death Head" designs began to emerge and "were always used to signify membership in a [Charter] and the [Club]".

82    The first Charter outside California was established in Omaha, Nebraska.  The second was established in Lowell, Massachusetts.

83    In 1948, the Berdoo members used a small design for its membership insignia consisting of a skull in profile, a helmet and two wings.  It came to be called the "Original Death Head":  see the image at para 12 of Mr Barger's declaration.  It was used only "between and among members as an indicia of membership in the [Berdoo] club".

84    In 1948, Berdoo club members began using an insignia that consisted of an "upper rocker" (a semi-circle of the words "Hells Angels"), the Original Death Head in the centre, and a "bottom rocker" (a semi-circle of the word Berdoo).  This configuration was known as the "original patch".  It was sewn onto the back of jackets.  It too was only used between and among members as an indication of membership in the Charter.

85    In 1953 or 1954, Mr Graves organised the formation of a San Francisco Charter called "Hells Angels Frisco" (the "Frisco Charter").  In 1955, the Frisco Charter restructured with 13 members including Mr Frank Sadilek as President.  Mr Barger says that at about this time, a modified version of the Original Death Head was created, also relatively small in size:  see the image at para 21 of Mr Barger's declaration.  It came to be known as the Modified Original Death Head.  It was created by a member of the Frisco Charter for use as an indicia of membership of the Frisco Charter.

86    Mr Gordon Grow is a United States citizen who resides in Oakland, California.  He says he has been a member of the Hells Angels Motorcycle Club continuously since 1967.  He was initially a member of the Frisco Charter.  In 1985, he transferred to the Oakland Charter and has been a member of that Charter since then.  He says that he was an officer of the Californian non-profit corporation that the Club formed to own and manage intellectual property of the Club and Charters.  He says the company is called "Hells Angels Motorcycle Corporation" which he calls the "Corporation".  I will return to Mr Barger's evidence on that topic later in these reasons.

87    Mr Grow says that he is the most knowledgeable person about, and familiar with, the historical archives and records of the San Francisco and Oakland Charters, and of the Corporation.  Mr Grow sets out in his declaration the sources of his information.

88    Mr Grow says that in the 1950s the "So. Cal." Charter used a single wing, side-facing, Death Head.  The Berdoo and Frisco Charters used a double wing Death Head as their membership insignia, often displayed as a patch on the back of vests or jackets with an upper and lower rocker as explained by Mr Barger.

89    Mr Grow says that before 1954 there was no Membership Card.

90    Mr Grow says that he personally located in the Club archives, minutes from the Frisco Charter meetings of members held in September 1954.  Mr Grow had been told about a September 1954 meeting by Mr Warren Gettler, a Frisco Charter member who was at the meetings.  Mr Gettler has since died.  Mr Grow refers to the minutes of the meeting of 9 September 1954.  The minutes reflect a roll call of members present, and the guests present.  The 2 September 1954 minute notes that a group of Berdoo members would arrive "Saturday and a party would be held in their honour at Thornton's Beach".  The 9 September1954 minute notes the party having been held.  It also notes that:

> It was decided that Sundown was to receive $2.50 for artwork on our club cards – and that he would be allowed three clean, unvoided cards for display purposes in his business.

91    It seems likely that the artwork had been done by the time of the meeting on 9 September 1954.  The members seemed to be in a position to assess the artwork and decide that Sundown ought to receive payment (although nominal) for it.  Membership Cards may have been prepared.

92    Mr Phil Torre gave evidence.  He was cross-examined as was Mr Barger.

93    Mr Torre is a United States citizen who resides in Santa Rosa, California.  He was born in 1934.  He says that he was a member of the Hells Angels Motorcycle Club continuously from 1953 or 1954 until he left the Club to look after his mother (although he remained a member of the Frisco Charter).  He says that the Frisco Charter was formed in 1953 or 1954.  He says that during his time as a Club member, he has learned a great deal about the history and activities of the Club especially from his own personal experiences.  He says that before 1954 there was no Membership Card for the Club.  He says that members of the Frisco Charter "frequently hung out and had meetings at Rialto pool hall on the north east corner of 7th and Market Street, San Francisco, California during the years 1953 and 1954 and later".  He says that he personally also "hung out there".

94    Mr Torre says:  "We got to know a tattoo artist who also hung out in that pool hall who went by the name Sundown".  Mr Torre says that "we knew he could draw" which, no doubt, is a

reference to those members who had a practice of hanging out at the pool hall.  Mr Torre says that he and other members had ideas about how they wanted the Membership Card to look. Mr Torre says that the Frisco Charter decided to hire Sundown to help them put their ideas about a Membership Card into a graphic form that "could be printed for each Charter member". Mr Torre says that Sundown provided technical illustration services that would "allow the membership card to be reproduced for and on behalf of the Club".  Mr Torre says that Sundown did the work at the direction, supervision and expense of the Hells Angels Frisco which seems to be another reference to the Frisco Charter.

95   Mr Torre saw the "rough sketches that Sundown created".

96   Mr Torre says that he and some members made comments.  Sundown made changes to the rough sketches.  The Frisco Charter approved the final design in the form at [17] of these reasons.  Mr Torre says that the Frisco Charter was to own all relevant rights in the card.  He says that Sundown was a tattoo artist whose place of business was near the Rialto pool hall earlier mentioned.  He says that Sundown's shop was in the same building as the pool hall "where many of us hung out".  He says that he recalls that Sundown's real name was "Bob". Mr Torre says this at paras 16-18 of his declaration:

> 16.   Listings in Polk's San Francisco City Directory, published in 1953, identified the pool hall as "Rialto Billiards" with the address of 1138a Market Street, San Francisco, CA.  A page of the City Directory is attached hereto as Exhibit [PT 2].  Rialto Billiards is where we met Sundown.

> 17.   Sundown's tattoo shop was located in the same building as Rialto Billiards. Contained within Polk's San Francisco City Directory 1953 attached to this declaration as [PT 2], is identified "Kestner, Robt D. Tattooing" listing an address of 1138 Market Street, San Francisco, California.  Robert D. Kestner is also listed as Robert D. Kistner, also as having an address of 1138 Market Street, San Francisco, California Polk's San Francisco City Directory 1953 [p 2, Ex **PT2**].

> 18.   Based upon personal knowledge, experience, and review of Exhibit **PT2**, Polk's San Francisco City Directory 1953, I can confidently testify that Sundown was the pseudonym for the person named "Bob", listed as Robert D. Kestner, who operated the tattoo shop in the same building as Rialto Billiards, and that the Sundown whom the Hells Angels Frisco hired to do the illustration for the Membership Card was named Robert Kestner or Robert Kistner.

97   Mr Torre gave evidence that when he joined the Frisco Charter in 1953 or 1954 there were about eight or 10 members.  Generally there were weekly meetings.  There was no Membership Card when he joined.  Mr Torre ultimately did receive a Membership Card.  When he gave evidence, he had with him a card he had received in 1961.  Mr Torre was asked to agree with the proposition put by Redbubble's counsel that everyone who was a member of the Frisco

Charter got a Membership Card in 1954.  Rather than expressly embrace that proposition, Mr Torre said that no-one received a card until they became a member and in his case, "Frank" as President, signed his card.  He was asked whether he could remember when he got his first card and he answered "55".  He seemed to say that he first joined the Club in 1954, and in 1955 he got his card.

98      Mr Torre made the point that he was trying hard to do the best he could to recall the events. However, it should be remembered that Mr Torre was born in 1934 and at the time of his giving evidence, he was 83 years of age.  Nevertheless, his recollection of some things seemed to be quite clear.

99      Mr Torre said that he was present at the Thornton's Beach party when the Berdoo members visited in September 1954.  Mr Torre was asked if he could recall whether the members might have received their Membership Cards at that party.  He seemed to reject that proposition (although not directly) by again saying and making the point that "you did not get a card until you became a member".  Perhaps Mr Torre was thinking that some persons who were not (or may not have been) members may have been present at the Thornton's Beach party or perhaps that "party" was not a forum for issuing the Membership Cards.

100     Mr Torre was asked whether, for those persons who were already members when the card was designed, they all got their cards at once.  Mr Torre seemed to then say that he got his card "in the latter part of 54".

101     I will return to some aspects of Mr Torre's evidence on this topic later in these reasons.

102     Returning to Mr Barger's evidence, Mr Barger refers to the Membership Card image (depicted at para 29 of his declaration in the same terms as the image at [17] of these reasons).  He says that the card also recorded the member's details and the member's Charter affiliation.

103     Mr Barger says that the Club began to develop internationally in 1961 with a Charter in Auckland, New Zealand.  In 1969, a London Charter was admitted.  Other Charters in the United States were admitted.  Today there are more than 250 Charters in Europe.  At the end of the 1970s, Australian Charters were admitted.  Against the background of growth in Charter admissions, the Club started to get ready to incorporate.  On 6 August 1966, Club members voted to create a non-profit corporation.  On that day, Mr Barger was elected Chairman of the Board of the still unincorporated association (that is, the Club).

104    The primary purpose of the new corporation was, he says, to be to own, licence and protect the Club's intellectual property.

105    Several years elapsed but on 2 September 1970, the Frisco Charter incorporated a non-profit corporation called "Hells Angels of San Francisco Inc." ("HA San Francisco Inc").

106    From then, Club members began to call HA San Francisco Inc, the "Corporation".   He says that members of Charters agreed that the Corporation would manage and enforce all of the Club's intellectual property.   He says that the Corporation began to "enforce" rights in relation to Hells Angels insignia, internationally.

107    In 1971 or 1972, a lawyer in Los Angeles incorporated "the Hells Angels Motorcycle Club Inc." (the "1972 Corporation") as a "for profit" corporation.   That entity applied for a side-view Death Head image together with the words "Hells Angels" as a trade mark.   Mr Barger gave evidence that both steps were a mistake which the Club "straightened out".   The 1972 Corporation was dissolved and the trade mark registration was assigned to HA San Francisco Inc in 1975.

108    On 4 May 1973, HA San Francisco Inc changed its name to "Hells Angels Frisco Inc." ("HA Frisco Inc") and on 3 October 1981 the Club resolved to change the name again to "Hells Angels of the United States Inc." ("HAUS Inc") with Mr Barger elected as Chairman.   The name changed again to "Hells Angels Motorcycle Club Inc." and again to "Hells Angels Motorcycle Corporation" which is the current name of the Corporation.   Mr Barger asserts that although there have been a succession of name changes, the Corporation, by its current name, is the entity "which owns all [Hells Angels] intellectual property".

109    Mr Barger says that the mechanism by which that result is so, arises in the following way.

110    Around October 1981, "Club members" and "Club Charters" which had participated in creating Hells Angels intellectual property "agreed" that the non-profit entity then called HAUS Inc "would own all copyrights and trade marks and other intellectual property and all intellectual property of the Charters", including the Membership Card image.   Mr Barger says that "by an oral agreement, which was fully and legally binding on all the Charters and members at that time", all of the intellectual property subject matter just described was "assigned into [HAUS Inc]".   Mr Barger says that the Club decided to have a non-profit corporation own all of the intellectual property (as earlier described) so that "no private individual or company

would own the Club's intellectual property".  The company would be used and managed for the benefit of "Club Charters and members" and not for gain.

111     As to the ownership of the copyright subsisting (or said to subsist) in the Membership Card image, the position for the purposes of Australian law is clear.  Notwithstanding United States copyright law in relation to "works for hire", Mr Cobden SC for Redbubble and Mr Eliades for the applicant, agree (and conducted this issue at trial on the footing) that for the purposes of Australian copyright law there *must* be an assignment in writing vesting the ownership of the copyright (originating in the author, Sundown) in the entity HAMC US:  s 239 of the *Copyright Act*; no such assignment is asserted or in evidence.

112     It may be that on proper analysis, the members of the San Francisco Charter on or about September 1954 became the beneficial owners of the copyright subsisting in the Membership Card image.  It may also be that by force of certain oral agreements, the continuing members of the San Francisco Charter decided to confer whatever interest they enjoyed in Sundown's work, upon HAMC US.  Perhaps they hold the legal title on trust for HAMC US.  However, HAMC US is not the owner of the legal title to the copyright in the work for the purposes of Australian domestic copyright law.  Accordingly, the applicant's title can rise no higher than that of HAMC US (putting to one side entirely the question of whether the applicant is properly characterised as an *exclusive licensee* of HAMC US in respect of any copyright that that corporation does own).

113     I am not satisfied that the second respondent is the owner of the copyright in the Membership Card image for the purposes of Australian copyright law.

**The Fuki current Death Head design**

114     It seems reasonably clear from the applicant's written submissions and certainly from the oral submissions that very little emphasis or weight (or analysis) has been placed upon the Fuki work as a source of rights said to have been infringed.  However, the applicant has not abandoned reliance upon the Fuki work and thus it is necessary to address the topic.

115     Mr Barger says that in 1983 "as part of standardising the brand", the Fuki Death Head design was created in digital form.  The objective of this "standardisation process" was to "help eliminate natural variations in patches that resulted from them [their] being hand-made".  Mr Fukushima gave a declaration of 2 February 2016 in which he says that he "created the design described as the 'Fuki Death Head' or 'Death Head (Side View)' as a derivative work,

intended to up-date a pre-existing copyrighted work owned by HAMC".  He says that his work is "based upon and derived from the 'Death Head' design" in the "Hells Angels Membership Card [image]".

116    Mr Fukushima identifies that work by displaying the Membership Card image at para 7.

117    Mr Fukushima then explains that from the moment of creation of his derivative work, he intended HAMC to have the sole and exclusive rights that might subsist in the work.  He says that in 2015 in order to perfect HAMC's "beneficial ownership in the Work to legal ownership of the Work" by vesting the legal title in HAMC, he executed a written assignment in favour of that corporation.  However, the 2015 assignment attached an incorrect illustration of the Fuki Death Head.  Mr Fukushima confused a very similar drawing by Mr Barger called the "Barger Larger Death Head", with his drawing.  The only real point of distinction between the two is that Mr Fukushima's drawing has nine "feather points" on the bottom section and not eight.  A fresh assignment was executed by Mr Fukushima on 29 March 2017 to correct the error.

118    There are four things to note about Mr Fukushima's evidence and that of Mr Barger.

119    *First*, Mr Fukushima gives no evidence about the skill, effort or work deployed by him in bringing his image into existence.

120    *Second*, he describes it as a "derivative work", "based upon and derived from" the Membership Card image.

121    *Third*, he says his work was simply to "update" the earlier Membership Card image.

122    *Fourth*, Mr Barger says that the process involved was a standardisation exercise to avoid natural variations in hand-made patches.

123    I am not satisfied that any copyright has been demonstrated to subsist in Mr Fukushima's work. Mr Fukushima's work is simply a derivative standardised version of the earlier Membership Card image.  There is no independent copyright subsisting in Mr Fukushima's work and all rights in that work derive from whatever rights subsist in the work from which it derives, namely, the Membership Card image.

124    Recognising the difficulties in demonstrating ownership of the copyright said to subsist in the Membership Card image (and, derivatively, the Fuki current Death Head design), the applicant sought to rely upon s 213 of the *Copyright Act*.  That section provides that s 35(5) does not

apply in relation to works made in pursuance of an agreement made before the commencement of the *Copyright Act* (1 May 1969):  s 213(2).  Where a work is excluded from the operation of s 35(5) by s 213(2), s 35(2) has effect (rendering the author of the artistic work the owner), *subject to* ss 213(4) to 213(8):  s 213(3).

125    Section 213(5) is in familiar terms and provides:

> **213    Ownership of copyright**
>
> …
>
> (5)    Where, in the case of a *work being a* photograph, *portrait* or engraving:
>
> > (a)    a person made, for valuable consideration, an agreement with another person for the taking of the photograph, the painting or *drawing of the portrait* or the making of the engraving by the other person; and
> >
> > (b)    the work was made in pursuance of the agreement;
> >
> > the first-mentioned person is the owner of any copyright subsisting in the work by virtue of Part III.
>
> [emphasis added]

126    The question of whether the drawing made by Sundown in September 1954 bears the characteristics comprehended by the statutory language of an agreement for the painting or "drawing of the portrait" by Sundown is seriously open to doubt.

127    The subject matter of the drawing is a profile or side-view of a human skull (described as a Death Head) wearing a helmet adorned with feathers or headdress.  The applicant says that the Membership Card image is "a portrait" and the agreement made between the Frisco Chapter and Sundown in 1954 was an agreement made for the "drawing of the portrait" and that the Frisco Chapter members are the owners of the copyright in the image.

128    The claim that the subject matter of the Sundown work is a portrait was not pleaded.

129    However, it was first raised in closing submissions.

130    The respondent says that it would have called expert evidence about the topic of whether the subject matter of the drawing is properly characterised as a portrait.  Questions might arise about whether the drawing can be regarded as something in the nature of a grotesque caricature of "a person".

131    I doubt very much that it can be so regarded.

132     The drawing is a side-view of a human skull (any and every human skull) in a state best described as a Death Head.  A "portrait" is understood as a "representation of a person or animal, especially of the face, made by drawing, painting or photography":  Oxford English Reference Dictionary, Revised 2nd Ed.

133     A particular representation of a person or animal might be an exaggeration of the features of that person or animal but nevertheless it would arguably remain *a representation* of a particular person (or animal).  In this case, there is no particular person or animal represented by the image.  It is an image of a skull as an anatomical feature of a human, wearing a helmet and adorned by particular feather points sometimes called a headdress.  No doubt, expert evidence might have been called about this topic.  I accept that the respondent may have elected to call evidence on this issue and was deprived of an opportunity to do so, as it contends, by the lateness of the point.

134     I am not willing to allow the applicant to run the point at this late stage.  I have very little doubt, in any event, that the point has no merit but that question would have been determined upon proper evidence which would almost certainly have involved some expert evidence about the nature of a "portrait" for the purposes of the *Copyright Act* and whether Sundown's work engages that concept.

135     If the work is to be regarded as a portrait, it would mean that the members of the Frisco Charter in 1954 would have become the owners of the copyright and presumably the copyright would have been held by the members of that Charter "for the time being", over time.  If that were so, the difficulty remains of demonstrating whether the ownership of the copyright in the portrait subsisting in the Frisco Charter members ever became vested in HAMC US.

**First publication of the Membership Card issue**

136     Notwithstanding that HAMC US treats the Membership Card image as "unpublished" for the purposes of United States copyright law, the parties again agree that the question of whether the work is a published work falls to be determined according to Australian domestic copyright law:  *Enzed Holdings Ltd v Wynthea Pty Ltd* (1984) 4 FCR 450 at 458, Sheppard, Morling and Wilcox JJ.

137     However, s 210 of the *Copyright Act* applies to the Sundown work as if, for the purposes of determining whether copyright subsisted under the *Copyright Act 1911* (Imp), the work was first published in Australia:  Reg 10, *Copyright (International Protection) Regulations 1969*

(Cth).  Redbubble says that the Membership Card endorsed with the Sundown work was first published in 1954.  Section 29(1)(a) provides that an artistic work or an edition of such a work, "shall be deemed to have been published if, but only if, reproductions of the work or edition have been supplied (whether by sale or otherwise) to the public".

138   Sundown's "exhibition" of the work, as an example of his work or skill, is expressly excluded by s 29(3) of the Act.

139   Redbubble relies upon "supply" of reproductions other than by sale, "to the public" (s 29(1)(a)) in the period 9 September 1954 to 31 December 1954 by distribution of the card to all members of the Club that commissioned the work, that is Hells Angels Frisco.  I accept that the Membership Card was established as a badge of membership of the Hells Angels Frisco Club; that it was endorsed with the Sundown work; that it was, over time, issued (distributed) to members as a badge or indicia of membership of persons accepted as "admitted" to membership by the relevant Chapter as like-minded persons sharing an enthusiasm for motorcycles.

140   I am not satisfied on the evidence that the Membership Card was first issued to members in the period 9 September 1954 to 31 December 1954.  It may have been issued in that period, but it may not.  It could easily, on the evidence, have been sometime in 1955.  Some cards may have been given to the small number of members of the Frisco Club in that period which seem to be around about eight to 10 or so members when Mr Torre joined in 1954 or 1955, but it is not clear.  I am satisfied that the Membership Card was probably (more likely than not) issued to members of the Frisco Club at some time in 1955.  The Membership Card was relatively widely used by members as a badge of membership by 1957 as it was issued to each member of four or five Charters then in existence amounting to a distribution to at least 48 members but possibly as many as 75 (being the best evidence of the range of possible members of the four or five Charters).

141   Is the distribution of a Membership Card to each member of a club of like-minded motorcycle enthusiasts a supply of reproductions of the work to the public?

142   At least so far as distribution by 1957 to either 48 or possibly as many as 75 members (at the outer boundary of the four or five Charters is concerned), I do not accept that issuing a Membership Card with the Sundown image endorsed upon it is a supply of reproductions of the work *to the public*.

143     Redbubble places great emphasis upon the observations of Dawson and Gaudron JJ in *Telstra Corporation Limited v Australasian Performing Right Association Limited* (1997) 191 CLR 140 at 156-157 ("*Telstra v APRA*"); Toohey J agreeing at 158; McHugh J agreeing at 174 and Kirby J agreeing at 202-203.  Those observations go to the question of the scope of the concept of transmissions or distributions "to the public" and the notion of things occurring "in public".  The discussion by Dawson and Gaudron JJ of the concept of "to the public" and "in public" concerned a particular statutory setting and circumstances very different to those presented by the question of the character to be attributed to issuing a Membership Card to a relatively small number of members of a club, in this case, made up of motorcycle enthusiasts.

144     *Telstra v APRA* was concerned with the conduct of Telstra in the operation of its telecommunications network in Australia.  APRA owned the copyright in the music and lyrics for various songs.  Telstra engaged in the provision, in various ways, of music to telephone users placed on hold (a music-on-hold activity).  APRA contended that Telstra's music-on-hold activity engaged an exercise of APRA's exclusive rights in the works, that is, to perform the work in public; to broadcast the work; and, to cause the work to be transmitted to subscribers to a diffusion service:  s 31(1)(a)(iii), (iv) and (v) of the *Copyright Act*.  The three ways Telstra provided music-on-hold were these.

145     *First*, where a person made a telephone call to a Telstra service centre and was placed on hold, music would be heard by the caller.

146     *Second*, where a person called a governmental or business organisation to which Telstra provided a transmission service, music-on-hold would be heard by a waiting caller.

147     *Third*, where a person made a call to a subscriber to Telstra's "CustomNet" service and the subscriber's line was busy, the call would be diverted to a music-on-hold facility at Telstra's nearest telephone exchange.

148     Each of those three situations might arise either where the caller uses a landline (or "conventional telephone") or where the caller uses a mobile telephone.  It is not necessary to examine in these reasons the detail of the reasoning Dawson and Gaudron JJ (and those Justices agreeing with their Honours) on all of the issues raised by that litigation.  The matters of relevant principle for present purposes arose in the context of whether, by providing music-on-hold to callers using a mobile telephone, Telstra engaged in a "broadcast" of the works in suit, and that question engaged whether Telstra had made a transmission by wireless

telegraphy "to the public".  There was no doubt that Telstra had made a transmission by wireless telegraphy and thus the "only issue" (Dawson and Gaudron JJ at 153) was whether the transmission was "to the public".

149     In that statutory context, Dawson and Gaudron JJ examined some of the notions developed in the jurisprudence about the words "to the public" and the notion of a "relationship" between a copyright owner and "the public".  The concept of the "copyright owner's public" (a possessive notion) evolved in cases concerned with a distinction between a performance of a work "in public" on the one hand and a private or domestic performance on the other hand.  The notion of transmitting (or supplying in the case of s 29(1)(a)) something (a work) "to the public" suggests a "broader concept" than something done "in public".  Dawson and Gaudron JJ observed at 155 that in the case of music-on-hold which might be heard when the caller is in a private or domestic setting, the transmission might nevertheless be "to the public".  Dawson and Gaudron JJ also observed at 155 that when thinking about a transmission to a "limited class of persons", the cases addressing whether a performance is "in public" recognise that "the *relationship* of the *audience to* the *owner* of the copyright is significant" [emphasis added]: Dawson and Gaudron JJ at 155.

150     Their Honours observe that this *recognition* led to the notion of the "copyright owner's public".  Whether an act occurred "in public" was to be considered *in relation to* the owner of the copyright.  If the audience in question might properly be regarded as "the owner's public" or part of "his [or her] public", with the result that the doing of the impugned act before *that audience* transgresses upon the audience reserved to the owner, an infringement arises: *Jennings v Stephens* [1936] Ch 469 at 485, Greene LJ.

151     The question then became, according to a line of authority, is the audience, one which the owner of the copyright could *fairly consider* a *part* of his [or her] public? (Dawson and Gaudron JJ at 156) and the cases cited by their Honours:  *Ernest Turner Electrical Instruments Ltd v Performing Right Society Ltd* [1943] Ch 167 at 171, 172-173, 175-176; *Performing Right Society Ltd v Harlequin Record Shops Ltd* [1979] 1 WLR 851 at 857; *Australian Performing Right Association Ltd v Canterbury-Bankstown League Club Ltd* (1964) 81 WN Pt (1) (NSW) 300 at 305-306; *Rank Film Production Ltd v Dodds* [1983] 2 NSWLR 553 at 559.

152     In *Performing Right Society Ltd v Harlequin Record Shops Ltd* (supra) at 857, Browne-Wilkinson J made this observation in the context of assessing the notion of whether

the owner of the copyright could fairly consider the relevant audience a "part of his [or her] audience":

> [T]he authorities show that it is also important to see whether the performance is given to an audience for performances to which the composer *would expect to receive a fee*: this is what I understood Lord Greene M.R. to have meant by the "owner's public" in *Jennings v Stephens* [1936] Ch 469 at 485 and *Performing Right Society Ltd v Gillette Industries Ltd* [1943] Ch 167, 173.
>
> [emphasis added]

153     In the Australian case of *Rank v Dodds* (supra), the transmission of films to television sets in motel rooms (and the playing of those films by a guest in his or her room) was held (at 559) to "easily envisage" the notion that the motel guest, in his or her room in those circumstances, was "part of the copyright owner's public". The "critical matter" was that the movie was presented to the guest in his or her capacity as a guest: Rath J at 559. As to that example, Dawson and Gaudron JJ in *Telstra v APRA* at 156-157 observe that "the number of guests playing films in their rooms may not have been large but the motel was open to the public".

154     Applying all of these principles, Dawson and Gaudron JJ observed in *Telstra v APRA* that those members of the public who chose to call a relevant number on their mobile phone may have been relatively small, but the music-on-hold facility was available "to members of the public generally". Their Honours also said this at 157:

> Lying behind the concept of the copyright owner's public is recognition of the fact that where a work is performed in a commercial setting, the occasion is unlikely to be private or domestic and the audience is more appropriately to be seen as a section of the public.

155     In the case of the Membership Card image, Sundown was content to be paid what seems to be a nominal fee of $2.50 for "our artwork on the club cards" and he was content to see the image used on a card signifying a person's membership of the Club. There can be little doubt that Sundown did not "expect to receive a fee" from the "audience" to whom the card was given. The members of the Club were not in any sense, it seems to me, "a part of Sundown's audience" in the sense that that term is understood in the authorities. Moreover, it seems clear enough that the work was made for the purpose of adorning the Club Membership card with an acceptable properly drawn image for the limited purpose of members holding a card affirming their membership of the Club. The work is not one made, performed or given in a commercial setting. Also, Sundown's "commercial interest" in the work was exhausted by the payment of $2.50.

156    The setting is very much in the nature of a private or domestic setting.

157    It follows that I do not accept that the Membership Card image was published by supplying cards bearing the image to members in 1955 or by 1957.  When it was "published", for the purposes of Australian copyright law, is not at all clear on the evidence.  There are now a sufficient number of members of the various Chapters that the Membership Card is very likely to have been published for the purposes of Australian copyright law.  Section 29(1)(a) of the *Copyright Act*, of course, is concerned with the circumstances (if, but only if) when, relevantly, an artistic work is "deemed" to have been published.

158    As to the question of whether the identity of Sundown was at any time between September 1954 and 31 December 2004 "generally known", it seems clear enough that he was generally known by and to Mr Torre and at least some small number of other Frisco Charter members as "Sundown".  The evidence does not reveal whether his *identity* was generally known in the sense of whether he was generally known to all the members of the Frisco Charter and also to those persons coming and going from his tattoo shop (his customers) so that, although he used the "name" or "pseudonym" of "Sundown", his identity was generally known to be, Robert (Bob) D. Kestner (sometimes spelt Kistner).

159    However, I am satisfied that his identity could have been ascertained by reasonable inquiry in September 1954 or at least within a reasonable period from September 1954 (a year or two or perhaps over a longer period).  That follows because Mr Torre and other members knew him.  They saw the draft image he drew.  They commented upon it.  They "hung out" in his daily environs.  They spoke to him.  Mr Torre could so easily have said to him, at any point in these engagements, "Hey, Sundown, what's your real name?  We need to know".  Is there any doubt that he would have received an answer from "Sundown" to that question?  I think not.

160    Although I have concluded that the applicant has not established that HAMC US is the owner of the copyright subsisting in the Membership Card image and that the Fuki current Death Head design is truly a derivative work, I will nevertheless examine the question of whether the applicant is properly characterised as an *exclusive licensee* of the second respondent for the purposes of the *Copyright Act* and whether (assuming copyright subsisted in HAMC US) an infringement of copyright arises out of the conduct of the respondent as pleaded and contended.

**Mr Kovalev's role**

161   Mr Kovalev is the "Chief Technology Officer" for the Redbubble group of companies, that is, Redbubble Limited, the first respondent; *Redbubble Inc.* ("Redbubble USA"); *Redbubble UK Limited* ("Redbubble UK") described as a non-operating entity incorporated in England and Wales; and *Redbubble Europe GmbH* which he describes as a non-operating entity incorporated in Germany.

162   These companies are the Redbubble group of companies referred to by Mr Kovalev in his evidence.

163   The Head Office for Redbubble Limited is located in Melbourne.  Mr Kovalev gives, as his address, a business premises address in Collins Street, Melbourne.  Mr Kovalev has been in continuous employment with Redbubble since 12 December 2015 as the Chief Technology Officer.  He is a member of Redbubble's executive leadership team and he is responsible for overseeing all technology matters including:  the management and maintenance of Redbubble's technology assets including the Redbubble website and the technology infrastructure supporting it; software engineering and development activities; and the management of Redbubble's technology staff.  He holds a Bachelor of Science degree in Computer Engineering and a Master of Science in Computer Science from Georgia Institute of Technology.  Mr Kovalev sets out in his affidavit of 28 July 2017 other aspects of his background skills which are not necessary to recite in these reasons.

**Martin Hosking and the business model deployed by Redbubble**

164   As to the background matters concerning the "business model" deployed by Redbubble and the role of the various Redbubble entities, the evidence of Mr Martin Hosking should be noted before returning to Mr Kovalev's evidence concerning the functionality of the Redbubble website.

165   Mr Hosking is the Managing Director ("MD") and Chief Executive Officer ("CEO") of Redbubble Limited.  He has been the MD and CEO since June 2010.  He is on the Board of Redbubble USA and Redbubble UK.  Mr Hosking was one of the founders of the Redbubble business in 2006 (as a proprietary limited company) together with his co-founders, Peter Styles and Paul Vanzella.  The business model adopted by the founders is described by Mr Hosking as based on the "idea of an online marketplace" where "artists and designers would be the primary customers".  The founders decided to "combine" their "new concept" with the

technology they had already developed for a "'print-on-demand' personalization service for customers who wanted to purchase a product with an image or word they had created". The "online marketplace" combined with the "personalization service" technology would enable artists to "upload and sell their designs": Hosking, affidavit, 28 July 2017, paras 7, 12, 16-18.

166     The Redbubble website was launched on 2 February 2007. It has operated as the "primary platform" for the Redbubble business model "ever since". The domain name was acquired by the first respondent in 2006 as the "primary brand and domain" for the business model. Mr Hosking gave evidence that although Redbubble operates under the URL *redbubble.com*, there are "separate sites" for users in, for example, Germany, France and Spain. The German site is *redbubble.de* (a German language site). There is also a site *redbubble.com.au*. If a user or consumer types that site description into an internet search engine, that site will "redirect" the inquirer to *redbubble.com*: T, p 295, lns 35-47; 296, lns 1-10. Mr Hosking says that the Redbubble website, from the outset, enabled artists to: sell directly to customers; maintain the copyright in their work; regulate their own margins; and choose which products would be sold bearing their artworks. Mr Hosking accepts that the Redbubble business model limits the artist to selecting products identified by Redbubble to which the artist's work might be applied. It does not enable an artist to select "any product", use a third party manufacturer of choice and sell through the Redbubble website: T, p 297, lns 17-23.

167     When the business commenced, arrangements were made with only one fulfiller to discharge the role of a fulfiller (explained later in these reasons) under the model. Mr Hosking says that it quickly became clear that fulfillers in the United States would be needed. Expansion meant that other entities were needed. Moreover, operations could no longer be conducted solely from Melbourne in Australia. Redbubble USA was incorporated in 2007 as a subsidiary of Redbubble. Since then, Redbubble USA "has been primarily responsible for worldwide sales, marketing and logistics operations". Although Redbubble UK was incorporated as a subsidiary to undertake that role in Europe, it has never done so. Redbubble USA performs that role in relation to Europe, as well.

168     In 2010, Redbubble "overhauled the look and feel" of the website. Some of the changes allowed users to refine searches of the site by multiple criteria including product type, colour and category. The layout of search results was altered. New product styles were added. The ability of artists to upload their works was improved along with the capacity to track sales. Also, artists were provided with an opportunity to market their artwork on social media.

169     In 2009, Redbubble decided to restructure its outsourced infrastructure arrangements.  From 2006 to 2009, the Redbubble website operated on servers physically located in Australia, in Melbourne, at an IT facility "hosted" by a third party.  In late 2009, Redbubble commenced a process by which all information including artists' accounts and images uploaded by them to the site were "transferred electronically to different hard drives and CPUs physically located in the United States of America [USA]".  Mr Hosking says that this step was necessary because the majority of Redbubble's website customers, both artists and end-customers, were located in the USA.  Mr Hosking says that the location of the customers made it more "cost effective" to utilise servers located in the USA and it also meant that the protocols governing "Google" would recognise the Redbubble website as a USA site which "improved our rankings from US customers in search results".

170     In mid-2012, Redbubble adopted the following logo:



171     The logo and the name "Redbubble" have been registered in Australia as trade marks by Redbubble Limited.  The registrations are these:

| Trade Mark Number | Trade Mark | Priority Date | Goods Class | Services Class |
|---|---|---|---|---|
| 1118057 | RedBubble | 9 June 2006 | 25, 28 | 35, 40, 42 |
| 1175669 | Redbubble | 11 May 2007 | 16 | 35 |
| 1529389 | Redbubble | 4 December 2012 | 16 | 35, 40 |
| 1529392 | Redbubble | 4 December 2012 | 25 | 42, 35 |
| 1529395 | Redbubble | 4 December 2012 | 9, 14, 15, 16, 18, 19, 20, 21, 24, 26, 27, 28 | 35 |
| 1474232 | The logo at [170] | 13 February 2012 | 16, 25, 28 | 35, 40, 42 |
| 1529481 | The logo at [170] | 4 December 2012 | 9, 14,15, 16, 18, 19, 20, 21, 24, 25, 26, 27, 28 | 35 |

172     The specification of the goods and services for which each of the following trade marks of Redbubble Limited is registered include these goods and services:

(1)     Trade Mark 1118057 for the word "RedBubble":

    (a)    **Class 25** Jackets (clothing); T-shirts; aprons (clothing) hoods (clothing) and other clothing;

    (b)    **Class 28** Jigsaw puzzles;

    (c)    **Class 35** Advertising services provided over the Internet;

    (d)    **Class 40** T-shirt printing; photo printing; framing of pictures; framing of works of art; picture framing; photographic printing; printing; textile printing;

    (e)    **Class 42** Clothing and fashion designing; clothing design services.

(2)    Trade Mark 1474232 for the Redbubble logo:

    (a)    **Class 16** Works of creative expression, namely photographs, paintings and printed matter;

    (b)    **Class 25** Jackets (clothing); T-shirts; aprons (clothing) hoods (clothing) and other clothing;

    (c)    **Class 28** Jigsaw puzzles;

    (d)    **Class 35** The provision of business services to facilitate creative expression;

    (e)    **Class 40** T-shirt printing; photo printing; framing of pictures; framing of works of art; picture framing; photographic printing; printing; textile printing;

    (f)    **Class 42** Clothing and fashion designing; clothing design services.

(3)    Trade Mark 1529395 for the word "Redbubble":

    (a)    **Class 9** Cases, covers and skins for mobile phones and smart phones, mobile phone and smart phone accessories, computer accessories, covers and accessories for tablet and hand-held computing devices;

    (b)    **Class 14** Watches and Clocks, jewellery, metal ornaments;

    (c)    **Class 15** Guitars and guitar accessories, musical keyboards and keyboard accessories;

    (d)    **Class 16** Works of creative expression, namely greeting cards, photographs, paintings and printed matter; decorative stickers, sticker albums, transfers, bumper stickers, decals, posters, cards;

    (e)    **Class 18** Travelling bags, wallets and wallet accessories, purses and purse accessories, handbags;

    (f)    **Class 19** Floor, facing, wall, ceiling and roof tiles;

    (g)    **Class 20** Soft furnishings including cushions, mirrors, pillows;

    (h)    **Class 21** Drinking mugs for beverages, combs, brushes, glassware, dishes, drinking cups;

    (i)    **Class 24** Tea towels, Towels, bed covers, textile wall covers;

    (j)    **Class 26** Badges and buttons;

    (k)    **Class 27** Wallpaper and wallpaper accessories;

    (l)    **Class 28** Jigsaw puzzles and sporting goods, Skateboards and skateboard accessories, surfboards and surfboard accessories;

    (m)    **Class 35** The provision of business services to facilitate creative expression.

(4)    Trade Mark 1529481 for the Redbubble logo:

(a)  **Class 9** Cases, covers and skins for mobile phones and smart phones, mobile phone and smart phone accessories, computer accessories, covers and accessories for tablet and hand-held computing devices;

(b)  **Class 14** Watches and Clocks, jewellery, metal ornaments;

(c)  **Class 15** Guitars and guitar accessories, musical keyboards and keyboard accessories;

(d)  **Class 16** Works of creative expression, namely greeting cards, photographs, paintings and printed matter; decorative stickers, sticker albums, transfers, bumper stickers, decals, posters, cards;

(e)  **Class 18** Travelling bags, wallets and wallet accessories, purses and purse accessories, handbags;

(f)  **Class 19** Floor, facing, wall, ceiling and roof tiles;

(g)  **Class 20** Soft furnishings including cushions, mirrors, pillows;

(h)  **Class 21** Drinking mugs for beverages, combs, brushes, glassware, dishes, drinking cups;

(i)  **Class 24** Tea towels, Towels, bed covers, textile wall covers;

(j)  **Class 25** Footwear, sneakers, basketball sneakers, belts;

(k)  **Class 26** Badges and buttons;

(l)  **Class 27** Wallpaper and wallpaper accessories;

(m)  **Class 28** Jigsaw puzzles and sporting goods, Skateboards and skateboard accessories, surfboards and surfboard accessories;

(n)  **Class 35** The provision of business services to facilitate creative expression.

173   As to these trade mark registrations, Mr Hosking accepts that Redbubble has registered its name and its logo in a range of goods or product categories and for a range of services. For example, Trade Mark 1474232 (the logo) is necessarily (by reason of the filing) asserted to be a trade mark used or intended to be used to distinguish goods (in this example, Class 25 jackets, T-shirts, aprons, clothing for sports, headbands, hoods (among other nominated goods)) and/or services (for example, business services to facilitate creative expression), "dealt with or provided" in the course of trade, by the owner of the trade mark, Redbubble, from goods and/or services so dealt with or provided by some other person:  T, p 280, lns 1-33; s 17, *Trade Marks Act*.  As the Schedule at [171] shows, the trade mark "Redbubble" (1529395 is registered in 12 separate goods classes and the logo trade mark at [170] (1529481) is registered in 13 separate goods classes.

174   Redbubble says (in Confidential Document MH-1 to Mr Hosking's affidavit) that Redbubble provides "a fulfilment engine which produces physical items on demand for customers". Mr Hosking says that Redbubble provides the "fulfilment engine" but the products are produced on demand for customers by third party fulfillers, not Redbubble:  T, p 281, lns 11-13.  Mr Hosking says that Redbubble acts as the "agent" of ("on behalf of") the artist in

making the arrangements with fulfillers:  T, p 281, lns 21-23.  Also, Redbubble sets the minimum price for the product being sold which cannot be a price lower than the price arranged with the fulfiller otherwise Redbubble would be losing on each transaction:  T, p 281, lns 25-32.

175    Mr Hosking accepts that the "clothing tag" depicted below is a tag attached to a T-shirt as delivered, as purchased by Dr Brent Coker, as explained in Dr Coker's affidavit of 1 August 2017:  paras 5.3.29 to 5.3.33, Dr Coker's report; T, p 283, lns 15-36.



176    Mr Hosking was taken to a page of the Redbubble website viewed by Mr Gavin Hansen (as explained in Mr Hansen's affidavit of 4 April 2017) which depicts the image (Example 1) at [44] of these reasons.  Mr Hosking accepts that above the image, on that page, is the Redbubble logo and that one of the 16 "tags" is "Hells Angels" along with "Hells Angels of Virginia" (among others).  In this example, the artist has chosen "Hells Angels of Virginia".

177    Mr Hosking accepts that Annexure GH-2 to Mr Hansen's affidavit is an order confirmation sent by Redbubble to Mr Hansen confirming the order of 1 Unisex T-shirt bearing the image.

178    Mr Hosking accepts that GH-3 is a message from Redbubble (also depicting the image) to the buyer (Mr Hansen), marked with "Redbubble" and the Redbubble logo, confirming that: "Your order has been completed and the shipping company will [be delivering] this very instant".

179     Mr Hosking accepts that GH-4 (pp 18-20) displays the same image but on this occasion
        displayed on a T-shirt which has a tag attached to the T-shirt and on the tag are the words
        "Redbubble", as shown in GH-4:  T, p 285, lns 1-13.

180     Mr Hosking accepts that GH-5 (a printout of a search result of the Redbubble website by
        Mr Hansen on 31 March 2017 which shows that his order was manufactured and shipped on
        18 November 2014), shows another reproduction of the image under the words:  "Designed by
        photroen, Portsmouth, United States":  T, p 258, lns 15-16.  Mr Hosking accepts that the same
        sequence of steps (where the tag is "Hells Angels"), supported by the relevant screenshots or
        printouts, had occurred concerning the image (Example 2) at [44] of these reasons.
        Mr Hosking accepts that the same position prevails concerning the image (Example 3) at [44]
        of these reasons.

181     Mr Hosking accepts that, in all these examples, at each stage of the process in the purchase of
        the article bearing the image, there is a clear marking of the communication with the Redbubble
        trade marks.

182     Redbubble listed on the Australian Securities Exchange on 16 May 2016.

183     As at the date of the trial, Redbubble had appointed 15 fulfillers to apply the work of artists to
        relevant products.  The particular step processes are explained by Mr Kovalev and described
        later in these reasons.

184     Mr Hosking says that at the time of developing the new business plan in 2006, one of the
        identified "risks" was that customers (that is, "artists") could use the Redbubble "marketplace"
        (website) to infringe copyright or upload illegal material.   I assume that Mr Hosking,
        understandably enough, had in mind a risk to which *Redbubble* would be exposed (which
        would need to be mitigated), rather than risks to which the copyright owners would become
        exposed by reason of the Redbubble business model.  The risk to Redbubble would be mitigated
        by extracting an acknowledgement from the artists that they would not upload infringing
        material and that they would indemnify Redbubble for copyright infringement or other illegal
        activity.   As to its general methodological position, Mr Hosking says this at para 55 of his
        affidavit:

> Given that the Respondent provides a *service to users* through the Redbubble Website
> and does *not create* any artistic content or *manufacture* any products, the Respondent
> considers itself to be a *service provider*.  Accordingly, in 2011, the Respondent adopted
> a notice and takedown process in line with the US Digital Millennium Copyright Act

(**DMCA**).

[emphasis added]

185    Mr Hosking accepts that search results of the website put to him contained the following information.

186    *First*, the image at *Example 3* ([44] of these reasons), was uploaded on 4 August 2015.  It resulted in one sale and 767 views.  It was subject to "Proactive Moderation" on 25 November 2015 approximately three months after the date of first uploading:   T, p 290, lns 25-47; T, p 291, lns 1-11.

187    *Second*, as to *Example 2* ([44] of these reasons), the work was created on 17 November 2009.  There were total sales of four items.  The number of views was 1,724.  The image was taken down from the website on 30 December 2014, a period of just over five years later:  T, p 291, lns 13-47, T, p 292, lns 1-17.

188    *Third*, as to *Example 1* ([44] of these reasons), it was uploaded on 21 September 2014.  There were two sales and 304 views.  The image was "moderated" on 30 December 2014.

189    *Fourth*, as to *Example 4* ([44] of these reasons), it was uploaded on 31 March 2015 and moderated on 3 April 2015.  There were 11 views and no sales.

190    *Fifth*, all four images were tagged "Hells Angels".

191    Mr Hosking explained that Redbubble had decided not to adopt a policy of "blocking" the use of certain tags such as "Hells Angels".  Mr Hosking says that there are many legitimate uses to which a tag can be put.  He says that any word "can be used in a whole series of contexts in relation to creative content".  Also, electing to block a tag "would mean that nothing could be found through the tag".  Mr Hosking gives the example of the brand name "Trump" which, if blocked, would mean that nothing would be found under the tag "Trump" and therefore no creative image or words using "Trump" as a matter of political criticism, rather than as a trade mark, would be possible.  Mr Hosking did not accept that there could be "no legitimate use" of the term "Hells Angels" so as to warrant blocking the term.  In his view, there could be "hundreds" or "thousands" of legitimate uses (by which he means other than as a trade mark use or perhaps a copyright use).  Mr Hosking took a similar position in relation to another example put to him concerning the term "Rolex".  Mr Hosking accepts, however, that there would also be "a lot of illegitimate uses" of such terms (the Rolex example, in particular).  Since Mr Hosking recognised the difficulty created by the use of terms that constitute names

or marks that could be either *legitimate* or *illegitimate* uses in particular contexts, Mr Hosking was asked whether he considered that a "better process" would be to block use of a particular name or mark as a tag and then consider applications by artists, one by one, to use the name, term or mark, legitimately.  Mr Hosking gave this evidence at T, p 294, lns 10-12 (openly rather than confidentially):

> [T]he internet is based around *user-generated content*.  User-generated content is uploaded.  The amount of work and images which are added to Redbubble every day [is significant].  We have *11 million images on the site*.

> [emphasis added]

192     Mr Hosking accepted that an image uploaded to the website has a "particular URL" and that if an image is moderated and made the subject of a "takedown notice", it remains "quite possible" for someone to upload "exactly the same image shortly after, on a different URL":  T, p 294, lns 17-23.

193     Mr Hosking also accepts that the "content team" may possibly find themselves taking down the same offending image either from the same or different artists who upload the image.  However, Mr Hosking says that with increasingly sophisticated tools, Redbubble is getting better at identifying "repeat offenders".  Mr Hosking says that Redbubble does "take down a great deal of content which has been identified to us which is problematic and that [content] is taken down proactively by us in response to the request by the brand-holders or rights holders":  T, p 294, lns 28-31.  Nevertheless, Mr Hosking accepted that the "Angel with Angel" image (Example 2 at [44]) remained on the website for over five years.

194     This exchange occurred at T, p 294, lns 45-46 and T, p 295, lns 1-6:

> Mr Eliades:     You would accept, wouldn't you that if I were an artist and I uploaded an image that was copying a very-well known brand -

> Mr Hosking:     Yes

> Mr Eliades:     - and I sought to apply it to quite a number of products, including phone case covers and pillows and artwork, but the owner or the rights owners or the rights holders were not aware of that image on the Redbubble website, you would accept that that image could stay on the website indefinitely until the rights holders made a complaint?

> Mr Hosking:     That's right.  Until we were aware of the trademark or the copyright which – we *can't know* what the complaint is *until* a complaint is made.

> [emphasis added]

195    Mr Hosking says that the focus for Redbubble was, at the outset, and remains, best expressed in the "mantra":  *"We stand for artists"*.  In 2014, in furtherance of its support for artists and designers, it established the "Redbubble Residency Program" by which a select group of artists take up residence in the Melbourne office for six months (and more recently in the San Francisco office) to work on their designs.

196    As to the evidence of Mr Hosking, I generally accept his evidence subject to the observations made later in these reasons from [405] as to whether the proper characterisation of the business model deployed through the functionality of the Redbubble website, having regard to all of the transactional features of the website and Redbubble's engagement in those features, is simply one of facilitating an online marketplace in which Redbubble provides personalisation services to artists in the way he describes.  The applicant contends that when account is taken of all of the things Redbubble does through the website, it is acting as a seller of goods bearing the relevant artworks or images.  Subject to conclusions about those matters, I accept his evidence.

197    It is now necessary to examine how the business model is deployed through the particular functionality of the website.

**The functionality of the Redbubble website and Mr Kovalev's evidence about that topic**

198    Mr Kovalev explains that the domain name *redbubble.com* is registered in the name of the first respondent.  Mr Kovalev accepts that *redbubble.com* is an "asset" of the first respondent: T, p 214, lns 16-33.

199    Mr Kovalev says that the day-to-day management of the Redbubble website (including aspects of its design and updates) is carried out by Redbubble USA which is based in San Francisco. Redbubble USA is also responsible for marketing activities and the management of "third party fulfillers" and "shippers".

200    Mr Kovalev says that the Redbubble website is "a global online marketplace facilitating transactions between independent artists and customers looking for distinctive products".  He says that independent artists are individuals who produce art and designs on their own and not as part of any organisation.  He says that the aim of the Redbubble website is to provide "a forum where "independent artists" can upload their creative works and offer them for sale on a wide variety of products".  He explains that when a customer places an order through the website, a product is then produced on demand by one of a network of third party fulfillers. Mr Kovalev then explains a sequence of activities.  These activities are said to take place from

the "Redbubble group's side of the transactions, in a completely automated fashion with no, or virtually no, human intervention on the part of the Redbubble group".

201    The activities are these.

202    The signing up of artists (and where applicable, customers); the indexing of artworks; receipt of orders; facilitation of transactions; communications with suppliers relating to transactions; and all despatch and billing, is controlled by the Redbubble group's software system. Mr Kovalev says that all of these activities are, for the most part, "completely automated", "with very little human intervention":   T, p 207, lns 23-32.   These software systems are described as a suite of various "bespoke applications written by Redbubble group staff and contractors".

203    These applications are executed on servers located in the United States of America.

204    The suite of programs making up the applications which execute on these servers in the United States are described by Mr Kovalev as the "Redbubble Software".   That term means: applications described as *Imagehaus* and *Magickraum* which perform the imaging functions described in Mr Kovalev's evidence mentioned later in these reasons; and software called *Redbubble* which is an application used for the signing up of artists; indexing artworks and searching for titles and tags in relation to those artworks; receipting orders from customers; facilitating transactions; and facilitating communications with suppliers.   Mr Kovalev gives evidence, mentioned later in these reasons, about all of those matters concerning the *Redbubble* application.

205    As to the way in which an artist might engage with the Redbubble website, Mr Kovalev gives the following evidence.

### *Artists*

206    Third parties who wish to offer their artwork for sale on the Redbubble website must first "sign up for an account".   The process for signing up for an account requires artists engaging with the website to click the "Get Started Now for Free" button on the "selling page" of the website. The artist then enters an "account name" which will feature at the end of the Uniform Resource Locator ("URL") [www].redbubble.com/people/[account name], together with the artist's email address and a password.   The artist then is required to click the button "Sign Up Now!" Immediately above that button is a disclaimer statement that reads "*By clicking* Sign Up Now,

*you agree to our User Agreement*".  I will return to aspects of the Redbubble User Agreement later in these reasons.

207    Mr Kovalev says that artists engaging with the Redbubble website may be located anywhere in the world.

208    Only once an artist has created an account on the site and accepted the terms of the Redbubble User Agreement, is the artist able to upload an artwork to the site through the enabling functionality of the site.  As to uploading an artwork, an artist must click the "Add New Work" button located at the bottom right-hand corner of the "account landing page".  The artist must then click the "UPLOAD TO ALL PRODUCTS" button on the "upload page".  The artist must then "browse their computer through the pop-up window on the Redbubble Website and select a high resolution image for the upload".  Mr Kovalev says that the pop-up window is presented to the artist after the artist has pressed the "upload to all products" button:  T, p 209, lns 1-3. Having pressed that button and having engaged the pop-up window, the words "open" appear. The pop-up window, in Mr Kovalev's example in evidence, is generated by the user's browser (internet explorer) which presents the "open" button.  Once the user clicks "open", that step commences the process for uploading an image.  However, Mr Kovalev accepts that "you only get to that point of the browser by going through the Redbubble [website] pages [as described earlier]":  T, p 209, lns 15-28.

209    The website enables artists to upload images to the site in a number of different ways depending upon the device they are using.  Artists can upload images from a computer, laptop, tablet or smart phone.

210    Mr Kovalev says that even though an artist may be located in Australia, the images selected by the artist for uploading to the site "may be stored outside of Australia, for example on a cloud storage service".  When the artist clicks "open" and takes the step to upload the artwork, the image is uploaded to one of Redbubble's servers.  Mr Kovalev says that "cloud services" allow artists to store data in third party data centres that may be located far from the artist.  As to the term "cloud computing", Mr Kovalev attaches 20 pages drawn from a *Wikipedia* entry for "cloud computing" which he says explains the elements of that term.  Thus, Mr Kovalev embraces the *Wikipedia* description of the elements of that term.

211    In simple terms, cloud computing is a shorthand description for a sequence of links between computers, networks of computers and servers which enable storage and access to data.  Every

device so linked has a unique number which identifies the device, computer, server etc.  It is sufficient to simply quote this section of the *Wikipedia* entry embraced by Mr Kovalev:

> **Cloud computing** is a new form of Internet-based computing that provides shared computer processing resources and data to computers and other devices on demand.  It is a model for enabling ubiquitous, on-demand access to a shared pool of configurable computing resources (e.g., computer networks, servers, storage, applications and services), which can be rapidly provisioned and released with minimal management effort.  Basically, Cloud computing allows the users and enterprises with various capabilities to store and process their data in either privately owned cloud, or on a third-party server in order to make data accessing mechanisms much more easy and reliable.  Data centres … may be located far from the user – ranging in distance from access to a city to across the world.  Cloud computing relies on sharing of resources to achieve coherence and economy of scale, similar to a utility (like the electricity grid) over an electricity network.

212    Mr Kovalev gives an example of cloud computing in these terms:

> *Example:  A Sydney-based artist could upload an image of their artwork from their Cloud service.  The image is stored by the Cloud service on a server located in California.*

213    Mr Kovalev says that Redbubble USA does not have "any visibility over where images uploaded by Artists have been sourced from".  By this I assume that Mr Kovalev means that staff of Redbubble USA do not know the source of an image uploaded by a user, wherever that user may be located in the world.

214    Mr Kovalev says that images uploaded to the Redbubble website by artists in the way he describes are automatically saved to a server operated by "Amazon Web Services" called the "S3 Service".  The server, so operated, is located physically in North Virginia in the United States of America (the "AWS Server").

### AWS Server

215    Mr Kovalev explains that the "Redbubble Software" (Mr Kovalev's term as earlier mentioned) consisting of the suite of programs executing on servers located in the US, causes *copies* of the original image stored on the AWS Server to be "displayed" on the Redbubble website in "different sizes".  Mr Kovalev says that the "original image" uploaded by the artist according to the process earlier explained is "never displayed on the Redbubble website".  The Redbubble Software used to create a *copy* of an image is source code written by employees of the respondent Redbubble and is "executed" on servers located in the United States.  Mr Kovalev accepts that before an artist's "original image" is automatically saved to the AWS Server, the "process [of uploading] requires the artist to interact with the features of the Redbubble website [that is], with the buttons on the Redbubble website":  T, p 210, lns 1-5.

216     Mr Kovalev accepts that if an artist engages with the Redbubble website (*redbubble.com*) so as to upload a work, the artist will be confronted with buttons to click (or not) located on the Redbubble website and unless the artist goes through that process (of responding to those buttons), the artist "cannot get [his or her] artwork displayed on the Redbubble website": T, p 210, lns 38-46; T, p 211, lns 1-2.

### Further steps by artists

217     Mr Kovalev says that at any time after an artist has uploaded his or her artwork or image, the artist is able to select which products he or she would like to offer to consumers for sale and purchase as products to which the artwork or image might be applied, by selecting possible products from a list of available products as determined by Redbubble.  The artist makes a selection by "enabling" or "disabling" products from the list of available products.  An artist can also edit the way in which an artwork is applied to each product by, for example, altering the orientation of the image or selecting a background colour for the image.  If an artist does not specify any products to which their artwork might be applied for sale, users will not be able to purchase a product bearing that artwork and the artwork will not "show up" in response to searches of the Redbubble website by consumer users.  Mr Kovalev says that the sale of any artwork applied to any particular product is entirely at the discretion of the artist.

218     Once an artist has uploaded an artwork to the site, the artist may also select a title for the artwork; write a description of the artwork; select one or more "tags" for the artwork; and select the relevant "media category" (or categories) which accurately describes their work.  The categories are photography; design and illustration; painting and mixed media; drawing; and digital art.  The artist may also select a "default view" of the artwork which can either be the artwork alone or an image of the artwork as applied to any one of the available products (as an illustration); decide if the artwork is available to be viewed by the public; and specify whether the artwork contains any "mature content".

219     As to the selection of one or more "tags", tags are key words to which searches of the Redbubble website will respond.  For example, if the artwork is an image of an "ocean pool", the artist might create tags for that work consisting of "ocean", "pool" and "water".

220     Once the artist has uploaded their artwork and worked through all of the things described at [215] to [219] of these reasons, the artist can make the artwork available *for sale* by clicking the button "Save Changes" on the "artwork landing page" and by entering their payment details.  Immediately above that button is a disclaimer in these terms:

> When a product is sold through the website the *sale* is between **you** and **the customer** – **Redbubble acts as your agent** in this process.  In order to act as your agent, we need your explicit permission.

[emphasis added]

221   Just below the disclaimer, there is a "check box" next to the words:  *"Yes and I agree to the Redbubble User Agreement"*.  The words "User Agreement" are hyperlinked to a full text copy of the User Agreement.  Artists must agree to the Redbubble User Agreement before they can complete their profile.  They cannot deselect the check box.

222   If an artist experiences technical difficulty in uploading an artwork to the Redbubble website, they can find solutions on the "Common Uploader Problems" page found in the "Help Centre" of the website.  If problems persist other steps are suggested on the website.  Alternatively, an artist can contact Redbubble's "Artist Experience team" by taking steps through the website by clicking particular prompts and buttons.  The Artist Experience team established by Redbubble consists of four people located in the San Francisco office and one person in the Melbourne office.  In engaging with an artist in addressing any such problems the Artist Experience team seeks an explanation from the artist of the problem; asks for details about the web browser used by the artist when uploading and details of firewalls; details of the artist's ISP; the method of connection; the country from which the artist is seeking to upload the artwork; and the artist's internet protocol address ("IP address").

223   In all of these things, Redbubble's team seeks to help and facilitate the successful uploading of the work to the site.

**The terms**

224   As to the terms upon which artists make their work available for sale, Mr Kovalev says this.

225   The *retail price* charged to customers for the physical product featuring an artwork uploaded by an artist is made up of a *Fulfiller Fee*; a *Redbubble Fee*; a *Creator Margin*; and any relevant sales tax.  The Fulfiller Fee and the Redbubble Fee are referred to in this methodology as the *Base Amount*.  These terms are central to the pricing methodology about which Mr Kovalev gave evidence.  The Creator Margin is the artist's selected margin being a percentage mark-up of the Base Amount.  The website contains a default Creator Margin of 20% but artists can choose any percentage mark-up of the Base Amount in the range 0% to 100%.

226   As to the Base Amount for each product type on the website, it is made up of the Redbubble Fee and the Fulfiller Fee.  Mr Kovalev says that the Redbubble Fee is a service fee that

Redbubble charges for "hosting" the marketplace and "facilitating the transaction" between the artist and the buyer of the product bearing the work. The phrase "facilitating the transaction" includes putting orders through to fulfillers (and Mr Kovalev accepts that artists do not organise the fulfillers): T, p 215, lns 27-33. The Redbubble Fee includes the cost of delivery to the customer's nominated address: T, 215, lns 45-47. As to the relationship between the artist and Redbubble, Mr Kovalev does not agree that the artist provides the artwork and Redbubble provides the products and services although he does accept that the artist certainly provides the artwork and then the fulfiller manufacturers the product, and that is the product sold to the customer: T, p 216, lns 7-25. The Fulfiller Fee is the "manufacturing fee" charged by the relevant third party fulfiller whose job is to apply the artwork to the relevant product. The retail price charged to a customer is the Base Amount made up, as described, plus the Creator Margin selected by the consumer.

### Consumers as users and customers

227    Mr Kovalev gives the following evidence concerning the mechanisms by which *a consumer* might become *a customer* of a product bearing an artist's artwork, through the website.

228    Customers can purchase products through the Redbubble website with or without creating an account. If a customer wishes to create an account, he or she can do so by clicking the "Sign Up For Free" button and then signing up for an account much in the same manner as artists do as earlier described. When a customer signs up, the customer must also agree to the Redbubble User Agreement.

229    When a customer performs a search on the Redbubble website, the Redbubble Software will "trawl the Redbubble Website for tags and titles that match the search terms". The Redbubble Software creates an "inverted index" which Mr Kovalev explains as operating in this way: "instead of storing information as 'artwork [that] has these keywords', it stores information as 'keyword matches [to] these artworks'". The inverted index enables "fast lookups". The "keywords" are generated from the "tags" and "titles" chosen by the artists. The description an artist provides when uploading their artwork is not used to generate results in response to keyword searches. Mr Kovalev says that Redbubble does not select or generate any of its own keywords. The Redbubble Software will only match tags or titles containing the exact word or words which are used in the search term entered by a customer. Mr Kovalev gives this example:

> Example: A customer searches the tag "elephant". The software will return results

*for all artworks that have the tag "elephant", or contain the word "elephant" in their title.*

230    As the Redbubble Software matches tags or titles as determined by the customer, results are displayed in order of relevance to the search terms used.  The Redbubble Software determines the "Most Relevant" works by producing a sorted list of artworks which matches the search terms.  The sorted list is then "re-ranked" based on "business metrics" such as "sales, homepage feature and product compatibility".  For example, if a user performs a search for "elephant T-shirts", the software will only display works if they are available for application to a T-shirt.  Mr Kovalev illustrates this general principle of re-ranking in this way:

> *Example:  If two items in the initial list of results have the same score in terms of their match with the search term, but the second ranked item has had more sales than the first ranked item, the items will be re-ranked, and the second ranked item will move to first position in the results set.*

231    Mr Kovalev says that customers also have the option of sorting the results by "Top Selling" which will rank the products in order of the most recent sales, or sorting by "Recent" which will rank the artworks in descending order based on the date of upload by the artist.  The Redbubble Software can also generate "related searches" that might be relevant to the customer on the basis of the keyword they have selected in their search.  For example, if a user enters the keyword "bulldog" in a search, the Redbubble Software will return all artworks where an artist has used the word "bulldog" in the title or as a tag, but also identify other tags used by other artists who have chosen the word "bulldog" as a tag for their artwork and list the most commonly used other keywords in order of frequency as a related search.  Mr Kovalev gives the following example:

> *High quality Bulldog inspired T-Shirts, Posters, Mugs and more by independent artists as designers from around the world.*
>
> *Related searches:  French Bulldog, Pet, Puppy, Cute, Animal, Dogs, Frenchie, Funny, French, Pets, and Love Gifts & Merchandise.*
>
> *All orders are custom made and most ship worldwide within 24 hours.*
>
> *Search results and related search terms are automatically generated from information provided by users.*

### Placing an order

232    As to placing an order through the Redbubble website, Mr Kovalev says this.

233    If a customer wants to purchase a product featuring an artwork uploaded by an artist, the customer must:  select an artwork/product featuring an artwork from the search results page;

select the size and/or type of the product and click "Add To Cart"; click "View Cart" and confirm the quantity of the product; select their "Shipping Option" and then click "Checkout"; choose to pay by PayPal or credit card; enter the shipping address and PayPal or credit card details; and then click "Pay".  Immediately above the "Pay" button is a disclaimer that reads:

> *By clicking pay, I agree to Redbubble's User Agreement.*

234    The words "User Agreement" are hyperlinked to a full copy of the User Agreement.

235    Upon clicking "Pay", the customer will be redirected to a confirmation page setting out the details of the customer's order, including an estimated delivery date.  Shortly after clicking "Pay", the customer will receive a confirmation email from [*aboutmyorder@redbubble.com*], setting out the details of the order and providing an order tracking number.  Mr Kovalev says that this is an automatically generated email sent from the AWS Server to the customer via a third party email service called *Sendgrid*.  Just as in the case of the artists, buyers must interact with features of the Redbubble website before their order is processed (T, p 211, lns 20-23) ultimately clicking the "Pay" button feature on the Redbubble website to go through the process of buying the product to which the artwork is applied:  T, p 211, lns 32-45.

### Fulfilling an order

236    Mr Kovalev says that the mechanism by which a customer's order is fulfilled, is this.

237    Customer payments are processed by third party payment processors on servers that are not owned or otherwise used by the Redbubble group.  Upon confirmation of a customer payment, a job is created on the AWS Server which generates what Mr Kovalev calls the "digital assets" required to fulfil the customer's order.  The digital assets include the customer's address; the order number; the product type and style; the quantity ordered; the shipping method; and a "content file" containing "a copy of the image file for the artwork uploaded by the Artist, or a URL link to that file".  Mr Kovalev says that the Redbubble Software sends "a special URL" to third party fulfillers which the fulfiller uses to download the "digital assets".  For a small number of fulfillers, the digital asset files are sent by the Redbubble Software to the fulfillers "FTP server".  The term "FTP" stands for "File Transfer Protocol" which is a standard network protocol used for the transfer of computer files from a server to a client.

238    No company within the Redbubble group manufactures, warehouses, despatches, receives or distributes any physical products ordered using the process just described.  Third party fulfillers receive orders placed by customers through the Redbubble website.  They are responsible for

the production and delivery of products to customers.  The customer's address might be anywhere in the world.  There are, presently, 15 third party fulfillers filling orders placed through the Redbubble website and those fulfillers are located in:  the United States of America; United Kingdom; Australia; Belgium; Hong Kong; and the Netherlands.

239   When a third party fulfiller is notified of a new order, the third party fulfiller will proceed to manufacture the ordered product.  This involves printing the relevant artwork onto the product or otherwise producing or manufacturing the product.  The third party fulfiller is automatically chosen by the Redbubble Software based on the product type and the customer's nominated delivery address.  Once the product has been manufactured, the software used by the third party fulfiller will send an "API request" to the Redbubble Software when the order is ready for shipment.  The term "API" stands for "Application Programming Interface" and is a set of "protocols and tools for building software and applications".  An API request is a request to a "resource" on a server which is "exposed via an API".  Mr Kovalev gives this example:

> *Example:  When an individual downloads an application to their smart phone, enters their registration details on the application and presses "Register", this is usually executed via an API request.*

240   When the Redbubble Software receives the API request, it will automatically generate an email containing order details as well as the shipping details.  This email is then sent to the customer via *Sendgrid*.  Once the customer receives the final product, the transaction is then regarded as "concluded".

241   The process of fulfilling an order commences on the Redbubble website by the customer completing a purchase by clicking the "Pay" button on the website.  When that button is clicked, either an image of the artist's work is sent to the fulfiller or a link to the image, stored on the AWS Server, is sent to the fulfiller enabling access to the image:  T, p 212, lns 13-23. The mechanism is put this way by Mr Kovalev:  software running on the Redbubble server, that is, on the AWS Server, causes the image or a link to the image to be sent to the fulfiller and that result is brought about by software commands executing on the Redbubble website which tell the software executing on the AWS Server to now send an image or a link:  T, p 212, lns 25-37.  He says that clicking the button "Pay" activates "the rest of the chain":  T, p 217, lns 6-7.  As to the process or mechanism by which an artist's original image is automatically stored on the AWS Server, Mr Kovalev says that software operating on the Redbubble website (upon the relevant commands or clicks) "initiates a process" of engaging with software on the AWS Server so as to save, automatically, the images to the AWS Server.  A "copy" of the

original image is displayed on the website: T, p 217, lns 23-45. That copy is made possible by the Redbubble software executed on servers in the United States: T, p 218, lns 9, 20-36. However, Mr Kovalev also says that the image (which is a copy of the original image), displayed on the Redbubble website, is "stored" on a "back end server" for the website "as is the case with any image on a website", and storage on that "back end server" is part of the Amazon Web Services provided in the United States: T, p 220, lns 21-33.

### Redbubble's relationship with fulfillers

242    As to the relationship between Redbubble and the third party fulfillers, Mr Kovalev says this.

243    Third party fulfillers issue invoices to Redbubble USA on a monthly basis. Those invoices relate to the entire month's volume of products manufactured by that fulfiller. The Fulfiller Fee charged by third party fulfillers varies depending upon the types of products provided. The Fulfiller Fee is comprised of: a product cost (which is described as a "blank" product cost of the relevant item pre-printing); printing costs; fulfilment costs (including packaging); and the margin set by the third party fulfiller. Redbubble USA arranges for "tags, stickers and other promotional material" to be provided to third party fulfillers to "deliver with shipments to customers". Mr Kovalev describes these tags, stickers and other promotional material as the "packaging materials". Mr Kovalev says that Redbubble USA does not manufacture the packaging materials or deliver the packaging materials to third party fulfillers. The packaging materials are manufactured by packaging companies in China and the United States of America and are delivered directly by those manufacturers to the third party fulfillers in large batches. Nevertheless, these "packaging materials" are attached to the products as an essential element of the business model, at the direction of Redbubble. The packaging materials, typically, are those illustrated at Annexure VK-22 of Mr Kovalev's affidavit of 28 July 2017 and they are set out below.









*Confidential statistics*

244   Mr Kovalev also gives evidence of statistics as at 26 July 2017 relating to the number of artworks displayed on the Redbubble website; the number of artists who have accounts on the Redbubble website; the approximate number of new artworks uploaded each day; the approximate number of orders placed by customers each day; the approximate number of new artists who sign up to the Redbubble website each day; and the number of sales made to date by the top selling artist.  All of this information is described as confidential.  Accordingly, the relevant statistics are set out in a redacted schedule to these reasons.  It is not necessary to

publish an un-redacted version of the Schedule to the parties because they already have the information available to them.

### The Redbubble User Agreement

245    It now necessary to note the following provisions from the User Agreement.

> **Introduction**
>
> …
>
> To make this online destination for creativity available, it is essential all Redbubble users respect the intellectual property rights of others, including copyright and trademarks. You must only upload content you have created yourself and have permission to use and authorize others to use. If you are a customer or browser, please respect the copyright and trademarks of all the works you see or buy on Redbubble. Respecting other people's intellectual property is an essential principle of Redbubble's community.
>
> …
>
> **Our service**
>
> Redbubble provides a range of services (the "Redbubble service") which, amongst other things, *enable you to publish, sell, discuss and purchase art*; interact with other members; and *receive the benefits of Redbubble's facilitation of product fulfilment*, including *payment processing*, customer services, *third party product manufacturing*. In addition, Redbubble will arrange for the *deliver[y]* of the physical product to your customer. …
>
> Any [artist's] content that you upload into the portfolio section of your account is described as your "art". Your art may be *viewed by all users of the website* once you elect to publish it. You may order a physical product based on your own art or you may *offer your art for sale* as part of the sale of a physical product. If you or a customer decide to place an order, then Redbubble will forward your instructions to third parties who will manufacture and ship the physical product in the form specified by you or the customer ("the product").
>
> **Members**
>
> You can become a registered member ("member") of the website by setting up a password protected account. You will be required to select a username and password when registering to become a member. You must become a member before placing any content on the website, including writing any comments in forums or reviews. In its sole discretion, Redbubble may refuse any username that it decides is inappropriate and/or refuse any person from becoming a member.
>
> **Putting content on the Redbubble site**
>
> You keep the copyright in any content you submit or upload to the website. In order to receive the Redbubble services you grant Redbubble a non-exclusive royalty free licence to use and archive the content in accordance with or as reasonably contemplated by this agreement.
>
> When you submit or upload content on the website *you represent and warrant that*:
>
> • you own all copyright in the content, or if you are not the owner, that you have

permission to use the content, and that you have all of the rights required to display, reproduce and sell the content;

- the content you upload will not infringe the intellectual property rights or other rights of any person or entity, including copyright, moral rights, trade mark, patent or rights of privacy or publicity;

- your use of the website will comply with all applicable law, rules and regulations;

- the content does not contain material that defames or vilifies any person, people, races, religion or religious group and is not obscene, or pornographic, indecent, harassing, threatening, harmful, invasive of privacy or publicity rights, abusive, inflammatory or otherwise objectionable;

- the content does not include malicious code, including but not limited to viruses, trojan horses [and a range of synonyms for those things], or other computer programming routines that may damage [and other synonyms] any system, program, data or personal information; and

- the content is not misleading and deceptive and does not offer or disseminate fraudulent goods, services, schemes or promotions.

Redbubble reserves the right to review and if in its sole discretion deemed necessary, *remove* any content from the website and/or *cancel* your account, because that content breaches your agreement with us and/or any applicable laws or otherwise.  You agree to *indemnify* Redbubble in respect of any direct or indirect damage caused due to your breach of one or more of these warranties.

**Offering your art for sale on a physical product**

Any member may *offer their art for sale* on a physical product on the website *by appointing Redbubble to facilitate the transaction* on the terms set out in the *Services Agreement in Appendix A*.  By agreeing to the terms of this user agreement you *expressly agree* to the *terms* of the *Services Agreement* in Appendix A, which will apply from the date on which you offer your first art for sale on a physical product and your continued use of the website will constitute ongoing agreement to the terms therein as updated from time to time.

**Intellectual Property Rights and license**

By submitting listings to Redbubble, you grant Redbubble a non-exclusive, worldwide, royalty free, sublicense able and transferable license to *use, reproduce, distribute*, prepare derivative works of and *display* the content of such listings *in connection with Redbubble's* (and its successors' and affiliates') *services and business in facilitating the sale of your product*, including without limitation for promoting and redistributing part or all of the Redbubble site (and derivative works thereof) in any media formats through any media channels.  You also hereby grant each user of the Redbubble site a non-exclusive license to access your content through the site, and to use, reproduce, distribute, and display such content as permitted through the functionality of the site and under this User Agreement.  The above licenses terminate within a commercially reasonable time after you remove or delete your listings from the Redbubble site.

…

**Indemnity**

You agree to indemnify, defend and hold us, our officers, directors, employees, agents

and representatives harmless, as well as, all third parties [undertaking all fulfilling activities] … harmless, from and against any and all claims, damages, losses, liabilities … or other expenses that arise directly or indirectly out of or from: your breach of any clause of this agreement; any allegation that any materials that you submit to us or transmit to the website infringe or otherwise violate the copyright, trademark, trade secret or other intellectual property or other rights of any third party; and/or your activities in connection with the website.

[emphasis added]

246     Appendix A to the Services Agreement contains these provisions which should be noted:

> You wish to use *Redbubble's services to facilitate marketing and sale of your art on a physical product* and to arrange for *manufacture* of the physical product (your product) once an order has been made through [.redbubble.com] ("the website"). Redbubble will provide these services on the terms set out in this Services Agreement. Additionally, Redbubble will provide for delivery of such products to the customer.

> **1.      Services**

> 1.1     Redbubble, *acting as independent contractor* under your instructions *will market to* and *obtain orders from customers for the purchase of your products* over the website and on instruction from you, Redbubble will arrange for third parties to fulfil those orders by facilitating payment for and manufacture of your products ("Services"). Redbubble will then arrange for the delivery of your products as per the customer's instructions.

> …

> **2.      License and standing instructions**

> 2.1     You grant Redbubble a non-exclusive royalty free *license to use* your intellectual property relating to your products *for the purpose of enabling us to carry out the Services*.

> 2.2     You hereby *instruct Redbubble to facilitate the sale of your product* which includes *payment, processing* and *arranging for manufacturing* your product(s) in respect of the orders placed by the customers via the website and Redbubble will facilitate such payment, and manufacturing in accordance with reasonable business practices unless you otherwise instruct prior to the placement of that order by a customer.

> …

> **3.      Sale of your products**

> 3.1     The *retail price* charged to customers who purchase your product is made up of the *manufacturing fee* charged by the third party manufacturer, *Redbubble's fee for hosting* the marketplace and facilitating the transaction (the manufacturing fee and Redbubble's fee are referred to collectively and inclusive of tax, as the "base amount"), *your creator margin* ("your margin"), and any relevant sales tax (such as Sales Tax, GST, VAT, etc) that Redbubble and/or you (as the case may be) are liable to account for to the appropriate tax authorities. Shipping charges will also be added to the retail price. When making each individual work available for sale you are able to select any percentage markup you wish, greater than or equal to zero, above the base amount but below the automated upper limit set by Redbubble (subject to change from time to time). The percentage markup selected by you on the

website for each of your products is used to calculate the dollar value of your margin for each sale.

**6.      Indemnity**

6.1      You hereby indemnify and will Redbubble indemnified from and against all claims [synonyms] … of any nature whatsoever … arising from … any breach or non-performance of your obligations under this Services Agreement or arising out of your wilful act, neglect or default in the performance of such obligations.

[emphasis added]

247      As to Mr Kovalev's evidence, I generally accept his evidence concerning the functionality of the Redbubble website again subject to the observations later in these reasons from [405] concerning the proper characterisation of Redbubble's engaged role in the transactional features of the activities enabled by and through the website.

**James Toy and the moderation protocols**

248      Mr James Toy is the Assistant General Counsel for the Redbubble group of companies. He is employed by Redbubble Inc. and works in the San Francisco office of Redbubble. He is involved in intellectual property issues and other legal matters concerning the Redbubble group of companies (which he calls "Redbubble"). He advises on the elements of the User Agreement. He advises on the content of the Redbubble "IP/Publicity Rights Policy" (the "IP Policy") adopted by Redbubble on its website. He works with and advises the team of Redbubble employees who are primarily responsible for administering the IP Policy. That team is called the "Content Team". He advises on the application of "certain aspects" of the Redbubble "Content & Suspension Policy" (the "Suspension Policy"). He says that the IP Policy together with the User Agreement, the Suspension Policy and another document called the "Community Guidelines" are designed to discourage and prevent the infringement or contravention of intellectual property and similar rights by "Uploaders". These policy documents are all available on the Redbubble website in English, German, French and Spanish.

249      In his affidavit evidence of 27 July 2017, Mr Toy describes the members of the Content Team and the roles they perform. It is not necessary to note those matters in these reasons except to say that the Content Team was then made up of 10 individuals some of whom are IP Operations Co-ordinators, Content Administrators, a Controversial Content Co-ordinator, a Senior Content Analyst and a Content Team Manager.

250      Mr Toy explains that when complaints from rights owners or authorised representatives of rights owners are made to Redbubble, consideration is given to those complaints and decisions

are made about whether the Redbubble "Notice and Takedown Procedures" will be invoked. The IP Policy sets out the procedures to be followed if a rights owner considers that artwork on the Redbubble website infringes his or her intellectual property rights or similar rights and seeks to have Redbubble "moderate" the artwork.  As mentioned at [54] of these reasons, by the term "Moderate", Mr Toy means taking steps to "remove or disable access to the webpage on the Redbubble website where the artwork is listed and through which products bearing the artwork can be purchased".

251     The IP Policy requires a complainant to provide the following information:  a description of the intellectual property right said to have been infringed; identification of the artwork said to infringe; a statement that the complainant is either the owner or otherwise authorised to act on behalf of the owner; a statement that the complainant has a good faith belief that the artworks have not been authorised by the rights owner or his or her agent; relevant details of the complainant; and an electronic or physical signature to the complaint.

252     This process is described as a complainant submitting a "Takedown Notice" to Redbubble.

253     The Takedown Notice procedure is invoked by sending the notice to [*dmca@redbubble.com*]. Mr Toy says that Takedown Notices are received through a management tool called *Zendesk* and routed to a *queue* to be viewed by a member of the Content Team.  Generally, the review will take place within one business day of receiving the Takedown Notice.  The member of the Content Team determines whether it complies with the IP Policy and contains the relevant information.  Mr Toy says that if that is so, the Content Team member will moderate the artwork said to have been identified.  Mr Toy says that the Content Team member "will not investigate whether the Rights Owner actually owns the rights, whether the rights are actually enforceable, or whether the relevant artwork(s) actually infringe or otherwise interfere with those rights".

254     When the work is moderated, the Content Team member sends an email to the complainant confirming that moderation has occurred.  If the Takedown Notice does not comply with the IP Policy, the Team Member will seek "additional information or clarification".  Where a Takedown Notice includes unusual elements such as threatening language, the Content Team member will escalate the Takedown Notice to the "Legal Team".  Mr Toy or another member of the Legal Team will advise the Content Team member on the best method of proceeding.

255     The IP Policy also sets out a procedure (a "Counter Notice") that an uploader can follow if they consider that their artwork was moderated as a result of a mistake or misidentification and the artist wants Redbubble to reinstate the work.  Mr Toy says that that type of procedure is consistent with the relevant elements of the United States *Digital Millennium Copyright Act* (the "DMCA").  Mr Toy describes the various steps the uploader would take to invoke that process.  Mr Toy says that if the Content Team member considers it unlikely that the artwork was moderated due to a mistake or misidentification, the member will promptly advise the uploader by email that the Counter Notice will not be progressed.  If the Content Team member considers that the Counter Notice is appropriate, the Counter Notice will be brought to the attention of Mr Toy or a member of the Legal Team who will then decide whether the Counter Notice should be processed.

256     If the Legal Team decides it should not be processed, the uploader will be so advised.  If the Legal Team decides that it is to be processed, the Legal Team member will send an email to the uploader and to the complainant.

257     The IP Policy also states that Redbubble may reinstate an artwork if the complainant does not commence legal proceedings in the United States.  Mr Toy's reference to the United States has the particular context of the DMCA in mind.  Mr Toy says that, to the best of his knowledge, a rights owner has never commenced legal proceedings outside the United States against an uploader.

258     Apart from the Takedown Notice and Counter Notice provisions, Mr Toy says that other steps taken by Redbubble to discourage infringements of intellectual property rights are these.  On a weekly basis, the Content Team endeavours to review the accounts and account histories of all uploaders who have had an artwork moderated in the previous week.  Depending upon the number and nature of artworks uploaded by the uploader which have been moderated, and the current contents of the artist's account on the Redbubble website, the Content Team will take one of a number of actions.  A warning might be sent to the uploader.  The account of the uploader might be restricted indefinitely with a "restriction notice" being sent to the uploader by email.  During that period, none of the artworks in the artist's account will be visible to the public on the Redbubble website "as if all of the artworks had been moderated".  Redbubble might suspend or delete the account and in either case, none of the artworks in the account will be visible to the public on the Redbubble website.

259    Alternatively, Redbubble might continue to monitor the uploader without restricting or suspending or deleting the artist's account.  Content Team members are expected to assess each uploader on a case-by-case basis.

260    Outside this weekly process, checks of this kind might be carried out if a rights owner complains to Redbubble that a particular infringer is a "repeat infringer".  Alternatively, a member of the Content Team or the Legal Team might consider that a particular uploader is, or may be, what Mr Toy describes as a "Scaled Abuser".

261    In addition, Redbubble operates a number of "anti-fraud software applications" to identify and automatically suspend or delete uploader accounts on the website that are "suspicious".

262    Apart from all of these processes, Mr Toy says that Redbubble operates a program of "Proactive Moderation".  He says that Redbubble offers to collaborate with certain rights owners to develop guidelines under which Redbubble will search its website on behalf of those owners for artworks that those owners consider to be infringing, and moderate them proactively.

263    Mr Toy says that this proactive moderation "essentially involves Redbubble in assisting the Rights Owners to enforce [their] intellectual property, at no cost to the Rights Owner".  Mr Toy says that this process of proactive moderation is offered to rights owners in circumstances where those owners have "legitimate difficulties" with the Takedown Notice procedure, and that might occur where such an owner "needs to submit frequent Takedown Notices identifying numerous allegedly infringing artworks on a daily basis" or where the rights owner does not understand how the Takedown Notice procedure works and the owner "is becoming increasingly frustrated, despite repeated attempts by members of the Content Team or Legal Team to assist".  Proactive moderation might also be offered where the rights owner has threatened imminent legal action.  Whatever the reason might be for engaging the offer process, Mr Toy seeks to speak with the rights owner by telephone at least, to explain the process and offer proactive moderation.  He says that proactive moderation is not offered in exchange for a release from liability.  He says this:

> Rather, it is a genuine attempt to assist the rights owner in circumstances where Redbubble does not consider that it has any liability or legal responsibility for any alleged infringements, but shares an interest with the Rights Owner in preventing Uploaders from uploading infringing material to the Redbubble Website to the extent feasible for Redbubble to do so.

264     The Proactive Moderation Guidelines involve the provision to Redbubble of depictions of the content in which the rights owners claim to have enforceable rights such as trade marks (whether word marks or logos) and copyright protected images (or other works) and guidance being given by the rights owner about the nature and degree of similarity that needs to exist between the owner's works and artwork appearing on the website about which complaint is made.  Mr Toy says that the Content Team in conjunction with the Legal Team formulates a list of "search terms" and other "filtering criteria" considered to be the most effective tools for finding artworks on the website that might comprise or contain protected works of the owner.

265     The search terms are intended to be broad enough to capture as many potentially infringing artworks as possible but not so broad as to capture a large number of works not likely to be related to the works of the relevant owner.  Redbubble does not want to generate too many "false positives" which will frustrate searches of the site.

266     Redbubble may update the search terms based on consultations with the rights owner.  Once the search terms have been determined (including as a result of consultation with the rights owner), the Content Team will begin searching the website using the "filtering criteria" adopted, according to a particular date range thought to be relevant in the particular circumstances.  If a rights owner wants a single "site sweep" in the date range 2006 (when Redbubble first established the website) to the present day, the Content Team will conduct that search but will not do so again unless requested by the rights owner.  If, however, the rights owner has requested Redbubble to conduct "regular policing" the Content Team will perform these single "site sweeps" on a regular basis with each site sweep commencing from the date of the last sweep.  The regular policing might be "daily, weekly or somewhere in between".

267     In some cases, Redbubble undertakes regular site sweeps even though a rights owner has not requested it to do so.  If the Content Team believes that an artwork is "similar enough" to any of the content claimed by a rights owner to be protected works, the Content Team will moderate the uploader's artwork and follow the procedure earlier described.  If the Content Team does not consider the artist's work to be "similar enough" to the works of the rights owner, the artwork will not be moderated.

268     Mr Toy says that in his experience there is a level of collaboration between a rights owner and Redbubble that is optimal for ensuring that Redbubble is able to effectively assist a rights owner to enforce its rights.  Mr Toy says that in this process it is helpful when a rights owner shares its "feedback and concerns", "on a regular basis".  He says that Redbubble takes this feedback

seriously and will, for example, amend the Proactive Moderation Guidelines and investigate complaints of possible repeat infringers.  The Legal Team encourages rights owners to use direct email addresses which enables contact with a member of the Legal Team directly and quickly.  Mr Toy sets out in his affidavit a list of rights owners for whom Redbubble is currently undertaking proactive moderation.  The table identifies the steps being taken (either single "site sweep" or "regular policing"), and the date when Redbubble commenced proactive moderation on behalf of the rights owners.

269     Mr Toy says that Redbubble has considered whether automatically preventing artists from using words which are trade mark protected, as "tags", would be an appropriate way of preventing intellectual property infringement and other unlawful conduct on the Redbubble website.  He says that adopting such an approach would be "easier, cheaper and require less effort than adopting the proactive measures" he describes in his affidavit.  He says that the proactive measures, as described, are "labour-intensive and expensive".  He then says this:

> However:
>
> (a)    Redbubble considers that a broadly applied policy of *banning* certain trademarks as tags would have the undesirable and disproportionate effect of preventing artists from using such words in *legitimate*, non-infringing ways and contexts.  For example, in Australia and the United States there are a number of registered trademarks for the words GREY GARDENS, but those words also have a common descriptive use in the English language.  Redbubble is able to apply a more precise approach by collaborating with a Rights Owner, understanding what the Rights Owner considers to be infringing and then conducting targeted searches of the Redbubble Website.  This limits the impact on legitimate artworks, including artworks that the Rights Owner itself may not consider to be infringing.
>
> (b)    A search of the Redbubble Website captures an artwork if the search term matches a title or tag created by the Uploader who uploaded the artwork.  If Redbubble bans Uploaders from using a trademarked word as a title or tag but an Uploader uploads an artwork that comprises or contains the trademark, *neither* Redbubble nor the Rights Owner *will be able to find the artwork* by *using the trademark as a search term* when searching the Redbubble Website.
>
> [emphasis added]

270     Mr Toy also gives evidence about the notion of "Proactive Policing" and the development of "Proactive Moderation Guidelines" for Hells Angels having regard to the rights in particular works put to Redbubble by the solicitors for the applicant in a letter dated 20 March 2015.  Mr Toy says that on 23 March 2015 the Content Team performed a single site sweep using the Hells Angels Guidelines and particular search terms.  He says that on 26 March 2015, the Content Team commenced "regular policing" which he says Redbubble has undertaken every

Thursday since that date.  Mr Toy decided to adopt a frequency search of once each week due to the fact that Hells Angels was complaining about alleged infringements that were not occurring "regularly".  Mr Toy says it became apparent from 23 November 2015 that some artworks were not being identified in these weekly site sweeps because uploaders had created titles and tags "Hells Angel" rather than "Hells Angels".  Accordingly, the following search terms were also adopted:  "Hell Angels"; "Hell Angel"; "Hels Angels"; "Hels Angel"; and "Hells Angel".  Mr Toy says in his affidavit of 27 July 2017 that the Content Team has continued to proactively moderate according to these searches since 20 March 2015.  He says that Redbubble has moderated 48 artworks uploaded to the website as a result of these moderation activities "without first receiving any complaint from Hells Angels or any other person" about a specific artwork in particular.

271    Mr Toy also says that Hells Angels has refused to engage with Redbubble in relation to the development of the "Hells Angels Guidelines" and the "Hells Angels Search Terms" and thus the Guidelines have remained as they were as at 20 March 2015 and the Search Terms have remained as they were as at 25 November 2015.

272    As to these *moderation protocols* generally, including Takedown Notices, the Suspension Policy, Proactive Moderation and Proactive Policing and the related steps Redbubble says it takes to discourage infringement of the rights of Rights Owners subsisting in particular works, Mr Toy was taken in cross-examination to a series of so-called well-known marks and designs (which, from time to time, have been uploaded by "artists" to the Redbubble website), so as to test with Mr Toy *working examples* of moderation of those uploaded marks and designs. Mr Bolam gave evidence that he conducted a search of the Redbubble website on 16 October 2015 using the search box and using, as a search term, each of the following terms:  Louis Vuitton, YSL, Versace, Burberry, Rolex, Bradman, Michael Jordan, Usain Bolt, Adidas, The Wiggles, Peppa Pig, Disney, Vegemite, VB, Fosters, Starbucks, Rolling Stones, INXS, Cold Chisel and Harley Davidson.

273    The results of the search are set out in a table, Attachment F, to the applicant's pleading.  The table shows the search term (Column 1); the image or device on the Redbubble website thrown up by that search (Column 2); the relevant registered trade mark of the corporation or person corresponding to the uploaded image on the website based on Mr Bolam's search (also on 16 October 2015), of the database of Australian registered trade marks maintained by IP Australia (Column 3).  Column 3 also shows the registered trade mark number.

274    There is a high degree of correlation (that is, substantial similarity or identicality) between the *website image* found in response to the search term and the proprietor's *registered trade mark*.

275    This correlation, and the schedule arising out of Mr Bolam's exercise, is not relied upon by the applicant as some sort of "similar fact" evidence to prove contended infringement of the trade marks in suit or an infringement of copyright.  This topic, and these examples, are engaged for the purpose of *testing* whether moderation protocols adopted by Redbubble have, *in fact*, any practical utility.  The applicant's ultimate proposition is that even though an uploaded artwork might be moderated by Redbubble under its protocols, the fact is that the artwork can simply be uploaded again *virtually immediately* under a new URL thus rendering moderation, for all practical purposes, of little utility as a contended mechanism for controlling infringements or guarding against "repeat infringers" (or "Scaled Abuser" to use Mr Toy's term).

276    Thus, the applicant says that a "better system" needs to be developed by Redbubble to discourage repeat infringers and deal with the problem of infringement of the rights of Rights Owners.  Such a mechanism might be a form of "blocking".

277    Mr Toy addresses Mr Bolam's table (Attachment F) in his affidavit of 27 July 2017 and in oral evidence.  He notes that on 20 June 2016, Mr Bolam sent a letter to Redbubble's solicitors enclosing screenshots of the Redbubble website showing each relevant URL and the "Uploader user name" for each search result tabulated in Attachment F.  Mr Toy attaches a table to his affidavit (JNT-47) which shows these things:  an item number for each search (Column 1); the artwork identified by Mr Bolam enclosed with his letter of 20 June 2016 (being the Attachment F search results of 16 October 2015) (Column 2); the URL on the Redbubble website for each search result by Mr Bolam (Column 3); the uploader username of each result (Column 4); and the "status", as at 26 July 2017, of each artwork revealed by each of Mr Bolam's artwork search results of 16 October 2015 (Column 5).

278    As to Column 5, Mr Toy says that each artwork as at 26 July 2017 was either moderated as a result of a specific complaint; otherwise subject to restriction, suspension or deletion from the uploader's account; moderated due to Proactive Moderation; no longer on the website as a result of the Content Team restricting, suspending or deleting the uploader's account; no longer on the site due to deletion by the artist; or the artwork remaining on the website.

279    On 22 August 2017, Mr Bolam conducted *another search* of the Redbubble website using the same search terms he used on 16 October 2015 as described at [272] of these reasons so as to

locate an image or device (if uploaded), on the website (sometimes displayed as illustrated on a product), substantially similar to or identical with the registered trade marks in Column 3 of Attachment F.  Mr Bolam prepared another table (PTB-55) by taking Attachment F and adding a new Column 4 showing whether there was an image or device substantially similar to or identical with each of the relevant trade marks, on the Redbubble website, at *that date*, and if so, Column 4 also shows the URL for the image on the site.  Mr Bolam made screenshots of the searches.

280     Annexure PTB-55 shows that **of** the 72 images or devices revealed on the website (by use of Mr Bolam's search terms) as a result of Mr Bolam's further search on 22 August 2017, which correlate with the relevant registered trade mark shown in Attachment F (that is, uploaded images either substantially similar or identical to the registered trade marks), 32 "offending" (substantially correlating) artworks were on the website *again*.  Where again present on the site, Column 4 also gives the relevant URL for the artwork.

281     That exercise by Mr Bolam resulted in a document being put to Mr Toy called a "Comparison of Sampling Search Results" which shows the search term (Column 1); the image revealed on 16 October 2015 being the earlier Attachment F images revealed by the earlier searches (Column 2); the registered trade marks (Column 3); the status of the Column 2 images as at 26 July 2017 according to Mr Toy at JNT-47 (Column 4), and references to the presence or otherwise of uploaded images on the website revealed by Mr Bolam's further search on 22 August 2017 (Column 5), being substantially similar to or identical with the registered trade marks.

282     For example, the entry below from p 2 of the Comparison document shows the Versace image from 16 October 2015 (Column 2), the Versace registered trade mark (Column 3); Mr Toy's comment as at 26 July 2017 that the account of the uploader is "Inactive" and was deleted on 7 December 2015 (Column 4); and the result of Mr Bolam's search on 22 August 2017 showing the presence or re-appearance again on the site of the image on that date.



283     Another example is set out below from p 3 of the document showing the same elements.



284     Other examples are these:







285   Mr Toy accepts that even though the uploaded artwork at the relevant URL (T, p 239, lns 42-46) is taken down on a particular date (in the example discussed with him, the takedown date was 13 May 2016), the *same image* could *reappear* on the Redbubble website under a different URL at a later date, after the takedown date:  T, p 240, lns 1-9; T, p 242, lns 21-31; T, p 244, lns 37-46.

286   Mr Toy accepts that should a person cause a moderated image to reappear on the website on a different URL by uploading the image to a *different URL*, one of the ways a rights holder would seek to remove the image is to *again* invoke the complaint protocol.  Another way is *taking up* Redbubble's proactive moderation protocol:  T, p 243, lns 1-16.

287   Mr Toy accepts that *should* the image be uploaded to a new URL, it will *stay* on the site until taken down at the request of the rights holder or proactively moderated by Redbubble: T, p 244, lns 41-46.

288   Mr Toy says that Redbubble "cannot prevent someone from uploading an image to the website" and Redbubble does not "pre-screen images", T, p 245, lns 7-9.

289   Mr Toy was taken to a letter dated 21 October 2015 from the lawyers for Rolex SA, Ashurst, to Redbubble asserting trade mark rights in "Rolex" and a "Crown" device.  The lawyers draw Redbubble's attention to the results of searches of the Redbubble website relating to use of the

mark and the Crown device. A Takedown Notice is enclosed in the letter. The Notice identifies 31 URLs said to be examples of unauthorised use of the trade marks, each URL deriving from the foundation *redbubble.com*. Undertakings are sought in the letter. Redbubble responded on 27 October 2015 and said that content at a particular URL had been removed. On 10 November 2015, Ashurst against wrote to Redbubble taking up issues concerning the failure to give the undertakings and drawing Redbubble's attention to content (images) at five additional URLs.

290    The point of these exchanges is that Mr Toy accepts that *one reason* why Redbubble could not give the undertakings sought by Rolex concerning the many URLs is that "there could be further infringements or uploads infringing the artwork or intellectual property of Rolex". Moreover, Mr Toy accepts that if the URLs mentioned in the letter of 10 November 2015 were taken down, "there could be no guarantee that the artwork in these URLs would not reappear a week later, for example": T, p 250, lns 1-9.

291    Mr Toy accepts that even though the Rolex marks had been moderated on 21 and 22 October 2015, artwork substantially similar to the marks had reappeared on 20 August 2017. It seems, however, that those images were not present on the site on 22 August 2017.

292    Mr Toy says that after these exchanges with Ashurst, discussions took place which engaged Redbubble in further proactive attempts to isolate infringing uses of the Rolex marks.

293    As to the evidence of Mr Toy, I generally accept his evidence subject to observations which follow from [405] in relation to the utility of moderation and those aspects of the evidence relating to the apparent difficulties in ensuring that images to which objection has been taken are not so readily uploaded to the website again, notwithstanding earlier moderation.

**The evidence of Mr Peter Bolam**

294    The applicant relies upon affidavit evidence of Mr Bolam. There is no need in these reasons to expressly address aspects of his evidence (apart from those aspects already addressed) which I accept, subject to the analysis in these reasons of the question of whether the applicant is properly characterised as an exclusive licensee of the copyright in suit or an *exclusive licensee* and *authorised user* of the trade marks in suit. I will separately address the factual issues in relation to the non-use cross-claim by Redbubble. Mr Bolam's affidavit of 23 August 2017 attaches a number of document relating to search results conducted on 20 August 2017 and 21 August 2017. It also attaches particular correspondence in relation to demands made upon

Redbubble by the lawyers for Rolex SA.  These are factual matters recited by Mr Bolam which I accept as accurately reflecting that which is described.

**Mr Gavin Hansen**

295    Mr Hansen describes himself as the "trainee trade mark officer" of HAMC Aust.  He has provided an affidavit sworn on 4 April 2017 and a further affidavit sworn 16 June 2017.

296    In each affidavit, he says that he resides at an address in the State of Queensland.  He says that he works under the supervision of the Director of the applicant, Mr Mark Nelms.  He says that he joined the "Hells Angels Motorcycle Club" in July 2013 and became a full member on 20 September 2014.  Mr Hansen has been in this role for about three and a half years as at the date of the trial.  Mr Hansen accepts that Mr Nelms has been absent from Australia for about the last two and a half years:  T, p 145, lns 46-47.  He says he has constant phone calls and constant email communication with him:  T, p 146, lns 1-3.  His role as trainee trade mark officer includes monitoring (predominantly online), and identifying uses of signs which might be considered deceptively similar to those HAMC Aust is, as he puts it, "entitled to use under the authority of the trade mark owner [HAMC US]".

297    Mr Hansen says that he is required to "monitor" the registration of the Australian Trade Mark Portfolio which HAMC Aust is entitled to use.  Mr Hansen's approach is that when something is questionable, or where he thinks the "wrong thing" has been done, he gets further advice from Mr Nelms in addition to forming his own view:  T, p 146, lns 20-22; lns 27-28 and lns 31-32.  As to monitoring, Mr Hansen says that "the whole membership always keeps an eye out for everything in the marketplace, online, physical sales, retail, everything": T, p 146, lns 37-38.  Mr Hansen accepts that it is "fairly common knowledge" amongst the members that there is a lot of unauthorised material on the internet:  T, p 147, lns 1-2.

298    As to monitoring and investigation, Mr Hansen acts with the authority of HAMC Aust, with the permission and under the supervision of Mr Nelms.  Mr Hansen says that it is part of his role "to make sure our images are not misused":  T, p 150, lns 35-39.  All of the examples of purchases by Mr Hansen occurred in that way.  Mr Hansen says that he also monitors eBay, YouTube, Etsy and Alibaba.

299    Although Mr Hansen also often searches sites under the tag "Harley Davidson", he does not just confine himself to searching under the tag "Hells Angels".  He accepts that having Hells

Angels as a tag for searching the site assists in finding Hells Angels images and then taking them down:  T, p 152, lns 25-29.

300    Mr Hansen says that on or about 18 November 2014, he conducted a search (that is, a computer search) using the search engine "Google" by conducting a search using the term "Redbubble". That search provided a response which identified the Redbubble website (that is, *redbubble.com*).  He says that he selected that site and was taken to the "Homepage" on the website.  Mr Hansen says that he was aware of Redbubble and had been to the website before 18 November 2014 as a matter of "curiosity" but "didn't investigate it fully":  T, p 148, lns 16-17; ln 29.  He gives this evidence.

301    The Homepage has a centrally visible search box or search field which allows a search of the Redbubble website for products.  He proceeded to type into the search box the words "Hells Angels".  He then clicked the "Search" button.  The search results "resulted in numerous images over a number of pages, many of which did not appear to have any apparent connection with Hells Angels whatsoever", although some did reveal a connection.  Mr Hansen says that it was quite apparent to him that none of the images he saw on the site were "licensed by the Club": T, p 149, lns 14-22.  Amongst the results was a "Unisex T-shirt" with an image which consisted of a black T-shirt bearing an image on the front which Mr Hansen says he has come to know as Australian registered trade mark 526530 (and the device shown in registered trade mark 723463) comprising three features which he describes but which are readily apparent in the image Example 1, [44] of these reasons.  Mr Hansen annexes the relevant page of the website he viewed, as GH-1, except that it did not then have the words:  "This work has been suspended.  Only you can view this page", on the page.

302    Mr Hansen says that using the functions on the Redbubble website he purchased the Hells Angels Virginia T-shirt for $31.43 using his credit card and inserting his name, mobile phone number, email address and his shipping and billing address.  He says that immediately after that step he received an email from Redbubble confirming his order and advising that the order was in production.  A copy of that email is annexed as GH-2 and it contains a small version of the image at Example 1, [44] of these reasons.

303    On 19 November 2014, he received an email (GH-3) from Redbubble advising that his Order Number 4848736 had been completed and shipped and that email also displayed a reproduction of the image at Example 1, [44] of these reasons.  Mr Hansen received the physical Hells Angels Virginia T-shirt at his Currumbin shipping address and at GH-4 he annexes three

images of the physical product he received.  The images show both sides of the swing tag attached to the article.  There is no need to display the swing tags or the article in these reasons.  It is sufficient to note that the two swing tags are in the same terms as the top two swing tags shown at [243] of these reasons except that one of the swing tags also has a sticker marked "7825 by photroen" with the site "*photroen.redbubble.com*" underneath.

304   Mr Hansen says that he conducted a search of the website on 28 March 2017 and the search result identified that his order was manufactured and shipped on 18 November 2014 and delivered on 18 December 2014.

305   On 5 December 2014, Mr Hansen conducted a further search of the Redbubble website using the Google engine and once again inserted the words "Hells Angels" in the search box and clicked the Search button.  The search results revealed numerous images over a number of pages and amongst the results was a poster entitled "Angel with Angel" which displays the image depicted as Example 2, [44] of these reasons.  The image on the poster includes a back view of a jacket worn by the adult bearing an image Mr Hansen says he has come to know as the image appearing in registered trade mark 526530 (and the device depicted in registered trade mark 723463).

306   Mr Hansen annexes as GH-6, a copy of the page he viewed showing the poster except that the page did not have the words:  "This work has been suspended.  Only you can view this page", on the page.

307   Using the functions available on the website, Mr Hansen purchased the "Angel with Angel" poster for $16.63 using his credit card and inserting all the required information.  Immediately after doing so, he received an email confirming his order.  The email reproduced the image: GH-7.  On or about 8 December 2014, he received another email from Redbubble advising that the order was in production and that email reproduced a copy of the image for the poster:  GH-8.

308   On or about 7 January 2015, Redbubble posted the "Angel with Angel" poster to his Currumbin address from Horsham, Victoria.  At GH-9, Mr Hansen attaches images of the poster as delivered with the postage packaging depicted.  On 31 March 2017, he searched the Redbubble website and the search result revealed that his order was manufactured and shipped on 7 December 2014 and delivered on 7 January 2015.

309   On or about 9 November 2015, he again conducted a search of the Redbubble website as he had done before except that on this occasion he says that he used, in the search box, the term

"Hells Angel" rather than "Hells Angels".   Again, the search results produced "numerous images over a number of pages" and one result was an artwork using the title "Hells Angel" and which offered the artwork on T-shirts which he describes as the "Becks Boyd T-shirt" being a T-shirt bearing the image shown as Example 3, [44] of these reasons.

310     The relevant page revealed by that search result is annexed as GH-11 except that when searched the page did not reveal the words:   "This work has been suspended.   Only you can view this page".

311     Mr Hansen says that using the functions on the website he purchased the Becks Boyd T-shirt for $23.94 using his credit card and provided all of the required information.   Immediately after doing so he received a confirmation email annexed at GH-12 advising that the order was in production.   The email reproduced a copy of the artwork in question.   Mr Hansen annexes at GH-13 a copy of the Redbubble purchase order identifying the product by reference to the title "Hells Angel" and also containing a small reproduction of the image.   Mr Hansen says that he was able to go to the Redbubble website and use it to check on the progress of his order, the results of which also appear in GH-13.

312     Mr Hansen says that his role does not engage him in any "ongoing communications" with Redbubble about what steps it might take to assist HAMC Aust in blocking further images said to offend its rights and that is so because he "can't interfere with everyone that's working on their current roles":   T, p 150, lns 32-33; T, p 157, lns 26-29.   Mr Hansen also accepts that if an artist tagged a subject matter clearly not associated with Hells Angels (such as a vase of flowers), with the tag "Hells Angels", he would probably not be concerned by that:   T, p 153, lns 14-16.   Mr Hansen accepts that a number of images put to him using the term "Hells Angels" (particularly some cartoons; Exhibit 2) did not engage, so far as he was concerned, breaches of any trade mark rights of the applicant:   T, p 154 and p 155.

313     In the second affidavit of Mr Hansen (16 June 2017), he says that in March 2015 on behalf of HAMC Aust he ordered 35 black T-shirts from "Print 'n Wear Pty Ltd".   Mr Hansen annexures illustrations of the images applied to those T-shirts as contended examples of the trade marks in suit.   I will return to these issues in dealing with the cross-claim.   As to elements of his role, however, Mr Hansen says that it was part of his job to order T-shirts such as these.   The applicant's "regular graphic artist" was responsible for the design.   In doing this part of his job, he does not send examples of a design to anyone in HAMC US:   T, p 156, lns 1-2.   If Mr Hansen finds something anywhere online, for retail, that "suggests it's manufactured in the

United States", he makes that apparent to HAMC US by sending an email to the nominated HAMC US "rep", "Rodney".  The rep usually acknowledges receipt of the email:  T, p 156, lns 5-28.

314   Mr Hansen has also engaged to some extent with Ms Brooke Oliver, HAMC US's lawyer concerning "monitoring products and just making them aware of it" (being a reference to his earlier reference to articles being offered online, by retail, apparently manufactured in the United States).  Mr Hansen says that any exchanges with Ms Oliver are not in respect of "seeking permission or approval for any particular design [he might] choose to use".  He says that the designs the applicant uses, or each Chapter users, in Australia, "is completely up to us":  T, p 156, lns 39-46.  Mr Hansen accepts that the "quality or style of the products" is "completely up to" Mr Hansen and the "quality and the images, in regards to design", is up to him in respect of "anything that's manufactured":  T, p 157, lns 1-10.

315   Mr Hansen says that a Charter may occasionally want to have T-shirts for a particular purpose (such as a motorcycle run), but if so, it has to be done "through the right channel", by going to him:  T, p 158, lns 10-21.  Mr Hansen says that there is no-one else in Australia, other than him, who is in a position to make decisions about trade mark matters:  T, p 157, lns 31-33.  Nor is there anyone in Australia who deals with companies for the purpose of discussing how guidelines might be implemented to discourage (or decrease) the number of unwanted images on the Redbubble website (or perhaps other relevant websites):  T, p 157, lns 42-44.

316   Mr Hansen was asked whether there was any "limitation" upon what was "completely up to him", as he puts it, in that regard.  In answer, he said this at T, p 158, lns 35-38:

> Mr Hansen:   No.  In that it's not completely up to me.  I will go through the design process with a graphic artist and then I will take it to the *membership* who want that T-shirt for their approval or to see if they want any changes.  But it's *only the members who get to make that decision*.

[emphasis added]

317   As to the evidence of Mr Hansen, I accept his evidence taking into account the wider explanation of aspects of his affidavit evidence given in cross-examination and briefly in re-examination.

### Mr Mark Nelms

318   Mr Nelms is the sole Director of the applicant, HAMC Aust, although, oddly enough, he has not been physically present in Australia since Christmas Day 2013 when he left to live in Dubai.

He now lives in Slovenia. Mr Nelms says that he "probably" does not regard himself as an Australian resident: T, p 168, lns 36-37.

319    Mr Nelms says that he joined the Hells Angels Motorcycle Club (the "Club") in 1999 and became a full member in 2001. He became the official trade mark officer for Australia in January 2005, when it was an unincorporated body. He was voted into the position by the members.

320    On 8 December 2006, the applicant was incorporated and Mr Nelms has been a director since incorporation. Initially, he was the sole shareholder. He was also the Company Secretary. At the date of the trial, he was the sole director although there have been other directors from time to time. Mr Nelms became the sole Director of the applicant again on 29 January 2013. Mr Nelms says that in late 2006, the right to incorporate a company with Hells Angels in its name derived from permission given by the Hells Angels Motorcycle Club, in Australia, although there apparently was correspondence "back and forth" with HAMC US about that: T, p 167, lns 1-20. Mr Nelms, however, was uncertain about these matters: T, p 167, lns 19-20.

321    Mr Nelms was the sole shareholder until 31 January 2016 in the applicant. He now holds 33 of the 100 issued shares.

322    In his evidence, Mr Nelms seeks to explain the *history* of HAMC Aust and its predecessors being the various Hells Angels Chapters in Australia and the *activities* of those Chapters especially, as he puts it, as the "licensees" of certain rights and privileges granted by HAMC US. This explanation concerns matters in a period before the incorporation of HAMC Aust and before Mr Nelms joined the Club in 1999 and before his full membership of the Club in 2001. He says that parts of his narrative are based upon inquiries and discussions with members of the Club in the various Chapters around Australia across the period of his 17 year association with the Club and the Chapters. He particularly refers to a member called "Ball Bearing", a former Melbourne member and an original founding member in 1975. He also refers to "Slim Spires", a former Sydney member and also an original founding member in 1975. Mr Nelms can speak from his own knowledge for the period of his membership, and to the extent that he relies upon statements made to him by others as founding members or otherwise, I simply take that part of the narrative as something said to him rather than necessarily evidence of the truth of the fact of the content.

323    As to the trade marks, Mr Nelms says that HAMC Aust has been, and continues to be, "authorised by HAMC US to use the trade marks", in Australia, identified in Attachment A to the applicant's SFASOC that is, the registered trade marks in suit owned by HAMC US. Mr Nelms then goes on to set out the history which is said to lead to that result.  He says that HAMC US has granted, that is, taken steps to establish or approve Charters in 47 countries. Mr Nelms says that groups of motorcycle enthusiasts have met together in Australia since the 1960s known as "Hells Angels".  Members have had informal contact from time to time with members of the Hells Angels Motorcycle Club in the

324    In about August 1975, a majority of members of the then Hells Angels organisation in Australia wished to become part of the recognised United States Hells Angels organisation as it existed at that time which was also developing in different countries.  As a result, the Club in Australia began to be *overseen* by members of the Californian Chapter of the United States Hells Angels organisation.  There were two Chapters granted Charters in 1975.  One was in Sydney and the other was in Melbourne.  Since that time, the number of Chapters has increased to 10 with three Chapters in Melbourne, two in Sydney, three in Adelaide and one in each of Darwin and Brisbane.  Mr Helms was asked how many members there might have been over the last 40 years.  He said he honestly could not say although it was "more than in the dozens, that's for sure": T, p 172, lns 5-6.  These remarks seemed to be addressed to the number of members of the Hells Angels Sydney Charter.

325    In 1987, the Sydney Chapter was licensed to use certain registered and unregistered trade marks by HAMC US.  Mr Nelms says that a copy of that licence is the document at PTB-48 to the affidavit of Mr Bolam sworn 30 March 2017.

326    That licence is made between a Californian corporation called Hells Angels Motorcycle Corporation and a body described as "Hells Angels Sydney".  The document recites that the purpose of the licence agreement is to "meet the legal requirements that a trademark owner exercise legitimate control over the use of its marks and vigilantly defend, under the laws of the United States of America, its trademark rights".  It also recites that because "each chapter is a separate and independent legal entity, a licence agreement is necessary to [ensure] the integrity of the trademarks".  The relevant trade marks are set out in Exhibit A to that agreement and there are 10 identified trade marks and some common law trade marks.  It is not clear how that list of marks might reconcile with, for example, the trade marks set out at [37] of these reasons.

327    In any event, the "licensee" is described as "an authorised, but legally independent, chartered organisation comprised of members belonging to the collective organization".  The licensee acknowledges the ownership of the marks in the grantor (HAMC) and agrees that it will do nothing inconsistent with such ownership and that all use of the relevant marks by the licensee shall inure to the benefit of HAMC.  The licensee agrees to assist HAMC in protecting the marks.  The grant is described, however, as a *non-exclusive*, non-transferable licence to use the marks.

328    Mr Nelms says that the various Chapters in Australia operate their charters under the guidance and direction of HAMC Aust.  He says that HAMC Aust, through the various Charters, has held many and various private and public functions and events, an example of which is a "run" by Charter members in which they engage in an outing on public roads wearing clothing and accessories bearing the registered marks.  The national run is held once a year.  All Charter members come together for it.  The event is hosted by a different Chapter each year.  There are also local runs and memorial runs; anniversary parties for each Chapter every year; and rock concerts organised by the Chapters.  There are also many motorcycle shows, tattoo shows and motoring events organised by the Chapters.  Many of these events are publicised in lifestyle magazines and the mass media including national radio and television channels.

329    HAMC Aust also produces books, CDs, DVDs, audio-visual recordings and calendars available for sale to the public through the various Chapters and through events and websites.  As to these matters, Mr Nelms says this at para 22 of his affidavit evidence:

> 22.    I am aware [that] the following are examples of this merchandise produced over the years:
>
> (a)    A CD entitled 'Hells Angels MC presents Larrie Cook & The Bluesmasters at the Brisbane Club House';
>
> (b)    A video recording of 'Darwin River Rocks 98' together with a promotional poster;
>
> (c)    A 2004 HAMC AUS Brisbane Calendar;
>
> (d)    A perpetual calendar;
>
> (e)    Pages of the publication entitled 'Hell's Angel' by Sonny Barger; and
>
> (f)    Cassette and CD recordings.

330    As to Item 22(a), Mr Nelms says the CD was sold to the public and either Hells Angels or Hells Angels MC, together with a picture of the "Death-Head" was on the cover.  This occurred

"something like" "more than" 10 years ago.  The numbers sold was "in the hundred": T, p 170, lns 38-46; T, p 171, lns 1-6.

331    As to Item 22(c), it too was produced for the public, had upon it Hells Angels or Hells Angels MC and a "Death-Head": T, p 171, lns 8-14.  Mr Nelms says that at least some of the items at para 22(a) to (f) had the Fuki Death Head endorsed on them:  T, p 171, lns 19-21.

332    Mr Nelms gives evidence about his understanding of matters relevant to the contended exclusive licence.

### Exclusive licence and authorised user issues

333    As to this topic, Mr Nelms says these things.

334    As already mentioned, "Hells Angels Sydney" was appointed on 1 July 1987 as a non-exclusive licensee of particular trade marks.  Mr Nelms says that HAMC Aust is the *exclusive* licensee, in Australia, of HAMC US, in respect of the registered trade marks in Australia of HAMC US, and any copyright subsisting in artistic works depicted in those trade marks.  He describes these rights collectively as the "HAMC IP rights".  These rights are said to arise under an agreement dated 14 May 2010.

335    This agreement is said to supersede the 1987 licence.

336    The agreement, bearing the heading "Exclusive Licence Agreement", recites that the parties acknowledge that:

> A.     HAMC [US] is the owner of the trademarks, service marks and collective membership marks, together with all the goodwill therein ("Marks") used by the Hells Angels Motorcycle Club for membership, goods and services.  The Marks licensed hereunder include those listed in Exhibit A ("Core Marks") and those listed in Exhibit B ("Affiliate Marks"), which exhibits may be amended from time to time;

> B.     Licensee maintains and administers the Marks for use by the charters of the Hells Angels Motorcycle Club within Australia ("Jurisdiction"); and

> C.     HAMC [US] is the owner of any and all copyrights subsisting in the Marks.

337    The "Core Marks" include the word mark "Hells Angels" and the devices shown at [37] (a), (c) and (e) of these reasons.  The agreement provides that the parties "intending that their rights shall be enforceable under the laws of the United States and/or under the laws of the Jurisdiction", agree as follows:

> 1.     <u>Grant</u>.  HAMC [US] hereby grants to Licensee an exclusive non-transferable

licence within the Jurisdiction for use of the Marks, subject to the limitations and responsibilities contained herein.

2.   <u>Copyright</u>.   HAMC [US] hereby grants to Licensee an exclusive non-transferable licence within the Jurisdiction of all rights to the copyrights in the Marks under the *Copyright Act 1968* (Cth).

3.   <u>Ownership</u>.  All the use of the Marks made under the laws of the Jurisdiction shall indicate HAMC [US] as the owner thereof.

4.   <u>Manner of Use</u>.  Licensee agrees that use of the Marks shall remain consistent with the standards and restrictions adopted and promulgated by HAMC [US] and the Hells Angels Motorcycle Club, adhering to the following policies:

a.   <u>Core Marks</u>.  The Core Marks shall be used primarily to indicate membership in the Hells Angels Motorcycle Club, and their use to indicate the source or approval of goods sold or services rendered to the public shall be strictly limited.

b.   <u>Affiliate Marks</u>.  The Affiliate Marks may be used on goods sold or services rendered to the public, to indicate source or approval of the Hells Angels Motorcycle Club.

…

338   As to the form of use, the agreement provides that the marks shall be used by the licensee in substantially the same form in which they have been registered in the United States Patent and Trademark Office.  The licensee agrees to adopt and use the appropriate trade mark notice "R" for registered marks and "TM" for non-registered trade marks and "SM" for non-registered service marks.

339   As to enforcement, the agreement says this:

6.   <u>Enforcement</u>.  HAMC [US] and Licensee shall cooperate as necessary to enforce their respective rights in the Marks, and to defend the Marks against conflicting claims asserted by third parties.  Licensee will be diligent in policing use of the Marks within the Jurisdiction, at its own expense.  In the event the Licensee learns:

a.   of any existing or pre-existing trademark or copyright infringement or threatened trade-mark or copyright infringement of any of the Marks, licensed under this agreement;

b.   of any common law passing off by reason of imitation of get up or otherwise; or

c.   that any third party alleges or claims that any of the Marks in this agreement are liable to cause deception or confusion to the public,

Licensee shall immediately notify HAMC [US] in writing giving particulars of the infringement.  Licensee is entitled to engage in or institute all infringement proceedings within the Jurisdiction, in relation to any perceived infringement of the trade mark rights in the Marks under the *Trade Marks Act* 1995 and/or any infringement of the rights in copyright in the Marks under the *Copyright Act* 1968 notwithstanding that such perceived infringements, may have

occurred prior to the date of this agreement, and whether or not those infringement activities have ceased as at the date of this agreement. HAMC [US] may at its own election join as a party in any such proceeding, and HAMC [US] shall be the real party in interest in [any] trademark or copyright suit involving the Marks.

…

340     As to reporting, the agreement says this:

> 8.     <u>Reporting</u>.  In order that HAMC [US] be assured that the Marks are being properly used by Licensee and be informed of the extent of the Marks' use in commerce, upon reasonable request from HAMC [US], Licensee will report the details of the Marks' usage and provide specimens or facsimiles of such usage.

341     The exclusive licence recites that it will remain in effect so long as there are active Charters of the Hells Angels Motorcycle Club in Australia.

342     As to the trade marks which are said to fall within the scope of the Exclusive Licence Agreement, Mr Nelms refers to the trade marks recited at para 41 of Mr Bolam's affidavit of 30 March 2017 which, in turn, is cross-referenced to Attachment A to the SFASOC.  The portfolio of marks in question are those trade marks recited at [37] of these reasons.  As to the trade marks, Mr Nelms says that the "use of the registered trade marks is and has always been under the control of HAMC USA since at least my joining the Hells Angels Club in 1999".  This observation was admitted into evidence but, of course, it is entirely conclusionary and cannot be, by itself, probative of the conclusion.  It rises no higher than his assertion of his belief as to the topic, although, of course, he has been the trade mark officer of HAMC Aust for 10 years.  Mr Nelms gives some examples of the activities of the applicant which are these: to collect membership fees from the various Chapters; to pay expenses including printing and related costs of items bearing the registered trade marks of HAMC US such as jackets, T-shirts and posters; to sell merchandise to members of HAMC Aust and some specific merchandise to the public such as calendars and take steps to protect "HAMC IP rights".

343     Mr Nelms says that he has had discussions with long-standing members of the Hells Angels Club since becoming a member in 1999, about the "uniformity of the uses of the registered marks".  He says that uniformity of use of the registered marks "has been a priority to HAMC USA and its predecessors since the late 1950s and certainly since the introduction of the Fuki Death Head in 1983".  Mr Nelms refers to the declaration of Mr Barger about that matter.

344    Mr Nelms also says that for some years, since at least 2011, he has been aware, by reason of his role as the trade mark officer of HAMC Aust, of the role of the "authorised user" under the *Trade Marks Act*. He says he is also aware of the nature of that role through his involvement in various enforcement actions taken by HAMC Aust, commenced since 2006. He says that as the Director of HAMC Aust, he provided, in 2011, a report to HAMC US on "relevant activities in relation to the use of the registered marks in Australia by HAMC Aust which were authorised by HAMC USA". He says that the topics upon which he reported to HAMC US included these matters:

    (a)    the requirements of the *Trade Marks Act* in terms of control and identifies the financial control [HAMC US] exercises by [HAMC Aust's] reporting of revenue from memberships and revenue from sales of goods bearing the marks;

    (b)    the progress of various infringement claims HAMC Aus was making and the various stages of prosecuting they had reached;

    (c)    changes in the procedures for providing objections to the Australian Customs [authorities]; and

    (d)    the position of Internet Service Providers in Australia and the notice requirements.

345    Mr Nelms refers to the 2011 Report to HAMC US which is a four page document and the 2014 Report which is also a four page document.

346    In the 2011 Report, Mr Nelms notes that although the Exclusive Licence Agreement establishes HAMC Aust as the licensee, HAMC Aust is required to demonstrate that the terms of control are actually being implemented and that steps are being taken to maintain control of the trade marks. Mr Nelms refers to an obligation HAMC Aust has to regularly document and report upon particular matters including use of the trade marks and financial reporting. He cross-references these obligations to s 8 of the *Trade Marks Act 1995*. He reports upon investigations being undertaken by HAMC Aust (including trap purchases) of potential infringements by 31 different organisations. He reports upon the progress of matters. He reports upon Customs regulations and various notifications under those regulations and he reports upon concerns in relation to the conduct of internet service providers.

347    The 2014 Report provides a report about infringement concerns relating to seven entities.

348    Mr Nelms says that in 2014, HAMC Aust commenced proceedings against Eyegasm Brands Pty Ltd ("Eyegasm") in the Federal Circuit Court of Australia in respect of alleged infringements of an HAMC US word mark used on a particular T-shirt design sold by the

respondent.  The 2014 Report refers to the Eyegasm proceeding which was settled and discontinued on or about 10 June 2014.  He says that that matter was discontinued because HAMC US directed HAMC Aust to discontinue it as HAMC US had settled a claim against the party who had supplied the respondent in the Eyegasm proceeding with the T-shirt bearing the relevant design.  That settlement in the United States was said to be a "whole of world" settlement.

349     The Australian Eyegasm proceeding was discontinued by HAMC Aust without reimbursement of the costs of the proceeding or any amount being received by HAMC Aust by way of compensatory damages.  Mr Nelms says that HAMC Aust reports to HAMC US about a number of things including revenue HAMC Aust derives from sales of goods bearing the registered trade marks.

350     Mr Nelms also says that the Schedule attached to Mr Bolam's affidavit of 30 March 2017 marked PTB-51 which is a table prepared on behalf of HAMC Aust to describe and depict uses made by HAMC Aust in Australia within the period of three years from 5 October 2012 to 5 October 2015, is correct and accurate as to the uses of the registered trade marks described in the Schedule.  I will return to that table but, for present purposes, is should be noted that Mr Nelms says this about it:  "I can say from my personal observation that the uses described and depicted in the table took place in Australia as indicated in the table and within the period of [the] 3 years period from 5 October 2012 to 5 October 2015".

351     This statement, of course, simply "swears the issue" and although Mr Nelms affirmatively asserts the fact, the proposition he contends for must necessarily be supported by proper and concrete details of the manner in which these things are said to have occurred.  Counsel for the applicant says it was really an "aid of summary" not the primary source of the evidence. Accordingly, the statement was ruled inadmissible.

352     I will return to that matter later in these reasons.

353     As to the role of Mr Hansen, Mr Nelms accepts that Mr Hansen has authority to arrange the manufacture of products on order from the Chapters.  Use of any of the trade marks on such products is within Mr Hansen's authority, especially in the absence of Mr Nelms:  T, p 169, lns 1-5.

354     Mr Nelms says that in the second half of 2012 (more than a year before he left Australia), he had been in contact, by phone and email, with HAMC US and he either met with or spoke with

HAMC US personnel twice a year (but "no more than that") and was in email contact "any number of times".  The purpose was to report what was happening with HAMC Aust's infringement claims and monitoring activity in Australia of unauthorised use of the trade marks:  T, p 169, lns 14-29.  Mr Nelms does not recall whether, in the period mid-2012 to the end of 2013, he sought the prior approval of HAMC US to any proposal by a Chapter to have T-shirts made:  T, p 169, lns 34-40.

355     As to whether there are any written guidelines (T, p 169, lns 42-44), instructions, manuals or standards (T, p 170, lns 14-15) issued by HAMC US as to the use of any of the trade marks or as to the quality of the goods to which they might be applied, Mr Nelms says that, as to the use of the "patch" (bearing the side view of the Death Head and "Hells Angels"), there are controls over its use including the "layout of it", and "a measurement and where it has to be placed and then the dimensions and so forth".  He also says:  "there's also a world rule in regard to the – [patch] that it must be standardised, that it has to be all exactly the same stitches and so forth: T, p 170, lns 17-25.  Mr Nelms says that every member of every one of the 10 Charters established since 1975 in Australia has a patch with the Death Head.  He accepts that there are many other items with a Death Head on it including possibly a Certificate of Appreciation, jewellery, belt buckles and the like:  T, p 172, lns 29-39.

356     Mr Nelms accepts that there are no "written manuals" or "standards documents" that tell him what type of T-shirts can be used or "anything of that sort":  T, p 170, lns 33-34.

357     As to websites other than the Redbubble website, Mr Nelms accepts that in relation to Hells Angels materials, "there is a lot of bogus stuff on eBay".  Mr Helms says he did not take that matter up with eBay in Australia.  He also accepts that unauthorised uses of Hells Angels emblems and words occurs on YouTube and neither he nor HAMC Aust has sought to have it taken down.  He says that is because "most [of] those things are dealt with internationally by [HAMC US]":  T, p 177, lns 40-41.

358     As to the relative roles of HAMC US and HAMC Aust concerning particular topics, Mr Nelms thought, for example, that if a "worldwide project" was to be undertaken such as producing a National Geographic documentary on the Hells Angels Motorcycle Clubs worldwide (a project suggested in 2007), which involves licences to use copyright works and trade marks, the "worldwide deal would be done by the Californian corporation and they wouldn't ask your permission":  T, p 179, lns 16-21.

359    However, Mr Nelms also said that **if** such a worldwide deal was being put together which involved permission to exercise the Australian rights, he would expect to be consulted by HAMC US and "given we've got an exclusive licence, they would have to consult with us": T, p 179, lns 23-26.   Mr Nelms believes that any such worldwide deal would have to be discussed:  T, p 179, lns 40-44.

360    Mr Nelms was taken to the settlement of the *Eyegasm* proceeding and accepted that as it turned out, the "world body" had "done a deal" and Mr Nelms had to fall into line with it:  T, p 180, lns 3-4.   That led to this question and answer:

| Mr Cobden SC (Counsel for Redbubble): | And that's because you understand it, don't you, that whatever [the] documentation is, they [HAMC US] reserve the right to exercise trade mark rights and copyrights themselves within the territory? |
|---|---|
| Mr Nelms: | Yes |

361    As to the complaints made by HAMC Aust to Redbubble, Mr Nelms seems to accept, as the applicant's trade mark officer for over 10 years, that one of the images to which objection was initially taken (a ball of knitting wool with two needles and the words "Hells Grannies") does not impinge upon the applicant's rights:  T, p 181, lns 24-25.

362    Mr Nelms also seemed to accept that reproducing the title of the Howard Hughes movie "Hells Angels" (from the 1930s) on T-shirts, did not infringe the applicant's rights notwithstanding that objection was initially taken to this example as well:  T, p 181, lns 31-33.

363    Mr Nelms accepts that the words "Hells Angels" could be legitimately used to index, on the Redbubble website, the Howard Hughes movie poster and also used to index any of the squadrons from WWI to WWII that adopted the name "Hells Angels":  T, p 182, lns 15-19.

364    Mr Nelms accepts that the scope of the applicant's complaint is that Hells Angels "can't legitimately be used to search for something that when one gets the result, it infringes upon Hells Angels property right" (T, p 182, lns 21-33), and this concern arises when a reproduction appears of an image that is "the same as or close to one of the registered trade marks":  T, p 181, lns 35-36.

365    Mr Nelms accepts that he has not turned his mind to the topic of the question of offers of proactive moderation of the Redbubble website for "Hells Angels imagery and the like":  T, p 183, lns 13-16.

366     Ms Brooke Oliver is an attorney admitted in 1994 to practice law in California.

367     She is employed by, and CEO of, "50 Balmy Law P.C." in San Francisco.  Since 12 August
        2015, she has acted as intellectual property counsel for HAMC US which "owns Hells Angels
        related intellectual property and manages and enforces [it] around the world".  Ms Oliver took
        over this role from another attorney, Mr Fritz Clapp, from a different law firm.  Ms Oliver,
        fundamentally, gives evidence about the steps she took to seek out witnesses and evidence
        relevant to the copyright issues in these proceedings.  However, Ms Oliver says that she did so
        "at the request of the lawyers for our exclusive licensee in Australia, the applicant in this
        proceeding".

368     Ms Oliver, as intellectual property lawyer for HAMC US, seems to be in no doubt at all that
        the applicant is regarded as the "exclusive licensee" in Australia of HAMC US in respect of
        the relevant rights.  She says the basis for that view is the grant of an "exclusive licence" as
        reflected in the "document" which "has been produced":  T, p 111, lns 15-27.  Ms Oliver
        accepts that she had not played a role in drafting the document.  Ms Oliver attends meetings of
        the governing body or committee of HAMC US from time to time.  Counsel for Redbubble
        sought to test with Ms Oliver whether, should a proposal emerge from a reputable producer for
        the making of a major documentary about the Hells Angels, using Hells Angels' intellectual
        property, would that proposal come to the Board of HAMC US for approval and to her?  She
        declined to answer as her answer might reveal privileged information although she said that
        she would discharge the "normal and customary duties" of a person in her role.

369     As to the evidence of Mr Nelms, I accept his evidence except as to those matters of a broad
        conclusionary nature or statements in the nature of simply "swearing the issue", as earlier
        mentioned.  There are no credit questions in respect of Mr Nelms or any other witness in this
        proceeding.  As to Ms Oliver's evidence, I generally accept her evidence.

        **The exclusive licence**

370     Assuming for the moment that HAMC US had secured the ownership of the copyright in the
        artistic works in suit (as determined according to the law of Australia) so as to bring the works
        within the scope of the licence of 14 May 2010, the question of whether HAMC Aust is an
        exclusive licensee of the owner falls to be determined according to the elements of the
        definition of "exclusive licence" in s 10(1) of the *Copyright Act*.  The term "exclusive licence"
        is defined in this way:

> **Exclusive Licence** means a licence in writing, signed by or on behalf of the owner or prospective owner of the copyright, authorising the licensee, *to the exclusion of all other persons*, to do an act that, by virtue of this Act, the *owner* of the copyright would, but for the licence, have the *exclusive right* to do, and **exclusive licensees** has a *corresponding meaning*.

[emphasis in italics added]

371     The owner of the copyright (subject to the question of term and continuing subsistence), enjoys the exclusive right, relevantly here, to reproduce the artistic work in a material form and to communicate the work to the public:  s 31(1)(b)(i) and (iii) of the *Copyright Act*.

372     The Licence Agreement expressly grants HAMC Aust "an exclusive non-transferable licence" within Australia "of all rights to the copyrights", in relevant works, "in the Marks", under the *Copyright Act*.  The parties chose to call the agreement an **Exclusive Licence Agreement**, and the grant, consistent with that expectation, is in clear terms.  The provisions of the agreement addressing "Ownership" in HAMC US and "Manner of Use" (cls 3 and 4) address only the trade marks but, of course, the relevant copyright is the copyright in the artistic works "in the Marks".  The enforcement clause (cl 6) contemplates co-operation between HAMC US and the Licensee "to enforce their respective rights in the Marks" and to defend the Marks against conflicting claims asserted by third parties.  The "respective rights" of HAMC US and the Licensee are, according to the document, as owner/grantor and as Exclusive Licensee, respectively.  There is no express reservation by HAMC US of a right to authorise others to exercise any of the exclusive rights invested in the owner, and HAMC US does not reserve a right to itself to exercise in Australia any of the rights in the works vested in the owner.  Clearly, HAMC US has an "interest" in the works as owner.  The Licensee has an obligation to immediately notify HAMC US should the Licensee become aware of acts of third party infringement.

373     Redbubble's critical point of contention is that the working operation of the agreement demonstrates that the grant or "authority" conferred under the licence to do an act reserved to the copyright owner, is not "to the exclusion of all other persons" because, according to the evidence of Mr Hansen, the HAMC US rep and Ms Oliver continue to be engaged in decision-making about the exercise of the copyrights by HAMC Aust.  Also, according to the evidence of Mr Nelms, HAMC US reserves the right "to exercise trade mark rights and copyrights themselves in the territory".  The evidence of Mr Nelms needs to be understood in context.  His answer to the question set out at [360] of these reasons came on the heels of an answer about worldwide settlement of a particular infringement proceeding.  Certainly,

Mr Nelms thought that HAMC Aust would need to fall into line with the overarching global settlement in the *Eyegasm* matter.   He had previously made it clear that in respect of any "worldwide deal" to exercise any rights in the copyright in Australia, he would *have to be consulted* because HAMC Aust has an exclusive licence.

374   A particular isolated act or acts across the life of the agreement, with the acquiescence of the grantee, does not render what would otherwise be an exclusive licence, an agreement characterised as one in which the grantor is to be understood, in the working operation of the document, as reserving to itself the right to undertake "acts" in the exercise of the exclusive rights vested in the owner, so as to bring about the result that the "authority" conferred on the licensee is not "to the exclusion of all other persons".

375   I am satisfied that, assuming ownership in HAMC US, the applicant is the Exclusive Licensee of the copyright in the relevant works.   However, as explained earlier, I am not satisfied that HAMC US is the owner of the copyright in the relevant artistic work.

**Authorised user**

376   Section 8(1) of the *Trade Marks Act* provides that a person is an *authorised user* of a trade mark if the person *uses* the trade mark in relation to goods or services, "under the control of the owner of the trade mark".   Use by an authorised user of the trade mark is an *authorised use* to the extent *only* that the user uses the trade mark "under the control of the owner":   s 8(2). Section 8(3) sets out particular acts on the part of the owner of the trade mark that result in the relevant counter-party being "taken" to use the trade mark under the control of the owner.

377   Section 8(3) is in these terms:

> 8 (3)   If the owner of a trade mark exercises quality control over goods or services:
>
>> (a)   dealt with or provided in the course of trade by another person; and
>>
>> (b)   in relation to which the trade mark is used;
>
> the other person is taken, for the purposes of subsection (1), to use the trade mark in relation to the goods or services under the control of the owner.

378   However, s 8(3) does not limit the meaning of the expression "under the control of" in s 8(1) and s 8(2).

379   By s 7(3) of the *Trade Marks Act*, an authorised use of a trade mark by a person (for the purposes of s 8(1)) is taken, for the purposes of the *Trade Marks Act*, to be a use of the trade mark by the owner of the trade mark.

380    The significance of whether an entity is an authorised user of a trade mark is, in part at least, measured by the powers conferred on a registered user by s 26 of the *Trade Marks Act*. Apart from the right of use, these powers should be noted at s 26(1)(b), (d) and (f):

> **26** (1)   Subject to any agreement between the registered owner of a registered trade mark and an authorised user of the trade mark, the authorised user may do any of the following:
>
> (a)     …
>
> (b)     the authorised user may (subject to subsection (2)) bring an action for infringement of the trade mark:
>
> > (i)     at any time, with the consent of the registered owner; or
> >
> > (ii)    during the prescribed period, if the registered owner refuses to bring such an action on a particular occasion during the prescribed period; or
> >
> > (iii)   after the end of the prescribed period, if the registered owner has failed to bring such an action during the prescribed period;
>
> (c)     …
>
> (d)     the authorised user may:
>
> > (i)     give to the Comptroller-General of Customs a notice under section 132 objecting to the importation of goods that infringe the trade mark; or
> >
> > (ii)    revoke such a notice;
>
> …
>
> (f)     the authorised user may give permission to any person to apply the trade mark to goods, or in relation to goods or services, in respect of which the trade mark is registered.

381    Section 26(2) provides:

> 26(2)  If the authorised user brings an action for infringement of the trade mark, the authorised user must make the registered owner of the trade mark a defendant in the action. However, the registered owner is not liable for costs if he or she does not take part in the proceedings.
>
> [s 26 am Act 99 of 2001 s 3 and Sch 1 item 4 opn 19 Sep 2001]

382    In *Lodestar Anstalt v Campari America LLC* (2016) 244 FCR 557, the Full Court, Allsop CJ, Greenwood, Besanko, Nicholas and Katzmann JJ, considered the meaning to be attributed to the statutory text of s 8 and, in particular, the phrase "under the control of", the owner of the trade mark. The Full Court observed that the phrase is given content by the principle stated by Aickin J in *Pioneer Kabushiki Kaishai v Registrar of Trade Marks* (1977) 137 CLR 670 that the "essential requirement" for maintenance of the validity of a trade mark is that it must

indicate a "connection" in the course of trade with the registered owner, "even though the connection may be slight": Aickin J at (683): Full Court, Besanko J at [95]; Allsop CJ at [1]; Greenwood J at [3] and [21]; Nicholas J at [112].

383    However, as the Full Court observes, it is the *connection* which may be slight "such as the selection or quality control or control of the user in the sense in which a parent company controls a subsidiary", but Aickin J was not saying that the *quality control* or *financial control* may be slight: Full Court citations above.

384    At [97] and [98], Besanko J said this (Allsop CJ at [1]; Greenwood J at [3] and [21]; Nicholas J at [112], agreeing):

> 97      I think control in s 8 means actual control in relation to the use of the trade mark and it means actual control in relation to the trade mark from time to time. I think (as the primary judge did) that that is the primary meaning of the word, and the English cases, so far as they go, support that conclusion. Control involves questions of fact and degree as does the notion of a sufficient connection. There must be control as a matter of substance. For example, I do not think that it could be suggested that the mere fact that the registered owner granted a licence or revocable authority to use the trade mark would be sufficient without more established control within s 8. That would be inconsistent with the approach taken under the 1995 Act and the *Trade Marks Act 1938* (UK). Had it been Parliament's intention it could be effected by a much simpler provision than s 8.
>
> 98      As I have said, actual control will be a question of fact and degree. A licence agreement may contain a term that sets in detail a quality standard to be achieved. The details in the agreement may be such that it is not necessary for the registered owner to give directions or instructions from time to time. The licensee, aware of its obligations, may faithfully comply with those obligations without any entreaties or demands from the licensor. The primary judge had such a situation in mind when he referred to cases where there was obedience to the trade mark owner "so instinctive and complete that instruction was not necessary".

385    There can be no doubt that the mere fact that HAMC Aust has entered into a Licence Agreement with the owner of the trade marks conferring a right to use them is insufficient to establish control.

386    As to the agreement of 14 May 2010, it grants an Exclusive Licence to use the trade marks "subject to the limitations and restrictions" in the document. As to that, cl 4 addresses the Manner of Use of the Marks and casts an obligation on HAMC Aust to ensure that use of the Marks remains "consistent with the standards and restrictions" adopted and promulgated by HAMC US and the Hells Angels Motorcycle Club (the "Club"). The Licensee is to adhere to the principle that the "Core Marks" (which include the trade marks in suit) shall be used to

indicate "membership in the Club".  Use of the Marks so as to indicate the *source* or *approval* of goods sold or services rendered "to the public", "shall be strictly limited".

387    The focus of the agreement is, in other words, predominantly internal.  It is concerned with use as a badge of identification of membership of a Club of like-minded motorcycle enthusiasts and although trade in goods or services rendered to the public is plainly contemplated, it is to be "strictly limited".  As to the form of use, cl 5 is in these terms:

>    5.    **Form of Use**.  Licensee agrees that the Marks shall be used in substantially the same form in which they have been registered in the United States Patent and Trademark Office.  Licensee agrees to adopt and use the appropriate trademark notice which is encircled "R" for registered marks, the superscript "TM" for non-registered trademarks and the superscript "SM" for non-registered service marks.

388    As to reporting, cl 8 is in these terms:

>    8.    **Reporting**.  In order that HAMC be assured that the Marks are being properly used by Licensee and be informed of the extent of the Marks' use in commerce, upon reasonable request from HAMC, Licensee will report the details of the Marks' usage and provide specimens or facsimiles of such usage.

389    As to reporting, the 2011 Report from Mr Nelms to HAMC contains this observation:

>    **Trademark Legislation in Australia**
>
>    The *Trade Marks Act 1995 (Cth)* requires Hells Angels Motorcycle Corporation (Australia) as Licensee to fulfil certain conditions in order to maintain the registration of its trade marks.
>
>    Although the exclusive license establishes Hells Angels Motorcycle Corporation (Australia) as the Licensee, they are required to show the terms of control are actually being implemented and steps are being taken by the club to maintain control of the trade marks.
>
>    To Satisfy section 8 of *Trade Marks Act 1995 (Cth)*, Hells Angels [M]otorcycle Corporation (Australia) must regularly document the reporting of the following:
>
>    1.    The trade marks used by the Australian licensee; and
>
>    2.    Financial reporting of matters such as:
>
>        a.    Revenue from memberships;
>
>        b.    Revenue from sales of goods bearing the mark.
>
>    A financial report on matters such as revenue from memberships and from sales of goods bearing the marks is compiled by the Hells Angels Motorcycle Corporation (Australia).
>
>    This regular reporting evidences the terms of control being implemented and complies with all requirements of the *Trade Marks Act 1995 (Cth)*.

390     There is nothing in the evidence which shows the content of the "regular reporting" as to the method of use of the trade marks in Australia or the financial reporting of revenue from memberships or from the sale of goods bearing the trade marks, as suggested in the 2011 Report.

391     Mr Nelms says that since at least 2011, he has been "aware of the role of [the] authorised user" under the *Trade Marks Act* in his role as HAMC Aust's trade mark officer, and by reason of his involvement in infringement actions taken since 2006.  He refers to the 2011 and 2014 Reports to HAMC as the expression of that realisation.

392     As earlier mentioned, Mr Nelms gave evidence of his contact with HAMC US either by phone, meetings or email exchanges.  The purpose was to report upon the infringement claims made by HAMC Aust and the monitoring activities of the entity.  As to guidelines, instructions, manuals or standards issued by HAMC US, Mr Nelms seemed unfamiliar with whether any such documents existed but did give evidence of the clear controls exercised over the use of the patch:  [355] of these reasons.

393     Mr Nelms accepts that there are no "written documents" or "standards documents" governing use of the trade marks on T-shirts or anything of that sort:  [356] of these reasons.  He gives examples of use:  [355] of these reasons.  Mr Nelms seems to accept that as to use of the trade marks, HAMC US reserves a right to exercise those rights in Australia although that concession seems to have been in relation to something in the nature of the global settlement of the *Eyegasm* litigation.   Mr Hansen gave evidence that in undertaking that part of his job concerning ordering T-shirts bearing the marks, he does not send examples of a design to anyone in HAMC US.  He reports possible infringements to the HAMC US representative.  He engages with Ms Oliver to some extent.  He does not seek approval from HAMC US about designs the applicant might use:  [314] of these reasons.  As to the scope of any "limitation" he perceives upon his decision-making in that regard, the limitation was expressed as the decision-making of the members of the Chapter rather than controls exercised by HAMC US:  [316] of these reasons.

394     Some of the designs applied to T-shirts the subject of Mr Hansen's evidence are not trade marks in suit although they are trade marks falling under the Exclusive Licence Agreement.  As to the use of trade marks, Mr Hansen attaches four photographs of a T-shirt ordered by him on or about 25 March 2015 for sale to members.  The images are set out below.









395    Three of them show use of the elements of the trade marks in suit:  Images 1, 2 and 4.

396    Mr Hansen ordered further T-shirts in or about March 2015 for supply to members. Annexure GH-24 to Mr Hansen's affidavit of 16 June 2017 is a copy of a form of order of T-shirts in about 2012, the primary.  The images show elements of the marks under the Exclusive Licence Agreement and particular elements of the device marks in suit in these proceedings.  That image is also set out below.



397    These images, so far as they relate to the side Death Head device and the word mark "Hells Angels", and the marks in suit, seem to show a consistency in the manner of presentation of the images as applied to T-shirts.  There is no doubt that HAMC US imposes very particular standards about the manner of presentation of the "patch".

398     Although I accept that neither Mr Nelms nor Mr Hansen was able to give any examples of manuals or guidelines or standards documents issued by HAMC US governing the issues of "quality control" over particular goods or services, it is important, in this case, to take context carefully into account.   This is not a case in which the dominant undertaking of either HAMC US or HAMC Aust is a major commercial undertaking dedicated to producing particular products as the core business (such as wine in *Lodestar*) with a commercial network of national and international distributors and licensees.   HAMC US certainly has a range of territorial licences for particular regions but the focus of the core undertaking is supporting *members* of the *Club* throughout the various Chapters in the United States and members of the various Chapters in the non-US territories.   The focus of the use of its trade marks is "primarily" to indicate membership in the Club, or Chapters, and to that end HAMC US has sought to standardise how the device (trade mark) contained on the patch is to be presented as a badge of membership of the Club or Chapter.

399     Its use in that form shows a connection with HAMC US because the members know the source and origin, to a greater or lesser degree, of the images that emblematically characterise the Hells Angels Motorcycle Club as an organisation of like-minded motorcycle enthusiasts who join or want to join the organisation.

400     Use of the trade marks occurs in the sense of a badge of origin of goods or services supplied to the public but that use of the marks is "strictly limited".   It seems to me that taking into account the very nature of the two organisations, HAMC US and HAMC Aust, against the background of the terms of the agreement of 14 May 2010, and weighing the oral evidence, this "arrangement" between HAMC US and HAMC Aust is in the nature of one where it is *common ground* between the two entities that it is *not necessary* for the owner to give directions or instructions or issue guidelines or standards documents setting out didactic supervisory protocols as these two organisations *understand* that HAMC Aust will faithfully comply with its obligation to present the trade marks in the way that HAMC US, put simply, wants and requires.

401     HAMC Aust and HAMC US are, put anecdotally, like-minded "brothers in arms" in a club representing motorcycle enthusiasts (albeit, so far as use of the trade marks is concerned, they have adopted the mechanism of special purpose vehicles for ownership and use of the trade marks).   These two entities are primarily domestic club entities.   Of course, products are ordered for members for sale to them and some products are sold to the public.   There is no

reason to believe that any different arrangements concerning those particular activities, so far as use of the trade marks is concerned, was necessary as between each entity. That follows because they each seem to know and understand their respective roles and each entity treats HAMC Aust as the authorised user of the trade marks of HAMC US, in Australia. I can see no reason to depart from what seems to be a relationship where obedience to the trade mark owner was *so intuitive* and *so complete* that no formal instruction was necessary.

402    I am satisfied that, taking all things into account, the applicant is properly understood as an *authorised user* of the owner of the trade marks in suit for the purposes of s 8 of the *Trade Marks Act*.

403    Thus, I am satisfied that the applicant has standing for the purposes of the proceeding.

404    It is not necessary in these reasons to examine all of the evidence adduced in the proceeding at large. I have examined extensively all of the relevant evidence of the principal witnesses. However, I have considered all of the evidence and I have re-examined the transcript of the oral evidence extensively. However, where necessary, I will also refer to the evidence of witnesses not already mentioned, for example, the evidence of Dr Coker. I will examine the evidence in relation to the respondent's cross-claim separately.

**The copyright claims of the applicant**

405    It is now necessary to examine the copyright claims made by the applicant notwithstanding that I have concluded that the applicant has not established ownership of the copyright in the artistic work in HAMC US so as to establish a subsisting exclusive licence in relation to that work. For the sake of ease of reference, all references to the statutory provisions concern the *Copyright Act*, unless otherwise stated.

406    The applicant contends that Redbubble has *directly infringed* the copyright in the work described as the Membership Card image (at [17] of these reasons) by communicating the work to the public and by reproducing the work in a material form, although the applicant's "case" was really put on the footing that the respondent has directly infringed the copyright by exercising the communication right. Alternatively, the respondent is said to have *authorised* the infringement, by the uploader, of each work said to be a communication to the public of the work in suit by the "artist" or is said to have authorised a reproduction of the work by the artist. Alternatively again, the applicant says that Redbubble and the artist are jointly liable because they are said to be engaged in a "common enterprise" or "joint design" rendering them

joint tortfeasors in relation to the acts of copyright infringement as a "wrong" which is tortious in nature, that is, there is concurrence in the act or acts causing damage: *The Koursk* [1924] P 140 at 159-160; *Thompson v Australian Capital Television Pty Ltd* (1996) 186 CLR 574 at 580-581; 600-602; *Ramset Fasteners (Aust) Pty Ltd v Advanced Building Systems Pty Ltd* (1999) 164 ALR 239 at 256-257.

407    In these proceedings, the applicant seeks an injunction restraining the respondent from engaging in the relevant conduct and damages. The applicant also seeks additional damages under s 115(4). The applicant pursues an *Australian Consumer Law* case as already mentioned.

408    As to the legislative provisions, s 31(1)(b) provides, relevantly, that copyright (which subsists in a relevant work; ss 32, 33 and 34), in relation to an artistic work, is the exclusive right to "reproduce the work in a material form" (s 31(1)(b)(i)) and the exclusive right "to communicate the work to the public": s 31(1)(b)(iii). Those exclusive rights (described as "acts comprised in the copyright") are vested in the owner of the copyright: s 13(1). Section 10(1) provides that the term **communicate** means: "make available online, or electronically transmit … a work or other subject-matter, including a performance or live performance within the meaning of [the] Act". This case, of course, is concerned with an artistic work. The phrase **to the public** means, "to the public within or outside Australia": s 10(1). In this case, the applicant relies upon an act of making the artistic work available online to the public. No reliance is placed upon the notion of electronic transmission of a work.

409    Section 22(6) provides that, for the purposes of the *Copyright Act*, a **communication**, other than a broadcast, is "taken" to have been made by the person responsible for determining the content of the communication. Section 22(6A) seeks to clarify any doubt about the operation of s 22(6) by providing:

> (6A)    To avoid doubt, for the purposes of subsection (6), a person is not responsible for determining the content of a communication *merely because* the person takes one or more steps for the purpose of:
>
> > (a)    gaining access to what is made available online by someone else in the communication; or
> >
> > (b)    receiving the electronic transmission of which the communication consists.
>
> [emphasis added]

410    Section 14(1)(a) provides that a reference to the doing of an act in relation to an artistic work includes a reference to the doing of that act in relation to a "substantial part" of the work and

so far as reproduction is concerned, that term includes a reference to a reproduction of a substantial part of the work: s 14(1)(b).

411    Section 36 provides that subject to the Act, the copyright in an artistic work "is infringed by a person who, not being the owner of the copyright, and without the licence of the owner of the copyright, does in Australia, or authorises the doing in Australia of, any act comprised in the copyright".  Section 36 contains two separate and distinct causes of action:  direct infringement of copyright by the doing of an act comprised in the copyright, that is, "an act of primary infringement":  *Roadshow Films Pty Ltd v iiNet Limited* (2012) 248 CLR 42 at [93] ("*Roadshow Films*"); and, infringement by authorisation of the doing of an act comprised in the copyright rendering Redbubble a "secondary infringer":  *Roadshow Films* at [93]; *WEA International Inc. v Hanimex Corporation Ltd* (1987) 17 FCR 274.

412    Section 13(2) provides that the exclusive right to **do** an act in relation to an artistic work includes the exclusive right to authorise a person to do that act in relation to that work.

413    As to authorisation, s 36(1A) is in these terms:

> (1A)    In determining, for the purposes of subsection (1), whether or not a person has authorised the doing in Australia of any act comprised in the copyright in a work, without the licence of the owner of the copyright, the matters that *must* be taken into account include the following:
>
> (a)    the extent (if any) of the person's power to prevent the doing of the act concerned;
>
> (b)    the nature of any relationship existing between the person and the person who did the act concerned;
>
> (c)    whether the person took any reasonable steps to prevent or avoid the doing of the act, including whether the person complied with any relevant industry codes of practice.
>
> [emphasis added]

414    The rights of an exclusive licensee are set out in s 119.  Put simply, the exclusive licensee has the same rights of action (except as against the owner of the copyright) as he or she would have, and is entitled to the same remedies as he or she would be entitled to, by virtue of s 115, as if the licence had been an assignment of the relevant rights, and those rights and remedies are concurrent with those of the owner of the copyright, under that section.  The exclusive licensee has the same rights and remedies under s 116 as if the licence had been an assignment.

415    The "scope" of the notion of "infringement by authorisation" is informed by the "linkage" between the statute and the common law rendering such conduct "tortious": *Roadshow Films*

at [107]. As to that linkage, where tortious liability arises in a person from some cause other than the commission of an unlawful act by that person, it generally does so because the person has put himself or herself in a position which exposes the rights of others to risk and danger *unless* he or she shows such care as the circumstances require: *Roadshow Films*, Gummow and Hayne JJ at [108].

416    In *University of New South Wales v Moorhouse* (1975) 133 CLR 1 ("*Moorhouse*"), Gibbs J sought to give content to the word "authorise" as used in earlier legislation in similar terms. Gibbs J said this at 12:

> The word "authorise", in legislation of similar intendment to s 36 of the Act, has been held judicially to have its dictionary meaning of "sanction, approve, countenance": *Falcon v Famous Players Film Co* ("*Falcon*"); *Adelaide Corporation v Australasian Performing Right Association Ltd* ("*Adelaide Corporation*"). It can also mean "permit", and in *Adelaide Corporation v Australasian Performing Right Association Ltd* "authorise" and "permit" appear to have been treated as synonymous. A person cannot be said to authorise an infringement of copyright unless he [or she] has some power to prevent it: *Adelaide Corporation v Australasian Performing Right Association Ltd*. Express or formal permission or sanction, or active conduct indicating approval, is not essential to constitute an authorisation; "Inactivity or indifference, exhibited by acts of commission or omission, may reach a degree from which an authorisation or permission may be inferred": *Adelaide Corporation v Australasian Performing Right Association Ltd*. However, the word "authorise" connotes a mental element and it should not be inferred that a person had, by mere inactivity, authorised something to be done if he [or she] neither knew nor had reason to suspect that the Act might be done. Knox CJ and Isaacs J referred to this mental element in their dissenting judgments in *Adelaide Corporation v Australasian Performing Right Association Ltd*. Knox CJ held that indifference or omission is "permission" where the party charged (amongst other things) "knows or has reason to anticipate or suspect that the particular act is to be or is likely to be done". Isaacs J apparently considered that it is enough if the person sought to be made liable "knows or has reason to know or believe" that the particular act of infringement "will or may" be done. This latter statement may be too widely expressed: cf. *Sweet v Parsley*. It seems to me to follow from these statements of principle that a person who has under his [or her] control the means by which an infringement of copyright may be committed – such as a photocopying machine – and who makes it available to other persons, knowing, or having reason to suspect, that it is likely to be used for the purpose of committing an infringement, and omitting to take reasonable steps to limit its use to legitimate purposes, would authorise any infringement that resulted from its use. … Although in some of the authorities it is said that the person who authorises an infringement must have knowledge or reason to suspect that the particular act of infringement is likely to be done, it is clearly sufficient if there is knowledge or reason to suspect that any one of a number of particular acts is likely to be done, as for example, where the proprietor of a shop installs a gramophone and supplies a number of records any one of which may be played on it. …

> [citations omitted]

417    In *Moorhouse* at 20, Jacobs J agrees with the observations of Gibbs J that the notion of authorisation is "wider than authority" and has been given the meaning, taken from the Oxford

Dictionary, of "sanction, approve, countenance" as adopted in the authorities of *Falcon* and *Adelaide Corporation* (adopting the abbreviation for those cases as reflected in the quote at [416] of these reasons). McTiernan ACJ agreed with the observations of Jacobs J. In *Roadshow Films*, Gummow and Hayne JJ make two observations about these remarks drawn from *Moorhouse*. The first is that it would be wrong to take from the phrase "sanction, approve, countenance" one element, such as "countenance", and by fixing upon the broadest Dictionary meaning of that word, to seek to expand the core notion of "authorise": *Roadshow Films* at [125]. The second point is that given the generality of the expression "authorise", it is worth remembering the observations in *Winstone v Wurlitzer Automatic Phonograph Co of Australia Pty Ltd* [1946] VLR 338 at 345 to this effect:

> As the acts that may be complained of as infringements of copyright are multifarious, so, too, the conduct that may justify an inference of authorisation may take on an infinite variety of differing forms. In these circumstances any attempt to prescribe beforehand ready-made tests for determining on which side of the line a particular case will fall, would seem doomed to failure.

418    Section 36(1A) of the *Copyright Act* contains language which reflects many of the considerations to be found in the observations of Gibbs J in *Moorhouse*. In relation to the equivalent provision concerning subject matter other than works (s 101(1A)), Gummow and Hayne JJ said this at [135] in *Roadshow Films*, which equally applies to s 36(1A):

> Section 101(1A) [s 36(1A)] is so drawn as to *take an act of primary infringement* and ask whether or not a person [the secondary infringer] has authorised *that act* of primary infringement. In answering that question there will be "matters" that must be taken into account. These include, but are not confined to, the matters identified in paras (a), (b) and (c). Was there *any relationship* that existed between the primary infringer and the (alleged) secondary infringer? If so, what was its *nature* (para (b))? Did the secondary infringer have *power* to prevent the primary infringement? If so, what was the *extent* of that power (para (a))? Other than the exercise of that power, did the secondary infringer *take any reasonable steps* to prevent the primary infringement, or to avoid the commission of that infringement (para (c))?
>
> [emphasis added]

419    As to the question of contended direct infringement or "primary infringement" (on the part of either the artist or Redbubble), to use the language of Gummow and Hayne JJ in *Roadshow Films*, the following matters should be noted.

420    The image at Example 1 containing the artistic work in suit was uploaded to the Redbubble website by a person named De Ann Troen from an address in Virginia in the United States of America on 21 September 2014. It was removed from the Redbubble website on 30 December 2014 as a result of Mr Bolam's letter of complaint to Redbubble of 24 December 2014. The

artwork has never been reinstated to the website.  In the period it remained on the website, two consumers/users purchased a product bearing the artwork through the website.  It was viewed on the website 304 times.  It may be that the artwork was viewed by 304 separate members of the public although it is quite possible that one or more persons viewed the image a multiple number of times.

421   The image at Example 2 is a poster image in which the adult character wears a jacket which, in turn, displays the artistic work in suit.  It was uploaded by a person named Mel Hok with a username of "LavaMel".  Ms Hok uploaded the artwork to the website on 17 November 2009 from an address in West Yorkshire, England.  The artwork was removed from the website on 30 December 2014 and was never reinstated.  Four consumers/users purchased a product (poster) bearing the artwork.  It was viewed 1,724 times.

422   The image at Example 3 which I accept involves a reproduction of a substantial part of the artistic work in suit, was uploaded to the website by a user named Becks Boyd from an address in Addlestone in the United Kingdom.  It was uploaded on 4 August 2015 and removed from the site on 25 November 2015.  It has never been reinstated.  One consumer/user purchased a product bearing the artwork through the website.  It was viewed 767 times.

423   The image at Example 4 was uploaded by a person named Pandora Kelly with the username of "Original Apparel" from an address in Winterton in the United Kingdom.  It was uploaded on 31 March 2015 and removed from the website on 3 April 2015.  The artwork was never reinstated and in the period in which it was online, it was viewed 11 times.

424   Thus, in none of the four examples was the artwork uploaded to the website "in Australia".

425   There is no doubt that the artwork, that is, the selection of the content of that which was uploaded to the website and thus initially made available online to those persons seeking to interrogate the website from any particular jurisdiction, originated with each artist:  De Ann Troen, Mel Hok, Becks Boyd and Pandora Kelly, and for that matter, in principle at least, every other artist who has placed an artwork "on" the website by engaging the uploading protocols described by Mr Kovalev, although, of course, the "original image" is stored on the servers in the United States and a "copy" is able to be seen by searching the website galleries of images. Mr Kovalev says that the "copy" is on a "back end server" also in the United States. Nevertheless, he accepts that one cannot get to those images so stored without going onto and

through the website in the sense of engaging with the website and undertaking the steps he describes so as to access a particular work.

426     It follows that the "act" of uploading the image in each case was done, I infer, by each artist although it is clear that if any of the four artists immediately relevant to the examples presently in issue (or any other artist, in principle, seeking to upload an image to the website) had experienced difficulty in uploading the image (or should any artist experience such difficulty), the "team" at Redbubble charged with assisting artists experiencing difficulty in uploading, is ready to engage so as to help the artist place the work online.

427     Thus, each of the four artists may have exercised one of the exclusive rights of the owner of the copyright in the relevant work in the jurisdiction where the act of uploading occurred.  None of these acts of uploading occurred in Australia.

428     However, each artist, by uploading the work to the website, has nevertheless made the work available online to members of the public in Australia.  Any member of the public in Australia using a computer, smart phone or other device enabling an internet connection and operating any one of the many search engines would be able to locate the Redbubble website through use of an internet browser, engage the functions of the website described by Mr Kovalev and, through the website, see the uploaded images in suit containing the artistic works in suit (that is, the work or at least a work being a substantial copy of the artistic work in suit).

429     The Redbubble business model was expressly designed to enable members of the public in Australia (relevantly in this case; and worldwide or at least in a wide-range of particular jurisdictions), to interrogate any or all of the images on the website in the hope that a user/consumer in Australia (and in other places) would find an image of sufficient appeal to engage the consumer in a *transaction* bringing about the *purchase* of a product bearing an application of the work to that product, for the very purpose of generating revenue for Redbubble (now a listed entity in which members of the public may buy shares on market valued in the main as a function of a multiple of net earnings) and, of course, revenue for the artist.  However, the *act* of the artist in uploading the image to the website and thus making the work available online to the public must be an act "done" (that is, an exercise of the exclusive right), "in Australia" and therefore, none of the artists in the examples in suit can be regarded as a "primary infringer" in the territorial sense contemplated by s 36(1) because the relevant act was not done "in Australia".

430     In this case, it is clear that Redbubble is not the originator of any of the four images in suit in these proceedings uploaded to its website. Each artist placed the image on the website in the various jurisdictions. However, Redbubble established a business model which enabled each image to be uploaded to its website. Redbubble *operates* the website which enables any person interrogating the website, in Australia, to view particular material notwithstanding that the electronic pipeline from the user's computer or device, in Australia, through which those images are seen, ultimately leads to servers located in the United States. Although the artist is the originator of the works uploaded to the website, the relevant phrase to be considered in s 22(6) is the phrase "made by the person *responsible* for *determining the content of the communication*" [emphasis added], that is, the particular communication in question. Thus, it is necessary to have regard to the relevant communication. It may be that, having regard to the relevant facts in any given case, more than one person is responsible for determining the content of a communication in question.

431     The first relevant communication occurred on 18 November 2014 when Mr Hansen, using his computer in Australia (having a designated IP address characterised typically by a sequence of numbers; for example, an IP address for a computer might contain numbers like this: 177.16.254.1), conducted a search using the Google search engine to locate the Homepage of the Redbubble website, enter a search field "Hells Angels", click the search button and receive, in Australia, a communication in the form of search results that included Example 1 being the image displayed on the "Unisex T-shirt". The same steps were undertaken on other dates that resulted in a sequence of other communications of other images as already described: [53]-[65]; [300]-[311]. Is Redbubble responsible for determining the content of the communication to Mr Hansen on each occasion on the relevant dates as earlier described?

432     In *Universal Music Australia Pty Ltd v Cooper and Others* (2005) 150 FCR 1, Tamberlin J considered whether the operator, manager and owner (Mr Cooper) of a "highly structured and organised website" (at [13]; the "Cooper website") which contained hyperlinks to thousands of sound recordings located on remote websites from which those sound recordings could be downloaded directly to the computer of the internet user, was "the person responsible for determining the content of the communication". As to the Cooper website, Tamberlin J said this at [74] to [76]:

> 74      On the natural and ordinary meaning of the words used in s 22(6), in the context of the present dispute, I do not think it can be said that a person who is the proprietor, manager or operator of a website which provides hyperlinks to

other websites on which the sound recordings are hosted *determines* the content of the communication. It is artificial in the extreme to suggest that the person or body who **facilitates access from the website to a remote site** and provides a trigger which enables sound recordings to be downloaded from that remote site is responsible for the content of the communication from the remote website.   The fact is that, on the evidence, Cooper does not "determine", "formulate" or "create" the content of the remote website from which the communication takes place.

75    The applicants point to Cooper's ability to control the links on his website, to determine precisely what files would be made available by means of the links created on his website and the manner in which the files were made available to internet users as indicative of his responsibility for determining the content of the communication.  However, **a power to remove a hyperlink** to a remote website from the Cooper website is not **a power or responsibility for determining the content of that remote website** and the content of the communication to the internet user.  The capacity to prevent hyperlinks from being added to the website, and therefore to prevent internet users from accessing sound recordings via the Cooper website, is not the same as the ability to determine the content of a communication from a remote website. In cross-examination, Mr Speck [an expert] agreed that Cooper had no control over whether a music file remained available on a remote website. …

76    It is the entitlement and role of the designer, operator and owner of a remote website to determine what is placed on that website and therefore what is the "content" of that website.  If the content includes infringing copyright material, then the responsibility for that lies with the person or persons who place that material on the remote website and thereby make it available for transmission to the public. …

[bold emphasis added]

433    Although Mr Hansen was the individual who requested a communication by engaging with the Redbubble website and placing the search term in the search box and clicking the search button, it was Redbubble and Redbubble's software located on the server in the United States which caused the *communication* to be made to Mr Hansen and it was Redbubble's software that determined the content of the communication to Mr Hansen's computer by causing the relevant images to be displayed on it in Australia.  In *Roadshow Films Pty Ltd and Others v iiNet Ltd* (2011) 194 FCR 285, a decision of the Full Court, Nicholas J observed that the content of the relevant communication (on the facts in that case) was determined by the person who responded to the request not the person who made the request:  [685].  A similar view was adopted by Emmett J at [166].

434    No doubt, in every case, the answer to the question of identifying the person responsible for determining the content of the communication is a fact-specific and fact-intensive inquiry.  In this case, the facts, in my view as set out in these reasons, speak for themselves.

435   The business model as described by Mr Hosking and its working operation as described by Mr Kovalev makes it plain that Redbubble is not in the nature of an ISP linking a user to remote websites. It is not an intermediary providing a transmission service between particular participants. It owns, operates, manages and controls the website and conducts a transactional enterprise in which it facilitates the uploading of images, the interrogation of those images in Australia, relevantly, by users, with a view to enabling sales to consumers of articles bearing the relevant images. It has a detailed business model in which it derives revenue from each transaction and controls every step of the transactional engagement between an artist and a buyer. It confirms the sale. It facilitates payment. It organises a fulfiller to apply the work to the relevant goods. It facilitates delivery of the goods to the buyer. It generates email responses which not only confirm the order but track every step of the transaction. It affixes its own trade marks to the goods. It says that it does not directly do that but there is no doubt that an essential part of its business model is ensuring that fulfillers affix the Redbubble trade marks to the goods. The labels bearing the trade marks are on the goods as delivered to each buyer. Although I will address the trade mark case shortly, the reference to Redbubble's trade marks, in this context, is simply to note another feature of the extent of Redbubble's engagement in and association with each transaction. It is Redbubble's business. But for the Redbubble website, the transactions would not occur. The artworks would not be available online to consumers in Australia to consider and appraise with a view to purchasing a product bearing the artwork. The entire focus of the business model is to enable works to be made available online so that consumers can pick and choose amongst the works so as to have them applied to goods. It would be difficult to imagine a more directly engaged participant than one deploying the business model adopted by Redbubble. Although Redbubble describes itself as the "agent" of the artist (presumably as principal), the relationship is not, in truth, a relationship of agent and principal. Redbubble acts as an "independent contractor" to "facilitate the transaction" as the Redbubble User Agreement and Appendix A to the Services Agreement makes plain: [245] and [246] of these reasons. The artist, in truth, is not the "seller" in the classic sense in which that term might be understood because Redbubble is the supplier as the facilitator of all of the essential elements of the transaction with the consumer in an analogous way to that discussed in: *International Harvester Company of Australia Pty Ltd v Carrigan's Hazeldene Pastoral Company* (1958) 100 CLR 644 at 653; *Heidelberg Graphics Equipment Ltd v Andrew Knox & Associates Pty Ltd* (1994) ATPR 41-326 at 42, 310-11, notwithstanding that the nature of the technology is different to the forms of distribution arrangement in those cases.

436     I am satisfied that Redbubble, in Australia, by its business model deployed in Australia, has made the artistic work in suit available online in Australia and I am satisfied that Redbubble is the person responsible for determining the content of the communications *to* Mr Hansen for all the reasons mentioned above.

437     It is not necessary to consider whether Redbubble is authorising, as a secondary infringer, infringements by a primary infringer. In this case, Redbubble is the primary infringer in respect of the examples in suit.

438     However, had I concluded that an act of primary infringement had occurred because an artist had, in Australia, done an act of making the "work available online to the public", or, had exercised, in Australia, the reproduction right by electronically reproducing the artistic work in suit (or a substantial part of) by uploading and thus causing the reproduction to be presented, in Australia when a member of the public interrogates the website and views an electronic reproduction of the work, I would have concluded that Redbubble had authorised that primary infringement for these reasons.

439     *First*, the relationship between the artist and Redbubble is one in which Redbubble conceived, deployed, operates, manages and controls the means by which the artist makes the work available for application to relevant goods. It is the *supplier* to the consumer of the goods bearing the work. It controls and dominates the supply-side process.

440     *Second*, Redbubble has the "power" and "control" of the website and the entire process as described. It is at the centre of the entire method. It has the power to prevent continuing infringements. It has the power to moderate. Its moderation steps seem not to operate in a way which prevents the same "offending" work to be uploaded immediately to the website under a different URL, even though the work has been moderated under an uploaded URL: [282] to [292] of these reasons.

**The trade mark claims of the applicant**

441     The question of whether Redbubble has infringed any of the trade marks of HAMC US in suit falls to be determined by reference to s 120 of the *Trade Marks Act*.

442     The integers of s 120(1) are well-known. Redbubble infringes a registered trade mark of HAMC US (at the suit of the authorised user) if Redbubble uses, as a trade mark, a sign that is either substantially identical with, or deceptively similar to, the relevant HAMC US trade mark, in relation to goods (or services) in respect of which the trade mark is registered.

443    The specification of the classes of goods for which each HAMC US trade mark is registered relevant to the infringement case is set out at [37] to [43] of these reasons.

444    Section 7(4) of the *Trade Marks Act* provides that use of a trade mark "in relation to goods" means use of the trade mark upon, or in physical or other relation to the goods.

445    As to substantial identicality, the marks are to be compared side-by-side for their similarities and differences having regard to the essential features of the registered mark and the total impression of resemblance or dissimilarity that emerges from the comparison: *The Shell Company of Australia Limited v Esso Standard Oil (Australia) Limited* (1963) 109 CLR 407 at 414, Windeyer J ("*Shell v Esso*"). As to deceptive similarity, the issue is not abstract similarity, but deceptive similarity and, accordingly, the comparison is "between, on the one hand, the impression based on recollection of the plaintiff's mark that persons of ordinary intelligence and memory would have; and, on the other hand, the impressions that such persons would get from the defendant's [sign, mark or image]": *Shell v Esso* at 415, Windeyer J.

446    Section 120(2) contains the same integers as s 120(1) except that the relevant use is in relation to goods of the "same description as that of goods (registered goods) in respect of which the trade mark is registered" (s 120(2)(a)) or "services that are closely related to registered goods" (s 120(2)(b)). Since there are no registered service marks in suit in the infringement case, s 120(2)(c) and (d) have no role to play in this proceeding.

447    Unlike s 36(1) of the *Copyright Act*, neither s 120(1) nor s 120(2) *expressly* requires that the impugned (use) occur "in Australia". Again, Redbubble contends that because the Redbubble software executes on servers in the United States, any *contended use* (quite apart from any other integer of s 120), of any of the trade marks of HAMC US is an act executed on servers in the United States.

448    As to Example 1 at [44] of these reasons, the questions in issue are these.

449    *First*, whether, when Mr Hansen, acting on his computer, in Australia, engaged with the image he saw (by engaging the search protocols of the Redbubble website) displayed on the Unisex T-shirt displaying the elements of Trade Mark 526530 with the addition of the word "Virginia" as the "bottom rocker", the device in Trade Marks 723463 and 1257993 and the words "Hells Angels" being the word marks of Trade Marks 723219 and 1257992, was Redbubble "using" the "sign" displayed to Mr Hansen as Example 1, *as a trade mark*, in relation to goods in respect of which the relevant trade mark is registered.

450    *Second*, whether any "use" occurs in Australia.

451    *Third*, whether the sign so displayed as Example 1 is a sign substantially identical with or deceptively similar to any one of those registered trade marks said to be infringed.

452    Example 1 displays the image applied to a T-shirt. Mr Hansen engaged in a transaction which involved the application of the image to a T-shirt. As to T-shirts, Trade Mark 526530 is not registered in relation to clothing.

453    As to Trade Mark 723219 for "Hells Angels", it is registered in Class 25 of Schedule 1 to the Regulations, for "clothing" including particular items.

454    As to the device the subject of Trade Mark 723463, it is also registered in Class 25 of Schedule 1 of the Regulations, for "clothing".

455    The word mark "Hells Angels", Trade Mark 1257992, is registered in Class 25 of Schedule 1 to the Regulations, for "articles of clothing" and the Device Mark 1257993 is also registered for "articles of clothing".

456    The image at Example 1 contains the words "Hells Angels" with the addition of the device of the side view of the Death Head. I am satisfied that the image engages a "use" of the identical Trade Marks 723219 and 1257992 with an addition, and the addition, in any event, is the device represented by Trade Marks 723463 and 1257993. Thus, the use is use of a sign substantially identical with those registered trade marks. I am also satisfied that it is use "in relation to" goods (clothing) in respect of which each trade mark is registered.

457    Whose use is it? Is it use by Redbubble? If so, is it use, as a trade mark, by Redbubble, that is, use as a badge of origin of the goods for which the marks are registered, or services "closely related" to the "registered goods", in the sense contemplated by s 120(2)(b) of the *Trade Marks Act*? Is it use "in Australia"?

458    Redbubble says that an artist, De Ann Troen, has acted, in Virginia, to upload the image at Example 1 to the website. The "work" of the artist is offered by her for application to goods, including clothing. The purchase by Mr Hansen concerned application of the work to a T-shirt. There is, no doubt, that Ms Troen was, by uploading the work, seeking to engage consumers, commercially, (that is, in trade) with the commercially attractive force of the recognised name and image (the side view Death Head) of Hells Angels. That livery is the subject, as a matter

of law, of the registered word marks and registered device marks of the Hells Angels special purpose vehicle, HAMC US.

459    I accept that Ms Troen is using the registered trade marks (as earlier identified) as a trade mark in the sense of a badge of origin of her work and inviting consumers to apply the work in physical relation to goods for which the relevant marks are registered.

460    As to Redbubble, that company is "in the business" of facilitating the supply of products bearing the uploaded image of Ms Troen (in this example) or, put another way, Redbubble is in the business of facilitating the supply of clothing bearing, put simply, the registered trade marks of HAMC US (in this example).  Redbubble is not the "seller" of artwork.  However, it is the supplier, in the sense that it is responsible for all of the transactional supply-side elements of a transaction for the supply of goods bearing the applied works.

461    Redbubble has created a business model designed to *enable* users, in Australia (and, for that matter users in all jurisdictions in which the website is accessible), to find images through the website comprised of, in this example, Ms Troen's image made up of the identified trade marks of HAMC US.  Redbubble enables images containing the relevant trade marks to be presented to buyers of particular goods (nominated by the artists from the website categories of those goods to which the work can be applied) *expressly* for the purpose of facilitating the supply of goods (clothing, in this example) to which the marks are applied.  It does so by and through the functions and protocols of the website engaged by Mr Hansen (and other potential viewers of the image), in Australia.

462    Redbubble is the supplier of the goods (clothing) bearing the trade marks because it enables the sale and purchase transaction, confirms the order, takes payment, receives revenue for itself and facilitates revenue payable to the artist, instructs the fulfiller, arranges delivery and places its own name and logo on the goods in the form of swing tags as part of its set of procedures for the supply of the goods.  The artist makes *the work* available for selection by consumers for application to selected goods.  Redbubble is directly engaged in all facets of the transaction for the *supply* of goods bearing the works, to the consumer.  That is the way the Redbubble business model works, and the way that it is designed to work.

463    I have had regard to the expert evidence of Dr Brent Coker on this topic.

464    Dr Coker provides expert evidence in relation to marketing and image and brand management and he expresses the view that having regard to the presentation of the website and the way in

which it engages with artists and users, Redbubble is not a seller of goods bearing the mark.  I have taken that view into account but the question of whether Redbubble is acting, on the facts as accepted, as a supplier of the goods bearing the marks needs to be considered against a careful consideration of the working application of the business model in a very practical way.  I am satisfied that all of the features of the Redbubble model render it a supplier of the goods bearing the marks because it exercises management, control and power in relation to all of the steps (apart from uploading) which characterise conduct of transactional supply.

465    It seems to me that in that sense, Redbubble is also "using" the trade marks, in Australia, within its own business model, to generate revenue from the supply of goods (clothing) bearing marks or signs substantially identical with the relevant registered trade marks as earlier identified.  Redbubble is using the relevant registered HAMC US trade marks for the purpose of indicating, or so as to indicate, a connection in the course of its trade between clothing bearing the marks, and *Redbubble*, as a source of supply of those goods.

466    Moreover, Redbubble, as an aspect of the indicia of the depth of Redbubble's engagement in the supply-side set of steps relating to goods bearing the relevant image, has registered its own name as a trade mark in Class 25 of Schedule 1 to the Regulations for some items of clothing and the Redbubble name and logo are registered in many classes of goods.  At [172] of these reasons, the field of goods and services of Redbubble's registrations is set out.  These "goods registrations" suggest that Redbubble necessarily sees itself as using, or intending to use, its word mark and logo so as to distinguish "goods" (so far as the goods classes are concerned) dealt with or provided, in the course of *its trade*, from goods so dealt with "by any other person":  s 17 of the *Trade Marks Act*.

467    Redbubble also says that it provides:  printing services (T-shirt printing, textile printing, photographic printing (Class 40)); clothing and fashion design services (Class 42); clothing design services (Class 42); and business services to facilitate creative expression (Class 35).  The services of T-shirt printing, textile printing and business services to facilitate creative expression, seem to be services, having regard to the elements of the Redbubble business model deployed by Redbubble, falling within the description of services "closely related" to "registered goods", that is, goods in respect of which the HAMC US trade marks relevant to Example 1 are registered.

468    I am satisfied that Redbubble is "using" the HAMC US registered trade marks relevant to Example 1, within its own business and revenue model, in the course of its supply-side

transactional trade effected through the Redbubble website, in relation to the supply of goods (T-shirts) bearing the marks, in respect of which the HAMC US trade marks, relevant to Example 1, are registered.  Redbubble is, in that sense, "using" the HAMC US registered trade marks as a badge of origin of supply and distribution within its trading activity as the source or origin of supply of goods bearing those particular marks.  In other words, put simply, Redbubble is saying, by its business model, in effect:  "If you come to Redbubble you can get this T-shirt online from us bearing the Hells Angels trade marks".

469    The capacity to engage, in Australia, through the website, as Mr Hansen did, constitutes use in Australia by Redbubble.

470    As to Example 2 at [44] of these reasons, I am not satisfied that displaying an image of a young child wearing a jacket, viewed from the back, sitting next to an adult wearing a jacket (also viewed from the back) on which the mark "Hells Angels" and the device mark can be seen in the image, amounts to "use" by either the artist or Redbubble of any of the relevant HAMC US registered trade marks, *as a trade mark*, in connection with goods for which the trade marks are registered.  The image called "Angel with Angel" (which in itself is a parody) is an image for application to a poster.  The material matter is the parodic composition of the image made up of a child (an angel) with an adult (a "Hells Angel").

471    There is no trade mark infringement involved.

472    As to Example 3 at [44] of these reasons, this image falls into the same analysis as Example 1 except that the relevant HAMC US registered trade marks are 723463 and 1257993 in respect of the device of the side view of the Death Head.  Each mark is registered in Class 25 for articles of clothing.  I am satisfied that the image is "deceptively similar" to each mark having regard to s 10(1) of the *Trade Marks Act* and the principles identified by Windeyer J in *Shell v Esso* at 415.  That follows because, in respect of the views of the image, in the course of members of the public in Australia engaging with the website, there is a real and tangible danger of some of those persons being "caused to wonder" whether the image is that of the trade marks of HAMC US, and being caused to wonder whether Redbubble has the authority or approval of the owner (HAMC US) to use the registered trade marks *within* its business model, as it does.  This image was viewed 767 times.  However, there is only one sale.

473    Two other things are important in relation to this example.  *First*, the artist uploaded the image giving it a description as a title which uses the words "Hells Angels" which is the word mark.

*Second*, Mr Hansen saw and was led to the image by searching the website on 9 November 2015 using the search term "Hells Angel", a term virtually identical to the word mark "Hells Angels".  In other words, consumers searching the website in Australia using the search term "Hells Angels" (or "Hells Angel" or either of those terms with or without an apostrophe) could have been taken (as Mr Hansen was taken) to the image at Example 3 (as was the case for all four examples).  Having found the image at Example 3 in that way, the Redbubble website was telling a consumer (that is, triggering cognitive cues in the mind of the consumer) that the image found by reference to that search term has, one way or another, a connection or association with images related to the Hells Angels Motorcycle Club.  Accordingly, the search protocols have the effect of leading consumers to an image that causes them to have "cause to wonder" in the sense contemplated by Windeyer J in *Shell v Esso* at 415.  As to the factual matters, see [64] and [309] of these reasons.

474     Example 4 falls into the same analysis as Example 1.  The relevant trade marks are 723219, 723463, 1257992 and 1257993.  In the example, use of the marks is in relation to clothing for which each mark is registered.  I am satisfied that the image is substantially identical with the device marks.  The words "Hells Angels" appear in the image being identical to the two word marks.  However, in this case, the image was seen or viewed only 11 times and no sales arose from its exhibition.

475     Accordingly, I am satisfied that Redbubble has infringed the registered trade marks of HAMC US as identified in respect of Examples 1, 3 and 4.

476     However, I am not satisfied that any infringement has occurred in respect of Example 2 for the reasons already indicated.

477     It is now necessary to turn to aspects of the cross-claim by the respondent.

**The cross-claim by Redbubble**

478     The table below sets out each trade mark of the applicant in suit, the relevant class and the goods for which each mark is registered.

| The Registered Trade Marks | Class | Goods or Services |
|---|---|---|
| **526530**<br> | 16 | Printed matter including magazines, pamphlets and brochures, labels in this class, flags in this class, instructional and teaching material (except apparatus), playing cards, stationery including pens and posters. |
| **723219**<br><br>HELLS ANGELS | 9 | Recordings:  Apparatus for recording, transmission or reproduction of sound or images including recording discs, tapes, compact discs, films and video tapes; computer software life saving equipment including protective helmets. |
| | 12 | Motorcycles; automotive parts and accessories including motorcycle components and accessories, motorcycle engines and engine parts. |
| | 14 | Jewellery, precious stones, watches and clocks, rings, metal badges and belt buckles. |
| | 16 | Printed matter including magazines, pamphlets and brochures, labels in this class, flags in this class, instructional and teaching material (except apparatus), playing cards, stationery including pens and posters. |
| | 25 | Articles of clothing, footwear and headwear, including coats, jackets, trousers, overalls, shirts, pullovers, sweaters, hats, vests, waistcoats, cardigans and belts (for wear). |
| | 26 | Badges and belt buckles not being made of precious metal, embroidered and cloth material badges for attachment to clothing and headgear. |
| | 28 | Sporting equipment:  toys, games and playthings; gymnastic and sporting articles. |
| | 41 | Entertainment services; sporting and cultural services including wrestling and boxing, educational and training services, concert and discotheque services, organisation of exhibitions especially relating to motorcycles for educational and cultural purposes. |

**723463**



| | | |
|---|---|---|
| | 9 | Recordings:  Apparatus for recording, transmission or reproduction of sound or images including recording disks, tapes, compact disks, films and video tapes; computer software life saving equipment including protective helmets. |
| | 12 | Motorcycles; automotive parts and accessories including motorcycle components and accessories, motorcycle engines and engine parts. |
| | 14 | Jewellery, precious stones, watches and clocks, rings, metal badges and belt buckles in this class. |
| | 16 | Printed matter including magazines, pamphlets and brochures, labels in this class, flags in this class, instructional and teaching material (except apparatus), playing cards, stationery including pens and posters. |
| | 25 | Articles of clothing, footwear and headwear, including coats, jackets, trousers, overalls, shirts, pullovers, sweaters, hats, vests, waistcoats, cardigans and belts (for wear). |
| | 26 | Badges and belt buckles not being made of precious metal, embroidered and cloth material badges for attachment to clothing and headgear, headbands and armbands not being of leather. |

**1257992**

**HELLS ANGELS**

| | | |
|---|---|---|
| | 14 | Jewellery, precious stones, watches and clocks, rings, metal badges and belt buckles in this class. |
| | 16 | Printed matter including magazines, pamphlets and brochures, labels in this class, flags in this class, instructional and teaching material (except apparatus), playing cards, stationery including pens and posters. |
| | 25 | Articles of clothing, footwear and headgear, including coats, jackets, trousers, overalls, shirts, pullovers, sweaters, hats, vests, waistcoats, cardigans and belts (for wear). |
| | 26 | Badges, belt clasps, lace and embroidery, buttons, headwear ornaments, patches for repairing textile articles, pins and needles. |
| | 41 | Entertainment services; sporting and cultural services including wrestling and boxing, |

|  | | educational and training services, concert and discotheque services, organisation of exhibitions especially relating to motorcycle for educational and cultural purposes. |

**1257993**



| | 14 | Jewellery, precious stones, watches and clocks, rings, metal badges and belt buckles. |
| | 16 | Printed matter including magazines, pamphlets and brochures, labels in this class, flags in this class, instructional and teaching material (except apparatus), playing cards, stationery including pens and posters. |
| | 25 | Articles of clothing, footwear and headgear, including coats, jackets, trousers, overalls, shirts, pullovers, sweaters, hats, vests, waistcoats, cardigans and belts (for wear). |
| | 26 | Badges, belt clasps, lace and embroidery, buttons, headwear ornaments, patches for repairing textile articles, pins and needles. |
| | 41 | Entertainment services; sporting and cultural services including wrestling and boxing, educational and training services, concert and discotheque services, organisation of exhibitions especially relating to motorcycle for educational and cultural purposes. |

479    Redbubble says, for the purposes of s 92(4)(b) of the *Trade Marks Act*, that *at no time* during a period of three years ending one month before the day on which Redbubble's notice of cross-claim was filed (that is, between 5 October 2012 and 5 October 2015) did HAMC US use *any* of the registered trade marks in Australia in relation to *any* of the goods or services in respect of which the registered trade marks are registered.  Accordingly, Redbubble seeks an order pursuant to s 92(3) of the *Trade Marks Act* for an order directing the Registrar to remove each trade mark from the Register.

480    Accordingly, the relevant period of non-use is *5 October 2012* to *5 October 2015* (the "relevant period").

481     I accept that in the relevant period HAMC US has not *itself* directly used any of the registered trade marks.  HAMC Aust says that it has used the registered trade marks in the relevant period as an authorised user of HAMC US.  I have already concluded that HAMC Aust is an authorised user of the marks of HAMC US for the purposes of s 8 of the *Trade Marks Act*.

482     HAMC US, as the opponent to the application for removal, has the onus of rebutting the contention made by Redbubble under s 92(4)(b); s 100(1)(c) of the *Trade Marks Act*.

483     Even though HAMC Aust is an authorised user of the registered trade marks of HAMC US, *use* of the registered trade marks by HAMC Aust is "an authorised use" to the extent *only* that the user uses the trade mark under the control of the owner of the trade mark.  For present purposes, that means use under the control of the owner of the trade mark *in* the relevant period: s 8(2).  Section 7(3) provides that an authorised use of a trade mark by a person is taken, for the purposes of the *Trade Marks Act*, to be use of the trade mark *by* the *owner* of the trade mark.

484     Accordingly, I will examine two questions.  *First*, whether there was use by HAMC Aust of any of the trade marks in the relevant period and, *second*, whether *that use* was an authorised use.

### Use of any of the trade marks by HAMC Aust

485     The first evidence to note on this topic is the evidence of Mark Nelms given by his affidavit of 30 March 2017.

486     I have already examined aspects of the evidence of Mr Nelms and, particularly, his evidence at para 22.  Mr Nelms says that there have been many motorcycle shows and motoring events in every Australian State, annually, and that many of these events have been the subject of articles published in lifestyle magazines nationally as well as in the mass media.  He nominates publications such as "Live to Ride".  He says that many of the events of the Hells Angels Club have been publicised on "national radio" and "television channels", "for advertising".  He says that HAMC Aust has produced, and produces, books, CDs, DVDs, audio-visual recordings and calendars all of which are available for sale and sold to the public, both through the "various charters, events and websites".  He then mentions the six examples given at para 22 of his affidavit (quoted at [329] of these reasons).

487     Mr Nelms says that books have been published about the Club and those works contain reproductions of the registered trade marks and he says that Club members, only, may purchase

or have made, items such as jackets and belt buckles which bear the registered trade marks.  He says that HAMC Aust has operated two URLs at which the registered marks are publicly displayed.  He says it has done so "for a number of years".  Again, Mr Nelms says that the registered trade marks are prominently displayed in newspaper publications and Australian national lifestyle magazines.

488     The difficulty with this evidence is that Mr Nelms does not identify, with any particularity, specific things sold and done in the relevant period.  Moreover, in his affidavit at para 47, Mr Nelms refers to Annexure PTB-51 to Mr Bolam's affidavit which sets out a Schedule identifying each mark and the goods or services.  The Schedule has a column which identifies whether the relevant mark was or was not used in the relevant period in relation to particular goods or services.  Mr Nelms then embraces the accuracy of that Schedule.  I have ruled para 47 of the affidavit of Mr Nelms inadmissible because it simply swears the issue by cross-reference to an unparticularised schedule.

489     As to Mr Bolam's Schedule at PTB-51, it provides no *details* of use in the relevant period and Mr Bolam's affidavit on this topic, by the schedule, is not probative of the fact in issue, by itself.

490     Mr Hansen, however, has given evidence about examples of use.

491     Mr Hansen says in his affidavit of 16 June 2017 that on or about 25 March 2015 he ordered, on behalf of HAMC Aust, 35 black T-shirts from Print 'n Wear Pty Ltd in an amount of $1,072.75.  The T-shirts were supplied and he took a photograph of the images on them.  Those images are set out at [394] of these reasons and the images show the word marks "Hells Angels" and the side Death Head device mark.  He on-sold these T-shirts, or a number of them, to members on 28 March 2015 and 7 April 2015.

492     On 6 December 2012, he sold to members 100 stickers from a batch of stickers he had acquired on behalf of HAMC Aust in March 2012.  Examples of the stickers are set out below.



493     Mr Hansen says that an anniversary card is distributed to members on the anniversary of the Club each year and this occurred in 2012, 2013, 2014 and 2015.  The image of the card is set out below.



494     Mr Hansen also says that on 3 September 2015 and 28 September 2015 sales occurred for 54 pins (in total) which are metal badges in three-dimensional form which take the shape of the side view of the Death Head device.  An image of the pin is set out below.



495     Mr Hansen also says that in August 2015 there was a presentation of a motorcycle to a member of 40 years standing.  The motorcycle was endorsed with the trade mark "Hells Angels" and the side view of the Death Head.  See the image below.



496     Mr Peter Keith Stacy also swore an affidavit on this topic.

497     Mr Stacy is a member of the Adelaide Chapter of the Hells Angels Motorcycle Club and he has been a member continuously for 29 years.  He is also the Treasurer of the Adelaide Chapter and he has been National Secretary of the Club for the last 15 years.  Mr Stacy says that during the relevant period in his role as National Secretary he did these things on behalf of HAMC Aust.  He received orders and payments from members or Chapters of the Club for goods that reproduce certain of the trade marks of HAMC US.  He ordered and took delivery of those goods from suppliers.  He arranged delivery of the goods to the respective members or Chapter of the Club and he accounted to HAMC Aust for the payments received for the goods.

498     Mr Stacy says that members of the Club in Australia (as well as overseas) are provided with a catalogue comprising images identifiable by orders numbers so as to select and order items manufactured in satin or cotton.  The catalogue has been used by members since about 2011.  He exhibits a copy of the catalogue to his affidavit (PKS-2).

499     The trade marks the subject of the cross-claim appear in the catalogue at pp 15, 16, 20, 27 to 29 and 31 and 32.  He says that in the relevant period members and Chapters of the Club were charged a fee for the purchase of items ordered from the catalogue.  Mr Stacy annexes at PKS-3

a document which he says is an order form used by members and Chapters of the Club for placing orders with him for items in the catalogue at PKS-2. Mr Stacy also annexes to his affidavit minutes of meetings which refer to various purchase orders by various Clubs for "patches and flashes" bearing the HAMC US trade marks. The minutes which refer to these purchases and the dollar value of the orders, the Clubs, the total owed and other financial aspects of the transactions, of relevance for present purposes are 26 January 2013, 24 August 2013, 9 November 2013, 1 March 2014, 31 May 2014 and 2 May 2015.

500    Mr Stacy says that during the relevant period, as Treasurer, he preferred that a Chapter collect orders and payments from Chapter members and then place an order with him on behalf of those members. However, sometimes Mr Stacy also received orders directly from individual members. He exhibits at PKS-5 a copy of a bundle of emails received or sent by him to members or Chapters of the Club in Australia concerning orders received by him for items in the catalogue. Not all of the emails are in the relevant period. However, emails of relevance are emails dated 4 April 2015, 6 April 2015, 10 September 2015, 11 September 2015 and 13 September 2015.

501    Mr Stacy says that throughout the whole of the relevant period he was directly contacted by members about orders for items in the catalogue marked PKS-2. He says that his practice was to tell these members that they should place their orders through the Treasurer of their Chapter using the form, an example of which is at PKS-3. He says that, in frustration, he eventually sent an email to representatives of the Chapters dated 16 February 2016 reminding them that the orders should be placed with Mr Stacy through the Treasurer of the Chapter and not directly with Mr Stacy. He says that although that email is not in the relevant period, it reflects upon conduct that was occurring during the relevant period in relation to orders for items bearing the trade marks.

502    Mr Stacy says that in his role as National Secretary of HAMC Aust he would place an order with "Europatch", a European supplier of items listed in the catalogue at PKS-2, and that order was prepared using the orders he had received from members and Chapters of the Club for items in the catalogue. Mr Stacy's practice was to send an order form which specified the catalogue order number of the relevant item, the number of items ordered, the material for the item (being either cotton or satin) and any further details required to properly describe the item. He would set out the costs of each item on the order form. He annexes an example of the order form from June 2014, October 2014, May 2015 and August 2015. The order forms reflect a

very extensive number of orders based on the catalogue.  It also shows three orders for a "Hells Angels flag" described as either the "Hells Angel Australia flag" or the "Hells Angels CABRA Crew flag" or the "Hells Angels City Crew flag"

503     Mr Stacy also annexes to his affidavit invoices from Europatch dated 14 March 2014 (two invoices) and 26 May 2015 (three invoices) and an invoice dated 28 May 2015.

504     Mr Stacy says that the catalogue marked PKS-2 from which the members make their orders, contains all the available patches made from the relevant material and these patches are almost always sewn onto clothing to show that the product and the person wearing it are associated with the Club.  Mr Stacy says that this material was being purchased and used extensively during the relevant period.

505     Mr Stacy says that in about 2006, a large quantity of DVD copies of a 1983 documentary entitled "Hells Angels Forever" was purchased by the Adelaide Chapter of the Club.  He annexes to his affidavit at PKS-9 a copy of the artwork for the DVD showing the title and a copy of the artwork for the case in which the DVD was sold.  Mr Stacy says that during the relevant period, the DVD was made available for sale including at events organised by the Adelaide Chapter of the Club.  He says that, in particular, he can recall the DVD being available for sale at a regular rock concert, at Ponde, in South Australia (within the relevant period).  He says that at these events the purchase price for the DVD tended to be paid in cash which he received and accounted for as Treasurer of the Adelaide Chapter of the Club.  He says that over the years that the DVD has been sold, handwritten records of these sales have been kept and at PKS-10 he annexes a copy of handwritten records in respect of sales of the DVD in the relevant period (and outside the relevant period).  He particularly refers to records dated May 2013 ("received from East County from C. House – sales $1,490.00") and 8 June 2013 ("from Gold Coast and Brisbane for DVD sales $1,600.00").

506     Mr Paul Johnson also filed an affidavit of 16 June 2017 on this topic.  He is a Work Boat Captain working from Weipa in Far North Queensland.

507     Mr Johnson has been a full member of the Darwin Chapter of the Club since 1999 and he has been responsible for planning and organising activities of the Chapter including a "National Run" held in Darwin in 2013.  A National Run is an event at which the members of all Chapters of the Club from across Australia gather for a celebration or party.  Members usually ride to the location of the National Run which, in 2013, was Darwin.

508     Mr Johnson says that in the course of organising the 2013 National Run in Darwin, and with the permission of HAMC Aust, he ordered the design and manufacture of shirts by *Auzprint* in Brisbane.  The invoice from Auzprint dated 22 April 2013 for what seems to be 170 Polo shirts in a total amount of $8,965 is annexed to his affidavit as PJ-2.  The mock-up for the shirts is annexed as PJ-3 and although a number of images appear on the shirts, the word mark "Hells Angels" prominently appears and so too does the side view of the Death Head which is the device mark.

509     Mr Johnson says that in preparation for the 2013 National Run in Darwin, each Chapter paid an initial fee of $200.00 per member to attend the Run and that fee was designed to cover accommodation, the supply of a Darwin National Run shirt as earlier described and a photograph.  The shirt was distributed to members of the Club attending the Run.

510     As to printed matter, Mr Johnson says that in 2013 a member of the Darwin Chapter of the Club died.  The Darwin Chapter arranged a printed eulogy for the funeral of the deceased member which had endorsed upon it the word mark "Hells Angels" and the device mark of the side view of the Death Head.

511     It is perfectly obvious that the members of the Club in Australia attach very great significance to the use of the trade marks as signification of their engagement in the affairs and collegiality of the Motorcycle Club.  That can be seen from the prominence given to the trade marks on the headstones of members who died in 2013.  A photograph of the headstones is set out below.



512     As to jewellery, Mr Johnson says that he has regularly ordered the manufacture and purchase
        of jewellery for members of the Club using the registered trade marks.

513     Mr Johnson annexes a tax invoice from A J Concepts dated 31 January 2014 (at p 26) in respect
        of jewellery items ordered in January 2014 for the Darwin Chapter.  He says that the invoice
        (6885101, at p 26) is in respect of an item of jewellery that he knows as the "Darwin pin" and
        at PJ-8 he exhibits a photograph of it.  The pin is suitable for attachment to clothing and is
        made of 9 carat gold.  The Darwin pin is used as a gift to a 20 year Club member.  Mr Johnson
        says that he understand this is a national practice on the part of the Club.  The image is set out
        below.



514     As to motorcycles, Mr Johnson annexes as PJ-9 a photograph of a moulded metal article known
        as a "Derby Cover" that was manufactured and presented to the Darwin Chapter of the Club.
        It is a motorcycle accessory made for attachment to the left-hand side of a "Harley-Davidson
        Motorcycle".  It acts as a "clutch cover".  The Derby Cover is also presented to a member of a
        Club on an anniversary of the person's membership of the Club.

515     It may be that the Derby Cover was not presented to a member in the relevant period.
        Mr Johnson does not say whether that occurred or not.  However, it seems clear enough that in
        the relevant period the Club had available to it, and had ordered so as to have available to it,
        Derby Covers for supply.  A photograph of the Derby Cover is set out below.



516    Mr Andrew Jesse has sworn an affidavit of 16 June 2016 on this topic.

517    Mr Jesse says that he is a Master Jeweller.  He has worked as a jeweller for 34 years.  He says that for approximately 25 years he has manufactured and sold jewellery items to Chapters and individual members of the Hells Angels Motorcycle Club.  He annexes to his affidavit a bundle of invoices which he has issued under the business name "A J Concepts" in respect of jewellery items he has manufactured and sold to Chapters or members of the Club.  He annexes 12 invoices which includes invoices dated 31 January 2014, 22 April 2014, 28 July 2014, 19 August 2014, 5 September 2014, 4 January 2015, 10 March 2015 and 1 April 2015.

518    Apart from the invoices, Mr Jesse annexes photographs of jewellery designs and moulds used by him to manufacture jewellery items for the Chapters or individual members of the Club.  He also annexes images of some of those jewellery items that were manufactured and sold by him.  For example, Invoice 5 dated 28 July 2014, concerns an item described as "cast 2 silver Hells Angels letters only belt buckles" and Invoice 7 dated 5 September 2014 concerns "Two silver Hells Angels letters buckles".  Image 2 reproduces the form that the belt buckles took, made from silver, including the particular lettering but excluding the central side view Death Head.  The belt buckle bears the words "Hells Angels".

519    Invoice 9 concerns an item described as a "Hells End Chapter Pin" which is a Chapter of the Club in Adelaide and its design can be seen in the figure found at Image 5 which exhibits a "top rocker" comprising the words "Hells Angels" and the device of the side view of the Death Head with the words "Hells End" as the "bottom rocker".  Images 4, 6 and 7 are examples of the Hells Angels Chapter Pin badges which Mr Jesse manufactured and sold to Chapters and individual members of the Club in the relevant period.  The images are depicted below.







520    Invoices 10 and 11 dated 10 March 2015 and 1 April 2015 concern orders for the supply of items Mr Jesse describes as "Hells End Chapter rings". Image 8 is an example of the ring as set out below.



521   After manufacture, Mr Jesse delivered the items and received electronic payment for them.

522   Mr Jesse says that based on his dealings with the Club over a period of 25 years he is aware that only members of the Club are entitled to wear jewellery items with the trade marks such as the word "Hells Angels" and/or the side view of the Death Head figure.  Mr Jesse says that if he is asked directly by an individual to manufacture such a jewellery item, his practice is to contact the representative of the Chapter to confirm that the individual is a member of the Club.

523   Mr Alan Birch has affirmed an affidavit of 15 June 2017 on this topic.

524   Mr Birch is a Director of Print 'n Wear Pty Ltd and his affidavit simply corroborates the matters Mr Hansen talks about concerning the purchase of the 35 shirts earlier mentioned.

525   Ms Robyn Rigby has affirmed an affidavit of 16 June 2017 on this topic.  She is an owner of Auzprint.  She gives evidence about the matters mentioned by Mr Johnson concerning the 2013 Darwin National Run.

526   Apart from that matter, Ms Rigby gives evidence about an order Auzprint received from Mr Nelms in March 2012 for 500 digital stickers (as depicted at [492] of these reasons).  This order, of course, is outside the relevant period.  However, it concerns the purchase of 500 stickers and I am willing to infer that these stickers were available for use by the Club from the date of delivery in March 2012.  It seems to me more likely than not that these stickers would have been used at least into the early part of the relevant period.

527   Ms Rigby also gives evidence about an order received from Mr Nelms in March 2012 for 150 black T-shirts bearing the Hells Angels word mark and the side view of the Death Head device.  The invoice is dated 26 March 2012.  The order concerns 150 T-shirts described in the order as "Screenprinting Clothing – 150 Black Tees printed 4 colours front, back and left sleeve, 50

singles printed 4 colours front and back" described by her as the "National Run T-Shirts" order. The T-shirts were delivered to the Brisbane Chapter in March 2012.  Ms Rigby also refers to an order in February 2012 for 50 T-shirts also bearing the trade marks.  These orders are outside the relevant period and it is not at all clear whether they were used simply during the period of the relevant "Run" or whether that event occurred during the relevant period.

528    Ms Rigby also says that Auzprint received an order for and delivered to the Brisbane Chapter of the Club in or about September 2012 a quantity of 50 black T-shirts.  Ms Rigby annexes at RR-8 a copy of the mock-up for the T-shirts which shows a depiction of the word mark "Hells Angels" and the device of the side view of the Death Head.  The image is depicted below.



529    This order and the supply of the T-shirts occurred within a few weeks of the relevant period and I am willing to infer that the T-shirts are, more likely than not, to have been used and supplied to members in a period on and after 5 October 2012.

530    As to all of these deponents and their evidence referred to at [491] to [529], I accept their evidence.

531    For the reasons indicated at [333] to [404], I am satisfied that each use by HAMC Aust of the trade marks is an authorised use for the purposes of s 8(2) and s 7(3) of the *Trade Marks Act*. I am satisfied that HAMC Aust (together with HAMC US) has rebutted the s 92(4)(b) contention that "at no time" during the relevant period has HAMC US "used" the registered trade marks in Australia.  Use of the registered trade marks in Australia is made out in relation

to:  printed matter (stickers, anniversary cards and a printed eulogy); use on the gravestones of two members; flags; recordings in the form of sales of the DVD entitled "Hells Angels Forever"; use on a motorcycle; a motorcycle part called a "Derby Cover"; jewellery (badges, pins, rings, belt buckles, patches, flashes); clothing (T-shirts); and entertainment services (national motorcycle runs).

532     These uses are examples of use of the trade marks in virtually all of the classes of registration. The evidence of HAMC Aust and HAMC US does not demonstrate use in relation to sporting equipment.  However, the use of the trade marks is sufficiently extensive in the relevant period across almost all of the classes that, as an exercise of the discretion, I would not be willing to direct the Registrar, pursuant to s 92(3) of the *Trade Marks Act*, to remove the relevant trade mark from the Register essentially for three considerations.

533     *First*, use of the registered trade marks in the relevant period is considerable across almost the categories.

534     *Second*, use *before* and *after* the relevant period is considerable and although these uses, obviously enough, go to conduct outside the relevant period, it is nevertheless relevant to the exercise of the discretion more broadly.

535     *Third*, because of considerations 1 and 2, it would work, put simply, unfairness to HAMC US to remove a trade mark from registration in a specified class where there may not be specific use in that class (such as sporting equipment), but where, nevertheless, the registered marks have been used extensively for a long time, on the evidence, so as to distinguish in many applications and uses Hells Angels Motorcycle Club (through its special purpose vehicle) as the *source* or *origin* of particular goods and services.

536     It would be inconceivable that HAMC US's registration of one of the registered trade marks in a category (such as sporting goods) where non-use may have occurred, is depriving a bona fide person of an opportunity to use that mark, as a trade mark, in respect of the relevant class of goods or services in question.  Any such third party use would immediately cause confusion having regard to considerations 1 and 2 and the long history of use.

537     As to Example 1, it was removed from the website on 30 December 2014 as a result of Mr Bolam's letter of 24 December 2014 (that is, removed six days later).  It was on the website for three months and three days in all and viewed 304 times (presumably across all jurisdictions not just "in Australia").  Two sales occurred.  The damages for infringement ought to be

nominal.   As to Example 3, it was uploaded on 4 August 2015.   It was removed on 25 November 2015, about three months later.  In that time, it was viewed 767 times (and again I assume that this represents views across all jurisdictions and not just in Australia).  One sale occurred.  Again, the damages ought to be nominal.

538   As to Example 4, it was uploaded on 31 March 2015.  It was removed on 3 April 2015.  It was viewed 11 times (and again I assume that that includes views across all jurisdictions and not just in Australia) over a period of three days.  No sale occurred.  I am not satisfied that any award of damages is appropriate in respect of Example 4.

539   There is no basis for any consideration of exemplary damages.

540   As to the damages in relation to Examples 1 and 3, total damages to be awarded will be $5,000.00.

541   Three matters remain to be considered.

**Key words as a search term**

542   As to the use of the term "Hells Angels" or "Hells Angel" or any variant of that term which is properly characterised as being substantially identical with, or deceptively similar to, the word marks, I accept that use of such terms as "key words", as search terms, as an element of Redbubble's business model in facilitating a transaction leading to an application of the relevant "offending" work to the particular goods is "a use" of the registered word marks of HAMC US.  However, I am not satisfied that this use, in itself, is use of the word marks *as a trade mark*, at this point in the functionality of the website.  I take that view because I am not satisfied that using the term as a search term to find a relevant image is use of the term as a "badge of origin" of Redbubble.  It is, undoubtedly, a use which is designed, quite deliberately, to lead a consumer by the "search nose" to images, marks, devices, livery and badging somehow or other connected with the Hells Angels Motorcycle Club.

543   Redbubble well knows and understands, by reason of its deployed business model, that this is precisely how a consumer finds an image that Redbubble hopes the consumer will want to have applied to goods for supply to him or her so that Redbubble might derive revenue for itself of substance (and for the artist).  It is the conjunction of the use of the search term (reflecting the word marks) and the use of the image containing substantially identical or deceptively similar marks of HAMC US that renders use by Redbubble of the *uploaded image* (incorporating the

essential elements of the registered trade marks) in its transactional application *to goods* for *supply* by Redbubble to the consumer, an infringement of the trade marks in suit by Redbubble.

544     However, use of the word marks (or marks substantially identical with or deceptively similar to the word marks) as a search term is a search step *along the way* to use of the image and thus the registered trade marks, as trade marks but use of the word marks at the point of searching is not, in itself, in my view, use as a trade mark.

**The *Australian Consumer Law* claim**

545     The second matter concerns the case advanced by HAMC Aust under the provisions of the *Australian Consumer Law*.  That case was barely addressed at all in closing submissions by senior counsel for the applicant.  Counsel for Redbubble contends that the ACL case was, in effect, abandoned by the applicant at trial.  It is certainly true that very little was made of the case in closing submissions and, apart from paragraphs of the written submissions that set out the relevant statutory provisions and a brief statement of principle derived from *Google Inc. v Australian Competition and Consumer Commission* (2013) 249 CLR 435 at [6] to [9], the written submissions of the applicant addressing this topic, in terms of the application of the identified principle to the facts, comprises six short paragraphs.

546     As to Example 3, I have concluded that the image is deceptively similar to the device mark in the particular sense contemplated for the purposes of trade mark law by Windeyer J in *Shell v Esso* at 415:  see [472] of these reasons.  As to the wider statutory question of just how many members of a properly defined cohort in Australia, may have been among the 767 people who viewed the image across all jurisdictions and whether the 767 views represents 767 people or a lesser number viewing the image multiple times, I am not satisfied that I am in a position to assess, on the evidence and the submissions, whether a relevantly defined cohort in Australia of any particular size with a properly identified reasonable member, emblematic of the cohort, has been made out so as to establish conduct by Redbubble which goes beyond "causing a person to wonder" about a relevant matter, to conduct properly described as "conduct that is misleading or deceptive or is likely to mislead or deceive" in the statutory sense contemplated by s 18 of the ACL and, for that matter, s 29 of the ACL.

547     In respect of Example 1 and Example 4, I have found that the relevant use is use of an image comprising marks which are substantially identical to the relevant trade marks rather than deceptively similar.  Had I found such use to fall within the description of "deceptive similarity", the observations I have just made about the ACL would equally apply.

548    Accordingly, the case based upon contraventions of the ACL must be dismissed.

**The contention that the artist and Redbubble are joint tortfeasors**

549    As to the copyright claim, I have concluded that no statutory tort arises as contended and thus no question of a joint liability arises.  As to the trade mark infringements, I am not satisfied that there is a "common design", as contemplated in the authorities, in the sense of the specific meeting of minds in relation to each specific example.  The evidence shows that an artist engages in conduct and, by force of the business model, Redbubble engages in its own conduct: *Thompson v Australian Capital Television Pty Ltd* (1996) 186 CLR 574 at 581-585; *The Koursk* [1924] p 140 at 159-160.

550    In the result, the copyright case fails.  The ACL case must be dismissed.  Infringement of the trade marks in relation to Examples 1, 3 and 4 are made out.  However, damages in respect of Examples 1 and 3 are nominal, namely $5,000.00, and there can be no award of exemplary damages.  The cross-claim for removal of the registered trade marks is dismissed.

551    It is not clear to me whether the applicant is seeking a declaration in relation to any matters.  The applicant, by the originating application, seeks injunctions.  Accordingly, the formal orders for today will be simply that the applicant, within 10 days, submit to the Court proposed orders it would seek so as to give effect to these reasons.

552    The costs of the proceedings will be reserved for later determination and, in due course, directions will be made for putting on submissions about that matter.

I certify that the preceding five hundred and fifty-two (552) numbered paragraphs are a true copy of the Reasons for Judgment herein of the Honourable Justice Greenwood.


Associate:


Dated:       15 March 2019

**REDACTED SCHEDULE**
**(Referred to in [244] of the reasons for judgment)**

As at 26 July 2017, approximately:

(a)  [redacted] artworks were displayed on the Redbubble Website;

(b)  [redacted] Artists had accounts on the Redbubble Website;

(c)  approximately [redacted] new artworks are uploaded per day;

(d)  approximately [redacted] orders are placed by customers each day;

(e)  approximately [redacted] new Artists sign up to the Redbubble Website each day; and

(f)  the top-selling Artist has made [redacted] sales to date.