# EXHIBIT 2

Ex. 2

KENNETH B. WILSON  (SBN 130009)
ken@coastsidelegal.com
COASTSIDE LEGAL
455 1st Avenue
Half Moon Bay, California 94019
Telephone: (650) 440-4211

JOSHUA M. MASUR  (SBN 203510)
jmasur@zuberlawler.com
ZUBER LAWLER & DEL DUCA LLP
2000 Broadway Street, Office 154
Redwood City, California 94063
Telephone: (650) 866-5901
Facsimile: (213) 596-5621

ZACHARY S. DAVIDSON (SBN 287041)
zdavidson@zuberlawler.com
ZUBER LAWLER & DEL DUCA LLP
350 S. Grand Ave., 32nd Fl.
Los Angeles, California 90071
Telephone: (213) 596-5620
Facsimile: (213) 596-5621

Attorneys for Defendant
REDBUBBLE INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| Y.Y.G.M. SA d.b.a. BRANDY MELVILLE, a Swiss corporation,<br><br>        Plaintiff,<br><br>    v.<br><br>REDBUBBLE INC.,<br><br>        Defendant. | Case No. 2:19-cv-04618-RGK (JPRx)<br><br>**REBUTTAL EXPERT REPORT OF MICHAEL MASNICK** |

2911-1006 / 1610102.1

1

Ex. 2

## I.    Introduction

1.    I have been asked to opine on issues facing websites like Redbubble that moderate content at scale in response to the Expert Witness report of Jamie Goldberg Gerson.

2.    I am a journalist, researcher, writer, and consultant who has studied and written about issues related to online content moderation for over a decade. I have regularly written about and speak on these issues, and have written, edited, and published papers related to the topic. I have also conducted numerous interviews with content moderation experts, on the policy, legal and operations teams, from a variety of different internet platforms.

3.    I am a frequent speaker on issues related to content moderation and, in particular, the challenges of content moderation with regards to intellectual property. I have spoken before a Copyright Office Roundtable discussion concerning an upcoming report considering changes to Section 512 of the DMCA, exploring how well the laws currently deal with issues around moderation and takedowns (https://www.copyright.gov/policy/section512/publicroundtable/ transcript_05-12-2016.pdf May 12, 2016). I have presented before the EU Parliament on issues related to copyright protection and internet platforms. I have spoken regularly about content moderation and IP issues at conferences including the Content Moderation at Scale Summit, CES (the Consumer Electronics Show), State of the Net, Leadership Music Digital Summit, NARM (National Association of Recording Merchandisers) Summit (now called the Music Business Association), MIDEM (the world's largest music trade show) and many others. Last year, I gave the keynote address at the California Lawyers Association "IP and the Internet" Conference, in which my talk was about the vast challenges for internet platforms being required to proactively moderate copyright-protected content (https://mk0californiala1yag7.kinstacdn.com/wp-content/uploads/2019/05/2019-IP-and-Internet- Conference-Brochure.pdf June 6, 2019).

Ex. 2

4.     As should be clear from the opinions I express herein, my opinions
were not developed solely, or even largely, in the context of the particular materials
I reviewed for purposes of this case. I have a longstanding interest and expertise in
content moderation issues. Indeed, I have written so frequently about the
impossibility of consistently performing content moderation at scale that the site I
founded and run, Techdirt, has its own "tag" for posts on the issue. I have
reproduced, summarized, or referenced many of my postings with that tag –
https://www.techdirt.com/blog/?tag=content+moderation+at+scale – in this report.
Where I have reproduced, summarized, or referenced those postings, I have done so
for convenience and to keep the length of this report manageable. To the extent
necessary, I incorporate the referenced postings as though they were fully set forth
herein (which I understand is a legal phrase). In addition to those postings identified
within the opinions themselves, the facts or data I specifically considered in forming
my opinions related to this case include:

- Brandy Melville's complaint against Redbubble and Redbubble's
  Answer;

- Portions of Redbubble's summary judgment briefing and factual
  declarations of James Toy and Ayaire Cantil-Vorhees in Redbubble's
  cases against Ohio State University and LTTB, LLC and of Anuj
  Luthra in the Ohio State case;

- The deposition transcripts of Rule 30(b)(6) designee James Toy in this
  litigation, and of Jenny Greenhough and Redbubble's Rule 30(b)(6)
  designee James Toy in Redbubble's litigation against Atari Interactive,
  Inc.;[1]

- The "one row per work" document that Redbubble produced in this
  case (RBBM016058);

---

[1]  I understand that Plaintiff is reusing the transcripts from the Atari litigation.

Ex. 2

- Redbubble's proactive policing guidelines for Brandy Melville (RBBM016863, RBBM016865);

- Redbubble's public-facing documents regarding its policies and procedures, including:

  - "Intellectual Property FAQ" (RBBM214307, RBAT121867);

  - "Community and Content Guidelines" (RBAT124431);

  - "Content & Suspension" (RBAT124440);

  - "Copyright" (RBBM214310, RBAT124445);

  - "Fair Use & Other Defenses" (RBBM214315, RBAT124450);

  - "My Work Was Removed" (RBBM214322, RBAT124457);

  - "Publicity Rights" (RBBM214327);

  - "Restricted & Deleted Accounts" (RBBM214331, RBAT124466);

  - "Someone Is Infringing My Rights or Another" (RBBM214335, RBAT124470);

  - "Trademark" (RBBM214339, RBAT124474);

  - "Redbubble IP-Publicity Rights Policy" (RBBM214881, RBAT124477);

  - "User Agreement" (RBBM214887, RBAT124483); and

  - "Redbubble User Policies" (RBBM214903, RBAT124499).

- Confidential documents containing Redbubble's policies and procedures for content moderation, including:

  - "Correspondence - Questions from users and rights holders" (RBBM214194, RBAT029831);

  - "Deliberate Misuse" (RBBM214195, RBAT029832);

  - "Deliberate Misuse Examples" (RBBM214196, RBAT029833);

4

Ex. 2

○ "Redbubble Policies, some Foundational Ideas, Intellectual Property and the DMCA" (RBBM214200, RBAT029837);

○ "Repeat Infringer Policy" (RBBM214202, RBAT029839);

○ "Suspend-from-sale" (RBAT029842);

○ "Warnings and Account Restriction" (RBBM214206, RBAT029843);

○ "MPI Scripts" (RBAT029845);

○ "Scripts - Warn - Restrict - Deliberate Misuse" (RBBM214242, RBAT029878);

○ "Title & Trademark Policing Tips" (RBBM214348, RBAT121870);

○ "Proactive Policing" (RBBM214351, RBAT121873);

○ "Creating Policing Guidelines" (RBBM214343);

○ "Understanding Policing Guidelines" (RBBM214358, RBAT121880);

○ "Moderating Content - Takedown" (RBAT121884);

○ "Marketplace Integrity Onboarding" (RBBM214268, RBAT121886);

○ "Account Restriction Q&A" (RBBM214191);

○ "Account Deletion QA" (RBBM214193);

○ "Takedown Quality Assurance" (RBBM214258);

○ "Bulk Moderator Style Guide" (RBBM214342);

○ "Unusable Tags Spreadsheet" (RBBM214361);

○ "User History Check Process" (RBBM214362);

○ "Reviewing Accounts- Escalation and Account Abuse" (RBBM214293, RBAT124546); and

Ex. 2

○   "ZD [ZenDesk] Takedown Form Requirements" (RBBM214260, RBAT125968).

5.      I understand that the applicable rules require me to identify "all publications authored in the previous 10 years." Most of my writing is in the form of short pieces, including blog entries, that are more informal and more numerous than what is considered a "publication" in academic circles – sometimes several in a day. I estimate that I have written thousands of posts in the past 10 years. I have attempted here – both in this section and in my substantive discussion below – to point to the locations where lists of those posts can be found, and to identify certain writings that are particularly relevant to this litigation.

6.      Techdirt automatically lists my publications on the site – which are too numerous to list here – at the URL https://www.techdirt.com/user/mmasnick.

7.      I also founded and run The Copia Institute, a think tank that does research and events, often with a focus on issues related to content moderation and/or intellectual property. I have authored or co-authored numerous Copia papers, listed at https://copia.is/library/. My Copia papers on related topics include "Don't Shoot the Message Board" (https://copia.is/library/dontshoot- the-message-board/, discussing the impact of intermediary liability protections on investment), "The Sky is Rising" (https://copia.is/library/the-sky-is-rising-2019/, on the state of the industry in responding to and adapting to challenges with infringement) and "The Carrot and the Stick" (https://copia.is/library/the-carrot-or-the-stick/, exploring the impact of licensed internet platforms on IP infringement).

8.      I recently published a paper for the Knight First Amendment Institute at Columbia University (https://knightcolumbia.org/content/protocols-not-platforms-a-technological-approachto-free-speech, August 21, 2019) exploring technological approaches to rethinking how internet platforms could be structured, including a detailed discussion on the challenges of content moderation and how a different technological approach might impact those challenges.

Ex. 2

9.      In addition to the above, I have occasionally been published by other news publications over the past decade. These include Wired Magazine (https://www.wired.com/author/mike-masnick/), The Verge (https://www.theverge.com/2017/4/3/15161522/mpaa-riaa-copyright-office-library-of-congressdmca-infringement), The Hill (https://thehill.com/blogs/congress-blog/politics/315032-internetfreedom-isnt-free-five-years-after-the-sopa-pipa and https://thehill.com/blogs/congressblog/technology/258258-the-answer-to-the-copyright-question-is-innovation), Reason Magazine (https://reason.com/2019/12/17/can-jack-dorsey-reinvent-the-internet-by-making-twitter-more like-email/), Boing Boing (https://boingboing.net/author/mikemasnick), and Morning Consult (https://morningconsult.com/opinions/renegotiating-nafta-must-protect-creative-innovators/). In addition to the articles above, I have contributed chapters to the book "Hacking Politics" (https://www.goodreads.com/book/show/17876446-hacking-politics) and "Working Futures" (https://www.goodreads.com/book/show/48342389-working-futures) which I also helped to edit. For the Copia Institute, I have recently been working on creating two "training simulations" that both relate to content moderation. The first is a simulation for a small group of individuals to have them experience what it is like to run or work on a "Trust & Safety" team in charge of moderating content. This simulation is a much more advanced and detailed expansion of a simplified simulation -- called "You Make the Call" that I helped put together and run at the Content Moderation at Scale conference in Washington DC in 2018. I also recently helped put together and run a large group simulation for the Mozilla Foundation, training content moderation experts and others in what forms of disinformation they may need to deal with during the 2020 US Presidential election.

10.      During the previous 4 years, I have testified as an expert at trial in United States v. Wexler (8:15-cr-00122) in the Central District of California.

Ex. 2

11.     I am being compensated at a rate of $300 per hour for my work in connection with this case.

## II.    Analysis of Expert Report by Jamie Goldberg Gerson

12.     I have reviewed the Expert Report of Jamie Goldberg Gerson regarding Redbubble's content moderation practices.

13.     The Gerson Report claims that "there were more intellectual property violations on Redbubble than any other print-on-demand website to which our clients submit reports" and names a large number of other sites which Gerson compared Redbubble too.  Ms. Gerson does not provide her data, so I have no way to evaluate the truth of her assertion.  But even if her comparison were substantiated, however, the sites to which she compares Redbubble are either in very different businesses or significantly smaller than Redbubble.

14.     A few companies are listed that have a larger web presence than Redbubble -- Amazon.com, Facebook.com, Etsy, Shopify, and Walmart.com. However, all are in very different businesses than Redbubble.  Redbubble is exclusively in the business of enabling content creators to offer print-on-demand merchandise.  Amazon, Walmart and Etsy are all large marketplaces for selling goods (with Etsy focused on home made goods, and Amazon and Walmart selling almost any product).

15.     While Amazon does offer a print-on-demand t-shirt offering called "Merch by Amazon," it is not a very large part of Amazon's business.  Entrepreneur Magazine called it "one of the best kept secrets out there." (https://www.entrepreneur.com/article/295010 May 31, 2017).  On top of that, as one of the top 5 companies by valuation in the world, Amazon presumably has the resources to hire many more content moderators and build out much greater expertise in automated content moderation solutions, which would apply not only to its print-on-demand offerings but to other intellectual property assertions with regards to listings on its website.

Ex. 2

16.     Walmart.com, the online arm of retailing giant Walmart, is focused on selling finished goods, and while it has dabbled in selling "promotional" goods, it is a tiny part of its business and recently shut down during the COVID-19 pandemic (https://www.walmartpromoshop.com/estore/responsive/global/static_content.jsp?page=covid-19 "Effective April 4, 2020: We are temporarily suspending the sales of promotional products as of 12:00 AM Central Time on April 4, 2020.")

17.     Shopify provides a service for anyone to create an online store selling whatever they want, but it is just the store interface. Shopify does not connect its users to print-on-demand providers or handle any aspect of printing, inventory, or fulfillment.

18.     Facebook is the largest social network in the world, and is not a marketplace for print-on-demand products.  The comparison does not seem relevant. But, as discussed later in this report, Facebook has its own content moderation problems.

19.     Of all the rest of the companies listed, many of whom are in the print-on-demand space, nearly all of them are significantly smaller than Redbubble.  The first two listed and highlighted are Sunfrog and Spreadshirt, both of which are noticeably smaller than Redbubble.

20.     Using SimilarWeb's comparison tools (which, in my experience, are the most accurate of a number of similar analytics platforms), I generated reports comparing the size and reach of both Sunfrog and Spreadshirt to Redbubble to confirm that both are significantly smaller.  Redbubble is among the top 1,000 websites within the US, as ranked by SimilarWeb. Spreadshirt is listed over 5,000 and Sunfrog is listed over 40,000.

Ex. 2



21.     Many of the other "similarly situated platforms" listed by Ms. Gerson are so small that SimilarWeb does not even have any data regarding how much traffic they receive.  This includes ChipChipTee.com, Customglory.com, tee4fans.club, aweshirts.net, lunartree.com, teehag.com, tee-holic.com, teefuel.com, teelizz.com, tiposhirt.com, coolcustomshirt.com, teekalab.com, holatee.com, myfrogtee.com, quinzees.com, gearbubble.com, mytrendymugs.com, thegearspot.co, teesdaddy.com, awesomefanatics.com, tee-fashionshop.com, teegunny.com, usgearlaunch.com, dms2tee.com, rafikigear.com, jerseysus.ru, storeglory.com, teeustore.com, nicefrogtees.com, teesgogo.com, detectiveshirts.com, niceteepro.com, tee47.com, bedshirts1.info, teebeautiful.com, crazycoolcustomtees.com, thedihardfans.com, awesometeeshirts.com,

Ex. 2

1   thegearapex.com, coolgiftsnow.com, best4shirt.com, teeluxi.com, teebily.com,

2   teescircle.com, teeshirtpublic.com, sportsfantees.com, igottahaviteshop.com,

3   swagshirts99.com, bestgear99.com, teetaste.com, leetaste.com, bandanafever.com,

4   mstee.co, 3dshirtstore.com, printeddream.com, fanztastic.com, fashiongirdle.com,

5   blingintees.com, oldskoolshirts.com, rawteesgear.com, kbteez.com,

6   threadmeup.com, teefashionstyle.com, shopchilltees.com, aljerseystore.com,

7   getmebedazzled.com, nflstoreofficial.ru, tee4life.com, supertshirt.net,

8   projerseycheap.com, bestprintever.com, laladiscount.com, humourshops.com,

9   gloriousleggings.com, trendygrabber.com, tenuoushirt.com, sportshirtlove.com,

10  bongtee.com, scrogestore.com, ducanvas.com, novteesstoress.com, awesome-

11  tshirt.com, coolsunnytee.com, xmestees.com, tee2us.com, 129store.com,

12  teeatop.com, az-tee.com, teeashl.com, gongchatee.com, ssltee.com, printcorn.com,

13  teepasta.com, z9nine.com, isunshines.com, stayhungryshirt.com, tonasee.com,

14  95wear.com, beanprints.com, zazzilee.net, eesomegift.com, tdttee.com,

15  m4utees.com, shopteeonline.com, domitee.com, samditee.com, teetropical.com,

16  steemtee.com, sportstyle.co, zingzingtee.com, tingtee.com, civiltee.com, and

17  dragonshoponline.com.

18      22.    In my experience, if SimilarWeb has no data regarding a site, that site

19  does not get much, if any, traffic, and would not be similarly situated or comparable

20  to a top 1,000 website, such as Redbubble.

21      23.    The Gerson Report notes that her company, CounterFind, has reported

22  more violations to Redbubble than any other print-on-demand website to which the

23  company submits reports.  Without context, and most importantly the data to back

24  up her assertions, this information reveals very little. As noted above, most of the

25  other websites CounterFind identifies receive little to no traffic, and thus it would

26  make sense that they would see less alleged infringement.

27      24.    Additionally, since CounterFind is the organization sending the notices,

28  it also has total control over how many are sent to any particular platform.  Without

Ex. 2

1  more details or data, merely going by the number of notices sent reveals little other

2  than that one company, CounterFind, chose to send a large number of notices to

3  Redbubble.

4       25.    Historically, third party infringement notice-senders, such as

5  CounterFind, have been accused of "flooding" certain target companies with

6  notices, in order to elicit specific behavior.  For example, in BMG Rights

7  Management v. Cox, a third-party rights management firm, RightsCorp., was

8  accused by the ISP Cox of flooding their takedown system in order to pressure Cox

9  to pass along its notices to end users, from whom RightsCorp sought to receive

10  payments.  It reached the point that Cox began to ignore RightsCorp notices, in the

11  belief that they were "improper notices."

12  (https://ia803102.us.archive.org/13/items/gov.uscourts.vaed.310858/gov.uscourts.va

13  ed.310858.398.0.pdf)

14       26.    Thus, without additional context or the underlying data, the number of

15  notices sent tells us only that CounterFind chose to send a lot of notices, and little if

16  anything about Redbubble or how it compares to similarly situated platforms.

17       27.    While the Gerson Report claims that Redbubble "does not proactively

18  remove designs," that is in direct conflict with the evidence I have reviewed, both of

19  the details of Redbubble's proactive policing policies, and the data it has provided in

20  multiple lawsuits demonstrating the extent of its proactive takedowns and account

21  cancellation.

22       28.    In particular, in reviewing the "one row per work" document that

23  Redbubble produced in this case (RBBM016058), it is evident that, consistent with

24  standard practices at many internet platforms, the content moderation procedures

25  Redbubble engages in involve a mixture of both proactive policing and responsive

26  reviews of takedown notices from rightsholders. Since some content will always be

27  missed in any proactive policing scheme (and, often a proactive policing program

28  will remove content that it should not), the presence of allegedly infringing works

Ex. 2

on a site is not, in any way, evidence of a lack of proactive policing.

29.    Indeed, while many e-commerce websites do not do any proactive policing, Redbubble appears to go beyond what the law requires in removing infringing content by setting up and operating an effort to be more proactive.

30.    The Gerson Report highlights that Redbubble's Intellectual Property FAQ on its site says "We generally don't go looking for similar works to remove from the marketplace" as evidence that Redbubble does no proactive policing. This is contrary to both the evidence and a plain English reading of the statement. The statement says that the company "generally" will not go searching for things, which does not mean it never does.  It is, instead, a clear admission that the company will not pre-review every piece of content, nor could it reasonably be expected to find every "similar" work without some guidance from the rights holder.

31.    This is a sensible and standard policy, since it is logistically and technologically impossible to pre-vet every single upload, or to take a single example of an infringing work and find any "similar" work -- especially when similar is such a subjective standard and when image-based recognition tools are notoriously imperfect and limited in their abilities.

32.    In many cases, companies require rightsholders to present the specific location of each allegedly infringing product, rather than merely presenting an example of the infringing content and expecting the service provider to automatically be able to find all such examples.  Indeed, many websites rely on court decisions such as those in Perfect 10 v. ccBill regarding the requirement to have rightsholders provider specific locations for where to look for the products they allege are infringing.

33.    The Gerson Report claims that Redbubble is slower in its response time compared to "similar platforms."  However, as noted above, the three "similar" platforms that the Gerson Report lists -- Sunfrog, Moteefe.com and Spreadshirt are not comparable.  I have already shown that Sunfrog and Spreadshirt are much

Ex. 2

smaller, and the same is true of Moteefe.com:



34.    Given the massive differences in size, and traffic, it is not unexpected that the larger site might take slightly more time to respond to notices -- especially those generated by third party "rights management" firms, who historically are not always as accurate in their takedowns as when notices come directly from rightsholders.  Many firms rightly investigate takedown notices to determine if the notices are accurate, if the work in question actually infringes, or if the works in question fall into protected classes, such as fair use.

35.    Based on filings I reviewed regarding earlier Redbubble cases, by April of 2019, Redbubble claimed it had received 66,000 takedown notices in its history.  Gerson asserts that CounterFind alone has submitted 30,000 takedown notices to Redbubble, though it does not explain over what timeline or provide any relevant data.  At the very least, though, this would suggest that CounterFind would be seen as a "high volume" notice sender, whose notices may require additional screening.  It is also possible that the large number of notices originating from a single submitter may have overwhelmed the existing content moderation systems, creating an expected delay.  Under such circumstances, an average response time of six days

Ex. 2

1   may not be surprising.

2       36.    In addition, "average" response time without any additional context or
3   data leaves open many questions as well.  It is possible that "obvious" infringements
4   are taken down quickly, while those that require investigation take much longer.
5   Again, this is a number that could be influenced by the submitter based on the
6   quality and clarity of its submissions.

7       37.    The Gerson Report expresses concern that Redbubble allows continued
8   searches for brands it has reported, such as "Dallas Cowboys."  However, there is
9   nothing infringing about allowing a search for "Dallas Cowboys," as there can very
10  well be non-infringing products that are appropriately described by that phrase,
11  whether fair use or parody or something else entirely, and thus leaving such a search
12  still enabled is not only appropriate, but standard practice across nearly all platforms
13  that I am aware of.  It is the products that might or might not be infringing -- not the
14  search terms.

15      38.    The Gerson Report notes that after a work is taken down or a seller is
16  suspended, that similar designs often reappear on the site.  This gets back to the key
17  point made throughout my report, that such is the nature of content moderation at
18  scale.  When users are always going to be looking to upload works, merely taking
19  down a work does not guarantee that it will stay down, and it is effectively
20  impossible to prevent attempts to post similar content.  As discussed below, image-
21  based content moderation tools are notoriously unsophisticated and easily tricked by
22  changing as little as a single pixel in a design.

23      39.    Indeed, if it were easy to identify and stop or remove infringing content
24  on a site, companies like CounterFind would have little reason to exist at all.

25      40.    While the Gerson Report notes that CounterFind has reported some
26  accounts more than once, again, without context or data, this tells us very little.  It
27  does not reveal the time between reports, how Redbuble judged these reports,
28  whether or not the works were deemed to actually be infringing. It just tells us that

Ex. 2

1  CounterFind submitted reports.

2  **III.    Content Moderation**

3        41.     The process by which Internet companies that host user-submitted

4  content decide which of that content to allow to be accessed and which to remove is

5  generally called "content moderation."

6        42.     Failing to moderate enough can lead to or promote major social

7  problems, like dissemination of false information, harassment, abuse or unwanted

8  commercial messages (colloquially referred to as "spam"). But moderating too

9  much can suppress socially beneficial content, like negative but true consumer

10 reviews, criticism, commentary, parody and more.

11       43.     Part of the challenge is that no one agrees what is the "correct" level of

12 moderation. Ask 100 people and you will likely get 100 different answers (which I

13 confirmed empirically in 2018 by getting approximately 100 content moderation

14 experts, attending the "Content Moderation at Scale" conference, to evaluate content

15 on a lightly fictionalized social media platform). What many people think must be

16 mostly "black and white" choices actually have a tremendous amount of gray. Even

17 if there were clear and easy choices to make, (which in many situations is not the

18 case) at the scale of most major platforms, even a tiny error rate (of either false

19 positives or false negatives) will still be a very large absolute number of "mistakes."

20       44.     Even when there are clear choices to make content moderation suffers

21 from two types of errors. Using standard statistical terminology, blocking content

22 that shouldn't be blocked is called a "type I error," and failing to block content that

23 probably should be blocked is referred to as a "type II error."

24       45.     As difficult as it is to perform content moderation at a small scale,

25 scaling content moderation – doing so consistently for thousands of items of user-

26 generated content – is impossible to do well. Among other issues, both type I and

27 type II errors are essentially inevitable, and the need to involve multiple human

28 beings, with different interpretations of often subjective rules and policies, means

Ex. 2

1   that inconsistency is unavoidable.

2       46.    As Techdirt contributor Professor Eric Goldman of the Santa Clara

3   University School of Law has written, in a piece titled "Top Myths About Content

4   Moderation," https://www.techdirt.com/articles/20191015/14542243198/top-myths-

5   about-contentmoderation. shtml (Oct. 16, 2019), attempts to regulate, legislate, or

6   litigate content moderation often fail because of a misunderstanding of how content

7   moderation actually works. As Prof. Goldman points out, "Regulators are right to

8   identify content moderation as a critically important topic. However, until regulators

9   overcome these myths, regulatory interventions will cause more problems than they

10  solve."

11      Prof. Goldman identifies nine particular myths:

12  *Myth:* Content moderation can be done perfectly.

13      *Reality:* Regulators routinely assume Internet services can remove all
14      bad content without suppressing any good content. Unfortunately, they
15      can't. First, mistakes occur when the service lacks key contextual
16      information about the content—such as details about the author's
17      identity, other online and offline activities, and cultural references.
18      Second, any line-drawing exercise creates mistake-prone border cases
19      because users routinely submit "edgy" content. Third, a high-volume
20      service will make many mistakes, even if it's highly accurate—1 billion
21      submissions a day at 99.9% accuracy still yields a million mistakes a
22      day.

23  *Myth:* Bad content is easy to find and remove.

24      *Reality:* Regulators often assume every item of bad content has an
25      impossible-to-miss flashing neon sign saying "REMOVE THIS
26      CONTENT," but that's rare. Content is often obviously bad only in
27      hindsight or with context unavailable to the service. Regulators'
28      cherrypicked anecdotes don't prove otherwise.

    *Myth:* Technologists just need to "nerd harder."

Ex. 2

*Reality:* Filtering and artificial intelligence play important roles in content moderation. However, technology alone cannot magically solve the problem. "Edgy" and contextless content vexes the machines, too.

*Myth:* Internet services should hire more humans to review content.

*Reality:* Humans have biases and make mistakes too, so adding human reviewers won't lead to perfection. Furthermore, human reviewers sometimes experience an unrelenting onslaught of horrible content to protect the rest of us.

*Myth:* Internet companies have no incentive to moderate content.

*Reality*: In 1996, Congress passed 47 U.S.C. 230, which says Internet services generally aren't liable for third-party content. Due to this legal protection, critics often assume Internet services won't invest in content moderation; and some companies have stoked that perception by publicly positioning themselves as "neutral" technology platforms. Yet, virtually every Internet service moderates content, and major services like Facebook and YouTube employ many thousands of content reviewers. Why? The services have their own reputation to manage, and they care about how content can affect their users (e.g., Pinterest combats content that promotes eating disorders). Furthermore, advertisers won't let their ads appear on bad content, which provides additional financial incentives to moderate.

*Myth:* Content moderation, if done right, will make everyone happy.

*Reality:* By definition, content moderation is a zero-sum game. Someone gets their desired outcome, and someone else doesn't—and those folks won't be happy with the result.

*Myth:* There is a one-size-fits-all approach to content moderation.

*Reality:* Internet services cater to diverse audiences that have different moderation needs. For example, an online crowdsourced encyclopedia like Wikipedia, an open-source software repository like GitHub, and a payment service for content publishers like Patreon all solve different

2911-1006 / 1610102.1

Ex. 2

problems for their communities. These services shouldn't have identical content moderation rules.

*Myth:* Imposing content moderation requirements will stick it to Google and Facebook.

> *Reality:* Google and Facebook have enough money to handle virtually any requirement imposed by regulators. Startup enterprises do not. Increased content moderation burdens are more likely to block new entrants than to punish Google and Facebook.

*Myth*: Poor content moderation causes anti-social behavior.

> *Reality:* Poorly executed content moderation can accelerate bad behavior, but often the Internet simply mirrors existing anti-social behavior or tendencies. Better content moderation can't fix problems that are endemic in the human condition.

## IV.    Masnick's Impossibility Theorem: Content Moderation at Scale Is Impossible to Do Well

47.    On November 20, 2019, I published a piece at https://www.techdirt.com/articles/20191111/23032743367/masnicks-impossibility-theoremcontent- moderation-scale-is-impossible-to-do-well.shtml, titled "Masnick's Impossibility Theorem: Content Moderation At Scale Is Impossible To Do Well," from which this section of my report is adapted.

48.    For many years, I have explained that while many people claim that content moderation is **difficult**, that's misleading. It implies that more hard work can "solve" the mistakes made in content moderation. Instead, it is important to recognize: **content moderation at scale is impossible to do well**. Importantly, this is **not** an argument that everyone should do nothing. Nor is it an argument that companies can't do *better jobs* within their own content moderation efforts. But there's a huge problem in that many people expect that these companies not only

Ex. 2

1 | can, but should, strive for a level of content moderation that is simply impossible to
2 | reach.

3 |     49.    I have recently proposed "Masnick's Impossibility Theorem," as a sort
4 | of play on Arrow's Impossibility Theorem.[2] Content moderation at scale is
5 | impossible to do well. More specifically, it will always end up frustrating very large
6 | segments of the population and will always fail to accurately represent the "proper"
7 | level of moderation of anyone. While I have not gone through the process of
8 | formalizing the theorem, as Arrow did in his seminal text, I will highlight a few
9 | points on why the Impossibility Theorem regarding content moderation is inevitably
10 | true.

11 |     50.    First, any moderation is likely to end up angering those who are
12 | moderated. Those who initially posted the content in the first place almost certainly
13 | thought it properly belonged wherever it was posted -- so they will likely disagree
14 | with the decision to moderate it. Some might argue the obvious response to this
15 | concern is to do no moderation at all. However, that also fails for the obvious reason
16 | that many people would greatly prefer some level of moderation, especially given
17 | that any unmoderated area of the internet quickly fills up with spam, not to mention
18 | abusive and harassing content. Or, worse, if content is violating some laws, a
19 | platform is unlikely to even have the option of not moderating. Some have
20 | suggested that pushing out the moderation to the ends of the network (i.e., giving
21 | more control to the end users to make their own moderation choices) is better, but
22 | that also has some complications in that it puts the burden on end users, and they
23 | have neither the time nor inclination to continually tweak their own settings. It also

24 | _____

25 | [2] Arrow's Impossibility Theorem is a theorem put forth by Nobel Prize-winning
26 | economist Kenneth Arrow in his doctoral dissertation and later in his 1951 book
     | "Social Choice and Individual Values" and roughly speaking shows that no voting
27 | system can accurately represent the preferences of the voters, and that no matter
     | how a voting systemwas constructed, it would end up being "unfair" to a certain set
28 | of voter preferences.

2911-1006 / 1610102.1

Ex. 2

1  fails to deal with issues regarding content that violates the law. No matter what path
2  is chosen, it will end up being not ideal for a large segment of the population.
3  Moderation is necessary (indeed, in some cases, required to stay on the right side of
4  the law), and as such, will upset at least some significant portion of those
5  moderated.

6      51.    Second, moderation is, inherently, a subjective practice. Despite some
7  people's desire to have content moderation be more scientific and objective, true
8  objectivity is impossible. By definition, content moderation is always going to rely
9  on judgment calls, and many of the judgment calls will end up in gray areas where
10  lots of people's opinions may differ greatly. Indeed, one of the problems of content
11  moderation that we've seen over the years is that to make good decisions you often
12  need a tremendous amount of context, and there's simply no way to adequately
13  provide that at scale in a manner that actually works. That is, when doing content
14  moderation at scale, you need to set rules, but rules leave little to no room for
15  understanding context and applying it appropriately. And thus, you get many edge
16  cases that end up looking bad. Empirical data support this conclusion. In 2018, when
17  we turned an entire conference of "content moderation" specialists into content
18  moderators for an hour, we found that there were exactly zero cases where we could
19  get all attendees to agree on what should be done in any of the eight cases we
20  presented. Indeed, all eight scenarios involved four possible options for the content
21  moderators to choose from, and in every single case, all four options were chosen by
22  at least some participants.

23      52.    Third, people frequently underestimate the impact that "scale" has on
24  this equation. Getting 99.9% of content moderation decisions at an "acceptable"
25  level probably works acceptably for situations when you're dealing with 1,000
26  moderation decisions per day, but large platforms are dealing with way more than
27  that. If you assume that there are 1 million decisions made every day, even with
28  99.9% "accuracy" (and 99.9% accuracy is already impossible), you're still going to

Ex. 2

1  "miss" 1,000 calls. And the numbers can scale up massively from there. On

2  Facebook alone a recent report (https://www.businessinsider.com/facebook-350-

3  million-photos-each-day-2013- 9?IR=T) noted that there are 350 million photos

4  uploaded every single day. And that's just photos. If there's a 99.9% accuracy rate,

5  it's still going to make "mistakes" on 350,000 images each and every day. Those add

6  up.

7       53.    Even if you could achieve such high "accuracy," (which is unlikely)

8  with so many mistakes in absolute terms, it is always possible for someone, such as

9  a journalist, to go searching and find a bunch of those mistakes -- and point them

10  out. This may make some suggest that if a reporter can find those bad calls,

11  Facebook should be able to as well. That leaves out that Facebook DID find that

12  other 99.9%. Obviously, these numbers are just illustrative, but the point stands that

13  when you're doing content moderation at scale, the scale part means that even if

14  you're extraordinarily good, you will still make a large number of mistakes in

15  absolute numbers every single day.

16       54.    It is important to keep exploring different approaches to content

17  moderation, and to call out failures when they (frequently) occur, but it's important

18  to recognize that there is no perfect solution to content moderation, and any

19  company, no matter how thoughtful and deliberate and careful is going to make

20  many mistakes.

21       55.    I have written repeatedly about failed content moderation at scale.

22  Often, intentionally bad actors can game content moderation policies to their own

23  benefit, at the expense of those who do not seek to manipulate those policies to their

24  benefit. Here are just a few examples from just the past few months:

25       ●    White supremacists were accused of manipulating Twitter's content
26            moderation policies to get people they dislike banned from Twitter over
27            old, out-of-context jokes that were on the site for many years:
28            (https://www.techdirt.com/articles/20191201/00375943479/content-

Ex. 2

moderationscale- is-impossible-that-time-twitter-nazis-got-reporter-barred-twitter-over-somejokes. shtml Dec. 4, 2019);

- Facebook, while invoking a policy to ban "anti-vaccine" advertisements, instead removed pro-vaccine ads from hospitals and other health organizations, while allowing ads by anti-vaccine conspiracy theorists to continue (https://www.techdirt.com/articles/20191026/23243243268/content-moderationscale- remains-impossible-vaccines-edition.shtml Oct. 31, 2019); and

- Men are gaming dating app Tinder's moderation policies to get women who reject them banned from Tinder by falsely reporting that they have engaged in prohibited behavior on the platform. (https://www.techdirt.com/articles/20190918/00363543015/jerks-reporting women-who-swipe-left-them-tinder-once-again-highlighting-how-contentmoderation- gets-abused.shtml Sep. 25, 2019).

56.    Even without intentional abuse of reporting mechanisms, content moderation policies can create perverse, or at least undesired, effects. Famous art is removed as violating policies against nudity and other explicit content (https://www.techdirt.com/articles/20190818/17594042811/content-moderation-is-impossiblefacebook- settles-legal-fight-over-famous-painting-womans-genitals.shtml Sep. 13, 2019). Because the exact same content can mean very different things in different contexts, policies intended to exclude hateful content end up excluding those who seek to document or teach about that hate (https://www.techdirt.com/articles/20190606/14122842345/impossibility-contentmoderation- youtubes-new-ban-nazis-hits-reporter-who-documents-extremism-professor-teachingabout- hitler.shtml Jun. 7, 2019), or to satirize or parody it (https://www.techdirt.com/articles/20190613/02505742390/content-moderation-is-impossibleyou- cant-expect-moderators-to-understand-satire-irony.shtml Jun 13, 2019). In the name of "stopping" terrorist content online,

Ex. 2

1  Facebook has deleted evidence of war crimes

2  (https://www.techdirt.com/articles/20190513/17005042202/flip-side-to-stopping-

3  terrorist-contentonline- facebook-is-deleting-evidence-war-crimes.shtml May 20,

4  2019). Talking about racism gets blocked as hate speech

5  (https://www.techdirt.com/articles/20190426/00092142092/impossiblecontent-

6  moderation-dilemmas-talking-about-racism-blocked-as-hate-speech.shtml May 1,

7  2019). Put another way, algorithms can't tell the difference between "bad stuff" and

8  "reporting about bad stuff."

9  (https://www.techdirt.com/articles/20180321/00413939466/once-again-algorithms-

10  canttell- difference-between-bad-stuff-reporting-about-bad-stuff.shtml Mar. 28,

11  2018). And in an act of almost unimaginable irony, Google has refused to allow

12  AdSense words to appear with an article we published about the "impossible

13  choices" platforms have to make when moderating speech on their platforms.

14  (https://www.techdirt.com/articles/20190108/00410741352/google-stillsays- our-

15  post-content-moderation-is-dangerous-derogatory.shtml Jan. 10, 2019;

16  https://www.techdirt.com/articles/20181024/09444240903/google-says-our-article-

17  difficultygood- content-moderation-is-dangerous.shtml Oct. 24, 2018;

18  https://www.techdirt.com/articles/20180808/17090940397/platforms-speech-truth-

19  policypolicing- impossible-choices.shtml Aug. 8, 2018). There may be no better

20  example than "moderating" an article about how internet platforms to illustrate how

21  bad most internet platforms are at content moderation.

22      57.    Creating categories of unmoderated content creates problems of its

23  own. Elizabeth Warren's presidential campaign has documented that Facebook's

24  refusal to moderate candidate political ads fosters abuse

25  (https://www.techdirt.com/articles/20191014/22010943192/elizabethwarrens- feud-

26  with-facebook-over-false-ads-just-highlights-impossibility-content-moderationscale.

27  shtml Oct. 15, 2019). This happened a few months after Elizabeth Warren's

28  presidential campaign complained about her own campaign's ads being moderated

Ex. 2

1   (https://www.techdirt.com/articles/20190312/00332641776/everyones-overreacting-
2   to-wrongthing- about-facebook-briefly-blocking-elizabeth-warrens-ads.shtml March
3   12, 2019). Those two stories alone help demonstrated the impossibility of content
4   moderation. Warren's campaign was upset when Facebook moderated her ads,
5   saying that the company had "too much power" and shouldn't be deciding what
6   political ads are allowed. Yet when Facebook chose not to moderate other
7   advertisements (those making misleading claims about her), she got upset that the
8   company chose not to act.

9         58.   Implementation of any content moderation policy is not nearly as easy
10  as many people believe. Almost every content moderation decision involves some
11  sort of subjective call. Is this content promoting bad behavior or documenting bad
12  behavior? Is this content making a joke at someone's expense, or is it a part of
13  friendly in-group banter? Is this content infringing, or is it protected fair use? The
14  end result of all of these subjective decisions is that "mistakes" are made. Archival
15  and documentary footage documenting bad behavior gets blocked as promoting it.
16  Joking among friends gets blocked as an attack. Protected parodies get blocked as
17  infringement. All of those mistakes can have longer term implications on free
18  speech, education, and culture.

19        59.   These impossible decisions have been around for many years. Early
20  attempts to ban "porn" also took down information on breast cancer. Attempts to
21  block "terrorist content" have repeatedly taken down human rights activists
22  documenting war crimes. Internet content moderation has always had problems, and
23  for each "fix" to a difficult scenario, only more problems are introduced.

24        60.   A report by the podcast Radiolab, talking to Facebook moderators
25  (https://www.wnycstudios.org/podcasts/radiolab/articles/post-no-evil August 17,
26  2018 and covered on Techdirt
27  https://www.techdirt.com/articles/20180817/11460840450/before-you-talkabout-
28  how-easy-content-moderation-is-you-should-listen-to-this.shtml August 21, 2018)

Ex. 2

1  highlights just a small set of examples, beginning with Facebook's initial "no

2  nudity" policy.

3    61.    The team at Facebook then realized they had to define "nudity," which

4  an early Facebook employees described as the following: "So, I mean, yeah, first cut

5  at it was visible male and female genitalia and then visible female breasts. And then

6  the question is, well, okay, how much of her breast needs to be showing before it's

7  nude? And the thing that we landed on was if you could see essentially the nipple

8  and areola, then that's nudity." But that created problems for breastfeeding mothers

9  who felt their images were unfairly blocked.

10    62.    Facebook then adjusted the rules to have what was called an

11  "attachment clause" for breastfeeding. If the baby was "attached," then the image

12  could stay up. But that upset mothers who had posted pictures of them with their

13  babies right after they'd finished breastfeeding. So Facebook had to add another rule

14  for that situation. But then they found that people started posting pornographic

15  pictures that looked the same as baby breastfeeding images, but with adult males. So

16  Facebook then decided to put an age cap on the person breastfeeding -- but they

17  chose "toddler" as the age cap, which is already subjective and actually below the

18  World Health Organization's recommendations for the proper age to stop

19  breastfeeding.

20    63.    The story becomes even more absurd, and more representative of the

21  impossibility of moderating content at scale, when a Facebook employee comes

22  across an image of a teenage girl "African by dress and skin, breastfeeding a baby

23  goat." It turns out that this is a cultural, traditional survival practice in Kenya for

24  surviving droughts. But for Facebook, moderators had no idea how it fit with their

25  increasingly long list of rules regarding breastfeeding -- leading them to have

26  change the rules yet again to deal with this new, unexpected variation, that all

27  previous rules and amendments failed to contend with.

28    64.    As Facebook and most other platforms eventually discover, every

Ex. 2

1  content moderation rule leads to new questions, new edge cases, and new variations

2  -- many of which require subclauses, asterisks and amendments.

3      65.     Indeed, the Supreme Court itself seemed to recognize this in defining

4  obscenity with Justice Potter Stewart's now iconic phrase "I know it when I see it"

5  in Jacobellis v. Ohio. That was, in effect, a Supreme Court Justice admitting that he

6  could not come up with a written policy or rules to define obscenity, and that it was

7  always going to come down to the subjective opinion of whoever was judging that

8  content.

9      66.     Yet in this world, where we expect every internet platform to moderate

10 all of the content on their platform, "I know it when I see it" is not sufficient. But

11 any other set of rules, no matter how detailed and flexible, can never account for all

12 variations or all subjective decisions.

13 **V.    Teespring's Takedown of Techdirt's "Copying Is Not Theft" Products**

14     67.     As the editor of Techdirt and CEO of its parent company, Floor64. Inc.,

15 I have personal experience with the consequences of overbroad moderation.

16 Beginning in 2016, we offered t-shirts and other products with a "copying is not

17 theft"[3] graphic on our Teespring storefront.

18

19

20

21

22

23

24  _____

25 [3] By saying "copying is not theft," I and Techdirt are attempting to underscore the
   distinction between copying and theft. Stealing an item deprives the rightful owner
26 of that item, while making a copy of the item leaves the item from which the copy
   was made. The fact that copying is not theft does not necessarily make copying
27 legally or morally right or defensible. But even when copying is unlawful, it is not
   theft. Particularly in the digital age, this distinction is often meaningful.
28



68.     In early December 2019, Techdirt received a notice from Teespring that our "copying is not theft" products had been taken down by Teespring for alleged copyright infringement. I've attached our takedown correspondence with Teespring as Exhibit A. We emailed Teespring's "IP Escalations" address in the takedown notification, clarifying that we had created and owned the original design and it did not include any "third-party content." But rather than reinstate our products, Teespring responded that they could not reinstate the campaign because it violates Teespring's "Acceptable Use Policies" (https://teespring.com/policies/acceptable-use) against nudity, hate speech, violence, "promot[ing] illegal activity," and "false or misleading claims," as well as intellectual property rights. When we asked which policy we violated, Teespring replied with a link to the same policy page. When we clarified that we had read the page, that we believed that we were not in violation of any of the policies, and asked which of the six policies we had supposedly violated, we received what appeared to be a scripted customer service response:

We apologize if you disagree with our decision and for any inconvenience this matter has caused. Please understand that we are

Ex. 2

not in a position to debate our policies or discuss this issue further;
however, your feedback has been noted and we truly appreciate your
time today.

69.    When we repeated our request that Teespring identify the policy we
violated, Teespring responded:

You've been advised three times that the content has violated our
acceptable use policy. You have been provided with the links to this
policy for further information. This policy and choice to remove the
content are not up for discussion. We apologize if you disagree with
the decision. You will not receive anymore communication from us
on this matter.

70.    Due to Teespring's takedown of our products, we moved our Copying
Is Not Theft store to Threadless, at https://techdirt.threadless.com/designs/copying-
is-not-theft/.

**VI.    Excessive Moderation Is A Significant And Persistent Problem When It
Comes To Copyright**

71.    The situation with Teespring was hardly the first time that we
experienced issues with excessive copyright moderation. Over the years, we have
dealt with multiple attempts by individuals who sought to use clearly erroneous
copyright takedown notices in an attempt to censor or silence articles and posts they
do not like.

72.    In 2017 we reported on what appeared to be a crowdfunding scam,
seeking to raise money for a transcription device, called Titan Note, that had
initially raised over $1 million despite many questions about whether or not the
technology actually existed. The individual behind the project sent us a DMCA
takedown notice claiming that our discussion was infringing by including
screenshots from his website and Facebook comments
(https://www.techdirt.com/articles/20170531/16392437490/our-response-to-titan-

1  note-sendingfrivolous- takedown-notice-over-our-critical-coverage.shtml June 1,
2  2017).

3      73.    There are numerous stories of potentially abusive DMCA takedown
4  claims, such that we have many of them tagged as "Copyright as Censorship"
5  (https://www.techdirt.com/search-
6  g.php?num=20&q=copyright+as+censorship&search=Search) used to describe
7  cases where DMCA takedown or other copyright claiming systems were used not to
8  stop the infringement of actual copyright infringement, but rather to silence
9  commentary or criticism. I incorporate my posts under that tag as part of this report.

10     74.    FIFA, the organization that runs the Soccer World Cup in 2018 used
11 copyright claims to take down a video of protestors during a World Cup match
12 (https://www.techdirt.com/articles/20180716/16190840245/copyright-as-
13 censorship-fifasoveraggressive- copyright-takedowns-target-fans-celebrating-pussy-
14 riot-protesting.shtml July 17, 2018). A reporter for the tech news website Venture
15 Beat issued a DMCA takedown notice to Twitter to get criticism of one of his
16 articles taken down
17 (https://www.techdirt.com/articles/20180509/17341739812/venture-beat-reporter-
18 abuses-dmca-tosilence- critic.shtml May 10, 2018). A video game company, Wild
19 Game Studio issued a DMCA takedown notice to YouTube to remove a critical
20 game review (https://www.techdirt.com/articles/20131021/00080224939/copyright-
21 as-censorship-again-gamedeveloper- takes-down-scathing-youtube-review.shtml
22 October 21, 2013). A blog covering copyright law in India got targeted with an
23 erroneous DMCA takedown notice for discussing the copyright issues around a
24 song. The copyright holder for that song issued the takedown notice
25 (https://www.techdirt.com/articles/20190307/17360241761/bogus-dmca-takedown-
26 targetingindian- copyright-blog-demonstrates-problems-notice-takedown.shtml
27 March 14, 2019). The open document hosting platform Scribd took down the public
28 domain Mueller Report in the false belief that someone held the copyright on it

Ex. 2

(https://www.techdirt.com/articles/20190420/23233942052/scribds-takedown-public-domainmueller- report-is-preview-eus-future-under-copyright-directive.shtml April 22, 2019). The TV channel Starz used the DMCA to attempt to take down a news article that merely spoke about some of Starz's TV shows being leaked on the internet. The article did not include any of the copyright-covered content, nor did it provide links, details or instructions on how to find the content. It was merely reporting the news that the content had leaked and Starz sent a DMCA takedown notice to Twitter, seeking to have a tweet about the article existing removed from Twitter (https://www.techdirt.com/articles/20190414/23472142010/starz-really-really-doesntwant- you-to-know-that-torrentfreak-wrote-about-leaked-shows-that-anyone-tweeted-aboutit. shtml April 15, 2019). A convicted investment advisor sought to use the DMCA takedown process to remove the news of his own conviction from Google, asking it to delist links to the FBI, the DOJ, and Wikipedia that all discussed his arrest and conviction (https://www.techdirt.com/articles/20180502/18304039765/another-convicted-fraudster-attemptsto- manage-his-reputation-with-bogus-dmca-takedown-notices.shtml May 7, 2018).

75. While these present a variety of anecdotal evidence of excessive or abusive copyright takedowns -- which highlight the difficulty that internet platforms have in determining whether or not a takedown request is legitimate, there is also empirical data to support this. In 2016, researchers Jennifer Urban, Joe Karagais, and Brianna Schofield, released a study called "Notice and Takedown in Everyday Practice." (https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2755628) Among other things, the report found widespread problems with copyright takedown notices. From the report (emphasis mine):

- One in twenty-five of the takedown requests (4.2%) **were fundamentally flawed** because they targeted content that clearly did not match the identified infringed work. **This extrapolates to**

Ex. 2

**approximately 4.5 million requests** suffering from this problem across the entire six-month dataset.

●   Nearly a third of takedown requests (28.4%) **had characteristics that raised clear questions about their validity**, based solely on the facial review and comparisons we were able to conduct. Some had multiple potential issues. While these requests cannot be described as categorically invalid without further investigation, **they suggest that a very substantial number of requests in the six-month dataset—approximately 30.1 million—would benefit from human review.**

●   This "questionable" set included requests that raised questions about compliance with the statutory requirements (15.4%), potential fair use defenses (7.3%), and subject matter inappropriate for DMCA takedown (2.3%), along with a small handful of other issues.

**VII.   There Is No Magic Bullet for Moderating A Social Media Platform**

76.   On May 18, 2018, I published a piece at https://www.techdirt.com/articles/20180518/00271539858/there-is-no-magic-bullet-moderating social-media-platform.shtml, titled "There Is No Magic Bullet For Moderating A Social Media Platform," from which this section of my report is adapted.

77.   We frequently see people who suggest that the reason social media platforms are so bad at moderating content is because they just don't care or don't try hard enough. While it is true that these platforms can often do a much better job, it's still amazing at how many people think that deciding what content "belongs" and what content doesn't belong is somehow easy. In May 2018, in Washington DC there was the **Content Moderation at Scale** "COMO" conference (http://comoatscale.com/). It was a one day event in which many internet platform companies revealed (sometimes for the first time) how they handle questions around content moderation. It was a follow-up to a similar event at Santa Clara University

Ex. 2

held back in February 2018 (http://law.scu.edu/event/content-moderation-removal-at-scale/) (for which I was the editor and Techdirt was the official publisher of the multiple academic and industry papers that were written in conjunction with the event: https://www.techdirt.com/articles/20180128/11121539097/time-totalk-about-internet-companies-content-moderation-operations.shtml January 29, 2018)

78.    For the DC event, we teamed up with the Center for Democracy and Technology (CDT) to produce a live simulation for all attendees -- turning them into a trust & safety team, tasked with responding to "reported" content on a fictional social media platform. Emma Llanso from CDT and I ran the hour-long session, which included discussions of why people made their eventual moderation decisions decisions. The video of that session can be viewed at https://youtu.be/VIXGkoKfOS0.

79.    Many of the case studies we chose were designed to be challenging (most based on real situations that content moderators had come across at various platforms). But the process was useful and instructive. With each question there were four potential actions that the "trust & safety" team could take and on every single example at least one person chose each option. In other words, even when there was a pretty strong agreement on the course of action to take, there was still at least some disagreement.

80.    Part of what we hoped to demonstrate was that when even a small group of "professionals" couldn't even agree on just one out of eight cases, it demonstrated the impossibility of content moderation at scale. As we noted, if you took that simulation and then imagined (1) having to do that at scale, with hundreds, thousands, hundreds of thousands or even millions of pieces of "flagged" content showing up, (2) having to do it when you're not someone who is so interested in content moderation that you spent an entire day at a content moderation summit, and (3) having to do it quickly where there are trade-offs and consequences to each choice -- including possible legal liability -- and no matter which option you make,

Ex. 2

1  someone (or perhaps lots of someones) is going to get very upset.

2      81.    This was not to say that internet platforms shouldn't strive to do better -

3  - they should. But one of the great things about attending these events is that it

4  demonstrated how each internet platform is experimenting in very different ways on

5  how to tackle these problems. Google and Facebook are trying to throw a

6  combination of lots and lots of people plus artificial intelligence at the problem.

7  Wikipedia and Reddit are trying to leverage their own communities to deal with

8  these issues. Smaller platforms are taking different approaches. Some are much

9  more proactive, others are reactive. And out of all that experimentation, even if

10  mistakes are being made, we're finally starting to get some ideas on things that work

11  for this community or that community (and remember, not all communities work the

12  same way).

13  **VIII.  Platform Issues and Content Moderation**

14      82.    Large internet platforms like Redbubble need some level of moderation

15  or they can be overwhelmed with infringement, spam, or abuse. But at that scale,

16  there will be a large number of "mistakes" – both type I and type II errors (blocking

17  content that shouldn't be blocked and failing to block content that probably should

18  be blocked) -- as well as disagreements over where to come down over subjective

19  issues regarding whether or not certain content should or should not be allowed.

20  While it will always be impossible for a platform like Redbubble to moderate in a

21  way that makes everyone happy, the company can still get better and make fewer

22  errors. Part of the way that companies learn to improve is through an iterative and

23  experimental process of trying different approaches to see which ones work best

24  regarding the content on their own platform.

25      83.    When it comes to allegations of intellectual property infringement, for

26  example, expecting a platform like Redbubble to identify all potential infringement

27  on its own is impossible -- which is one of the reasons why Congress established the

28  takedown process of the DMCA, requiring copyright holders to alert internet service

Ex. 2

providers of the specific instances of copyright infringing material. To identify whether a given listing on Redbubble's site infringes someone's intellectual property, Redbubble first needs to know what that person claims their intellectual property actually is. That's only the first step, of course, because the fact that someone claims something is their intellectual property doesn't mean it is, and IP rightsholders often overstate the scope of their rights, without regard to protecting legitimate criticism, parody, satire, or irony, among other things.

84.     The fact that it's impossible to do content moderation at scale well does not mean that companies like Redbubble shouldn't try to get better at it. They should. I have had the opportunity to review Redbubble's policies and procedures, as well as filings from Redbubble's prior litigations against Atari, Ohio State University, and a company called LTTB, which describe both what Redbubble calls "proactive policing" – the company's attempts to identify problematic content, including IP infringement, without being notified about it by third parties – and its procedures for responding to takedown notices it receives from IP rightsholders and others who complain about content hosted on the Redbubble site. I summarize my understanding of those procedures as follows, in language adapted from Redbubble's filings in the OSU and LTTB litigations.

85.     I understand that Redbubble's Marketplace Integrity ("MPI") Team proactively polices the Redbubble Marketplace for potentially infringing content, using screening criteria established by Redbubble. I understand that those screening criteria are based on information Redbubble has received from content owners and almost always are created in collaboration with those content owners. I understand that in some cases content owners refuse to participate in the process, making implementation of effective screening criteria more difficult. Indeed, the level of proactive policing done by RedBubble goes above and beyond the type of content moderation efforts handled by other platforms.

86.     I understand that Redbubble has created detailed internal policies and

Ex. 2

training for its MPI Team that teaches them how to spot signs of accounts that are more likely to post infringing content, and to disable such accounts quickly. I understand that these policies actually go above and beyond the policies of similarly situated companies.

87.    I understand that in Redbubble's proactive policing process, a member of the MPI Team creates a list of search terms that are deemed likely to correspond to potential infringing word marks or listings. I understand that this list of search terms is typically based on a list of claimed trademarks and other protected content provided by the content owner, and the content owner sometimes assists in providing common misspellings of its trademarks to make the search keywords more effective. I understand that if the content owner collaborates with Redbubble by providing it with a complete list of what it believes its protected content is, whether that be logos, trademarks, characters, etc., that means that Redbubble can search for and remove that content from the Marketplace more effectively. I understand that when content owners do not cooperate with Redbubble in this process, however, Redbubble is forced to use its best judgment as to what terms a content owner might use to identify arguable infringement.

88.    I understand that Redbubble personnel input the search terms into a proprietary software tool, which automatically and continuously monitors for changes in a dynamic database of Seller-generated titles, tags and descriptions in the Redbubble Marketplace, and in near realtime (i.e., approximately one minute from design upload to detection) displays the results of its searches in a user interface for the MPI Team to review and access. I understand that Redbubble's MPI Team manually reviews these search results, which include images of the artwork for the listing, to identify content that matches the policing guidelines, and is therefore potentially infringing, based on information provided by the content owner. I understand that, like the search terms, these guidelines are typically created in collaboration with the content owner, because policing functions most effectively if

Ex. 2

1   Redbubble has a full understanding of what designs a content owner considers

2   infringing and how broadly the content owner wishes to enforce any rights it has in

3   such content, in part because various content owners have different approaches to

4   policing, particularly as it relates to fan art, mashups, and artwork that makes critical

5   commentary on the content owner's brand. I understand that if a content owner

6   refuses to work with Redbubble to create policing guidelines, Redbubble typically

7   attempts to use its best judgment as to what the content owner might consider

8   arguably infringing and therefore might want removed.

9          89.    I understand that if the policing tool displays user-generated content

10  that matches the content contained in policing guidelines, the MPI Team will

11  promptly remove the listing containing such content proactively and without

12  receiving a specific takedown notice from the rightsholder. I understand that in

13  addition, the third-party Seller is automatically notified upon removal and is

14  otherwise treated in accordance with Redbubble's IP/Publicity Rights Policy.

15         90.    I understand that in 2017, Redbubble began testing a new internally

16  developed tool that allows a limited number of listings to be screened for potentially

17  infringing titles or tags immediately after upload but before they become publicly

18  visible. I understand that this tool, which Redbubble has sometimes referred to as

19  the "ACE" tool, is still being tested and is under review, and it has inherent

20  limitations because it is keyword based and cannot match images. I understand that,

21  as a result, a human must still review each upload prior to removal to determine

22  whether the design matches any of the protected words or images in the policing

23  guidelines created in collaboration with the content owner. Given the high volume

24  of designs uploaded daily to the Marketplace – which I understand to have been

25  nearly 19,000 listings on average in recent years – it is my opinion that it would be

26  logistically impossible for Redbubble employees to perform a full pre-upload

27  screening of all listings, and, in fact, doing so would likely increase the error rate in

28  decision making, by increasing the initial size of the data set on which "errors"

Ex. 2

1  would be made.

2      91.    I understand that Redbubble also uses a combination of proprietary and

3  third-party software tools that seek to identify scaled and/or repeated abusers of the

4  Redbubble user agreement. For instance, I understand that Redbubble uses third-

5  party machine learning software called Sift Science to search for user accounts that

6  are linked to other accounts that have already been restricted or deleted for repeat

7  infringement, as the existence of such accounts might indicate that the applicable

8  Sellers have attempted to circumvent Redbubble Policies by simply creating new

9  accounts. I understand that these tools also look for other Seller behavior that may

10  indicate that a Seller is a scaled abuser or repeat infringer, such as high content

11  upload rates, which might indicate that the user is not a legitimate human artist, but

12  rather a software robot designed to upload content in bulk. I understand that when

13  Sift Science detects a high-risk account, it may automatically disable the account or

14  put it on a watch list to be monitored by the MPI Team. I understand that when an

15  account is disabled, all listings offered for sale by that account are automatically

16  removed from the Redbubble Marketplace.

17      92.    I understand that Redbubble has tested additional proprietary tools that

18  can analyze content, including image-based content (which is significantly more

19  challenging than text-based content), but has reasonably concluded that such tools

20  are not currently adequate for content moderation tasks. I understand that image-

21  recognition tools are still a relatively new field in which the only moderately

22  successful products tend to rely on a large corpus of publicly accessible data (e.g.,

23  Google's public image search), and that smaller proprietary attempts, focused on

24  narrow data sets (such as a collection of uploaded images for a single company)

25  have yet to reach a level that make them practical or effective.

26      93.    I understand that Redbubble's MPI Team currently conducts proactive

27  policing for marks belonging to hundreds of content owners, including some of the

28  largest content owners in the world. I understand that many of these companies have

Ex. 2

a large and diverse portfolio of intellectual property rights (i.e., copyrights, trademarks and publicity rights) in properties like TV shows and individual movies, and some represent a large roster of musical artists. I understand that, in total, Redbubble's MPI team proactively polices for more than 1,500 individual properties for these content owners, and on any given day, the MPI Team may review roughly 6,000 individual designs and compare them against the policing and removal guidelines established (mostly) in collaboration with these content owners.

94.    I understand that, as of April 2019, the proactive policing efforts of Redbubble's MPI Team have resulted in the disabling or removal of over 850,000 listings from the Redbubble Marketplace, covering more than 20 million products. I understand that, if listings in user accounts disabled by Sift Science are included, then proactive policing efforts as of that date had resulted in the disabling or removal of about 2,300,000 listings from the Redbubble Marketplace, covering approximately 66,700,000 products. And I understand that Redbubble had disabled and/or terminated roughly 468,000 Seller accounts for violation of Redbubble policies, including its IP/Publicity Rights Policy.

95.    I understand that Redbubble frequently needs to make subjective decisions regarding what content should and should not be moderated. Quite frequently, the content at issue, even if covered by intellectual property rights, might easily fall into a protected class of works, such as fair use, nominative fair use, or parody. This is true of both works that were proactively moderated by the Redbubble MPI Team, as well as moderation efforts in response to infringement notices. I understand that Redbubble has educational material regarding such content, but that it is ultimately a subjective call to be made.

96.    As discussed earlier, with such content moderation decisions, there will always be some level of mistakes (Type I or Type II errors) made, and in reviewing a large list of decisions made by Redbubble, it appears that the company has leaned heavily towards being even more aggressive in proactively taking down content than

Ex. 2

1  might otherwise be necessary. That is, there are indications that Redbubble is even
2  over-protecting and has chosen to have more Type I errors - - taking down content
3  that might not need to be taken down -- in order to make sure that it is not running
4  afoul of IP claims.

5       97.    Based on my review of these policies and procedures, and with the
6  caveat that perfect moderation is impossible, it is my opinion that Redbubble's
7  approach appropriately balances rightsholders' rights in their intellectual property
8  and Redbubble's users' rights as well. Indeed, it goes beyond what other, similarly
9  situated companies do in attempting to police infringing content. Content
10  moderation involves choices, and every choice involves real tradeoffs, and those
11  tradeoffs can be significant and will upset some contingent who will have legitimate
12  complaints. From the outside, many people believe that content moderation involves
13  little more than having a single person or a small team dedicated to reviewing
14  content -- and that increasing the number of people can "solve" the problems
15  associated with content moderation. However, a site the size of Redbubble can't rely
16  on a single person to review all the content that needs review, and no single person
17  can even know everything to look for. I believe that it is not helpful to demand that
18  companies magically do something that is impossible, especially when much of that
19  is trying to stop bad actors from working to try to game available systems to their
20  own advantage. No system can magically stop all bad actors. A serious look at the
21  issues of bad actors online starts with those actors and what they're doing, not in
22  blaming the tools they use – especially when those tools are content-neutral, such as
23  with a print-on-demand service like Redbubble.

24  **IX.**    **Some Examples of the Impossibility of Content Moderation at Scale**

25       98.    Content moderation at scale is literally impossible to do well. It's not
26  "difficult." It's impossible. Although Redbubble is faced with an impossible task, it
27  appears to do it as well as it is reasonable to expect it to do. Indeed, it appears to go
28  above and beyond what similar platforms of similar sizes have done, and appears to

Ex. 2

1  take the impossible task seriously and approach it with an eye towards always

2  experimenting and improving.

3      **A.**    **Breasts on Facebook: The Quintessential Example of the**

4             **Impossibility of Content Moderation at Scale**

5      99.    As I pointed out in a May 6, 2019 article on Techdirt, which I

6  incorporate by reference and adapt here,

7  (https://www.techdirt.com/articles/20190503/17322942136/contentmoderation-

8  scale-is-impossible-facebook-still-cant-figure-out-how-to-deal-with-nakedbreasts.

9  shtml), and as noted earlier in this report, for over a decade, the quintessential

10  example to show the impossibility of coming up with clear, reasonable rules for

11  content moderation at scale is Facebook's inability to figure out how to deal with

12  pictures of naked breasts. In the early days, as Facebook realized it needed to do

13  some content moderation, and had to establish a clear set of rules that could be

14  applied consistently by a larger team, it started with a simple "no nudity" policy --

15  and then after that raised questions, it was narrowed down to define female nipples

16  as forbidden.

17      100.   This might have seemed like a straightforward rule... until mothers

18  posting breastfeeding photos started complaining -- as they did after a bunch of their

19  photos got blocked. Stories about this go back at least until 2008 when the Guardian

20  reported on the issue, after a bunch of mothers started protesting the company,

21  leading Facebook to come up with this incredibly awkward statement defending the

22  practice (https://www.theguardian.com/media/2008/dec/30/facebook-breastfeeding-

23  ban December 30, 2008):

24      "Photos containing a fully exposed breast, as defined by showing the

25      nipple or areola, do violate those terms (on obscene, pornographic or

    sexually explicit material) and may be removed," he said in a

26      statement. "The photos we act upon are almost exclusively brought to

27      our attention by other users who complain."

28

41

Ex. 2

101.   More public pressure, and more public protests, resulted in Facebook adjusting its policy to allow breastfeeding, but photos still kept getting taken down, leading the company to have to keep changing and clarifying its policy, such as in this statement from 2012 (https://www.zdnet.com/article/facebook-clarifies-breastfeeding-photo-policy/).

> When it comes to uploaded photos on Facebook, the vast majority of breastfeeding photos comply with our Statement of Rights and Responsibilities, which closely mirrors the policy that governs broadcast television, and which places limitations on nudity due to the presence of minors on our site. On some occasions, breastfeeding photos contain nudity – for example an exposed breast that is not being used for feeding – and therefore violate our terms. When such photos are reported to us and are found to violate our policies, the person who posted the photo is contacted, and the photos are removed. Our policies strive to fit the needs of a diverse community while respecting everyone¹s interest in sharing content that is important to them, including experiences related to breastfeeding.

102.   But photos of babies sleeping after having breastfed were getting taken down because the baby's head was no longer blocking the nipple.

103.   In 2014, Facebook clarified its policies on nipples again (https://www.salon.com/2014/06/15/facebook_frees_the_nipple_finally_allows_breast_feeding_p hotos_partner/ June 15, 2014):

> "Our goal has always been to strike an appropriate balance between the interests of people who want to express themselves with the interests of others who may not want to see certain kinds of content," a Facebook spokesperson told the Daily Dot. "It is very hard to consistently make the right call on every photo that may or may not contain nudity that is reported to us, particularly when there are billions of photos and pieces of content being shared on Facebook

Ex. 2

every day, and that has sometimes resulted in content being removed
mistakenly.

"What we have done is modified the way we review reports of nudity
to help us better examine the context of the photo or image," the
spokesperson continued. "As a result of this, photos that show a
nursing mothers' other breast will be allowed even if it is fully
exposed, as will mastectomy photos showing a fully exposed other
breast."

104.    Then, just a few months later, people started protesting again, as,
according to the Washington Post, more breastfeeding photos were taken down
(https://www.washingtonpost.com/news/the-intersect/wp/2015/02/26/facebook-is-
embroiled-inyet- another-breastfeeding-photo-
controversy/?utm_term=.adcbbc2644eb February 26, 2015).

105.    Then some people started posting photos of "breast feeding porn" that
appeared to show breast feeding that wasn't infants. So they modified the rule to say
the breastfeeding individual had to be an infant. But how does Facebook determine
who is and who is not an infant? We're right back to the definitional problem. The
original rule Facebook put in place was "does the kid look old enough to walk?"
which raises other problems, since many kids breastfeed long after they can walk.
Facebook has to keep amending and changing. It eventually allowed one (just one)
nipple/areola showing if it appears related to breastfeeding. Later, Facebook
changed the policy and said that a second nipple/areola could be shown.

106.    Facebook continues to grapple with this issue. Earlier in 2019 there
were reports in Australia of some Facebook users were angry that Facebook was
taking down a series of ads for breast cancer survivors
(https://www.9news.com.au/national/news-australia-facebook-breastcancer-
network-ads-ban-outrage-christchurch-terror-attack-video/c6f5d8f2-652c-43ea-
b711- aa471f1d1649 ) . It appears that, over time, Facebook's rule has evolved so

Ex. 2

1    that there's some sort of amendment saying that there needs to be an educational

2    component if you're showing breasts related to breast cancer.

3         107.    The charity in question called the whole thing "nonsensical," but it's

4    actually the opposite of that. It's totally "sensical" once you understand much of the

5    history, and the fact that Facebook keeps having to change and adapt these rules,

6    often multiple times a month, to deal with the "new" cases that keep showing up that

7    don't quite match. And while it seems "obvious" why these ads should be allowed,

8    the company can't just rely on something being "obvious." It has over 10,000 people

9    it employs who are in charge of making these decisions, and what's obvious to one

10   of them may not be obvious to another. And thus it needs clearly spelled out rules.

11   "Obvious" is not a workable rule.

12        108.    And those rules will never encompass every possible situation, and so

13   these constant subjective calls and adjustments to the rules will continue. Content

14   moderation at scale is impossible to do well, and part of that is because of stories

15   like this. You can't create rules that work in every case, and there are more edge

16   cases than you can possibly imagine.

17   **B.    Other Examples**

18        109.    Even when content moderation is done relatively well – as when

19   Facebook dealt with the shooting in Christchurch, New Zealand – it's done

20   imperfectly. (https://www.techdirt.com/articles/20190425/15315242087/behind-

21   scenes-look-how-facebookdealt- with-christchurch-shooting-demonstrates-

22   impossible-task-content-moderation.shtml, Apr. 26, 2019).

23        110.    The French Internet Referral Unit used the Europol system to claim that

24   much of the Internet Archive's site (which backs up and stores websites as a library-

25   like archive) as "terrorist content" that violated the law and needed to be taken

26   down. This included the Internet Archive's collection of CSPAN recordings, its

27   Project Gutenberg collection of public domain books, the famous Prelinger Archive

28   of public domain videos

Ex. 2

(https://www.techdirt.com/articles/20190410/14580641973/eu-tells-internet-archive-that-muchsite- is-terrorist-content.shtml April 11, 2019)

111.   An Arizona candidate for the US Senate, Craig Brittain, who had settled a law enforcement action against him by the FTC in 2015 over his running of a "revenge porn" site called "Is Anybody Down?" (and proceeded to use a DMCA copyright claim to try to hide the FTC's own report of the settlement from Google search results: https://www.techdirt.com/articles/20150223/21334730120/deposed-revenge-porn-idiot-craigbrittain- tries-to-censor-popehat-adam-steinbaugh-ftc.shtml Feb 24, 2015) also issued DMCA notices seeking to take down embarrassing YouTube interviews of himself just days after he filed to run for the Arizona Senate. (https://www.techdirt.com/articles/20170929/17100738318/formerrevenge- porn-site-operator-readies-senate-run-issuing-bogus-takedown-requests-to-youtube.shtml Oct. 4, 2017)

112.   Law professor Eugene Volokh had to deal with multiple takedown notices trying to hide his reporting and exposure of a "reputation management" company that tried to make use of misleading takedown messages and even forged court documents to get content taken down. (https://www.techdirt.com/articles/20190124/11043041460/guy-who-forged-court-order-to-delistcontent- issues-more-bogus-takedown-notices-to-remove-posts-discussing-his-forgery.shtml Jan 28, 2019)

113.   Last year, Google sued and then settled with an individual who used threats of false DMCA notices to extort YouTube users to pay him money. (https://www.techdirt.com/articles/20191015/23132743201/guy-who-tried-to-extort-youtuberswith- bogus-dmca-takedowns-agrees-to-settlement.shtml Oct. 17, 2019)

88. The Electronic Frontier Foundation has created a website called "TOSsed Out" – "TOS" being an acronym for "Terms of Service" – at https://www.eff.org/tossedout to track stories of bad content moderation practices. (https://www.techdirt.com/articles/20190521/23105242257/eff-highlights-stories-

45

Ex. 2

1  bad-contentmoderation- with-new-tossed-out-site.shtml May 22, 2019).

2       114.   More recently, due to the COVID-19 pandemic, internet platforms have

3  encountered new and different challenges that demonstrate, again, the impossible

4  nature of content moderation at scale.  Facebook sought to remove people "price

5  gouging" on protective facemasks, and ended up removing instructions on making

6  your own facemasks at home

7  (https://www.techdirt.com/articles/20200405/23414344241/content-moderation-is-

8  impossible-facebooks-attempts-to-block-mask-gouging-took-down-diy-face-mask-

9  instructions.shtml April 8, 2020). In trying to post political advertisements

10  responding to the federal government's response to the pandemic, Democratic

11  candidates for office were upset to find that those ads were blocked by Google, who

12  put in place content moderation rules that said only the government could place

13  political ads related to COVID-19

14  (https://www.techdirt.com/articles/20200331/22104544209/democrats-being-

15  blocked-advertising-trumps-failed-covid-19-response-due-to-content-moderation-

16  rules.shtml April 1, 2020). Twitter announced that it would moderate content that

17  promoted actions that went against official government health organizations, and

18  then needed to contend with confusion as the WHO and the CDC initially

19  recommended that the public not wear facial masks, only to reverse themselves--in

20  part after an outcry on Twitter explaining why masks were actually helpful in

21  preventing the spread of the disease

22  (https://www.techdirt.com/articles/20200331/17242244208/how-do-you-moderate-

23  covid-19-misinformation-when-coming-official-sources.shtml April 1, 2020).

24  While Facebook sought to block COVID-19 misinformation, it took down NY

25  Times articles about the pandemic

26  (https://www.techdirt.com/articles/20200317/17521544122/social-media-promised-

27  to-block-covid-19-misinformation-theyre-also-blocking-legit-info-too.shtml

28  March 18, 2020).  In Wuhan, China, where the first outbreak of the pandemic began,

Ex. 2

1   students who were asked to attend school remotely were able to get the main

2   application that schools were using for distance learning banned (temporarily) from

3   the Apple app store by flooding it with 1-star reviews

4   (https://www.techdirt.com/articles/20200308/22180044058/content-moderation-

5   scale-is-impossible-naughty-kids-wuhan-edition.shtml March 10, 2020).

6

7   Executed this __30__ day of April, 2020.

8

9                                    *Michael Masnick*

10                                   Michael Masnick

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Ex. 2

**Exhibit A**



**Leigh Beadon <leigh.beadon@gmail.com>**

## Your Teespring campaign has been disabled

**Leigh Beadon** <leigh.beadon@floor64.com>                                        Fri, Dec 6, 2019 at 3:33 PM
To: ipescalations@teespring.com

Hi, I'm one of the operators of the Teespring account for rtb@techdirt.com

We received this notice (attached below) that our campaign at http://teespring.com/copying-is-not-theft was disabled for third-party content. This is an error - the campaign uses only original artwork that we created, and it has been live on Teespring for a long time now. No notice was attached so I am contacting you here as per instructions.

Please let me know when you can reinstate the campaign!

Thanks,
Leigh Beadon
Floor64/Techdirt
*leigh.beadon@floor64.com*

---------- Forwarded message ---------
From: **Teespring** <notifications@teespring.com>
Date: Thu, Dec 5, 2019 at 7:13 PM
Subject: Your Teespring campaign has been disabled
To: <rtb@techdirt.com>

Hello,

We are writing to you today because your campaign, Copying Is Not Theft, By Techdirt at http://teespring.com /copying-is-not-theft, has been terminated early due to content concerns. It appears your campaign may be using content owned by a third party.

We appreciate that intellectual property problems can happen inadvertently and have published some guidelines to help clarify how intellectual property works here http://answers.teespring.com/customer/en/portal/topics/936178-understanding-our-policies/articles – please take the time to familiarize yourself with these guidelines.

If we have included a notice attached to this notification and you disagree with the claimant and believe that the removal of the content is the result of a mistake (for example, that you have authorization) or misidentification, you can send us a counter notice by filling out a Counter-Notification Form https://teespring.com/policies/counter /claims/new. You can find information about the counter-notification process, the Counter-Notification form, and instructions for filling it out here http://answers.teespring.com/customer/en/portal/articles/2395971-notice-and-takedown-procedure. Failure to include information may result in rejection of your counter notice.

If we have not included a notice, and you believe the campaign was removed as a result of a mistake or you can show you have the right to reproduce the content in your campaign (for example, you have a written license from the third party rights holder), please let us know by emailing us at ipescalations@teespring.com as soon as possible. In that case, we may be able to reinstate your campaign. If you are not able to show you have the right to reproduce the content, we may not be able to reinstate your campaign.

We will fulfill any campaign orders placed prior to termination of the campaign. Any payment due to you will be shown in your payment dashboard.

Repeat violation of our policies will result in account termination, so please be sure to check any remaining campaigns for possible policy violations.

Thank you for your cooperation and understanding,

Ex. 2

Gmail - Your Teespring campaign has been disabled

https://mail.google.com/mail/u/0?ik=2c1cc90cd7&view=pt&search=all...

The Teespring Team

2019-12-20, 12:34 p.m.

Ex. 2



**Leigh Beadon <leigh.beadon@gmail.com>**

---

## Your Teespring campaign has been disabled

---

**IP Escalations** <ipescalations@teespring.com>                    Fri, Dec 6, 2019 at 6:02 PM
To: Leigh Beadon <leigh.beadon@gmail.com>

Hi,

You've been advised three times that the content has violated our acceptable use policy. You have been provided with the links to this policy for further information. This policy and choice to remove the content are not up for discussion. We apologize if you disagree with the decision. You will not receive anymore communication from us on this matter.

Thank you,
Team Teespring

On Fri, Dec 6, 2019 at 6:00 PM Leigh Beadon <leigh.beadon@gmail.com> wrote:
If the "IP Escalations" team is unable to provide any further information, I would like to know where I escalate this matter to next.

On Fri, Dec 6, 2019 at 5:38 PM Leigh Beadon <leigh.beadon@gmail.com> wrote:
I am not seeking a "debate" - I simply want to know what policy we violated. Please provide clarification.

I am raising this issue with Teespring Support as well.

On Fri, Dec 6, 2019 at 5:36 PM IP Escalations <ipescalations@teespring.com> wrote:
Hi,

We apologize if you disagree with our decision and for any inconvenience this matter has caused. Please understand that we are not in a position to debate our policies or discuss this issue further; however, your feedback has been noted and we truly appreciate your time today.

Sincerely,
Team Teespring

On Fri, Dec 6, 2019 at 5:25 PM Leigh Beadon <leigh.beadon@gmail.com> wrote:
I have read the policies. The product does not violate any of them. Can you explain what violation you believe has occurred?

On Fri, Dec 6, 2019 at 5:14 PM IP Escalations <ipescalations@teespring.com> wrote:
Hi,

You can find information regarding our our Acceptable Use Policies at https://teespring.com/policies/acceptable-use..

Thank you,
Team Teespring

On Fri, Dec 6, 2019 at 4:29 PM Leigh Beadon <leigh.beadon@gmail.com> wrote:
Hi,

We require some clarification. The email we received said the campaign contains third-party content - it does not. It is not in violation of any other acceptable use policy that I can see, and that was not what the notification email said anyway.

Can you explain what policy this product violates?

Ex. 2

Gmail - Your Teespring campaign has been disabled                    https://mail.google.com/mail/u/0?ik=2c1cc90cd7&view=pt&search=all...

-Leigh

On Fri, Dec 6, 2019 at 4:02 PM IP Escalations <ipescalations@teespring.com> wrote:

Hello Leigh,

Thank you so much for reaching out to Teespring today.

Unfortunately, we cannot reinstate the listing at this time.

It appears your campaign may be in violation of our Acceptable Use Policies at https://teespring.com/policies/acceptable-use.

Please understand that in the interest of maintaining a safe and respectful platform, Teespring must take action quickly in response to complaints that a campaign may be in violation of our Acceptable Use Policies.

Repeat violation of our policies will result in account termination, so please be sure to check any remaining campaigns for possible policy violations.

Thank you for your cooperation and understanding.

The Teespring Team

On Fri, Dec 6, 2019 at 3:33 PM IP Escalations <ipescalations@teespring.com> wrote:

Hello,

Thank you for reaching out! We have received your request, and our Trust & Safety team is investigating your inquiry.

If you have not included the email address associated with your Teespring account as well as the name of the campaign in question, please reply to your original email and do so. We are unable to respond to emails that are missing such information.

If you have questions about why your campaign was removed, please see our Help Center article here.

Thank you,
Team Teespring

2019-12-20, 12:33 p.m.

Ex. 2

1

## PROOF OF SERVICE

2

**Y.Y.G.M. SA d.b.a. Brandy Melville v. Redbubble Inc.**
**Case No. 2:19-cv-04618-RGM (JPRx)**

3

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

4

5          At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Los Angeles, State of California.  My business address is 350 S. Grand Avenue, 32nd Floor, Los Angeles, CA 90071, USA.

6

7          On May 1, 2020, I served true copies of the following document(s) described as **REBUTTAL EXPERT REPORT OF MICHAEL MASNICK** on the interested parties in this action as follows:

8

9      Keith J. Wesley                              Counsel for Plaintiff,
       Ryan Q. Keech                               Y.YG.M. SA d.b.a. Brandy Melville
       Jason Y. Kelly

10     BROWN GEORGE ROSS LLP            Telephone:  (310) 274-7100
       2121 Avenue of the Stars, Suite 2800   Facsimile: (310) 275-5697

11     Los Angeles, California 90067

12                                                      email:    kwesley@bgrfirm.com
                                                                   jkelly@bgrfirm.com

13                                                                 rkeech@bgrfirm.com
                                                                   lsingh@bgrfirm.com

14

15          **BY E-MAIL OR ELECTRONIC TRANSMISSION:**  Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the

16     document(s) to be sent from e-mail address dsanfelippo@zuberlawler.com to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the

17     transmission, any electronic message or other indication that the transmission was unsuccessful.

18          I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this

19     Court at whose direction the service was made.

20          Executed on May 1, 2020, at Los Angeles, California.

21

22     _____

23     Debora L. Sanfelippo

24

25

26

27

28

Ex. 2