# EXHIBIT B

# EXPERT REPORT OF JAMIE GOLDBERG GERSON

1.   I have been retained as an independent expert on behalf of plaintiff Atari Interactive, Inc. ("Atari") in the matter of *Atari Interactive, Inc. v. Redbubble, Inc.*, Case No. 3:18-cv-03451-JST, in the United States District Court for the Northern District of California, Oakland Division. My qualifications are summarized below.

## BACKGROUND

2.   In 2013, I graduated from the University of Texas at Austin with a degree in Sports Management and a minor in Corporate Communication. Through my years at the University of Texas, I worked in the University Marketing and Licensing office under the Assistant Athletic Director who oversaw Trademark Licensing.

3.   Following graduation, I was employed by the American Airlines Center in Dallas, Texas, first as Manager of Premium Services, then as Senior Manager of Premium Services. I worked directly with the Dallas Mavericks basketball team and Dallas Stars hockey team to learn the true value of their trademarks on an international scale. I saw firsthand that counterfeiting was becoming a bigger problem online than it was outside of the stadium, and that counterfeit merchandise was affecting not only the front office, but players, their families, fans, and consumers. I developed a passion for trademark licensing and

decided to move into the online space where I could help brands grow through online, e-commerce licensing.

4. From August 2015–June 2017, I was employed by FanPrint as Director of Licensing and Business Development. In this role, I managed several major licensing relationships with entities such as the National Football League Players Association (NFLPA), the National Hockey League Players Association (NHLPA), the Major League Baseball Players Association (MLBPA), the Dallas Cowboys, NASCAR, Nickelodeon, Collegiate Licensing Company, Learfield Licensing, Fermata Licensing Partners, and many others. I negotiated and executed licensing agreements with each of these entities.

5. FanPrint sells licensed print-on-demand apparel through targeted advertising on social media websites. I had firsthand experience seeing FanPrint designs show up for sale on Redbubble and many other print-on-demand websites without approval. I spent countless hours in meetings with some of the top trademark holders in the world discussing the impact of counterfeit merchandise on the Redbubble website. I became familiar with the damaging effect that counterfeit was having on trademark holders and the confusion it caused fans and consumers. This visibility and experience sparked my passion to solve the counterfeit issue online and bridge the gap between the ecommerce world and licensors.

6. I became a founding member of the Brand Protection Coalition in 2015, an organization created to help licensees identify and report counterfeit merchandise to their licensors and trademark holders. I helped educate brands on the most egregious violators based on data that was being collected, how their white-labeled websites and storefronts worked, and the severity of how print-on-demand sites were violating their trademarks. I assisted in collecting data on these repeat violators and helped teach these brands the most effective way to report IP infringement online.

7. The prevalence and increase of counterfeit merchandise on print-on-demand websites, and understanding that IP enforcement is of paramount importance to IP holders, is what led my executive team and me to create our company CounterFind, Inc. ("CounterFind"). In June 2017, I was one of the founding members of CounterFind, an internet based B2B software used by more than 90 of the world's most recognizable trademark holders to find and remove counterfeit merchandise from online marketplaces.

8. The CounterFind platform plugs directly into social media websites like Facebook and Instagram to systematically find and request removal of ads and posts marketing counterfeit products on third party websites. Specifically, the platform gives users the ability to submit notices requesting that counterfeit products are promptly removed. CounterFind also plugs into Amazon, Etsy,

Google Shopping, and Redbubble, among other print-on-demand platforms, to systematically identify listings with clear copyright or trademark infringements such that IP rights holders may request removal of the infringing products.

9.  CounterFind's platform collects more than 20 data points per listing to give users a clear visibility into the top violators in the counterfeit space.

10. My title at CounterFind is Senior Director of Business Development, but as one of the founding members of CounterFind, I also manage the company's anti-infringement operations. My role has four main functions that include sales, development, hiring, and account management. As part of the sales process, I educate companies and their legal teams on the best anti-counterfeiting strategies for online print-on-demand websites and marketplaces. In addition to growing CounterFind's sales, I have implemented and executed CounterFind's developmental vision and roadmap.

11. My previous trademark licensing experience came into play when crafting our initial product vision. I worked to outline the automation of previously manual data collection, reporting capabilities, and provide brands with data exports to identify the most egregious sellers and platforms. As online brand protection has become more of an industry standard, I have continued to evolve our product to stay ahead of the ever-changing landscape of online marketplaces by working as a leader for our development team.

12. I have personally interviewed all of our key developers, data analysts, and legal experts to make sure that their acumen was advanced enough to understand the anti-counterfeiting industry. I further manage such personnel as they perform their anti-infringement work. I also maintain working relationships with all of our clients in order to keep my ear to the ground on new features for implementation and manage CounterFind's future development roadmap.

13. As a leader in the brand protection space, I co-chaired the first annual CountertFind Brand Protection Summit in November 2019 in New York City, hosted by Warner Music group. More than 75 legal counsels and trademark specialists attended our event from across the country to hear legal, licensing, and trademark experts speak about best practices and how to take action as an industry.

14. I am also involved in many professional organizations surrounding the online brand protection space. I am a member and sponsor of the International Trademark Association (INTA), where my team and I attend annual meetings. I am a member of the International Anti-Counterfeiting Coalition, where I attend their annual conference as an opportunity to meet with other professionals in this space who are fighting for the rights of brands online. I'm also a member of Licensing International, where I regularly attend the Licensing Expo, and Annual Leadership meetings specifically to address Redbubble and online brand protection. In addition, I am a member of the International Collegiate Licensing Association

(ICLA) where we host events attended by the majority of collegiate licensing directors, many of whom use CounterFind for their online brand protection efforts.

15. I have deep relationships within the trademark licensing industry where I have worked with brands ranging from the Dallas Cowboys and Sony Pictures to Universal Music Group in order to bring them on as CounterFind clients.

16. In the past 10 years, I have not authored any publications.

17. Within the past four years, I have not testified at trial or at deposition as an expert.

18. I am being compensated at a rate of $550 per hour for my professional services related to this project, up to a total of $7,500 for the preparation of this report.

**SCOPE OF ASSIGNMENT**

19. I have been retained to analyze and provide a rebuttal to the expert report of Michael Masnick. In particular, my report focuses on responding to the opinion provided by Mr. Masnick that Redbubble "goes beyond what other, similarly situated companies do in attempting to police infringing content[,]" as principally outlined in paragraphs 57–71 of his report.

6

## FACTS CONSIDERED

20. In conducting my assignment, I reviewed the expert report of Michael Masnick. I also reviewed documents concerning Redbubble's policies and procedures for policing infringements generally, and related to Atari specifically, as identified in within paragraph 4 of Mr. Masnick's report, PP. 3:17–4:25.

21. I further reviewed Atari's Complaint and the expert reports of Christopher Lucero and Tim Lapetino.

22. I further considered analytical data maintained by CounterFind on behalf of its clients in policing infringements on websites such as Redbubble, Sunfrog, Spreadshirt, Amazon, Facebook, and Etsy. Because of CounterFind's role representing many brands, it has compiled a large amount of analytical data related to the most visible print-on-demand platforms. With respect to this aggregate data, I have considered data related to the number of product listings submitted by users to each of the individual websites and the time between when a client reported a listing to each marketplace and how long it took that marketplace to remove the product for sale. I also looked at data that shows sellers who were able to sell products multiple times after a successful infringement report had been submitted against them.

23. I further considered my industry experience in policing infringements on behalf of CounterFind's clients. This experience includes policing

infringements for our representative brands on Redbubble, as well as similarly situated platforms such as Sunfrog.com, Spreadshirt.com, Amazon.com, Facebook.com, Etsy, ChipChipTee.com, Viralstyle.com, Teezily.com, customglory.com, tee4fans.club, aweshirts.net, lunartee.com, reshopstore.com, shopify.com, moteefe.com, teehag.com, tee-holic.com, teepublic.com, teefuel.com, teelizz.com, tiposhirt.com, coolcustomshirt.com, teekalab.com, holatee.com, myfrogtee.com, quinzees.com, gearbubble.com, mydreamstore.in, mytrendymugs.com, thegearspot.co, sunfrogshirts.com, teesdaddy.com, awesomefanatics.com, tee-fashionshop.com, teegunny,com, usgearlaunch.com, dms2tee.com, rafikigear.com, jerseysus.ru, storeglory.com, teeustore.com, nicefrogtees.com, teesgogo.com, detectiveshirts.com, niceteepro.com, tee47.com, bestshirts1.info, teebeautiful.com, crazycoolcustomtees.com, thedihardfans.com, awesometeeshirts.com, thegearapex.com, coolgiftsnow.com, best4shirt.com, sunfrogshirts4.info, teeluxi.com, teebily.com, teescircle.com, teeshirtpublic.com, teespring.com, sportsfantees.com, storenvy.com, igottahaveitshop.com, swagshirts99.com, bestgear99.com, teetaste.com, leetaste.com, bandanafever.com, mstee.co, 3dshirtstore.com, printeddream.com, fanztastic.com, fashiongirdle.com, logosoftwear.com, cafepress.com, blingintees.com, walmart.com, oldskoolshirts.com, rawteesgear.com, kbteez.com, threadmeup.com, teesfashionstyle.com, shopchilltees.com, aljerseystore.com, getmebedazzled.com,

nflstoreofficial.ru, zazzle.com, tee4life.com, suppertshirt.net, projerseycheap.com, bestprintever.com, lalasdiscount.com, humourshops.com, gloriousleggings.com, mybigcommerce.com, trendygrabber.com, tenuoushirt.com, sportshirtlove.com, bongtee.com, scrogestore.com, ducanvas.com, novteesstoress.com, awesome-tshirt.com, coolsunnytee.com, xmestees.com, tee2us.com, 129store.com, teeatop.com, az-tee.com, teeashl.com, gongchatee.com, ssltee.com, printcorn.com, teepasta.com, z9nine.com, isunshines.com, stayhungryshirt.com, tonasee.com, 95wear.com, beanprints.com, zazzilee.net, eesomegift.com, tdttee.com, m4utees.com, shopteeonline.com, domitee.com, samditee.com, teetropical.com, steemtee.com, sportstyle.co, zingzingtee.com, tingtee.com, civiltee.com, and dragonshoponline.com.

24. I have overseen the reporting of more than 250,000 ads, posts, and designs selling infringing and counterfeit products across numerous print-on-demand websites. I have worked with my clients to report more than 30,000 listings specifically to Redbubble. There were more intellectual property violations on Redbubble than any other print-on-demand website to which our clients submit reports.

## SUMMARY OF OPINION

25. Redbubble is one of the worst violators when it comes to policing their marketplace for intellectual property infringements when compared to other print-on-demand sites.

## STATEMENT OF OPINION

26. Many of Redbubble's intellectual property violations are clear. That is, counterfeit objects incorporating exact copies of trademarks and copyrights are commonplace on the Redbubble platform. Most of these counterfeits are of well-known intellectual property—the reason why it is profitable to "knock them off."

27. Redbubble does not proactively remove designs that have blatant trademark and copyright violations without receiving a specific takedown notice from the IP owner at the individual listing level. Redbubble writes on their website under their Intellectual Property FAQ, "It is Redbubble's policy to remove allegedly infringing works in response to valid complaints under applicable law, but content is only removed when it has been specifically identified as infringing in a legally valid takedown notice. *We generally don't go looking for similar works to remove from the marketplace*."[1] Redbubble's lack of proactivity when it comes to

---

[1] Quoted policy is available at https://help.redbubble.com/hc/en-us/articles/211726403-My-Work-Was-Removed (emphasis added).

policing their own marketplace is what makes them one of the most egregious websites for repeat violations.

28. Even setting aside Redbubble's failure to proactively police its platform, at a minimum, it is industry standard that once a single report of a clear intellectual property violation is reported, the website should then proactively search and remove all additional similar infringements on their site in order to be compliant, in addition to disabling searches for the infringing material.

29. Redbubble falls short when it comes to promptly removing reported infringing products. CounterFind represents more than 90 different intellectual property rights holders with the ability to access data and cross-reference top violators for multiple brands. I analyzed data from 10,936 different products that were reported to Redbubble by our clients over the past three years from 4,356 unique sellers.

30. Using this data, I analyzed the average time it took Redbubble to remove an infringing product for sale from their site from the time it was reported by my clients. I found that Redbubble's average response time to remove a product reported by an intellectual property rights owner is six days.

31. By way of comparison, the average turnaround time for our clients that report infringements to similar platforms including Sunfrog.com, Moteefe.com, and Spreadshirt.com ranges from 24–48 hours.

32. Further, even after an infringement is reported, Redbubble allows consumers to search brand names that they know are trademarked, for example, Dallas Cowboys. In my experience working with other print-on-demand sites and marketplaces, I have seen that once a violation is reported using a brand name, the site will not only proactively remove all other infringements, but they will block the search name and internal tag so that other designs cannot be uploaded using that brand name, nor can consumers search to find products using that brand or their intellectual property.

33. Next, while Redbubble claims that users that upload designs that violate intellectual property will be banned, I have seen firsthand that Redbubble allows repeat violators and sellers to continuously post and sell products using the same trademarks and copyrights that were reported previously.

34. I have witnessed instances where intellectual property rights holders have reported a single seller on Redbubble on more than 30 separate occasions for selling infringing products without any account suspension or disruption from Redbubble in between those reports. While the specific products were eventually removed after each report, the seller was able to remain active and relaunch new infringing designs for the same intellectual property that was repeatedly reported for more than a year. There isn't just one instance of this. I've seen hundreds of cases from our clients where a seller on Redbubble has been reported multiple

times but continues to launch the same or new products and infringe the same brand over and over again.

35. Analyzing CounterFind's aggregate data, I found that of the 4,356 sellers that were reported by our clients to Redbubble, 1,081 of them were repeat infringers and had more than one report submitted to Redbubble for an intellectual property violation.

36. The number of times that a seller on Redbubble had to be reported more than once, prior to account suspension, ranged from two to 34 unique reports to Redbubble. I found that 412 sellers were reported three or more times, and 195 sellers were reported four or more times. There were 125 sellers that were reported five or more times and 93 sellers reported six or more times.

37. In summary, I have personally not witnessed any first hand "proactive policing" by Redbubble in any instances. Nor does Redbubble perform well when it comes to promptly removing infringing content, disabling searches for infringing content, or suspending accounts of users who have posted infringing content. I do not believe that Redbubble goes beyond what other, similarly situated companies do in attempting to police infringing content.

Dated: February 7, 2020

*Jamie Goldberg Gerson*

Jamie Goldberg Gerson