# EXHIBIT C

1                   UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3             HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4

5    Y.Y.G.M. SA d.b.a. BRANDY MELVILLE,   )
     a Swiss corporation,                  )
6                                          )
                    PLAINTIFF,             ) CASE NO.
7                                          )
            vs.                            ) CV 19-04618-RGK
8                                          )
     REDBUBBLE, INC., a Delaware           )
9    corporation,                          ) VOLUME 3
                                           ) PAGES 343 TO 524
10                  DEFENDANT.             )
     _____)

11

12

13

14                   REPORTER'S TRANSCRIPT OF
                          TRIAL DAY 3
15               TUESDAY, JUNE 22, 2021
                          8:34 A.M.
16               LOS ANGELES, CALIFORNIA

17

18

19

20

21

22

23   _____

24          MIRANDA ALGORRI, CSR 12743, RPR, CRR
               FEDERAL OFFICIAL COURT REPORTER
               350 WEST 1ST STREET, SUITE 4455
25              LOS ANGELES, CALIFORNIA 90012
                  MIRANDAALGORRI@GMAIL.COM

```
 1                    APPEARANCES OF COUNSEL:

 2

 3    FOR THE PLAINTIFF:

 4        BROWNE GEORGE ROSS ANNAGUEY & ELLIS, LLP
          BY:  KEITH J. WESLEY
 5        BY:  JASON Y. KELLY
          2121 Avenue of the Stars
 6        Suite 2800
          Los Angeles, California 90067

 7

 8    FOR THE DEFENDANT:

 9
          ZUBER LAWLER & DEL DUCA, LLP
10        BY:  JOSHUA M. MASUR
          BY:  JENNIFER KUHN
11        BY:  HEMING XU
          2000 Broadway Street
12        Office 154
          Redwood City, California 94063

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                            INDEX OF WITNESSES

2

3    WITNESSES                                               PAGE

4    TOY, James

5           Cross-examination resumed by Mr. Masur          348

6

     TOY, James
7
            Direct examination resumed by Mr. Masur         350
8           Cross-examination by Mr. Wesley                 400
            Redirect examination by Mr. Masur               412
9           Recross-examination by Mr. Wesley               416

10

     RICKERT, Kate
11
            Direct examination by Mr. Masur                 420
12          Cross-examination by Mr. Kelly                  435

13

     DAVIS, Carina
14
            Direct examination by Mr. Masur                 437
15          Cross-examination by Mr. Kelly                  450
            Redirect examination by Mr. Masur               464

16

17

18

19

20

21

22

23

24

25
```

**INDEX OF EXHIBITS**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 30 | Redbubble User Agreement | 363 | 363 |
| 31 | Redbubble IP/Publicity Rights Policy | 364 | 364 |
| 35 | Product Listing | 378 | 378 |
| 51 | CON Suspend-from-Sale | 382 | 382 |
| 52 | CON Warnings and Account Restriction | 370 | 370 |
| 58 | Confluence Document | 357 | 357 |
| 60 | New Hire Onboarding | 368 | 368 |
| 62 | Intellectual Property | 363 | 363 |
| 65 | Redbubble IP FAQ | 362 | 362 |
| 71 | CON Proactive Policing | 374 | 374 |
| 106 | Redbubble Webpage | 410 | 410 |
| 155 | E-mail | 390 | 360 |
| 622 | All Orders | 408 | 408 |
| 623 Pg 6 | All Works | 396 | 396 |
| 623 Pg 81 | All Works | 397 | 397 |
| 624 | BMUSA.com | 430 | 430 |
| 627 | Brandy Heart Orders | 406 | 406 |
| 629 | Brandy LA Orders | 429 | 429 |
| 631 | Brandy Melville Orders | 431 | 431 |

1

**INDEX OF EXHIBITS CON'T**

2

3

4

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|--------|-------------|------------------------|------------------|
| 633 | LA Lightning Order | 425 | 425 |

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1    search it and search results will come up.  That's not against

 2    the law.

 3         Q      That's exactly right.  Because Amazon and Etsy,

 4    they have sales of authentic Brandy Melville products and

 5    others; right?

 6         A      I don't know.

 7         Q      You didn't know Amazon resold products?

 8         A      I don't know.

 9         Q      Okay.

10         A      Maybe they do.  I will take your word for it.

11         Q      Okay.  But Redbubble -- every single product on

12    Redbubble is a new design; right?

13         A      So yeah.  The product does not exist.  There is

14    no product at all.  There is no inventory.  There is no product

15    until somebody places an order and buys it from the artist and

16    then it gets manufactured.

17         Q      So we know, if the Brandy Melville trademark is

18    on the site, displayed on a shirt, that that is an infringing

19    product.  It's not going to be a resale of an authentic

20    product.  It's infringing; right?

21         A      That's why we're looking for them and removing

22    them for you.

23         Q      Okay.  And Exhibit 622, I will show you

24    page 4460.  Do you see that?

25         A      Yes.

1      Q      And how many -- how many sales were there?

2      A      70.

3      Q      70 sales.  We're going to go back to trial

4  Exhibit 633 and look at page 129.  Can you tell me, based on

5  this, when the last sale was?

6             If we could zoom in on that third row?

7      A      Yes.  It was August 29, 2020.

8      Q      August 29, 2020.

9             So turning back to the demonstrative on page 3 --

10 I apologize.  I apologize.  We're going back to 633.  I

11 misspoke.

12            You said that you were familiar with the marks at

13 issue in this case.

14     A      Yes.

15     Q      Do you know what the Los Angeles Lightning logo

16 registration covers, what classification of products it covers?

17     A      Mainly clothing.

18     Q      Covers clothing.

19            Was any clothing sold through the Redbubble

20 marketplace?

21     A      No.

22     Q      Was there an order for clothing through the

23 Redbubble marketplace?

24     A      Yes.

25     Q      I'd like you to look at page 128 of Exhibit 633.

1    Let's look at lines 5 and 6.  Is that the order?

2         A       Yes, it is.

3         Q       What is that an order for?

4         A       It is for women's fitted scoop T-shirt and then a

5    lightweight hoodie.

6         Q       Do you know who placed that order?

7         A       Yes.  It came from the plaintiff's law firm.

8         Q       All right.  And what happened to that order?

9         A       As soon as we became aware of it, we cancelled

10   the order.

11        Q       So let's close out with the registered marks and

12   turn to the unregistered marks.

13                Are you familiar with the unregistered marks that

14   Brandy Melville is asserting in this lawsuit?

15        A       Yes, I am.

16        Q       What are those unregistered marks?

17        A       The Brandy L.A., brandymelvilleusa, and

18   Brandy Melville.

19        Q       Did you generate reports for those marks and

20   phrases?

21        A       Yes.

22        Q       For these unregistered marks, I'm only going to

23   ask you about sales that occurred after the notice letter.

24   Let's start with Brandy L.A.

25                Can we pull up trial Exhibit 629.

1           Can you identify it?  I'm not sure if it's been

2    admitted yet.

3        A     Yes.

4             MS. KUHN:  So I'd like to move this trial

5    Exhibit 629 entered into evidence.

6             THE COURT:  The number is?

7             MS. KUHN:  629.

8             THE COURT:  629.

9        (Marked for identification and received

10            into evidence Exhibit No. 629.)

11       Q     BY MS. KUHN:  Is this the report that you

12   prepared for that mark?

13       A     Yes.

14       Q     Were there any sales of items that used any of

15   the phrases Brandy L.A., Brandy Melville, Brandy U.S.A., any

16   sales of items that used that phrase after the May 2018 notice

17   letter?

18       A     Yes.

19       Q     All right.  Did you summarize those in the

20   demonstrative?

21       A     Yes, I did.

22       Q     Let's look at the demonstrative on page 4.

23             How many sales were there before the notice?  I'm

24   sorry.  How many sales were there between the notice letter and

25   the filing of the Complaint?

```
 1        A        There were 19 units sold which is $15.17.

 2        Q        And were any of those sales made after the

 3   lawsuit was filed?

 4        A        No.

 5        Q        All right.  So that was -- I'm sorry.  That was

 6   just for Brandy L.A.  Let's move on to brandymelvilleusa.

 7                 Did you create a spreadsheet for that mark?

 8        A        Yes, I did.

 9                 MS. KUHN:  Can we look at trial Exhibit 624 and

10   have her identify it?  This has been stipulated to.  I would

11   like to move to have it entered into evidence.

12                 THE COURT:  It will be received.

13                 (Marked for identification and received

14                 into evidence Exhibit No. 624.)

15        Q        BY MS. KUHN:  So is this the report that you

16   prepared for the brandymelvilleusa mark?

17        A        Yes, it is.

18        Q        Were there any sales of items that used the

19   phrase brandymelvilleusa on the Redbubble marketplace between

20   the date the plaintiff sent the notice letter and the date the

21   plaintiff filed the Complaint?

22        A        Yes.

23        Q        All right.  Did you summarize those in the

24   demonstrative?

25        A        Yes, I did.
```

```
1        Q        Let's look at the demonstrative at page 5.

2                 So how many units were sold?

3        A        674.

4        Q        And how much did Redbubble receive in service

5   fees?

6        A        $542.55.

7        Q        And how about sales after the Complaint was

8   filed?

9        A        One unit was sold which is less than a dollar.

10       Q        Were there any orders for works that didn't fit

11  into the categories that we talked about, namely, the

12  registered marks or the unregistered marks Brandy L.A.,

13  Brandy Melville or brandymelvilleusa.com?  Any other works that

14  had the words Brandy Melville on the product?

15       A        Yes.

16                MS. KUHN:  All right.  Can we take a look at

17  trial Exhibit 631.  This has been stipulated to for

18  preadmission.  I would like to move it into evidence.

19                THE COURT:  It will be received.

20            (Marked for identification and received

21            into evidence Exhibit No. 631.)

22       Q        BY MS. KUHN:  And did you summarize this trial

23  exhibit in the demonstrative?

24       A        Yes, I did.

25       Q        So let's take a look at the demonstrative,
```

page 6.

                 So can you please tell us how many sales were
made with just the words Brandy Melville on it without any
other marks?

        A       There were eight units sold.

        Q       Mainly what kind of products were these?

        A       Mainly stickers.

        Q       All right.  And for these sales, did these occur
before or after Brandy Melville started -- I mean, after
Redbubble started proactively policing for plaintiff's claim
marks?

        A       I'm sorry.  Can you repeat that?

        Q       Did these sales happen before or after Redbubble
began proactively policing for plaintiff's claim marks?

        A       Happened before.

        Q       So I understand that you have created a few
summary tables for us to understand exactly what the total
sales were.

        A       Yes.

        Q       So let's take a look at No. 7.

                 For the registered marks, the Heart and Lightning
logos, what were the total service fees collected by Redbubble
after the notice -- after they were given notice either through
the letter or the filing of the lawsuit?

        A       $1,049.43.

1    Q      All right.  And of those registered marks, how

2    many were -- I apologize.

3            For the registered marks for the sales, how many

4    of those were counterfeit -- sales from counterfeits?

5            Let's go on to the next page of the

6    demonstrative.

7    A      None of those.

8    Q      None of those.

9            And how about the sales for the unregistered

10   marks?  Let's go on to page 9.

11           For the unregistered marks, what are the -- what

12   were these sales?

13   A      $582.06.

14   Q      So based on the data, what was the total amount

15   of post notice service fees received by Redbubble for the

16   listings in this case -- can we please go to 10?

17   A      $1,631.49.

18   Q      For all marks -- that's the Redbubble fees for

19   all marks post notice, $1,631; right?

20   A      Yes.  The registered trademarks and also the

21   other trademarks at issue in this case.

22   Q      One more question.

23           The jury has heard testimony about other exhibits

24   that are not the focus of exhibits that -- other trial evidence

25   that are not the focus trial evidence that we discussed here.

```
 1    Say, trial Exhibit 623, can we just take a quick look at trial
 2    Exhibit 623?
 3              Now, you did prepare trial Exhibit 623; right?
 4    A    Yes.
 5    Q    And would you say this is focused in time on the
 6    marks at issue in -- is this exhibit focused on the marks at
 7    issue in this case?
 8    A    I'm sorry.  Can you --
 9    Q    I'm sorry.
10              Are there listings for products in trial
11    Exhibit 623 that are not at issue in this case?
12    A    Yes.  That is correct.
13    Q    All right.  And are -- does this exhibit contain
14    all sales whether they were pre-notice or post-notice?
15    A    Yes.
16    Q    And does this exhibit contain sales for things
17    that are, say, sales of products that are critical of
18    Brandy Melville?
19    A    Yes.
20    Q    And so if you were looking to calculate fees for
21    the issues related at stake in this case, would you use trial
22    Exhibit 623 to do it?
23    A    No, I would not.
24              MS. KUHN:  Thank you very much.
25              THE COURT:  All right.  Cross-examination.
```

1    Brandy Melville stickers, is there a likelihood of confusion?

2    I think there's a decent one.

3                    And, in addition, while Redbubble has its name on

4    its site, how about if I buy one of those products and I'm

5    walking down the street.  Where does it say Redbubble then?  If

6    I pass somebody with a computer with a Brandy Melville sticker

7    on it or a shirt with the LA Lightning on, do you think I will

8    think it came from Brandy Melville?  I'm pretty sure I would.

9                    Mr. Masur says this really isn't counterfeiting

10   because it has to be stitch-for-stitch.  Well, I sure hope

11   that's not the law because can you imagine the counterfeiter

12   out there hearing that is the case?  Well, let's just take this

13   Nike sweatshirt, sew in a little red stitch, voila, it's an

14   authentic good.  That's just not the law.

15                   The law says that for counterfeiting it has to be

16   an identical use or something very, very similar.  I believe a

17   spurious use.  And here we have -- we have the Redbubble

18   products with our exact marks on them on the same goods,

19   LA Lightning.  We sold a T-shirt, they offered for sale a

20   T-shirt.  Brandy Heart, our Brandy Heart mark is used in

21   connection with all of our products, and that is the language

22   that will be in the instruction, I anticipate.  It's used in

23   connection with.  It doesn't have to be stamped right on.

24   After all, if Nike was selling sweatshirts with a tag with a

25   swoosh on it, would it be a good defense for a counterfeiter to

1  come in and say, well, I stamped the swoosh right on the front

2  so no counterfeiting here?  I don't think so.

3          He says there was no harm to our brand.  Well --

4  and little profit.

5          I thought by now after a full trial I would have

6  figured it out.

7          No harm?  23,308 people are adding

8  Brandy Melville items to their cart on Redbubble in a single

9  year, and that was in 2017 and '18 before this explosive

10  growth.  Do you think any of those sales may have gone to us?

11          Brands are fragile things.  One week you're

12  driving by and you see a Blockbuster on every corner, and the

13  next week they're all gone.  One week Ed Hardy is the coolest

14  T-shirt brand around, and now it's a joke.  So were we harmed

15  by having tens of thousands of knockoffs offered for sale and

16  sold on Redbubble, and was that harm more than the couple

17  dollars that they posted?  I sure think it was.

18          Mr. Masur says every week Brandy Melville comes

19  out with new designs.  How can we know what to take down?  We

20  wouldn't know.  Well, we have a pretty readily available

21  solution for that.  It's not about the designs.  It's about

22  linking our designs to our trade name.  So if you can figure

23  that out, we don't have to send you designs all the time.  I

24  mean, imagine the -- what he's really saying, every week on the

25  Brandy Melville checklist, okay, designs in, shipped to stores,

1    take inventory.  We'd better check with Redbubble to make sure

2    they have all our designs.  And that's just one site out there.

3              Mr. Masur says, we don't disable keywords because

4    then we couldn't find the counterfeits.  Well, you know who

5    else couldn't find the counterfeits if they disabled keywords?

6    The customer.  And that's the whole point.  Will they try it?

7    No.  And why won't they try it?  The highest branded keyword

8    used at Redbubble for generating profit.

9              Mr. Masur says we look at a third of the postings

10   on Redbubble.  That's a lot of postings.  They're proud of

11   that.  Where I'm from, 33 percent is a flunking grade.

12   33 percent, that means that 67 percent of the products on your

13   site you don't even look at.

14             Now, you've heard throughout the trial it's our

15   fault.  We weren't cooperative enough.  We waited too long to

16   sue.  I think that's rich.  We tell them to stop selling our

17   trademark.  They don't proactively police.  The designs pop

18   back up.  We say stop using our keyword.  They tell us to go

19   pound sand.  But if only we had been more cooperative, problem

20   solved.

21             Well, where is that letter in evidence from

22   Redbubble or its lawyers saying that?  Where is that letter

23   saying, guys, we can do this outside of litigation.  You know,

24   let's work together.  Where is that?  Do you really think they

25   were that cooperative when we were writing to them?  And where

was that offer to pay back our profits before?  What I saw was

kind of a form e-mail -- probably automated -- that says tell

us any more designs.  Tell us any more designs.  That was it.

But now when their feet's on the fire, they're the most

cooperative company around.

What's really disturbing to me is the lack of

acceptance of any responsibility.  Blame the users.  It's all

the users' fault.  Blame Brandy.  Did you ever once in this

trial hear them say, you know what, we -- we really should have

double checked that customer service e-mail or, you know what,

maybe reaching out to manufacturers is a decent idea.  We will

do that.  We weren't perfect before, but we will do it in the

future.  No.  It was just them sitting on top, on high telling

us why it was everyone else's fault that their site is full of

counterfeits.

Let me leave you with this.  I think I figured

out the Redbubble calculous.  We have been in litigation for

about two years now with them.  I think I have got it down.

You know, the vast majority of brands or original designers

won't complain.  Maybe they lack the resources.  Maybe they

lack the time.  Maybe they lack the wherewithal.  Maybe they

haven't even stumbled upon Redbubble yet.  So for that big

group, until they say anything, we're not looking.  Don't go

all vigilante.  We're just going to close our eyes and say

there's too many brands out there, and until they let us know,

1   we're not going to do anything.

2          Now, if they get a letter, they take some designs

3   down.  The brand owner designer at that point will hopefully go

4   away and say, oh, problem solved.  And the copies will start up

5   again and go unnoticed.

6          THE COURT:  You have about five.

7          MR. WESLEY:  Thank you, Your Honor.

8          Now, a small number will actually sue, and we

9   were unfortunately one of those.  We heard that there's I guess

10  15 others now.  But, you know, litigation is long and expensive

11  and arduous.  It took two years for us to get here, and you saw

12  how Your Honor kept us on a clock.  So it's -- it is not quick.

13  So most who even go to the point of suing will tire somewhere

14  along the line.  They will settle.  They will say, you know

15  what, it's not worth it.  We're not going to -- we're not going

16  to pursue it anymore.  And all the while, from all these

17  categories, tens of millions of dollars is pouring into the

18  Redbubble coffers from sales of counterfeit goods.

19         There's only one thing that can mess up this

20  calculous, and they know it, and that's you.  You can tell

21  Redbubble that a slap on the wrist isn't good enough.  You can

22  tell Redbubble that supporting artists that do original work as

23  was intended when Redbubble started is a good thing, but the

24  counterfeits have to stop, and it's not enough to wait until

25  you hear from a designer or an owner.  You can tell Redbubble

1   that closing its eyes to a big problem on its site is not the

2   same as being sincerely blind to the problem.  Only you can

3   send this message, but it has to be loud and clear.

4              It's not really a message for Ms. Davis or

5   Mr. Toy or anyone in this courtroom.  They're just doing their

6   jobs, and they're trying, and they're up against a problem

7   that, based on the current structure, cannot be stopped.  The

8   message has to be loud and clear enough to go all the way to

9   Australia where this company that's on its way to a billion

10  dollars, much of it on the backs of counterfeit products, needs

11  to be told that it's not okay.  More needs to be done.

12             Thank you.

13             THE COURT:  Thank you, counsel.

14             You have now heard the argument from both sides.

15  At this time it's going to be my duty to instruct you on the

16  law that applies.  That's going to take a half hour.  Let's

17  take a short break, 10 to 15 minutes.  We'll come back, and I

18  will read you the instructions, and then we will send you back

19  to the jury room.

20             (A recess was taken at 2:49 p.m.)

21             (The following proceedings were held in

22             open court in the presence of the jury:)

23             THE COURT:  Okay.  The record will reflect that

24  all the members of the jury are in their respective seats in

25  the jury box.

1          "Members of the jury, now that you have heard all

2     the evidence and argument by the attorneys, it is my duty to

3     instruct you on the law that applies to this case.  A copy of

4     these instructions will be sent back to the jury room for you

5     to consult during your deliberations."

6          I gave you some instructions -- preliminary

7     instructions at the very beginning, those being what is

8     evidence, what is not evidence, how to look and handle

9     direct/circumstantial evidence, credibility of witnesses,

10    things like that.  All that pertains to your deliberations

11    also.

12         "To help you evaluate the evidence, I will give

13    you a brief summary of the positions of the parties.

14         "The plaintiff, Brandy Melville, claims that the

15    defendant, Redbubble, has engaged in contributory trademark

16    infringement and contributory counterfeiting.  Brandy Melville

17    has the burden of proving these claims.  The defendant,

18    Redbubble, denies these claims.  Redbubble has the burden of

19    proving any type of affirmative defense.  Brandy Melville

20    denies Redbubble's defenses.

21         "A trademark is any word, name, symbol, device,

22    or any other combination thereof used by a person to identify

23    and distinguish the person's goods from those of others and to

24    indicate the source of the goods even if that source is

25    generally unknown.  The person who uses a trademark of another

1  may be liable for damages.

2          "The defendant is liable to the plaintiff for

3  violating trademark law if the defendant contributorily

4  infringes plaintiff's registered or unregistered trademarks by

5  supplying a service to someone who uses those trademarks in

6  manners that is likely to cause confusion among the customers.

7          "Number two, also liable if he contributorily

8  counterfeits plaintiff's registered trademarks by supplying a

9  service to someone who uses the counterfeit of the plaintiff's

10  registered trademarks.

11          "A person is liable for trademark infringement by

12  another if that person supplies goods or services to another,

13  knowing or having reason to know that the person used the goods

14  to infringe on plaintiff's trademark.

15          "The plaintiff has the burden of proving each of

16  the following by a preponderance of the evidence:

17          "The defendant -- number one, the defendant

18  supplied goods or services to the direct infringer;

19          "Number two, any of the direct infringers used

20  the goods or services that the defendant sold or supplied to

21  infringe on any of plaintiff's trademarks; and,

22          "Number three, the defendant knew or had some

23  reason to know one of the direct infringers would use the goods

24  or services to infringe on any of the plaintiff's trademarks or

25  was infringing on any of the plaintiff's trademarks and that

1    the defendant continued to supply goods and services;

2              "Number four, that the defendant who provided the

3    goods or services to any of the direct infringers had direct

4    control in monitoring of the instrumentality used by the direct

5    infringers to infringe on; and,

6              "Number five, the plaintiff was damaged by the

7    infringement.

8              "On the plaintiff's claim for a contributory

9    trademark infringement and contributory counterfeiting, the

10   defendant has the burden of proving each of the following

11   elements by a preponderance of the evidence:

12             "The defendant's trademarks are valid,

13   protectable trademarks;

14             "Number two, the plaintiff owns trademarks; and,

15             "Number three, the direct infringers used a

16   counterfeit of these symbols or terms or marks similar to the

17   symbols or terms or marks without the consent of the plaintiff

18   in a manner that is likely to confuse -- to cause confusion

19   among ordinary customers as to the source, sponsorship,

20   affiliation, or approval of those goods.

21             "One way for the plaintiff to prove trademark

22   validity is to show that the trademark is registered.  An owner

23   of the trademark may obtain a certificate of registration

24   issued by the United States Patent & Trademark Office and may

25   submit a certificate of evidence of the validity and

protectability of the trademark and of the certificate holder's ownership of the trademark covered by that certificate.

"A trademark is, as I said, before a word, name, symbol, device, or combination thereof that is either inherently distinctive or descriptive but has acquired a secondary meaning.  Only a valid trademark can be infringed.

"Only if you determine that the unregistered trademarks are not inherently distinctive should you consider whether they are descriptive but becomes distinctive through the development of what we call a secondary meaning.

"Likelihood of confusion exists when a substantial number of customers believe that the direct infringed goods are produced by the plaintiff.  A likelihood of confusion exists when the direct infringer's trademark is likely to cause confusion as to a connection between the direct infringer and the plaintiff such that the plaintiff's sponsor -- such that the plaintiff sponsors or approves of the direct infringer's goods or services.

"How distinctively a trademark indicates that goods come from a particular source, even though if unknown, is an important factor to consider in assessing the validity of a trademark and for determining whether or not that trademark used by the defendant constitutes for the customer a likelihood of confusion with the plaintiff's trademarks.

"An inherently distinctive trademark is a word,

1    symbol, device, or combination thereof which distinctively

2    identifies a particular source of the goods in the marketplace.

3    The law assumes that an -- the law assumes that an inherently

4    distinctive mark is one that almost automatically tells a

5    customer that refers to a brand or a source of a product and

6    the consumer will be predisposed to equate that trademark with

7    the source of the product.

8              "Trademarks are grouped into categories according

9    to the relative strength and distinctiveness.  These categories

10   include arbitrary trademarks which are inherently distinctive

11   and suggestive trademarks which are also inherently

12   distinctive.

13             "Arbitrary trademarks, the first category being

14   arbitrary trademarks are inherently distinctive trademarks.

15   They are considered strong marks and are clearly protectable.

16   They involve the arbitrary or fanciful or fictitious use of a

17   word to designate the source of the product or service.

18             "Such a trademark is a word that in no way

19   describes or has any relevance to the particular product or

20   service it means to identify.  It may be a common word used in

21   an unfamiliar way, or it may be a newly created common word or

22   parts of a common word which are applied in a fanciful or

23   fictitious or unfamiliar way solely as a trademark.

24             "Now, suggestive trademarks, the next category,

25   suggestive trademarks, these trademarks are also inherently

1  distinctive but are considered weaker than arbitrary

2  trademarks.  Unlike arbitrary trademarks, which are in no way

3  related to the product, are as components, qualities, or

4  characteristics.  Suggestive trademarks implies some

5  characteristic or quality of the product to which they are

6  attached.

7          "If a customer must use his imagination or in any

8  way or type use a multistage reasoning to understand the

9  trademark's significance, then the trademark does not describe

10  the product's features but merely suggests them.

11          "If you decide that the plaintiff's unregistered

12  trademarks are arbitrary or suggestive, they are considered to

13  be inherently distinctive, and an inherently distinctive

14  trademark is valid and protectable.

15          "If you decide that the plaintiff's unregistered

16  trademarks are descriptive, you will not know if the trademark

17  is valid or invalid until you consider whether or not it has

18  gained the distinction by the acquisition of a secondary

19  meaning.

20          "Initial interest confusion is actionable under

21  the likelihood of confusion test.  Initial interest confusion

22  occurs when the direct infringer uses a plaintiff's trademark

23  in a manner calculated to capture initial customer 's attention

24  even though no actual sale is finally completed as a result of

25  that confusion.

1              "If you determine that the plaintiff's

2     unregistered trademarks are descriptive, you must consider the

3     recognition of that mark -- that mark have among prospective

4     customers in order to determine whether or not they are valid

5     or protectable even though they are descriptive.  The market

6     recognition is called the trademark's secondary meaning.

7              "A word, name, symbol, or other combination of

8     these items requires a secondary meaning when it has been used

9     in such a way that the primary significance in the minds of the

10    prospective customers is not the product itself but the

11    identification of the product with the single source regardless

12    of whether or not the consumer knows who or what that source

13    is.

14             "You must find by a preponderance of the evidence

15    that the evidence shows that the significant number of consumer

16    public associated with the unregistered trademark was a single

17    source in order to find that it has acquired a secondary

18    meaning.

19             "When you are determining whether or not the

20    plaintiff's unregistered trademarks have acquired a secondary

21    meaning consider some of the following:

22             "Consumer perception, number one, whether the

23    people who purchased the product or service that bears the

24    claim trademark associate that product or service with the

25    plaintiff;

1              "Number two, advertisement, to what degree and in

2    what manner plaintiff may have advertised under the claim

3    trademark;

4              "Number three, demonstrated utility, whether the

5    plaintiff successfully used a trademark to increase the sales

6    of its product;

7              "Number four, extended use, the length of time

8    and manner in which the plaintiff has used the claimed

9    trademark;

10             "Number five, exclusivity, whether or not the

11   plaintiff uses the claimed trademark was exclusive;

12             "Number six, copyrighting whether the defendant

13   intentionally copied plaintiff's trademark; and,

14             "Number seven, actual confusion, whether the

15   defendant's use of the plaintiff's trademark has led to actual

16   confusion among a significant number of people.

17             "The presence or absence of any one of these

18   particular factors should not necessarily resolve whether or

19   not the plaintiff's unregistered trademark has acquired the

20   secondary meaning.

21             "Descriptive marks are protected only to the

22   extent you find they have acquired distinctiveness by the

23   public coming to associate that mark with a particular source.

24   Distinctive marks are entitled to protection only as a broad --

25   only as a broad secondary meaning that they have acquired.

1          "If they have acquired no secondary meaning at

2   all, they are entitled to no protection and cannot be

3   considered a valid mark.

4          "The mere fact that the plaintiff is using an

5   unregistered trademark or that the plaintiffs began using it

6   before the defendant does not necessarily mean the trademark

7   acquired a secondary meaning.

8          "Now, counterfeiting, the use of -- as used for

9   the purposes of trademark, the term counterfeiting means a

10  designation that is identical with or substantially

11  indistinguishable from a trademark that is registered on the

12  principal register of the United States Patent & Trademark

13  Office for such goods and services sold, offered for sale, or

14  distributed.  Counterfeiting may occur whether or not the

15  person whom relief is sought knows that the plaintiff's mark

16  was registered.

17         "If you find that Redbubble contributorily

18  infringed or contributorily counterfeited the plaintiff's

19  registered Brandy Heart, Brandy Flags, or Los Angeles Lightning

20  trademarks after they were registered, you must determine if

21  Brandy Melville can recover statutory damages from Redbubble

22  and, if so, what the amount of those damages would be.

23         "To prove counterfeiting, the plaintiff must

24  prove, in addition to the elements required, to prove

25  infringement all of the following:

1          "The alleged direct infringement -- infringer

2   intentionally used in commerce a counterfeit mark;

3          "Number two, the alleged direct infringer knew

4   that the mark was counterfeit;

5          "Number three, that the alleged direct infringer

6   used the mark in connection with the sale, offering or

7   distribution of goods; and,

8          "Number four, the alleged direct infringer

9   was" -- excuse me -- "the alleged direct infringer's use was

10  likely to cause confusion, mistake, or deceit.

11         "For the purposes of a counterfeit mark -- for

12  this purpose, the counterfeit mark is a non-genuine mark which

13  is identical with or substantially indistinguishable from the

14  registered mark; the registered mark is registered with the

15  public register, for and used by the holder of the mark in

16  connection with the same goods in connection with which the

17  accused mark is being used; a registered mark is in use; and

18  the last element, that the accused use is not on or in

19  connection with the goods for which the producer was at the

20  time of the production authorized by the holder of the mark to

21  use the mark for those goods or services.

22         "A counterfeit production must be a

23  stitch-for-stitch copy of plaintiff's own product when viewed

24  in the marketplace including its packaging such as a customer

25  would be tricked into believing that the counterfeit is

1    actually one of the plaintiff's products.

2              "The law permits recovery of only one award of

3    statutory damages for each trademark infringed for each type of

4    goods sold.  This means that the statutory award cannot be

5    multiplied by the number of counterfeit items that were sold or

6    offered for sale.

7              "If you find that plaintiff is entitled to

8    statutory damages, you must further determine whether the

9    plaintiff's -- or the defendant's contributory infringement was

10   willful.

11             "Willful infringement under the law requires that

12   a person voluntarily and intentionally and with the specific

13   intent to commit an act.  If you find that the defendant

14   infringement was not willful, you must award statutory damages

15   of not less than $1,000 or more than $200,000 per counterfeit

16   mark per type of goods sold.  If you find that the defendant's

17   infringement was willful, you can award statutory damages of no

18   more than $2 million per counterfeit mark per type of goods

19   sold.

20             "The plaintiff is entitled to any profits earned

21   by the defendant that are attributed to the infringement which

22   the plaintiff proves by a preponderance of the evidence.

23             "Profit is determined by deducting all the

24   expenses from the gross revenue.  Gross revenue is all of the

25   defendant's receipts from using the trademark in the sale of

CERTIFICATE OF OFFICIAL REPORTER

1

2

3

4

5         I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

6  COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7  THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8  PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9  FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10 STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11 ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12 CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13 THE UNITED STATES.

14

15         DATED THIS  23RD  DAY OF JUNE, 2021.

16

17

18         /S/ MIRANDA ALGORRI

19         _____
           MIRANDA ALGORRI, CSR NO. 12743, CRR
20         FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25